# EXHIBIT A



# WASHINGTON STATE COVENANT HOMEOWNERSHIP PROGRAM STUDY

**March 22, 2024**



## STUDY PRESENTED BY:






## Core Study Team

### National Fair Housing Alliance
Lisa Rice, President and CEO
Morgan Williams, General Counsel
Shanti Abedin, Vice President, Housing and Community Development
Erin Kemple, Vice President, Fair Housing Services
Oneshia Herring, Senior Vice President and Counsel, Consulting and Compliance
Andrea Lau, Program Analyst, Housing and Community Development

### Abt Global
Jeffrey Lubell, Principal Associate
Sarah Wolff, Senior Associate
Brian Freeman, Senior Associate
Nishi Kumar, Associate
Zoe Greenwood, Analyst
Zoya Aleem, Senior Analyst
Rhaia Hull, Senior Analyst

### Fair Housing Center of Washington
Adria Buchanan, Executive Director

### Northwest Fair Housing Alliance
Marley Hochendoner, Executive Director
Cicily Thompson, Intake Analyst/Equity and Inclusion Coordinator
Glenda Mendoza Creager, Intake Analysis/Hispanic Outreach Coordinator

## Additional Partners

### Expert Reviewers
James Gregory, Professor, History, University of Washington
Arthur Acolin, Associate Professor, Runstad Department of Real Estate, University of Washington

### Research Partner
The following members of the Urban Institute Housing Finance Policy Center Team provided data and graphs included in Chapter 2 of this study.

Janneke Ratcliffe, Vice President for Housing Finance Policy
Jung Hyun Choi, Principal Research Associate
John Walsh, Research Analyst
Aniket Mehrotra, Policy Assistant
Matthew Pruitt, Research Assistant

### Spanish Language Community Forum Facilitators

Evelin Martinez, Equity in Homeownership Coordinator, Washington Homeownership Resource Center

Leysy Martinez, Bilingual Information & Referral Counselor, Washington Homeownership Resource Center

Daniel Cruz Pombo, Executive Assistant to the President & CEO, National Fair Housing Alliance

## Acknowledgements

The study team is grateful to the many key informants and stakeholders throughout Washington who helped inform the content of this study through one-on-one interviews, small group interviews, virtual community forums, through the online survey, and in various stakeholder and community meetings.

The study team extends special thanks (in alphabetical order) to Dr. Jade Aguilar, Ann Campbell, Logan Camporeale, Dr. Larry Cebula, Bambi Chavez, Cassie Chinn, Samantha Enos, Dr. Jane Herr, Dr. Tara Kelly, Patience Malaba, Richard Rothstein, Anzhane Slaughter, Ali Sheibani, and Hugh Spitzer for generously providing insight and sharing research materials that informed this study.



# TABLE OF CONTENTS

**EXECUTIVE SUMMARY**                                                                          **4**

**INTRODUCTION**                                                                               **12**

**CHAPTER 1: WASHINGTON'S HISTORY OF DISCRIMINATION IN HOUSING**
**AND THE LENDING OF CREDIT**                                                                  **15**

**CHAPTER 2: CURRENT IMPACTS OF HISTORIC DISCRIMINATION**                                      **58**

**CHAPTER 3: ANALYSIS OF EXISTING PROGRAMS AND RACE NEUTRAL AND**                              **94**
**RACE CONSCIOUS APPROACHES**

**CHAPTER 4: POLICY SCENARIOS AND RECOMMENDATIONS**                                            **117**

**CHAPTER 5: EVALUATION APPROACH RECOMMENDATIONS**                                             **154**

**APPENDICIES**

APPENDIX A - SELECT ACCOUNTS OF HOUSING DISCRIMINATION IN
WASHINGTON (CHAPTER 1)

APPENDIX B.  CONTEMPORARY STORIES ON THE LINGERING IMPACTS OF
HISTORIC HOUSING DISCRIMINATION IN WASHINGTON (CHAPTER 2)

APPENDIX C: PROGRAM LISTING (CHAPTER 3)

APPENDIX D: POLICY SCENARIO RESULTS (CHAPTER 3)

APPENDIX E. POLICY SCENARIO RESULTS (CHAPTER 4)

APPENDIX F. METHODOLOGY FOR ESTIMATING THE RACIAL COMPOSITION AND
SIZE OF THE ELIGIBLE APPLICANT POOL (CHAPTER 4)

# EXECUTIVE SUMMARY

In spring 2023, the Washington State Legislature passed the Covenant Homeownership Act (House Bill 1474, codified at Chapter 43.181 RCW) with bipartisan support. The Covenant Homeownership Act acknowledges the State government's role as both an active and passive participant in generations of discriminatory policies and practices that created barriers to credit and homeownership for historically marginalized communities in Washington and that these discriminatory actions continue to impact these communities today.

The Covenant Homeownership Act requires the Washington State Housing Finance Commission (WSHFC) to complete or commission a study to inform the development of a new special purpose credit program (SPCP) that will remedy racial disparities in homeownership and access to credit left by the State's long history of discrimination. This study fulfills the requirements of the Covenant Homeownership Act to document historical discrimination in housing and its impacts on current homeownership opportunities in Washington, to analyze the effectiveness of current programs and policies, and to recommend an approach to remedy lingering inequities.

The Covenant Homeownership Act creates a new source of funding for homebuyer assistance and mandates that the SPCP provide loans for down payment and closing cost assistance to program participants. The Act also mandates that program participants meet the following eligibility requirements:

- A household income at or below 100 percent of the Area Median Income (AMI),

- A first-time homebuyer, and

- A Washington resident who: (i) was a resident of Washington before the enactment of the Federal Fair Housing Act on April 11, 1968, and was, or would have been, excluded from homeownership in Washington by a racially restrictive covenant on or before that date; or (ii) is a descendant of a resident described in (i).

## Special Purpose Credit Programs

Congress authorized SPCPs in a 1976 amendment to the Equal Credit Opportunity Act of 1974 (ECOA) as a tool to counteract centuries of unfair laws and policies that deprived millions of consumers of the right and opportunity to access fair mortgages and credit. [1] SPCPs are targeted lending programs designed specifically to help an economically disadvantaged group of people who, under customary standards of creditworthiness, probably would not receive credit or would receive it on less favorable terms than are ordinarily available to other consumers applying for a similar type and amount of credit. Congress ensured that these programs serving an economically disadvantaged group may consider race or ethnicity without violating ECOA's prohibition on discrimination in order to "increase access to the credit market by persons

---

[1] 1. "SPCP Toolkit for Mortgage Lenders," SPCP Toolkit, accessed March 19, 2024, https://spcptoolkit.com/.

previously foreclosed from it." [2] In their design and implementation, SPCPs remediate the present-day impacts of historic and/or ongoing discrimination in the credit market.

This study provides the basis for developing Washington's Covenant Homeownership Program as an SPCP. The study uses a mixed methods approach involving analyses of historical records, legislation, census data, home lending records, housing market trends, zoning policies, a community survey, and stakeholder interviews.

## Over a Century of Housing Discrimination in Washington

Chapter 1 provides a historical overview of how discriminatory federal, state, and local policies systematically denied communities of color and other marginalized groups in Washington equal access to housing and credit opportunities for over a century. Key findings include:

- Washington residents of color and other marginalized groups faced widespread discriminatory barriers to equal housing opportunities from the 19th century onward, implemented through state and local governmental policies and practices.

- These discriminatory actions included land seizures, forced removal, over 50,000 racially restrictive covenants barring people of color and other marginalized groups from purchasing homes and living in specific neighborhoods, exclusionary zoning practices, and racist practices in the state-licensed real estate industry. State courts reinforced many of these practices.

- As a direct result, people of color and other marginalized groups in Washington were prevented from buying homes, accessing credit, and building wealth. These groups experienced widespread segregation and confinement to areas deemed least desirable by public officials and private actors. Residential segregation patterns established at this time persist to varying degrees today.

## Impacts of Discrimination Continue Today

Chapter 2 documents the ongoing, lingering impacts of this history of discrimination. The chapter analyzes present-day data on homeownership, wealth, housing cost burden, homelessness, access to mortgage lending, and appraisal disparities. Findings include:

- In Washington today, there are significant disparities between the White homeownership rate and the homeownership rates of Blacks, Latinos, Native Americans, Alaska Natives, Native Hawaiians and other Pacific Islanders (NHPI), and two Asian subgroups (Koreans and Asian Indians). [3]

---

[2] 15 U.S.C. § 1691(c)(1); Senate Report 94-589, 1976 U.S.C.C.A.N. at 409.
[3] For purposes of this study, we utilize the following language to refer to racial and ethnic groups: Black, Latino, Asian, Native American, Alaska Natives, Native Hawaiians and other Pacific Islanders, and White. However, when a dataset, case, historical document, or quotation uses alternate terminology, we often retain the original source's terminology to ensure that we convey the information shared accurately. For example, when including U.S. Census data for "American Indian/Alaska Natives," we use the



*Figure 1 -Washington Homeownership Rates by Race and Ethnicity.  Source: U.S. Census Bureau, 2021 American Community Survey.*

- Because the racial homeownership rates are significantly lower for Blacks, Latinos, Native Americans, Alaska Natives, Native Hawaiians and other Pacific Islanders, and two Asian subgroups (Koreans and Asian Indians), for the purposes of this study, renters from these racial and ethnic groups are considered "impacted residents" who should be assisted by the Covenant Homeownership Program.

- Racial wealth disparities have grown, limiting the ability of impacted households to access affordable home mortgages or qualify for lending. In Washington, White households have a net worth of $286,200 per household, while households of color have an estimated net worth one-quarter of that, or $67,600.

- The lack of access to credit and unfair treatment in the appraisal and lending processes continues to disadvantage impacted residents. For example, Blacks and Latinos in Washington are denied mortgage loans at a rate of 11.9 and 12 percent, respectively, compared to a 6.6 percent denial rate for Whites and 7.9 percent for Asians.

### Race-Neutral Approaches Are Not Effective

Chapter 3 evaluates different policy approaches for expanding ownership opportunities to impacted residents. Key findings from this analysis conclude that a race-neutral approach is unlikely to be effective or efficient in addressing past discrimination and ongoing disparities. The chapter establishes the following:

---

acronym "AIAN" to reflect the exact grouping of data that is being shared. The study also includes many unedited quotes that use discriminatory language, not to condone the use of this derogatory language but to present quotes in the context of how they were spoken or written.

- Existing homeownership programs in Washington primarily aid non-impacted residents rather than directly remedying past harm through a targeted approach.

- Modeling of five potential policy scenarios—(1) a no assistance scenario, (2) a baseline scenario that assumes $10,000 in down payment assistance (DPA) is available from existing sources, (3) a DPA scenario that adds $50,000 for income-eligible first-time buyers in low-cost counties and $120,000 in high-cost counties, (4) an interest-rate reduction scenario, and (5) a credit-counseling scenario—shows that additional DPA assistance is the most effective scenario to aid impacted residents.

- Modeling also shows that a specially designed race-conscious SPCP focused on impacted residents could substantially remedy the wealth and credit access gaps left by historical discrimination with significantly less funding than a race-neutral program. With the $75-$100 million per year in anticipated fee revenue [4] under the Covenant Homeownership Act, a race-conscious approach to DPA would reach four times the number of Black, Latino, Native American, Alaska Natives, Native Hawaiian and other Pacific Islanders, Korean and Asian Indian beneficiaries than a race-neutral approach. With an estimated $6 billion cost to reach all impacted residents through a race-neutral approach, it would take decades to serve them all based on the expected annual fee revenue for the program.

### A Race-Conscious Approach is Needed

Based on these findings, Chapter 4 recommends implementing a race-conscious SPCP to remedy the ongoing harms of discrimination by the State. It models several options for structuring a DPA program that could be incorporated into an SPCP. These include both fixed down payment assistance models, which provide the same amount regardless of where someone lives in the state and customized down payment assistance models, in which the amount each household receives varies based on housing prices in their county and their income. The modeling finds that:

- While a program that provided a fixed down payment assistance amount between $25,000 and $100,000 could serve a relatively large number of households – between 1,000 and 4,000 households with $100 million – the number of impacted residents with incomes between 80-100% AMI who would be able to purchase a home with these levels of assistance is relatively small. This suggests that these assistance levels are not large enough to be effective in an SPCP.

- A customized DPA program, on the other hand, could enable all eligible renters with incomes between 80-100% AMI to purchase a home in their county. A customized approach, which varies the amount of DPA based on the eligible homebuyer's income and location, is effective and efficient in reaching impacted residents and allows for a reasonable degree of housing choice.

- Additionally, a large number of impacted residents in the 100-140% AMI range have a substantial need for down payment assistance in excess of the level of assistance typically available from existing DPA programs in Washington (about $10,000-15,000).

---

[4] The current revenue forecast for FY 2025 as of the publication date is $61.8 million.

> Assisting this group of residents would cost far less, on average, than it would cost to assist households with lower incomes.

The chapter also identifies administrative challenges WSHFC may need to consider and identifies additional policies and programs that would complement a DPA program by addressing other housing challenges that limit homeownership opportunities in the state, such as policies that expand the supply of lower-cost homes for purchase.

## Program Recommendations

Recommendations for a new SPCP, consistent with the restrictions in the Covenant Homeownership Act, include:

- Implement the SPCP as outlined in RCW 43.181.040 for economically disadvantaged households with Black, Latino, Native American, Alaska Native, Native Hawaiian, Other Pacific Islander, Korean, or Asian Indian borrowers.

- Provide customized amounts of down payment assistance that enable households with incomes between 80-100% AMI to afford a modest-cost home in their county. Consider one of two models that effectively balance program cost and housing choice.

- Provide down payment assistance as a zero-interest loan.

The recommendations also encourage the consideration of new state legislation to allow for different types of assistance and eligibility criteria:

- Consider expanding eligibility for the SPCP to impacted residents with incomes up to 140% AMI, as the analysis identifies a large number of households within racial and ethnic groups impacted by the discrimination documented in Chapters 1 and 2, with incomes between 100-140% AMI, who need assistance to afford a modest-cost home and who could be served cost-effectively.

- To avoid trapping households in their homes and encourage wealth building, consider allowing them to re-use some or all of their assistance to apply to the purchase of a subsequent home and/or alternative repayment options.

- Given the widespread discrimination documented in Chapters 1 and 2, commission an additional study to consider the scope and feasibility of an SPCP that would support other economically disadvantaged households adversely impacted by the State's unlawful discrimination who are not eligible under the current legislation (for example, residents who do not meet the Act's pre-1968 residency requirement and residents who experienced adverse impacts from the State's discrimination but are not in an impacted group).

## Evaluating the Program

Chapter 5 discusses potential approaches for evaluating a Covenant Homeownership Program in Washington. It presents a logic model outlining the program's inputs, activities, outputs, and short-

and long-term outcomes. It then describes how different types of evaluations, such as output evaluation, outcomes evaluation, impact evaluation, and qualitative evaluation, could be used to evaluate different aspects of the program and answer specific research questions. Key areas of focus for future evaluation include the number of homeowners assisted, their demographics and locations of homes purchased, the amount of wealth built over time, and changes in homeownership rates by race.

Chapter 5 also proposes two potential targets for the program that could be used to monitor the continued need for the program. The first suggested target is based on application volume, and the second target is based on the size of the reduction in racial disparities in homeownership.

## Conclusion

This study completes the important first step in implementing the Covenant Homeownership Act to address the lasting impact of housing discrimination in Washington. By documenting the history of housing and lending discrimination against marginalized communities in Washington, outlining the significant role of the State in this discrimination, defining the impacts of that discrimination, and identifying approaches to remedy these impacts, the study provides an evidence-based framework for a remedial SPCP under the Act. Building on this framework, the Covenant Homeownership Program will bring critical assistance to members of historically marginalized groups and help them begin to build wealth through homeownership.



## INTRODUCTION

In early 2023, the Washington State Legislature passed the historic Covenant Homeownership Act (House Bill 1474) with bipartisan support, making Washington the first state to address the role of government institutions in housing-related racial discrimination. The term "covenant," in the context of the Act, refers to the racially restrictive clauses inserted into property deeds and used in neighborhoods throughout Washington to exclude people from purchasing homes based on their race, ethnicity, or religion. More than 50,000 of these racially restricted properties have been identified in Washington so far, and this research is still ongoing. The Covenant Homeownership Act represents a new commitment to correct this injustice and others, including the promotion of segregation, the use of exclusionary zoning practices, redlining, lending discrimination, and the lack of adequate state regulation and oversight to prevent discrimination.

The Covenant Homeownership Act presents an opportunity to help a subset of impacted residents build wealth through homeownership. It creates a source of funding for homebuyer assistance from a new $100 document recording assessment on real estate transactions. These fees will fund a Special Purpose Credit Program (SPCP) that will provide impacted residents with support to purchase a home and build wealth. This SPCP will be designed to rectify acts of racial housing discrimination by government institutions by addressing the lasting impacts of that discrimination that persist throughout Washington today.

The Covenant Homeownership Act also mandates that program participants meet the following eligibility requirements:

- A household income at or below 100 percent of the Area Median Income (AMI),

- A first-time homebuyer, and

- A Washington resident who: (i) was a resident of Washington before the enactment of the Federal Fair Housing Act on April 11, 1968, and was, or would have been, excluded from homeownership in Washington by a racially restrictive covenant on or before that date; or (ii) is a descendant of such a resident.

SPCPs are targeted lending products designed specifically to help an economically disadvantaged group of people. They were made allowable in a 1976 amendment to the Equal Credit Opportunity Act of 1974 (ECOA) to counteract centuries of unfair laws and policies that deprived millions of consumers of the right and opportunity to access fair mortgages and credit. [5] Those laws and policies created many inequities and barriers in U.S. housing and lending markets that still impact millions of consumers. SPCPs provide these consumers with access to the quality, affordable, sustainable credit they need to live successful, thriving lives. By setting aside funds through the Covenant Homeownership Act and implementing an SPCP through the Washington State Housing Finance Commission, the State is making a historic commitment to correct past discrimination and injustice and giving families the opportunity to build wealth through homeownership.

---

[5] Ibid.

ECOA affords the State of Washington the ability to implement SPCPs that help underserved consumers access the quality, affordable, sustainable credit they need to live successful, thriving lives. Under the authority of the Consumer Financial Protection Bureau, the federal government implements and oversees regulation under ECOA detailing the standards associated with different types of SPCPs (12 C.F.R. § 1002.8(a)(1)-(3)). Among the types of SPCPs acknowledged under the regulation are those programs "authorized by law," which is to say those administered by local, state, or federal government. Id. at (1). In this manner, Congress and the associated federal implementing agencies have created the opportunity for governments, including the State of Washington, to remedy the impacts of past discrimination by federal, state, and/or local governments through SPCPs that expand the credit market to impacted communities.

SPCPs authorized by law must be "for the benefit of an economically disadvantaged class of persons." Id. Congress ensured that these programs permit consideration of prohibited bases such as race, national origin, or sex to increase access to the credit market by persons previously foreclosed from it. To create an SPCP, it is imperative to assess data and determine need, design a program that serves the benefit of an economically disadvantaged class, and develop a written plan for the program, including a plan for monitoring the program implementation for a set time period. The Covenant Homeownership Act calls for completing an updated covenant homeownership study at least every five years after this initial study to update and reevaluate the findings and recommendations from this and any subsequent studies; document the experience of program participants and others impacted by past and ongoing discrimination; evaluate the special purpose credit program or programs' efficacy in providing down payment and closing cost assistance to the economically disadvantaged class or classes of persons identified in this initial covenant homeownership program study and any subsequent program studies, and the special purpose credit program or programs' impacts on remedying discrimination and reducing the resulting racial disparities in homeownership in the state; and recommend program modifications and improvements. [6]

SPCPs provide a framework to create credit programs to address special social needs while complying with federal fair lending laws. In their design and implementation, SPCPs remediate the present-day impacts of discrimination in the credit market.

In line with these requirements, the Covenant Homeownership Act specifically requires the completion of a study to do the following:

(i)     Document past discrimination against Black, indigenous, and people of color and other historically marginalized communities in Washington in which the government was an active or passive participant, and the ongoing impacts of this discrimination on homeownership in the state, including access to credit and other barriers to homeownership;

(ii)    Analyze whether and to what extent existing programs and race-neutral approaches are insufficient to remedy this discrimination and its impacts;

---

[6] HB1474, Sec. 5 (2)(a). Full bill available online at: https://lawfilesext.leg.wa.gov/biennium/2023-24/Pdf/Bills/House%20Passed%20Legislature/1474-S2.PL.pdf?q=20230925022524

      (iii)      (A) Recommend and evaluate potential programmatic and policy changes, including creation of one or more special purpose credit programs, to remedy this discrimination and its impacts;

                    (B) As part of the recommendations related to creation of one or more Special Purpose Credit Programs, identify through evidence-based documentation the economically disadvantaged class or classes of persons that require down payment and closing cost assistance to reduce racial disparities in homeownership in the state caused by documented discrimination. The class or classes of persons identified in the study may share one or more common characteristics such as race, national origin, or sex; and

      (iv)      Identify methodology to evaluate the efficacy of any recommended programmatic and policy changes over time. [7]

This study completed the four requirements above to inform the creation of a program under the Covenant Homeownership Act that achieves its principal goals. The findings are presented in five chapters.

Chapter 1 documents past housing and lending discrimination in which the state was a passive or active actor. Chapter 2 analyzes the extent to which the impacts of that discrimination still persist, as evidenced in the data on Washington's racial and ethnic homeownership, credit access, and other housing stability gaps. Chapter 3 analyzes whether and the extent to which existing and race-neutral approaches are sufficient to remedy the impacts of this discrimination. After finding that race-neutral approaches are in fact insufficient, Chapter 4 models various options for programmatic solutions that use a race-conscious framework. It then outlines the recommended income requirements, assistance amounts, and other program elements of a special purpose credit program that remediates homeownership gaps and supports housing choice. Finally, the study concludes with Chapter 5, which discusses potential approaches for evaluating a Covenant Homeownership Program in Washington and proposes targets and metrics for monitoring the continued need for the program.

---

[7] HB1474 (2023). Available online at: https://lawfilesext.leg.wa.gov/biennium/2023-24/Pdf/Bills/House%20Passed%20Legislature/1474-S2.PL.pdf?q=20230925022524

# CHAPTER 1: WASHINGTON'S HISTORY OF DISCRIMINATION IN HOUSING AND THE LENDING OF CREDIT

## Introduction

The goal of this chapter, as outlined in the Washington State Housing Finance Commission's Request for Proposals, [8] was for the study team to provide an overview of its comprehensive examination of historical and literary records used to document whether there was "specific discrimination against specific marginalized groups in Washington through restrictive covenants, the lending of credit, and other barriers to homeownership, including in particular, how state government has been an active and/or passive participant in that discrimination." To complete this task, the research team reviewed historical records from the State of Washington's archives, information from the U.S. federal government, historical legislation and policies implemented in Washington before and after statehood, legislation and policies passed by the U.S. federal government that were implemented in the region, studies, surveys, documentation from universities throughout the state, U.S. Census records, newspaper reports, documents from housing industry groups as well as civil society organizations, transcripts of public hearings, and records from various state agencies. The team also consulted academic researchers and reviewed information from interviews conducted with Washington residents and key stakeholders in the state.

The study team found that since Washington's inception, housing discrimination and segregation have been embedded in its history. As noted by the legislature, in the Covenant Homeownership Act: "Generations of systemic, racist, and discriminatory policies and practices have created barriers to credit and homeownership for Black, Indigenous, and people of color and other historically marginalized communities in Washington." The legislation goes on to note that the homeownership rate for Black, Native American, and people of color and other historically marginalized communities (herein referred to as "historically marginalized communities") in Washington is 19 percentage points below that of non-Hispanic White households, and that gap is even wider between Black and White households. The law also recognizes that mortgages are harder to obtain and more expensive for historically marginalized communities.[5] Our thorough analysis of hundreds of reports, articles, and documents reveals this pervasive discrimination led to decades of missed wealth building opportunities for marginalized communities and continues to yield racially and ethnically disparate outcomes in housing, credit, education, health, employment, and other areas.

The first section of this chapter delves into the history referenced above, documenting a wide range of discriminatory housing and lending acts against historically marginalized communities in Washington. The subsequent sections outline era by era, how opportunities for land ownership and access to credit were created for White Washingtonians and deliberately kept out of the hands of historically marginalized communities. These systems of discrimination were created not only by pervasive discrimination in the private real estate and lending industries but explicitly by local, state, and federal government policies and practices designed to exclude historically

---

[8] "Request for Proposals (RFP). NO. WSHFC_HOCV23." Washington State Housing Finance Commission. April 21, 2023. https://wshfc.org/admin/20230503RFPCPAddendumPostingPacket.pdf.

marginalized communities. The historical account concludes with an overview of homeownership rates over time in Washington by race and ethnicity.

### Approach and Limitations

To develop this initial part of the study, the research team undertook research, interview, and survey approaches to gather background information. The team conducted an extensive review of existing literature on housing and lending discrimination in the state. The literature review encompassed any firsthand accounts, public records, articles, and reports that answered the following questions: (1) "What discriminatory conduct (acts or omissions) by state, federal, and local governments and private actors in Washington created barriers to homeownership?" and (2) "What were the effects of this discriminatory conduct on subsets of the population (including Black, Latino, Asian, Native American, Alaska Native, Native Hawaiian and other Pacific Islander borrowers) in Washington?" The authors also interviewed historians and researchers as key informants to obtain information about research that would inform the accounting of housing and lending discrimination acts. [9] A survey was also circulated to obtain anecdotal information about historical acts of discrimination and inform the effects of historical discrimination on present-day access to homeownership and credit.

The contents of this chapter of the study are limited to content available in historical records, news articles, books, and interviews compiled by researchers and historians. The authors of this study did not independently verify every account of discrimination documented and compiled here. Moreover, the authors recognize that much of what was recorded by historians, journalists, and public agencies is limited to larger metropolitan areas such as Seattle, Tacoma, and Spokane that were hubs for migration, and had larger populations of people of color than other parts of the state at various periods of history and were therefore more often subject to clearly documented policies and practices.

## Historical Timeline of Discriminatory Actions

The sections below outline a factual record of historical acts of discrimination that limited access to homeownership, credit, and related wealth building to particular groups of people. The timeline outlines actions taken by government players and agencies, as well as private institutions between the early 1800s and the last decade.

### Government Involvement in Land and Ownership-Related Discrimination Pre-20th Century

While actions by the State of Washington to limit land ownership and wealth building opportunities officially began when the Washington Constitution was passed in 1889, steps taken prior to statehood set the stage for these activities. Washington was home to many thriving Indigenous communities before the arrival of White settlers beginning in the mid-1800s, with likely tens of thousands of people living across the land that now comprises the state. With the settlers' arrival came the beginning of White land ownership in the region. The territorial and federal

---

[9] Informant Interviewees included: Professor James Gregory (Racial Restrictive Covenants, University of Washington), Logan Camporeale (Racial Covenants Project, Eastern Washington University), Dr. Lawrence Cebula (Racial Covenants Project, Eastern Washington University), Dr. Jade Aguilar (ECONorthwest), and Professor Hugh Spitzer (Professor of Law, University of Washington).

government at the time put a series of treaties [10] in place that required Native Americans in the area to cede much of their land over just a few years. This land seizure was paired with violence, intimidation, and forced removal of Native people from their lands and onto reservations. The reservations established in Washington, as was the case in other regions of the U.S., tended to be sited in remote locations and often suffered from poor soil quality. [11] There are now 29 federally recognized reservations in the state. [12]



Figure 2 - United States Department of the Interior (Bureau of Indian Affairs) advertisement offering 'Indian Land for Sale'. The man pictured is a Yankton Sioux named Not Afraid Of Pawnee. https://commons.wikimedia.org/wiki/File:Indian_Land_for_Sale.jpg

In addition to these treaties, a series of other laws further displaced Native Americans from non-reservation land and excluded Black people and other people of color, resulting in wealth-building opportunities for Whites while Native Americans, Black Washingtonians, and other people of color lost access to resources and opportunity.

For example, the Territorial legislature, which included what is now Washington, [13] passed its first exclusion law in 1843. The law prohibited slavery and ordered anyone who had brought enslaved people to the region to resolve the matter within a certain time frame. Black people who had been emancipated were required to leave the state. White settlers in the region generally opposed slavery because they viewed it as detrimental to their financial interests. Slavery primarily benefited Southern farmers and made competition with them extremely difficult. Settlers in the territory also expressed that they did not want Black people living in the region. Peter Burnett, who headed the legislative council, explained "The object is to keep clear of that most troublesome class of population [Blacks]. We are in a new world, under the most favorable circumstances and we wish to avoid

---

[10] These treaties included 10 treaties with tribes in the region executed between 1854-1855 that are collectively called the Stevens Treaties. Kent Richards, "The Stevens Treaties of 1854-1855," Oregon Historical Quarterly 106, no. 3 (2005): 342−50, https://doi.org/10.1353/ohq.2005.0012.

[11] Kurt Kim Schaefer, "The Promise and the Price of Contact: Puyallup Indian Acculturation, Federal Indian Policy and the City of Tacoma, 1832-1909 ," June 2016, https://digital.lib.washington.edu/researchworks/bitstream/handle/1773/36721/Schaefer_washington_0250E_15821.pdf?sequenc e=1.

[12] "Indigenous Tribes of Seattle and Washington," About ALA, April 20, 2020, https://www.ala.org/aboutala/indigenous-tribes-seattle-and-washington#:~:text=There%20are%2029%20federally%20recognized,Suiattle%2C%20Shoalwater%20Bay%2C%20Skokomish%2C.

[13] The Territory of Washington was established as its own incorporated area in 1853. Prior to that, the region was a part of the Oregon Territory.

most of those evils that have so much afflicted the United States and other countries." [14] The second exclusion law passed in 1844 prohibited Black people from moving to the territory. Any Black person who moved to the region would be publicly whipped, receiving 39 lashes every 6 months until they left. Later in the year, the law was changed to remove public flogging as a penalty. Instead, Black people would be required to conduct public labor. In 1849, the legislature passed another exclusion law banning any "negro or mulatto to enter into or reside within the limits of this Territory." [15] People falling into these categories already living in the territory were not subject to the law.

In 1850, the federal government passed the Donation Land Claim Act (DLCA), which offered 320 acres to White males or "half-breed Indian males" and 640 acres for married couples in the Washington Territory. [16] This clearly meant that most Indigenous people would not be eligible. Moreover, Black residents and other people of color were not eligible to access this land and homeownership opportunity.

The Homestead Act, signed into law by President Lincoln in 1862, superseded the Donation Land Claim Act and provided 160 acres of land to White settlers, including White people who were not U.S. citizens, but declared their intention to become a citizen. Homesteaders had to be the head of the household, at least 21 years old, never have taken up arms against the U.S. (this provision was later lifted for Confederate soldiers), live on the land for five years, make improvements to the land, grow crops, and build a dwelling that was at least 12' X 14'.  After meeting these requirements, homesteaders could file for deed of title. Over 250 million acres of formerly Native American lands were transferred to White homesteaders nationwide. [17] The last Homestead title in the State of Washington was granted in 1969. [18]

Over the decades, as western territories became more populous and the railway systems were established, the Homestead grant program was amended and ultimately, required settlers to pay a nominal fee to obtain land. The Homestead Act and other land grant programs helped establish land and homeownership opportunities for White residents of the U.S., greatly contributing to their ability to obtain and generate wealth.

Black, Native American, Asian, and other people of color in the state were severely limited in their ability to participate in the land grant programs, including the Donation Land Claim and Homestead programs, largely because the programs were designated for White residents and immigrants. Many people of color were not deemed to be citizens or able to apply for citizenship

---

[14] "Black Exclusion Laws in Oregon," The Oregon Encyclopedia, accessed March 19, 2024, https://www.oregonencyclopedia.org/articles/exclusion_laws/.
[15] https://sos.oregon.gov/archives/exhibits/black-history/Pages/context/chronology.aspx#:~:text=September%2021%2C%201849,not%20subject%20to%20this%20law.
[16] Margaret Riddle, "Donation Land Claim Act, Spur to American Settlement of Oregon Territ," Donation Land Claim Act, spur to American settlement of Oregon Territory, takes effect on September 27, 1850., August 9, 2010, https://www.historylink.org/File/9501.
[17] "The Homestead Act of 1862," National Archives and Records Administration, accessed March 19, 2024, https://www.archives.gov/education/lessons/homestead-act#background.
[18] Center for the Study of the Pacific Northwest, accessed March 19, 2024, https://www.washington.edu/uwired/outreach/cspn/Website/Classroom%20Materials/Curriculum%20Packets/Homesteading/II.html.

status. Moreover, discriminatory practices prohibited people of color from accessing the program and from exercising their rights in general.[19]

By 1864, the first "alien land law"[20] was passed in Washington by the Territorial legislature. The law was designed to facilitate land ownership among non-citizen White immigrants to populate the territory. While future alien land laws aimed to limit immigration, this first alien land law was designed to displace Native Americans by increasing White immigration to Washington. The law stated that non-citizens could own land "*in like manner and with like effect as if such an alien were a native citizen…*" in order to *"consolidate the Territory as White man's land."* The U.S. used taxpayer funds and resources, including the military, to help foment land and homeownership for Whites in the territory. The law had the intended effect, more than doubling the population of Washington Territory through the 1860s and resulting in the further displacement of the Native Americans living there. [21]

Laws explicitly excluding Native Americans from cities began as this land seizure was solidified. In 1865, for example, Seattle passed an ordinance expelling and banning all Native Americans from the city. [22] The ordinance stated that Native Americans could only enter Seattle if they had permission from a non-Native American for a specific job. Such ordinances further forced Native people to leave their ancestral lands entirely and to live on the reservations assigned to them.

Chinese immigrants began to migrate to Washington in the mid-19th century due to an economic crisis in China and the availability of employment in the Washington territory. Asian immigrants created small but thriving communities in Washington's cities, including "Chinatowns" such as Trent Alley in Spokane, which was home to both Chinese and Japanese markets and restaurants. [23]

Laws restricting immigration emerged throughout the United States, including the federal Chinese Exclusion Act of 1882. The Chinese Exclusion Act banned the immigration of Chinese laborers to the United States and also prevented existing Chinese residents from becoming citizens. [24] It was soon followed by the Scott Act of 1888, which prohibited reentry of Chinese people returning from trips to China, and the Geary Act of 1892, which required registration of all Chinese people and deportation of anyone found without a residence certificate. [25]

This series of federal laws encouraged deportation and anti-Chinese hostility that led to a series of violent incidents in Seattle and Tacoma. In 1886, a mob expelled Chinese residents from the

---

[19] Gregory D. Squires, *The Fight for Fair Housing: Causes, Consequences, and Future Implications of the 1968 Federal Fair Housing Act.* New York: Routledge, Taylor &amp; Francis Group, 2018.
[20] Alien land laws were laws that attempted to discourage Asian and other immigrants from settling permanently or owning property in the U.S.  See: https://encyclopedia.densho.org/Alien_land_laws/ and https://encyclopedia.densho.org/Alien_land_laws/
[21] Nicole Grant, White supremacy and the Alien Land Laws of Washington State, 2008, https://depts.washington.edu/civilr/alien_land_laws.htm.
[22] "Reflecting on an Act of Discrimination: County Council Recognizes Native American Expulsion Remembrance Day," King County, Washington, February 4, 2015, https://kingcounty.gov/en/legacy/council/news/2015/february/native_expulsion#:~:text=Ten%20years%20after%20local%20tribes %20signed%20the%20Treaty,for%20the%20removal%20of%20Indians%20from%20the%20city.
[23] Nicolette Reames, "Spokane's Chinatown," Spokane Historical, accessed March 19, 2024, https://spokanehistorical.org/items/show/400.
[24] "Chinese Exclusion Act (1882)," National Archives and Records Administration, accessed March 19, 2024, https://www.archives.gov/milestone-documents/chinese-exclusion-act#:~:text=It%20was%20the%20first%20significant,immigrating%20to%20the%20United%20States.
[25] "Chinese Immigration and the Chinese Exclusion Acts," Office of the Historian, accessed March 19, 2024, https://history.state.gov/milestones/1866-1898/chinese-immigration.

City of Seattle. The Chinese residents who were expelled were accused of violating Seattle's 1885 "cubic air ordinance", Ordinance 694, [26] which required that all lodging have at least 512 cubic feet of air space for each person sleeping there. Most residences that did not comply with this ordinance belonged to Chinese workers, who were restricted to smaller living arrangements due to the low wages and lack of options for other types of housing due to discrimination. This violence, which forcibly expelled about 350 Chinese residents, displaced the Chinese community from Seattle for several decades. A similar demonstration expelled approximately 700 residents from Tacoma the year prior. [27] Another incident occurred in Bellingham in 1907 targeting South Asian immigrants. [28] In none of these incidents did local law enforcement intercede to prevent the expulsions.

In 1886, the Washington Territorial legislature passed a new law that prohibited land ownership among "*aliens ineligible to citizenship.*" This prohibition was later incorporated in the 1889 Washington State Constitution. Coupled with the Immigration Act of 1790 that prevented Asians from naturalization and the amendment to the Immigration Act in 1875 stating that citizenship was only allowed to "aliens [being free White persons, and to aliens] of African nativity and to persons of African descent," Asians were effectively barred from citizenship. As a result, the prohibition of "alien land ownership" in the 1889 State Constitution ensured that they could not own land in the newly formed state. [29]

---

**PRE-20TH CENTURY ACTIONS TAKEN BY GOVERNMENT ENTITIES TO LIMIT LAND AND HOME OWNERSHIP**

**Actions Taken by the State of Washington**

- Washington's Constitution included prohibition of "alien land ownership" in 1889

**Actions Taken by Local Government Entities**

- Expulsion of Native People and Asian Immigrants from Cities in Washington
- Cubic Air Ordinance in Seattle

**Actions Taken by Federal or Territorial Government**

- U.S. and Territorial Government Treaties with Tribes in Washington taking land from Native Americans and Creating Reservations
- Territorial Government Exclusion Laws Preventing Blacks from Settling in Washington
- Homestead Act
- Donation Land Claim Act
- Alien Land Law of 1864
- Chinese Exclusion Act

---

[26] Center for the Study of the Pacific Northwest. "Timeline: Asian Americans in Washington State History." Accessed online at: https://www.washington.edu/uwired/outreach/cspn/Website/Classroom%20Materials/Curriculum%20Packets/Asian%20Americans/Section%20IV.html.
[27] Ibid.
[28] David Cahn, "The 1907 Bellingham Riots in Historical Context," Seattle Civil Rights and Labor History Project, accessed March 19, 2024, https://depts.washington.edu/civilr/bham_history.htm.
[29] Grant, *White supremacy and the Alien Land Laws.*

### Population & Demographic Snapshot in 1890

| TOTAL POPULATION | WHITE | BLACK | AMERICAN INDIAN/ ALASKA NATIVE | ASIAN PACIFIC ISLANDER | OTHER RACE | HISPANIC ORIGIN | WHITE NON-HISPANIC |
|---|---|---|---|---|---|---|---|
| 349,390 | 340,513 | 1,602 | 3,655 | 3,620 | N/A | N/A | N/A |

Table 1 - Washington's Population by Race in 1890, Source: U.S. Census Bureau.

## The Early 1900s:

### Expulsion and Barriers to Land Access Continue

While the Chinese Exclusion Act specifically barred Chinese immigrants from migrating to the U.S., by the turn of the century, Japanese immigrants became the largest non-White community in Seattle [30] and had a significant presence in other parts of the state. For example, there were over 1,000 Japanese first- and second-generation immigrants in Spokane. [31] Unlike the Chinese laborers who were not permitted to bring wives to the U.S., Japanese laborers were able to bring wives and children and settled more permanently principally into agricultural work. Japanese American relations pre-World War I and throughout the war also allowed for some more favorable conditions for Japanese immigrants. Many immigrant families were able to lease plots of land on which to grow crops and create successful businesses. [32]

Although discrimination against the Japanese community was still prevalent at the time, [33] by 1920, Japanese farmers provided nearly 75 percent of the vegetables consumed in King County. Threatened by their success, anti-Japanese sentiment led to the passage of the 1921 Alien Land Bill by the Washington Legislature. The bill restricted the ability of non-citizens to own and lease land, which directly impacted Japanese farmers in several ways. First, it prevented anyone who did not "in good faith declare his intention to become a citizen of the United States" from owning or leasing land. Such a declaration was impossible for a Japanese immigrant to make due to longstanding federal naturalization laws still in place. Second, it mandated that any land held by such a person be forfeited. Third, it criminalized any attempt to evade the law, aiming to prevent others from doing business that would support land access for Japanese residents.

The bill achieved its intended result. From 1920 to 1930, the population of Japanese residents in Washington that had reached 17,387 in 1920 increased by only 450 people. Spokane, which even had its own Japanese newspaper just decades earlier, was home to only 383 Japanese residents by 1935. The bill was even amended in 1923 to ensure that land also could not be held in the name of minor children of "alien" residents. [34] [35] On the national level, the Immigration Acts of

---

[30] "Japanese Americans in the Pacific Northwest," Japanese Americans in the Pacific Northwest , accessed March 19, 2024, https://guides.lib.uw.edu/research/nikkei.

[31] Jim Kershner, Spokane's Japanese Community, 2007, https://www.historylink.org/File/8048.

[32] John Caldbick, "Washington Governor Louis Hart Signs Stringent Alien Land Bill on March 8, 1921.," HistoryLink, 2018, https://www.historylink.org/File/2124.

[33] See: Caldbick, *Washington Governor Louis Hart;* and Grant, *White Supremacy and Alien Land Laws*.

[34] Caldbick, *Washington Governor Louis Hart*.

[35] Grant, *White Supremacy and Alien Land Laws*.

1917 and 1924 ended further immigration by the Japanese and other Asian immigrants, [36] [37] and the U.S. Supreme Court ensured that citizenship was not a possibility for those of Asian descent in *Ozawa v. United States* and *United States vs. Bhagat Singh Thind*. These laws were paired with violence and intimidation against Japanese and other Asians in Washington. There are accounts of White vigilantes, spurred by the State's anti-immigration bill, burning and bombing the homes and farms of Filipino migrants in the Yakima Valley and Wenatchee Valley shortly after the law was passed. [38] Local law enforcement allowed violence and intimidation to persist.

### *Residential Segregation Reinforced with Zoning*

Black families began to move to the state in small numbers late in the 19th century, and that migration increased at the start of the 20th century. In 1900, there were about 600 Black residents in King County, but just a decade later, that number increased to nearly 2,500 people. Black churches and civic clubs were established in Seattle, and the Seattle branch of the NAACP was created in 1913. There were also 376 Black residents in Spokane in 1900 (about 1 percent of the population). [39]

In 1923, Seattle passed its first zoning ordinance, which dictated how land within a neighborhood was allowed to be used. Prior to this ordinance, Seattle building codes limited the size of buildings, but this was the first time an ordinance created space between where people lived and where other activities occurred in the city.

This type of zoning had already been a common practice in other parts of the country during the decades prior. Cities like Baltimore, Atlanta, and St. Louis had all adopted race-specific zoning ordinances by the time the U.S. Supreme Court overturned the racial zoning ordinance in Louisville, Kentucky in 1917. That case, *Buchanan v. Warley*, held that racial zoning interfered with the right of a property owner to sell to whomever he pleased. Thus, Seattle's first zoning ordinance in 1923 could not be explicit about its intention to keep out Black families, but as University of Washington Professor Rick Mohler opines, "part of it was in the interest of exclusion, frankly. There was concern about people of color and, to some extent, renters moving into the neighborhood." [40]

Seattle's City Zoning Commission also relied on the guidance of Harland Bartholomew, a civil engineer who was responsible for creating a comprehensive plan inclusive of zoning ordinances for St. Louis in 1919. During his time working in St. Louis, Bartholomew said that a goal of zoning was to inhibit movement into "finer districts… by colored people." He specified that this was needed to prevent such neighborhoods from falling subject to the fate of others that had not had

---

[36] "Immigration Act of 1917 (Barred Zone Act)," Immigration History Project, February 1, 2019, https://immigrationhistory.org/item/1917-barred-zone-act/.

[37] "Immigration Act of 1924 (Johnson-Reed Act)," Immigration History Project, February 1, 2019, https://immigrationhistory.org/item/1924-immigration-act-johnson-reed-act/.

[38] "Civil Rights in America: Racial Discrimination in Housing," National Park Service, March 2021, https://www.nps.gov/subjects/nationalhistoriclandmarks/upload/Civil_Rights_Housing_NHL_Theme_Study_revisedfinal.pdf.

[39] Daudi Abe and Quintard Taylor, "From Memphis and Mogadishu: The History of African Americans in King County, Washington, 1858-2014 •," Black Past, August 2, 2022, https://www.blackpast.org/african-american-history/perspectives-african-american-history/memphis-and-mogadishu-history-african-americans-martin-luther-king-county-washington-1858-2014/.

[40] Josh Cohen, "Rectifying Seattle's Racist Past Requires a Denser Future, Says Report," Crosscut, December 12, 2018, https://crosscut.com/2018/12/rectifying-seattles-racist-past-requires-denser-future-says-report.

zoning laws, where home values had depreciated and "homes are either vacant or occupied by colored people." [41]

The 1923 zoning plan that Bartholomew developed for Seattle introduced six types of districts, including first and second residential zones. First residential zones were allocated for single-family homes, churches, parks, libraries, schools, and rail stations. Multi-family dwellings, "flats, apartments, boarding, or lodging houses, and hotels," were limited to second residential zones. [42] The ordinance that adopted this zoning requirement was based on "existing conditions," and since Black residents of Seattle had already settled in more dense and lower-cost housing, this step further solidified patterns of residential segregation in second residential zones.



Figure 3- Transcript of Harland Bartholomew discussion the rationale for using zoning to reinforce existing conditions. Source : http://archives.seattle.gov/digital-collections/media/collectiveaccess/images/1/9/5/3/17233_ca_object_representations_media_195306_original.pdf

The municipal authority for cities such as Seattle to enact such zoning policy was granted through article XI, section 11 of the Washington State Constitution, which grants police powers to municipalities. These powers include the ability to independently regulate land use. [43]

In 1935, Washington's legislature passed its first law to expressly authorize land use planning and the imposition of zoning controls: The Planning Commissions Act of 1935. The Planning Commissions Act established the role of planning commissions at any municipality – city, town or county – to prepare recommendations on zoning and other land use subjects and regulate the municipalities' physical development. [44] Following the 1935 Act, King County adopted its first zoning ordinance in 1937, with terms similar to Seattle's law. Other cities, towns and counties in Washington followed with their own zoning practices in subsequent decades.

On June 17, 2021, the White House posted a blog on exclusionary zoning and its effect on racial discrimination in the housing market, which highlighted Seattle's 1923 zoning laws. [45] The blog post discusses how exclusionary zoning and its historical impacts negatively affect economic well-being and wealth accumulation by making housing more expensive in some neighborhoods with fewer homes being built. In addition, research has connected exclusionary zoning to racial segregation and the exclusion of people of color from areas of where there is access to jobs and

---

[41] Rothstein, *The Color of Law*, p. 49.

[42] Ordinance No. 45382, http://clerk.seattle.gov/~archives/Ordinances/Ord_45382.pdf.

[43] G. B. Clement & Egil Krogh, Jr., Comment, Regional Planning and Local Autonomy in Washington Zoning. Law, 45 Wash. L. Rev. 593 (1970). Accessed online at: https://digitalcommons.law.uw.edu/wlr/vol45/iss3/8,

[44] Ibid.

[45] "Exclusionary Zoning: Its Effect on Racial Discrimination in the Housing Market," The White House, November 30, 2021, https://www.whitehouse.gov/cea/written-materials/2021/06/17/exclusionary-zoning-its-effect-on-racial-discrimination-in-the-housing-market/.

public transportation, high performing schools, and low crime rates. [46] This is reinforced by the blog's citation to research on Seattle's 1923 zoning laws which show that areas in which Black or Chinese American families lived were disproportionately likely to receive a commercial zoning designation downgrading the areas from residential usage and leading to unhealthy living environments for people of color. [47] Finally, the post concludes that exclusionary zoning contributes to the racial wealth gap by keeping Black families out of higher priced neighborhoods and by making neighborhoods occupied by people of color less valuable. A review of zoning laws in Washington supports this conclusion.

In 1959, the Washington State Legislature passed a new Planning Enabling Act that authorized counties to regulate land development and establish planning departments to carry out planning and zoning activities. [48] The zoning codes adopted under these laws typically zoned existing predominantly White neighborhoods differently than Black neighborhoods, sanctioning and reinforcing residential segregation.

### *Residential Segregation Takes Hold*

The result of early laws in the Washington region, like the series of treaties with Native American tribes, exclusion acts, DLCA, Homestead Act, Alien Land Act, Chinese Exclusion Act, and other laws, made it almost impossible for people of color to reside in the region long-term. But the need for industry, labor, and economic growth eventually meant that doors of entry would open to people of color. As they moved into the area, their ability to live where they wanted was severely restricted by racial covenants, zoning ordinances, racial steering, redlining, appraisal bias, housing and lending discriminatory practices, racial and ethnic violence, and other restrictive measures.

The result was the deliberate engineering of racial enclaves and a deeply segregated community. By the 1930s, Seattle, Spokane, and other cities were hyper-segregated. In 1940, almost every non-White person in King County, for example, lived in a few census tracts in the urban core. (See Map 1 below.) The pattern holds in later decades, including through 1970 (See Map 2 below), when large numbers of Black people were migrating west in the aftermath of World War II during the second Great Migration of Black Americans. [49] A map of the area shows a White residential donut surrounding a central community of color.

In Spokane, Black, Asian, and other non-White residents were primarily concentrated in the central city and southwest section of the city. (See Map 3 below.) Other areas, like the Tri-Cities, have long histories of excluding people of color and restricting where they could live. For example, for decades the cities of Kennewick and Richland were sundown towns, [50] which were towns or suburbs that forbade Blacks and other people of color from residing in the jurisdiction. Sundown towns were meant to be exclusively White enclaves, with the exception that certain people of

---

[46] Rothwell J, Massey DS. THE EFFECT OF DENSITY ZONING ON RACIAL SEGREGATION IN U.S. URBAN AREAS. Urban Aff Rev Thousand Oaks Calif. 2009 Jul 1;44(6):779-806. doi: 10.1177/1078087409334163. PMID: 25009413; PMCID: PMC4083588.
[47] Tate Twinam, "The Long-Run Impact of Zoning: Institutional Hysteresis and Durable Capital in Seattle, 1920–2015," Regional Science and Urban Economics 73 (November 2018): 155–69, https://doi.org/10.1016/j.regsciurbeco.2018.08.004.
[48] Oldham, Kit. Washington State Legislature passes new Planning Enabling Act on March 9, 1959. 2006. HistoryLink. https://www.historylink.org/File/7741.
[49] "The Second Great Migration," Smithsonian American Art Museum. Accessed on March 20, 2024. https://americanexperience.si.edu/wp-content/uploads/2015/02/The-Second-Great-Migration.pdf.
[50] The History and Social Justice website, hosted by Tougaloo College, contains a registry of sundown towns. It lists Bellingham, Brewster, Chehalis, Chelan, Colville, Kennewick, Montesano, Olympia, Richland, Seattle, Shelton, Tacoma, Vancouver, and Walla Walla as all have once been Sundown Towns. See: https://justice.tougaloo.edu/location/washington/.

color could come to the city for certain purposes, like to work. As detailed more extensively later in this Chapter, Black people could not be in Richland or Kennewick after dark (See Map 4). [51]



Map 1 - 1940 map of King County depicting the residential location of the non-White population, hyper-segregated in the County's urban core.
Map 2 - 1970 map of King County depicting the residential location of the White population.
Source: University of Washington, https://depts.washington.edu/civilr/maps_race_seattle.htm



Map 3 -1950 map of Spokane shows the concentration of Black residents in a few census tracts.
Map 4 - 1970 Map of the Tri-Cities depicting over a 90 percent White population for every census tract except one in the central eastern part of the area.

---

[51] Civil Rights and Labor History Consortium. "Mapping Race and Segregation in Tri-Cities, Washington, 1970 – 2020." https://depts.washington.edu/labhist/maps-race-tricities.shtml.

It is important to note patterns of residential segregation since they impact people's ability to access housing and credit opportunities. For example, areas that were open to residents of color were often areas with older, substandard housing, poor infrastructure, devalued properties, lax city services, few amenities, and disinvestment. They were also areas that were often zoned for non-residential purposes making it difficult for residents to obtain funding or permits from the city to improve their homes.

### *Widespread Use of Racially Restrictive Covenants Reinforces Segregation Patterns*

Around the turn of the century, racially restrictive covenants emerged as another tool to segregate cities and towns in Washington. Racially restrictive covenants are clauses inserted into property deeds or related records to prevent certain groups of people from buying or occupying land and/or housing. In Washington, these clauses were recorded with the county auditors' offices. They were recorded in many different forms: as Conditions, Covenants and Restrictions (CC&R), in restrictions established by homeowners' associations, in restrictions established in a notarized petition by multiple property owners, or in restrictions appearing in individual deeds of sale. [52] As described below, by recording and recognizing these restrictions, state and local governments enforced and sanctioned racially restrictive covenants.

This racially exclusive language began to show up in deeds in Washington as early as 1907, but became much more prevalent as a way to segregate neighborhoods after racial zoning was deemed unconstitutional (*Buchanan v. Warley)* in 1917 and when racially restrictive covenants were affirmed as enforceable by the U.S. Supreme Court's decision in *Corrigan v. Buckley* in 1926.[53]

Although most racially restrictive covenants in Washington were written by land developers and real estate companies, real estate boards were quick to champion their use. The National Association of Real Estate Boards, established in 1908 as "a clearing house for the best thought and best ideas developed everywhere in the business," was also instrumental in developing public policy related to the real estate business. In 1924, the Association developed an amendment to its code of ethics that stated: "A Realtor should never be instrumental in introducing into a neighborhood a character of property or occupancy, members of any race or nationality, or any individuals whose presence will clearly be detrimental to property values in that neighborhood."[54] Such boards were highly influential and could expel or ostracize members who did not adhere to the code of ethics.

---

[52] Gregory, James. "Understanding Racial Restrictive Covenants and their Legacy." Racial Restrictive Covenants Project, Washington State. University of Washington. Accessed March 20, 2024. https://depts.washington.edu/covenants/segregation.shtml.
[53] Ibid.
[54] Jones-Correa, Michael. "The Origins and Diffusion of Racial Restrictive Covenants." *Political Science Quarterly*, Vol. 115, No. 4 (Winter, 2000-2001), pp. 541-568. Stable URL: http://www.jstor.org/stable/2657609.

Spokane Realty Board's bylaws included the article above and also stated the following: [55]

> Article III. By-Laws—Duty of Members to Public: It shall be unethical for any member to be instrumental in introducing into a neighborhood a character of property or use, occupancy or ownership of property, or individual whose presence will clearly be detrimental to property values in that neighborhood. No instruction from any client or customer, except such as shall be applicable to changes of zone under the Zoning Ordinance of the City of Spokane, shall relieve the member from his responsibility strictly to observe this Article. Complaints for violations of this Article shall not be considered unless filed with the Spokane Realty Board within ninety (90) days after the introduction into a neighborhood of the character of property, use, occupancy, or ownership of property, member of the race or natiolity, or individuals to which objection is made. The Board of Directors shall have power to make all needful rules and regulations, not inconsistent herewith, to effectuate the object of this section.

Several years later, the Association drafted a model restrictive covenant document, which was shared with boards and homeowners' associations around the country.

Because it was easy to embed racially restrictive language in a plat (a map showing streets and property lines for new subdivision) the restrictions were put into place in newer neighborhoods and applied to all future owners and properties in that development. [56] For example, subdivided residential areas after 1926 were more likely to be in the North and South of Seattle, leaving the central neighborhoods less restricted. In Spokane, the first covenant is on record from 1928, but the use of these covenants grew exponentially by the 1940s.

Although some of the same language was repeated in multiple records, the specific exclusionary language in the restrictive deeds varied. For example, the South Seattle Land Company used the following language: "no part of said property hereby conveyed shall ever be used or occupied by any person of the Ethiopian, Malay, or any Asiatic race." In 1930, "Hebrews" was added to that list.[57] Some covenants list "Hawaiians" as an excluded race, while others specify the exclusion of people of Chinese, Japanese, African or Hindu



The South Seattle Land Company used the following language : "No part of said property hereby conveyed shall ever be used or occupied by any person of the Ethiopian, Malay, or any Asiatic race."

descent." [58] However, as Professor James Gregory of the Racial Restrictive Covenants Project at the University of Washington notes, "Every single deed restriction [they] found that specified a group of people covered African Americans. Almost as frequently, Asians were also excluded." He also notes that Jewish people were excluded in a number of documents, although not as

---

[55] 1. Dwayne Mack, *Black Spokane: The Civil Rights Struggle in the Inland Northwest* (Norman, OK: University of Oklahoma Press, 2022). p. 76.
[56] Ibid.
[57] Silva, Catherine. "Racial Restrictive Covenants History: Enforcing Neighborhood Segregation in Seattle." Seattle Civil Rights and Labor History Project. Accessed March 20, 2024. https://depts.washington.edu/civilr/covenants_report.htm.
[58] Note from article's author: To clarify, from the 1920s to 1940s terminology, "Hebrews" meant Jews; "Ethiopians" meant African ancestry; "Malays" generally referred to Filipinos; and "Asiatic" meant anyone from the Asian continent. See also: https://depts.washington.edu/civilr/covenants_database.htm.

4.  No person or persons of Asiatic, African or Negro blood, lineage or extraction shall be permitted to occupy a portion of said property, or any building thereon; except, domestic servant or servant may be actually and in good faith employed by white occupants of such premises.

5.  No house or part thereof, or other structure, shall be constructed or maintained upon said premises nearer to the front street margin than the line described upon the plat of Queen Anne Park as "building limit."

Upon the violation of any of the foregoing restrictions by the vendee, or the officers, agents, devisees, grantees or assignees, of the vendee, the entire estate in the herein described property shall revert to the grantor herein, its successors or assigns. - X

Dated this 15th day of July, A. D., 1929.

Geo. E. Morford          (Seal)

Gertrude Keen Morford     (Seal)

State of Washington,
                        )ss
County of King

On this 15th day of July, A. D. 1929, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared Geo. E. Morford and Gertrude Keen Morford, his wife, to me known to be the individuals described in and who executed the foregoing instrument, and acknowledged to me that they signed and sealed the said instrument as their free and voluntary act and deed for the uses and purposes therein mentioned.

Witness my hand and official seal hereto affixed the day and year in this certificate above written.

(E. S. Notarial Seal)                    Esther Solibakke

(Com. Ex. May 15, 1932)                  Notary Public in and for the State of Washington, residing at Seattle.

Filed for record at request of F. W. Keen Company, July 15, 1929 at 25 min. past 3 P. M.

IWP Hill                                  George A. Grant, County Auditor

*Figure 4 – Notarized example of text found in a covenant from 1929. Source: Racial Restrictive Covenants Project, University of Washington. https://depts.washington.edu/covenants/images/docs/1444%20restricted%20180.pdf*



ARTICLE 34.
A Realtor should never be instrumental in introducing into a neighborhood a character of property or occupancy, members of any race or nationality, or any individuals whose presence will clearly be detrimental to property values in that neighborhood.

*Figure 5 – Article in the National Association of Real Estate Board's Code of Ethics, 1924. https://www.scribd.com/document/86952803/1924-Code-of-Ethics-of-the-National-Association-of-REALTORS?doc_id=86952803&order=615629872*

frequently. Most prevalent, however, was language stating the property should not be used or occupied by any person "of any other race other than White or Caucasian." [59]

Racially restrictive covenants were adopted across Washington in the 1920s-1940s. By the time they were deemed unenforceable by the Supreme Court in *Shelley vs. Kraemer* in 1948, tens of thousands of racially restrictive covenants had been written into deeds throughout the state. The Racial Restrictive Covenants Project has identified 50,000 restricted properties. [60] It is also important to note that while the Supreme Court deemed racial covenants to be unenforceable, this did not stop their use. In fact, the Federal Housing Administration (FHA) worked with real estate groups and other players to circumvent the Supreme Court's decision in a concerted effort to promote segregation.

### *Racially Restrictive Covenants: Government Roles*

Although private actors led the charge to spread the use of racially restrictive covenants, various government actors played passive and active roles in ensuring that racially restrictive covenants were a viable tool to segregate neighborhoods and limit access to homeownership to White families.

The state was responsible for licensing real estate agents during the time when racially restrictive covenants were used. It continued to issue licenses to real estate agents affiliated with the National Association of Real Estate Boards even though the organization's Code of Ethics encouraged race-specific, exclusionary language until 1974. [61] Moreover, discrimination was not considered a basis for the state to suspend, revoke, or deny a real estate broker or agent's license until 1967. [62] In this way, the State indirectly endorsed the use of racially restrictive covenants by licensed real estate agents in Washington for several decades.

County auditors allowed restrictions to be recorded for decades as well, thereby actively supporting the practice. Even after the 1948 U.S. Supreme Court decision finding racial restrictive covenants unenforceable, county auditors in Washington continued recording such covenants. Two decisions by the State Supreme Court in the early 1960s (*Price v. Evergreen Cemetery Co. of Seattle* and *O'Meara v. Washington State Board Against Discrimination*, described below) strongly signaled that State courts would not intervene to prevent racial discrimination by property owners. Not until the passage of the federal Fair Housing Act in 1968, which made racial restrictive covenants illegal, did the practice cease. Specific examples of such restrictive covenants have been found in Spokane County through the 1950s, and in Snohomish County as late as 1967. [63]

Finally, the FHA, created in 1934 and discussed in more detail in the following section, provided a model racially restrictive covenant that builders could use to include in the deeds of the homes

---

[59] August 16, 2023. Authors' Interview with James Gregory. See also: https://depts.washington.edu/civilr/covenants.htm.
[60] Ibid.
[61] "An Apology from the National Association of Realtors®," www.nar.realtor, November 19, 2020, https://www.nar.realtor/magazine/real-estate-news/commentary/an-apology-from-the-national-association-of-realtors.
[62] "Acceptance of Real Estate Listings from Property Owners Who May Desire to Discriminate," Washington State Office of the Attorney General, 1967, https://www.atg.wa.gov/ago-opinions/real-estate-civil-rights-acceptance-real-estate-listings-property-owners-who-may-desire.
[63] Gregory, James. Understanding Racial Restrictive Covenants and their Legacy. Racial Restrictive Covenants Project Washington State. https://depts.washington.edu/covenants/segregation.shtml.

they built. Housing scholar Charles Abrams stated, "All [developers] had to do was copy the federal form and fill in the race or religion to be banned." [64]

### New Deal Era Housing Programs Institutionalized Redlining

During the time that exclusionary zoning practices and racially restrictive covenants created neighborhoods closed to Black families, the federal government embarked on a series of national efforts that encouraged the movement of White middle-class families to single-family housing in the suburbs. At the same time, the federal government limited the opportunities for families of color, regardless of their income, to do the same. [65]

During the Depression era, Congress approved two important laws that shaped homeownership opportunities in cities and towns across the country: the Home Owners' Loan Corporation (HOLC) Act in 1933 and the National Housing Act in 1934. These actions created loan opportunities that made homeownership affordable and attainable for White working- and middle-class families at scale.

The HOLC was established in 1933 to stabilize the housing market and protect homeownership as the nation faced unprecedented rates of foreclosure in the midst of the Great Depression. Its main purpose was to refinance mortgages that were at risk of foreclosure, and in doing so, the HOLC created the first 15-25-year (or longer) fixed-rate, fully amortizing mortgages. It also created a method of assessing risk and only offered these affordable mortgages to borrowers deemed by the government to be "less risky."

In doing so, the HOLC institutionalized a system that included race as a fundamental factor in determining the value of certain neighborhoods. The system utilized Residential Security Survey Forms that explicitly captured the percentage of "Negro" populations and other racial groups living in the area and then utilized that race-based data to assign a grade from A-D to a neighborhood. Neighborhoods receiving an "A" or "B" grade were "best" or "still desirable" areas in which to live, while neighborhoods receiving "C" and "D" grades were considered "declining" or "hazardous." With this system, the HOLC solidified an association between race and risk that still exists today. Redlining maps were created during this era for Seattle, Tacoma, and Spokane, and there are about a dozen examples of racist language in the HOLC records. [66] For example, the "Clarifying Remarks" for the Spokane, Liberty Park District, stated: "*Largely zoned for industry and business. Lot values are $5 per front foot or less. The territory immediately adjacent to Liberty Park is slightly better grade but proximity to largest negro (Black) concentration of the city precludes higher grading. This is the "melting pot" of Spokane and is extremely heterogeneous. The area is accorded a "low red" grade.*" In Seattle, area D-4 has only one comment justifying its hazardous designation: "*This is a Negro area of Seattle.*"

[64] Abrams, Charles. The Segregation Threat in Housing. in Straus, Nathan, *Two-Thirds of a Nation: A Housing Program.* Alfred A. Knopf, New York, 1952.
[65] Rothstein, *The Color of Law*, p. 60.
[66] Robert K. Nelson, LaDale Winling, Richard Marciano, Nathan Connolly, et al., "Mapping Inequality," American Panorama, ed. Robert K. Nelson and Edward L. Ayers, https://dsl.richmond.edu/panorama/redlining/.

**Seattle HOLC Residential Security Map, 1936. Author T.H. Bowden, (Field Agent, HOLC, Washington D.C.) said the following of two neighborhoods receiving hazardous designations:**

D-4 Area:
This is the Negro area of Seattle.

D-5 Area:
This district is composed of various mixed nationalities. Homes are occupied by tenants in a vast majority. Homes generally old and obsolete in need of extensive repairs.

**Tacoma HOLC Residential Security Map, 1929. Said of D7:**

5. CLARIFYING REMARKS: This might be classed as a 'Low Yellow' area were it not for the presence of the number of Negroes and low class Foreign families who reside in the area. Lot values run from $2.00 to $5.00 per front foot.

**Tacoma HOLC Residential Security Map, 1929. Said of D1, a small red block surrounded by blue districts:**

5. CLARIFYING REMARKS: Three highly respected Negro families own homes and live in the middle block of this area facing Verde Street. While very much above the average of their race, it is quite generally recognized by Realtors that their presence seriously detracts from the desirability of their immediate neighborhood.

**Spokane HOLC Residential Security Map, 1938. Said of the D10, Liberty Park District:**

CLARIFYING REMARKS: Largely zoned for industry and business. Lot values are $5 per front f or less. The territory immediately adjacent to Liberty Park is slightly better grade but p imity to largest negro concentration of the city precludes higher grading. This is the "me ing pot" of Spokane, and is extremely heterogeneous. The area is accorded a "low red" grad

*Source: Robert K. Nelson, LaDale Winling, Richard Marciano, Nathan Connolly, et al., "Mapping Inequality," American Panorama, ed. Robert K. Nelson and Edward L. Ayers, accessed September 13, 2023, https://dsl.richmond.edu/panorama/redlining/.*

The second major New Deal Era housing law, the National Housing Act of 1934, created the Federal Housing Administration (FHA). The FHA was intended to facilitate safe and sound mortgage lending and alleviate unemployment, particularly in the construction industry. It did this by insuring loans for construction and sale of newly built homes. The FHA built on the practices of the HOLC, adding minimum construction standards and lower down payment requirements in A and B graded neighborhoods, making it much easier for working- and middle-class families to achieve homeownership.

However, this opportunity was largely only extended to White families, as the FHA's procedures were influenced by the methodology of assessing risk that was adopted by the HOLC. These principles were encapsulated in the FHA Underwriting Manual, which stated, "If a neighborhood

is to retain stability, it is necessary that the properties continue to be occupied by the same social and racial classes." [67]

Importantly, the FHA's Underwriting Manual also advocated the use of deed restrictions, both with respect to the types of structures built and the people who could occupy them. The Manual notes that recorded deed restrictions are the most effective way to preserve neighborhood stability and maintain healthy property values and should include, among other things, "(g) Prohibition of the occupancy of properties except by the race for which they are intended." [68] These provisions ensured that only a few FHA-insured loans were made to Black borrowers or other borrowers of color, and very few loans were made in urban neighborhoods.

The FHA's policies had a segregating effect on these areas because the FHA recommended that developers not sell new homes to Black buyers. As noted in the prior section regarding racially restrictive covenants, the FHA even included a model restrictive covenant that builders could include in their home deeds to facilitate an easier financing process.

In addition to limiting where financing was issued based on the racial makeup of a neighborhood, the FHA's race-based risk criteria also impacted the value of properties in all neighborhoods. When a yellow- or red-coded neighborhood managed to receive FHA insurance, its appraised value was often much lower than similar properties in other neighborhoods. Consequently, properties in racially diverse neighborhoods were undervalued because, as stated in the FHA Underwriting Manual, the neighborhoods' "racial aspects render[ed] the locations actually noncompetitive." [69]

The HOLC and FHA's discriminatory, race-based construct for valuing properties also served as a foundation for the U.S. appraisal system. The consideration of race as a factor in determining the worth of residential real estate properties as well as broader communities is a problem that still impacts millions of communities and consumers. State and local governments as well as private actors also helped perpetuate the discriminatory valuation of properties by supporting the use of racial covenants and neglecting to provide effective oversight of real estate and lending professionals working in the state of Washington.

It is important to note that the precursor agencies to what is presently known as the Washington State Department of Financial Institutions were created during this period. The Washington State Division of Banking was created in 1907 [70] and the Washington State Division of Savings and Loan Associations was established in 1933. [71] The latter was formed to regulate savings and loan associations of state-chartered banking institutions. These state-chartered banks provided loans through the HOLC and FHA, perpetuating housing discrimination in Washington. The state failed to regulate the use of redlining by state-charted banks during this period.

---

[67] Federal Housing Administration Underwriting Manual, 1938, cited in Abrams, Charles, "The Segregation Threat in Housing," in Straus, Nathan, "Two-Thirds of a Nation: A Housing Program," Alfred A. Knopf, New York, 1952.
[68] FHA Underwriting Manual. 1938. Accessed on March 20, 2024. https://www.huduser.gov/portal/sites/default/files/pdf/Federal-Housing-Administration-Underwriting-Manual.pdf.
[69] Majumdar, Rajeev. Racially Restrictive Covenants in the State of Washington: A Primer for Practitioners. 30 SEATTLE U. L. REV. 1095. 2007. https://digitalcommons.law.seattleu.edu/sulr/vol30/iss4/11/, p. 1102.
[70] "Traditional Financial Regulation to FinTech Regulation: A Brief History," Department of Financial Institutions, accessed March 20, 2024, https://dfi.wa.gov/fintech/timeline#:~:text=1993,under%20the%20Department%20of%20Licensing).
[71] SB 239 (1933). https://leg.wa.gov/CodeReviser/documents/sessionlaw/1933c183.pdf?cite=1933%20c%20183%20%C2%A7%203.





Home Owners' Loan Corporation Security Maps for
Seattle (Washington, January 10, 1936) and
Spokane, Washington, February 1, 1938

Source: Mapping Inequality

### New Housing Authorities Create Public Housing

Housing demand was so high that in 1933 the National Industrial Recovery Act created the Public Works Administration to develop low-cost housing to address the shortage for middle and working-class families and people of color. This act was followed by the Housing Act of 1937, which established the United States Housing Authority (USHA) and provided $500 million in loans to state and local agencies for low-cost housing. [72]

The Housing Act of 1937 inspired the development of several housing authorities in Washington during the late 1930s and early 1940s. The creation of these new housing authorities by municipalities was directly enabled by the passage of two laws in 1939 by the Washington State Legislature. The first of these laws, the Housing Authorities Law, enabled the creation of housing authorities, and the second, the Housing Cooperation Law, authorized municipalities to do business with the newly created housing authorities. [73]

The first housing authority in the state was the Seattle Housing Authority (SHA), established in 1939 by the Seattle City Council. The first project developed by the newly created SHA was a low-income housing development called Yesler Terrace. Jesse Epstein, who served as the first executive director of the SHA, was instrumental in ensuring that the development was integrated. Yesler Terrace became the first integrated public housing development in the country. [74] Yet, although Epstein insisted on not segregating Yesler Terrace, he capped Black occupancy in the project at 20 percent, an effort he described as necessary for the success of the project. "We must limit the number of Negros if we are to achieve integration. Keep in mind that we are determined on that. Coloreds and Whites will live side by side; this in itself is revolutionary." [75]

Although it provided the option for residents who previously lived on the site to return, only 25 of the 1,000 recorded residents returned to the public housing that was built. Thus, the project displaced many people who had been living there, 84 percent of whom were non-White families (including Filipino, Chinese, Japanese, Black, and Native American residents). [76]

The King County Housing Authority was established shortly after in 1939, and the Tacoma Housing Authority was established in 1940. The federal government managed developments in other parts of the state without housing authorities through World War II and the decade after. For example, the Victory Heights and Coplen Park housing projects in North East Spokane were built in 1943 and had 1,250 units of affordable housing. Although Victory Heights was non-segregated and home to Black, White, and Japanese residents, the FHA-funded Coplen Park Project segregated Black families into a small section within the project. [77]

[72] "75th Anniversary of the Wagner-Steagall Housing Act of 1937," FDR Presidential Library &#38; Museum, accessed March 20, 2024, https://www.fdrlibrary.org/housing.
[73] Chesley, Frank. Seattle City Council resolutions established the Seattle Housing Authority on March 13, 1939." HistoryLink. Accessed online at https://www.historylink.org/File/8992.
[74] Seattle Housing. "History." Accessed online at: https://www.seattlehousing.org/about-us/history
[75] Taylor, Quintard (1995). *Columbia: The Magazine of Northwest History, Summer 1995.* Pp. 26-32. Accessed online at: https://www.washingtonhistory.org/wp-content/uploads/2021/01/1995-v9-n2-final.pdf.
[76] ECONorthwest (2023). "Redlining and Wealth Loss: Measuring the Historical Impacts of Racist Housing Practices in King County." Accessed online at: https://static1.squarespace.com/static/597fb96acd39c34098e8d423/t/64d3ef54dfdf9e68af64efe0/1691610976401/Redlining+and+Wealth+Loss+Final.pdf.
[77] Mack, *Black Spokane*, p. 54.

When World War II began, the demand for housing authority-provided homes greatly increased. The SHA, for example, began to shift its focus to more middle-income housing for veterans and military families. Thus, units became less available for lower-income people and people of color. By the 1940s, the vast majority of residents in SHA's housing were White, and many Black and Asian families moved to poor-quality war-time housing built as temporary housing. [78] By focusing on housing middle-income Whites, either by using quotas for people who were Black or through explicit exclusion, early housing authorities helped White residents build the wealth needed to buy a home. These advantages, plus those provided by the GI Bill for returning veterans, fueled the post-World War II suburban expansion and subsequent disinvestment in urban housing. This will be addressed more fully in the sections that follow.

### *Population and Demographic Snapshot in 1940*

| TOTAL POPULATION | WHITE | BLACK | AMERICAN INDIAN/ ALASKA NATIVE | ASIAN PACIFIC ISLANDER [79] | OTHER RACE | HISPANIC ORIGIN [80] | WHITE NON-HISPANIC |
|---|---|---|---|---|---|---|---|
| 1,736,191 | 1,698,147 | 7,424 | 11,394 | 19,226 | X | 2,398 | 1,695,749 |

Table 2 - Washington's Population by Race in 1940, Source: U.S. Census Bureau.

## World War II Ushers in Demographic Shifts

With the advent of World War II and during the Second Great Migration of the 1940s, Black and Latino migrants came to Washington in sizable numbers. At the same time, the same anti-Japanese sentiment that had led to Alien Land Laws in the 1920s laid the foundation for the internment of Japanese Americans, a process that stripped thousands of families of land and wealth across the state between 1941 and 1946.

### *Black Migration to Washington Increases*

Due to World War II, Seattle's Black population quadrupled within a 10-year period. Black migration also fueled demographic shifts in the populations on the eastern side of the state. Spokane's Black population, for example, went from 644 people in 1940 to an estimated 1,200 people in 1945. [81]

One notable reason for these increases was the passage of federal Executive Order 8802 which ramped up defense production by banning racial discrimination in government contracts at defense plants. A vast amount of military and defense-related work at the time was centered in the Pacific Northwest, and companies like the Boeing Airplane Company began hiring Black employees. Researchers report that Boeing only hired Blacks as janitors and otherwise discriminated against them by not paying them equal wages for equal work. [82]

---

[78] Caldbick, John. "Seattle Housing Authority, Part 1." HistoryLink, March 27, 2014. https://www.historylink.org/File/10760.
[79] The 1940 census included a Japanese population of 14,565, Chinese population of 2,345, 1940 Filipino population of 2,222, a Hawaiian and other Pacific Islander population of 59, a 'Hindu' population of 23, and a Korean population of 12. See: https://www.historylink.org/File/9454#:~:text=The%201940%20U.S.%20Census%20counted,the%20rate%20of%20population%20growth.
[80] The 1940 census estimated that there were 2,398 persons white persons in Washington state of Spanish mother tongue. See: https://www.historylink.org/File/9454#:~:text=The%201940%20U.S.%20Census%20counted,the%20rate%20of%20population%20growth.
[81] Mack, *Black Spokane*, p. 54.
[82] Rothstein, *The Color of Law*.

### Latino Migration to Washington

Another notable demographic shift during World War II was the increased migration of Mexican laborers. News articles and accounts from the time document a shortage of agricultural labor beginning with the start of the U.S. involvement in the war in 1941. In 1942, Mexico and the United States entered a temporary contract labor program called the *Bracero Program*, which allowed Mexican immigrants to come to the U.S. to address the rail and agricultural labor shortage that resulted from the war. About 4,400 workers came from Mexico to Washington, concentrated in the Yakima Valley. [83] The *braceros* entered an agreement through a legally binding contract with the farmers they worked for that spelled out minimum standards of housing, among other terms. However, accounts from the time show that those standards were not upheld by the farmers and migrant workers in the *bracero* program were essentially unable to take any recourse. [84]

This migration was paired with the increased migration of Texas-born and southwestern Mexican Americans northward as opportunities to work increased in the Pacific Northwest. Farmers preferred the Tejano and Chicano families migrating northward over the braceros, who were Mexican nationals and single men. Thus, the farmers in the region began a campaign to recruit workers from Colorado, Wyoming, and the southwestern states. Latinos who served in the war, some who were assigned to the region, moved to Washington and settled in the area long term.

### Housing Discrimination and Segregation in the Tri-Cities Area

Similarly, the Tri-Cities area saw notable Black migration for the first time, with around 15,000 Black workers recruited to work at the new Hanford site that was built to produce plutonium for the atomic bomb. [85] Others came to work at the Pasco Naval Air Station during the war. To put these numbers in perspective, Pasco had only 27 Black residents before World War II. Because the influx was related to military projects, and the military was still segregated at the time, a system of segregation quickly formed in Hanford and the surrounding sites. [86]

Black workers lived in segregated barracks and dining and worship were also fully segregated on the Hanford site. Richland was expanded into a planned government community, and houses were built for the White workers at Hanford but not the Black workers. Thus, many Black Hanford workers left the Tri-Cities as the war ended. There was no question that this occurred by design. Washington Governor Arthur Langley told Hanford's commanding officer that he hoped "arrangements can be made to return most of the construction workmen back to their original centers of activities, particularly the Negroes." [87]

The selection and building of the Hanford site also displaced around 2,300 people, and while those who owned and farmed land in the region received some compensation, the Native

---

[83] Aguilar, Ricardo and Yvonne Yabro-Bejarano. Aggressive Regionalism: Commentary. Center for the Study of the Pacific Northwest. Accessed on March 20, 2024.
https://www.washington.edu/uwired/outreach/cspn/Website/Classroom%20Materials/Reading%20the%20Region/Aggressive%20Regionalism/Commentary/12.html#:~:text=Over%20the%20course%20of%20the,4%25%20(Gamboa%201990).
[84] Gamboa, Erasmo. "Mexican Migration into Washington State: A History, 1940-1950." The Pacific Northwest Quarterly 72, no. 3 (1981): 121–31. http://www.jstor.org/stable/40490704.
[85] Newman, Alexis. African Americans and the Manhattan Project, Richland, Washington (1942-1945). Black Past. July 23, 2017. https://www.Blackpast.org/african-american-history/african-americans-and-manhattan-project-richland-wa-1942-1945/
[86] Cary, Annette. "'Tri-Cities was worse than the South.' Remnants of housing discrimination linger." Tri City Herald, February 24, 2023. https://www.tri-cityherald.com/news/local/article272226033.html
[87] Ibid.

Americans from four tribes (the Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes and Bands of the Yakama Nation, the Nez Perce Tribe in the Columbia Basin, and the Wanapum Tribe) who accessed or lived on the land taken by the project were not, although they were granted visitation rights in 1943 that were later upheld by the Washington Supreme Court in 1957. [88]

Across the Columbia River from Richland and the Hanford site, White residents of Pasco made it clear that Black migrants were not welcome in most of the city. Black residents were forced to live on the east side of the city, demarcated by the Lewis Street Underpass. East Pasco had no paved streets, no trash collection, and no sewage system. Housing options for Black families were limited. [89] In 1948, a Washington State College study found that although only 6 percent of White families in Pasco lived in one room, 78 percent of Black families lived in one room. Nevertheless, Black families remained in Pasco in significant numbers through and after the war. By 1950, 20 percent of Pasco's population was Black. [90]

The third city making up the Tri-Cities region, Kennewick, was even more restrictive during this timeframe. Kennewick was a "sundown" town that prided itself on being "lily White," according to Robert Bauman, a history professor at Washington University Tri-Cities. [91] A sign on the Pasco-Kennewick Bridge, also known as the Green Bridge, stated that Blacks were not allowed in Kennewick after sunset. [92] Several accounts from the time recount that this policy was fully enforced by the police during the 1940s. [93]

### Japanese American Internment

On December 7, 1941, when Japan bombed Pearl Harbor, the effects on Japanese Americans living in Washington were immediate. Just days later, the FBI arrested mostly first-generation Japanese in King County, and Japanese people were ordered to stay away from transit hubs. Bank accounts and business licenses were suspended. [94]

---

[88] "Civilian Displacement: Hanford, WA," Atomic Heritage Foundation. July 21, 2017. https://ahf.nuclearmuseum.org/ahf/history/civilian-displacement-hanford-wa/
[89] "Lewis Street Underpass." National Park Service, Accessed on March 20, 2024. https://www.nps.gov/places/000/lewis-street-underpass.htm.
[90] Cary, Annette. "'Worse than the South.' Remnants of housing discrimination linger in Eastern WA." The News Tribune, February 24, 2023. https://www.thenewstribune.com/news/state/washington/article272597982.html
[91] Ibid.
[92] "Green Bridge Historical Marker." National Park Service. Accessed on March 20, 2024. https://www.nps.gov/places/green-bridge-historical-marker.htm
[93] See: Hernandez, Zochitl, "Black History Month: The historiy behind how the Black community helped build the Tri-Cities despite segregation and racism." NBC Right Now. February 15, 2024. https://www.nbcrightnow.com/tricities/Black-history-month-the-history-behind-how-the-Black-community-helped-build-tri-cities-despite/article_1fb7cf80-8eb6-11ec-8291-97def23baf9c.html and Cary, "Worse than the South."
[94] Krona, Rochelle. "World War II and Japanese Internment in the Seattle Star.'" The Seattle Civil Rights and Labor History Project. https://depts.washington.edu/civilr/news_seattle_star.htm.

*Seattle Star* articles from the same week following the bombing include accounts of government action to detain and defend the city against Japanese Americans. Seattle's Mayor, Earl Millikan, ordered 51 Japanese Americans to be detained, saying: "Seattle must have tolerance toward American-born Japanese, most of whom are loyal. But I also want to warn the Japanese that they must not congregate or make any utterance that could be used as ground [for] reprisal." Additionally, the Seattle FBI office rounded up 122 Japanese, 27 Germans, and 3 Italians on December 9, 1941. Along with these actions, there are many accounts of both government and private individuals making statements about not condemning all Japanese residents in Seattle for the actions of Japan. [95]

Just months later, President Roosevelt signed Executive Order 9066, authorizing the evacuation of Japanese Americans to internment camps for the duration of the war. Leaders throughout Washington, including Governor Arthur B. Langlie, vocally supported the order. The order was popular, and there are reports of American Legion posts in Spokane, Elma, Yakima, Seattle, Wenatchee, Wapato, Naches, Toppenish, and Richland voicing support for the removal of Japanese residents. [96]

Seattle's Bainbridge Island, then home to 274 Japanese Americans, was the first site of forced evacuation. [97] Japanese Americans were taken to assembly centers before being moved to more permanent internment camps in other states. [98] They had not committed any crime or been charged with any act of espionage. The justification was simply their ancestry. [99]



**Bainbridge Island (Wash.) evacuation** -- Group of young evacuees wave from special train as it leaves Seattle with Island evacuees, March 30, 1942. Source: Library of Congress.

In an interview about the camps, Eileen Yamada Lamphere, whose parents were interned prior to her birth, noted "that [the camps] were surrounded by barbed wire. That they only had a single light bulb and a potbelly stove. There was no running water. There were no closets. There were no chest of drawers. There were metal cots, and for some of them, they had to stuff their own mattresses with straw." [100] While interned, Japanese American detainees took extremely low-

---

[95] Ibid.

[96] Ibid.

[97] University Libraries, University of Washington. "Bainbridge Island." https://www.lib.washington.edu/specialcollections/collections/exhibits/harmony/exhibit/bainbridge.

[98] Syed, Maleeha. "Life in incarceration: Japanese Americans in WA reflect on WWII." *Crosscut*, PBS. March 8, 2022. https://crosscut.com/equity/2022/03/life-incarceration-japanese-americans-wa-reflect-wwii.

[99] Takami, David. "Japanese Americans in Seattle and King County." History Link. November 6, 1998. https://www.historylink.org/File/231

[100] Syed, *Life in incarceration*.

paying jobs in poor working conditions. [101] Meanwhile, many second-generation Japanese Americans joined the armed forces and served the U.S. in the military.

**SPECIFIC WORLD WAR II-ERA ACTIONS TAKEN BY STATE AND LOCAL GOVERNMENTS TO LIMIT LAND AND HOME OWNERSHIP BY MARGINALIZED GROUPS**

- A **failure to prohibit housing discrimination** by all levels of government (especially at a time when discrimination was banned in employment) led to the segregation of Black workers as they migrated to Washington for defense-related jobs during the war.

- Local police in the Tri-Cities area, exercising the State's policing powers, enforced **"sunset town" policy** of keeping Black residents out of Kennewick.

**Federal Government Actions**

- The development of the **Hanford site of the Manhattan Project** in Richland by the federal government displaced Native Americans and created whites-only living conditions for its employees, leaving new-to-the-region Black workers segregated to a small area of East Pasco.

- The federal government **ordered the internment of Japanese Americans** in Washington and other states on the Pacific, forcing them to leave their homes and live in internment camps during the war. As a result, Japanese immigrants and Japanese Americans lost land and wealth that they and their families had established since migrating to the area. This internment was supported by Washington's Governor and Seattle's Mayor at the time, among other government officials.

- The use of **racially restrictive covenants** and **HOLC redlining maps** continued through this era, reinforced by government policies and practices.

## The Post-World War II War Era in Washington

After three Supreme Court cases upholding the detainment of Japanese Americans, a case involving Mitsuye Endo, a second-generation Japanese American woman who had been interned, was heard by the U.S. Supreme Court in 1944. On December 18, 1944, the Supreme Court ruled that the government could not detain citizens who were loyal to the United States. By 1946, the internment camps were closed and emptied. [102]

---

[101] Hinnershitz, Stephanie. "Japanese American Incarceration: The Camps and Coerced Labor," WWII The National WWII Museum. https://www.nationalww2museum.org/war/articles/japanese-american-incarceration-camps-coerced-labor. February 18, 2022.
[102] Buck, Stephanie. "Overlooked No More: Mitsuye Endo, a Name Linked to Justice for Japanese-Americans." *New York Times.* November 2019. https://www.nytimes.com/2019/10/09/obituaries/mitsuye-endo-overlooked.html.

Many Japanese Americans who had been imprisoned were given $25 and a one-way train ticket to re-establish their lives. [103] Many did not have a home to return to, because they had been prohibited from owning property in decades prior to internment. Some who had owned homes returned to find them destroyed. Land that had been farmed by Japanese Americans in the Seattle area was actively being developed into residential communities when they returned, [104] and returning families often faced lingering anti-Japanese sentiment in cities along the West Coast. [105]

In 1948, President Truman signed the Japanese-American Evacuation Claims Act, which provided $37 million to 26,000 claimants, a small fraction of the actual losses incurred by Japanese Americans. [106] It was not until 1988 that the federal government apologized for the Japanese-American incarceration through the passage of the Civil Liberties Act and provided a total of $1.6 billion ($20,000 per surviving person) in restitution to persons of Japanese ancestry who were interned during World War II. [107]In 1983, Washington also passed a bill that provided $5,000 to Japanese American state employees who were fired or forced to resign due to internment. The Washington State Legislature also passed a bill that allowed municipalities to grant redress in 1986. [108] All of these actions of redress were limited to those who were interned themselves and did not include direct descendants.

In 1983, Washington also passed a bill that provided $5,000 to Japanese American state employees who were fired or forced to resign due to internment. The State Legislature also passed a bill that allowed municipalities to grant redress in 1986.[109] All of these actions of redress were limited to those who were interned themselves and did not include direct descendants who also suffer continuing harm from the government's discriminatory actions.

[103] Pearson, Bradford. "For Japanese-Americans, Housing Injustices Outlived Internment," New York Times. August 20, 20202. https://www.nytimes.com/2020/08/20/magazine/japanese-internment-end-wwii-trailer-parks.html.
[104] Neiwert, David. "Bellevue College faces furor over attempt to whitewash a city father's white supremacist legacy." *Daily Kos.* August 20, 2020. https://www.dailykos.com/stories/2020/2/29/1922855/-Bellevue-College-faces-furor-over-attempt-to-whitewash-a-city-father-s-white-supremacist-legacy.
[105] National WWII Museum. "The Return of Japanese Americans to the West Coast in 1945." March 26, 2021. https://www.nationalww2museum.org/war/articles/return-japanese-americans-west-coast-1945.
[106] Densho Encyclopedia. "Japanese American Evacuation Claims Act," October 5, 2020. https://encyclopedia.densho.org/Japanese_American_Evacuation_Claims_Act/.
[107] Public Broadcasting Service. "Civil Liberties Act of 1988." https://www.pbs.org/childofcamp/history/civilact.html.
[108] van Harmelen, Jonathan. "Redress for fired state, county, and city employees before 1988." Densho Encyclopedia. February 1, 2024. https://encyclopedia.densho.org/Redress%20for%20fired%20state,%20county,%20and%20city%20employees%20before%201988
[109] https://encyclopedia.densho.org/Redress%20for%20fired%20state,%20county,%20and%20city%20employees%20before%201988

### The GI Bill's Housing Provisions

In 1944, President Roosevelt passed the GI Bill, which provided low-interest mortgages and other low-cost loans to veterans of World War II. The GI Bill is credited with "lifting a generation into the middle class." [110]  However, Black veterans were shut out of many benefits of the bill afforded to their fellow White veterans. For example, the newly formed Veterans Administration's (V.A.) appraisers adopted the FHA Underwriting Manual, which included guidance that "incompatible racial groups should not be permitted to live in the same communities" and recommended that highways be built to separate White neighborhoods from Black neighborhoods. [111] [112] In addition, although the V.A. provided mortgage guarantees through the GI Bill, it left the origination of the mortgage to a private lender or bank, which meant Black veterans were still subject to the discriminatory practices of private industry. [113]

Redlining by lenders, including state-regulated banks and pervasive housing discrimination by state-licensed real estate agents across Washington made it nearly impossible for Black veterans to reap the benefits of the GI Bill. As noted in Dwayne Mack's book *Black Spokane*, Spokane real estate agents and homeowners denied Black families the opportunity to purchase property. Spokane advocates Carl Maxey of the NAACP and J.W. Strong of the Spokane Chapter of the Brotherhood of Sleeping Car Porters both noted cases in the 1950s "where colored veterans could not take advantage of G.I. loans because of the refusal of certain real estate firms to sell them property." [114]

### The Indian Relocation Act

In 1956, the federal government passed the Indian Relocation Act, which ended the protected trust status of Indian-owned lands. It also sought to force Native Americans to assimilate by decreasing subsidies for those living on reservations and offering financial incentives for Native Americans who moved to select cities. [115] As a result of these national efforts, Native Americans arrived in Seattle in larger numbers, but were often unable to afford housing and were preyed upon because of their lack of familiarity with urban living. [116]

### Urban Renewal Begins

During the post-World War II period, urban redevelopment began to spread due to the prevalence of substandard housing in many cities around the country. Supported by federal resources for "slum clearance" in 1949 and 1954, the Planning Commission in Seattle began to identify areas that might be considered eligible for redevelopment.

---

[110] Lawrence, Quil. "Black vets were excluded from GI bill benefits — a bill in congress aims to fix that." NPR. October 18, 2022.
[111] Rothstein, *The Color of Law,* p 70.
[112] Gross, Terry. "A 'Forgotten History' Of How The U.S. Government Segregated America." NPR. May 3, 2017.
https://www.npr.org/2017/05/03/526655831/a-forgotten-history-of-how-the-u-s-government-segregated-america.
[113] Blakemore, Erin (2023). "How the GI Bill's Promise Was Denied to a Million Black WWII Veterans." HISTORY.
https://www.history.com/news/gi-bill-black-wwii-veterans-benefits.
[114] Mack (2022). p. 86.
[115] Seattle Urban Native Nonprofits. Our History | Seattle Urban Native Nonprofits (seattleurbannatives.org).
[116] Rachel Kramer, Harry Maher, Kevin Klingbeil, Nancy Pindus, Megan Knox, and Lonny Macy, "Assessment of the Housing Needs of American Indians, Alaska Natives and Native Hawaiians in Washington," Report to the Washington State Department of Commerce, March 24, 2022, available at https://www.commerce.wa.gov/wp-content/uploads/2022/04/CommerceReports_2021_CSHD_NA-Housing_4.26.22_Final.pdf.

In 1957, the Washington State Legislature passed the Urban Renewal Law, [117] authorizing jurisdictions to seek federal support and granting them authority to decide whether "blighted areas" existed and to designate areas for an urban renewal program, supply funds and services to aid urban renewal projects, and acquire property through the power of eminent domain. [118]

The practice of urban renewal displaced more than 300,000 people nationwide. Most of the displaced were people of color. As Brent Cebul, an urban historian at the University of North Carolina, Charlotte, noted, "Redlining created the crisis that urban renewal was created to solve." As was the case in many other cities, by the late 1960s, 491 families had been displaced by urban renewal projects in Seattle, 73 percent of whom were families of color. [119] The largest of these projects in Seattle was for the Yesler-Atlantic neighborhood, which began in 1966. [120]

Similar urban renewal projects were undertaken in Tacoma, where 31 percent of the households who were displaced were of color. In the neighborhood most affected, Center Street, a total of 98 families were displaced, 41 of whom were of color. Urban renewal projects were also undertaken in Vancouver, Hoquiam, and Anacortes [121] until 1974, when Congress passed the Housing and Community Development Act, ending urban renewal and creating the Community Development Block Grant Program. [122]

### Population and Demographic Snapshot in 1960

| TOTAL POPULATION | WHITE | BLACK | AMERICAN INDIAN/ ALASKA NATIVE | ASIAN PACIFIC ISLANDER | OTHER RACE | HISPANIC ORIGIN | WHITE NON-HISPANIC |
|---|---|---|---|---|---|---|---|
| 2,853,214 | 2,751,675 | 48,738 | 21,076 | 29,253 | 2,472 | 14,258 [123] | N/A |

Table 3 - Washington's Population by Race in 1960, Source: U.S. Census Bureau

---

[117] [1957c42.pdf (wa.gov)](#)
[118] "Urban Renewal in Seattle: Laying the Groundwork." Seattle Municipal Archives. Accessed on March 20, 2024. https://www.seattle.gov/cityarchives/exhibits-and-education/online-exhibits/urban-renewal-in-seattle/laying-the-groundwork.
[119] Digital Scholarship Lab, "Renewing Inequality," American Panorama, ed. Robert K. Nelson and Edward L. Ayers, accessed September 17, 2023, https://dsl.richmond.edu/panorama/renewal/#view=0/0/1&viz=cartogram&cityview=holc&city=seattleWA&loc=12/47.6080/-122.3230&text=citing.
[120] "Urban Renewal: Yesler-Atlantic "T" Seattle Municipal Archives. Accessed on March 20 2024. https://www.seattle.gov/cityarchives/exhibits-and-education/seattle-segments/urban-renewal#:~:text=In%201959%2C%20a%20City%20ordinance%20designated%20the%20area,redevelopment%2C%20or%20a%20combination%20thereof%22%20with%20federal%20dollars.
[121] Digital Scholarship Lab, "Renewing Inequality," American Panorama, ed. Robert K. Nelson and Edward L. Ayers. https://dsl.richmond.edu/panorama/renewal/.
[122] "Urban Renewal in Seattle: Evolution of Urban Renewal." Seattle Municipal Archives.  Accessed on March 20, 2024. https://www.seattle.gov/cityarchives/exhibits-and-education/online-exhibits/urban-renewal-in-seattle/evolution-of-urban-renewal.
[123] Hispanic/Latino was not counted as a separate ethnicity in the 1960 census. However, it did note that there were 11,076 Washington residents born in Mexico and 3,182 born in other Latin American countries. See: https://www.historylink.org/File/9341#:~:text=Population%20and%20Growth,from%201950%20count%20of%20732%2C992).

## Racial Steering and Violence Keep Neighborhoods Segregated while Civil Rights Advocates Take Action Across Washington

As the civil rights movement in the U.S. began to take root in the 1960's, the civil rights era in Washington was shaped by smaller, intersecting movements led by the Black, Asian, Jewish, Chicano, Native American, and LGBTQ rights advocates.

Housing discrimination continued to be an obstacle for members of marginalized racial and ethnic groups through the 1950s and into the 1960s. Actions by real estate agents, lenders, and insurance companies were accompanied by community violence, police actions, and the lack of intervention by government agencies. Accounts from homebuyers in Washington from the time paint a vivid picture of continued actions by real estate agents paired with violence and intimidation from the larger White community.

- Frank Hopkins, a Black café owner, told *The Spokesman-Review* in 1961 what happened when he bought a house on the North Side, outside of an established Black area. Just as he was about to move in, someone broke 28 windows in one night. "I just had to let it go," he said. [124]

- CJ Mitchell, an employee at the Hanford Site and then G.E., said the following of his challenges buying a home in the Tri-Cities: "I couldn't buy a house in Richland because I was Black, you know, from real estate people. And that was as late as 1965…The guy, he just flat told me, said because 'you're Black, we won't sell you a house. I can't take a chance on my investment. And then there was a gentleman by the name of Everdy Green had a real estate company. He called me up and he says 'well, he said I hear you're having problems getting a house, and I'll sell you anything you want.' And I said 'yeah, I know you will, because your prices eliminate me. I said the level of your homes, what they cost, I said I'm just making a weekly salary. I can't afford one of your homes.'" When CJ Mitchell was finally able to buy a home, he faced racist threats. "And then, where I live now…first night I was there I picked up the phone, phone rings, some guy said, this is the Ku Klux Klan he said, and you're next. That was what I got on the phone." [125]

- Rev. J.C. Brooks of Bethel African Methodist Episcopal Church in Spokane told *The Spokesman-Review* that a Black person looking for a house would be steered to the "area for Negroes," which is the East Central neighborhood. [126]

- University of Washington football player, Joe Jones, noted that "after returning from the Rose Bowl game, [he] was turned away at six apartment houses because he was a negro." [127]

Housing laws became a key focus of civil rights advocates, and the pursuit of housing justice played out in both local and federal courts.

This period also brought the creation of new councils, committees, and boards to respond to complaints of discrimination. One example was the Greater Seattle Housing Council, which was

---

[124] Kershner, Jim.  "Breaking Down the Barriers: Segregation is an Ugly, Not-So-Well-Known Part Of Spokane's History." *The Spokesman-Review. May 18, 1997.* https://www.spokesman.com/stories/1997/may/18/breaking-down-the-barriers-segregation-is-an-ugly/.

[125] Core, Dublin. *Interview with CJ Mitchell.* October 30, 2013. http://www.hanfordhistory.com/items/show/40.

[126] Kershner, Breaking Down the Barriers..

[127] The Seattle Open Housing Campaign, 1959-1968. Seattle Municipal Archives. Accessed on March 20, 2024. https://www.seattle.gov/cityarchives/exhibits-and-education/online-exhibits/seattle-open-housing-campaign.

formed in 1956 to encourage dialogue between open housing advocates and real estate professionals. Another was the Washington Advisory Committee to the U.S. Commission on Civil Rights (WACUSCCR), which documented obstacles for Black Washingtonians to rent and purchase quality homes. [128] The Washington State Board Against Discrimination (WSBAD) was also founded to address employment discrimination during this period. [129]

As noted earlier, even after racially restrictive covenants were made unenforceable by the 1948 decision in *Shelley vs. Kramer*, deed restrictions were still being recorded after 1948. The Washington State Legislature attempted to address racial segregation and pervasive housing discrimination by passing the Omnibus Civil Rights Act in 1957, which outlawed home sale discrimination involving federal or state financing. [130] Despite its narrow focus, this would have been a significant step on the part of the state to advance fair housing had it remained in place. [131]

> Judge Hodson ruled against the Omnibus Civil Rights Act of 1957, stating "that it interfered with the right of the owner of private property to complete freedom of choice in selecting those with whom he will deal."

However, in 1959 the Act was challenged in King County Superior Court when the Jones, a Black family, attempted to buy a home from John O'Meara, who had financed his home through a private loan insured by the FHA. O'Meara did not use a broker but listed the home himself. When the Jones family visited the home, they had their attorney leave a down payment and earnest money receipt with an all-cash offer. The check was returned to the Jones' attorney. The Jones family filed a complaint with the Washington State Board Against Discrimination (WSBAD), which upheld the complaint that the O'Mearas refused to sell their home to the Jones because of their race. The King County Superior Court ruled that the state law was unconstitutional, and the State Supreme Court affirmed. [132] The State Supreme Court explained that the act improperly denied O'Meara "special privileges and immunities" (i.e., the right to discriminate on the basis of race) afforded to property owners "who have who have conventional mortgages, or no mortgages, and those who are buying upon contract." In his concurring opinion, State Supreme Court Justice Joseph A. Mallery stated, "The personal characteristics of the home owner and would-be buyer are irrelevant to the constitutional protection of private property, which is absolute."

During this period civil rights activists mobilized to overturn racist laws. For example, the Seattle Chapter of the Japanese American Citizens League organized efforts to repeal Washington's 1921 alien land law. The effort resulted in a Senate resolution to repeal the alien land laws on the

---

[128] Mack, *Black Spokane,* p. 102.
[129] O'Connor, Allison. "Washington State Board Against Discrimination." *Black Past*, November 6, 2007. https://www.blackpast.org/african-american-history/washington-state-board-against-discrimination/
[130] https://kingcounty.gov/~/media/exec/civilrights/documents/History.ashx?la=en
[131] The Seattle Open Housing Campaign, 1959-1968, https://www.seattle.gov/cityarchives/exhibits-and-education/online-exhibits/seattle-open-housing-campaign.
[132] The Seattle Open Housing Campaign, 1959-1968 - Detailed Narrative - CityArchives | seattle.gov

1960 ballot, but the resolution was not passed that election, nor was it passed in a second attempt in 1962. The law was finally repealed in 1966.[133]



> ""As judges, we must recognize the role we have played in devaluing Black lives"
>
> 2020 letter from the Washington Supreme Court

Another notable Washington Supreme Court case from this period, *Price v. Evergreen Cemetery Co. of Seattle,* is an example of the Court's upholding exclusionary land ownership and segregation.  In 1957, the Price Family, a Black family in Seattle, tragically lost their 5-year-old son. They inquired about buying a cemetery plot in an area of the Washelli cemetery referred to as "Babyland" because it was set aside for children and were told the lot was available. When the Prices went to the office the next day, they were told their son could not be buried there because that section was limited to children "of the Caucasian race."[134] The Prices brought legal action against the Evergreen Cemetery Company, alleging that it violated the 1953 state law that provides "it shall be unlawful for any cemetery under this chapter to refuse burial to any person because such person may not be of the Caucasian race." [135] The family lost the case at a jury trial. On appeal, the State Supreme Court upheld the jury verdict against the family. In his concurring opinion, Justice Mallery said: "If Negro children were admitted, its white exclusiveness would be gone." He went on to say that there was a "Negro crusade to judicially deprive white people of their right to choose their associates in their private affairs." [136]

Only in 2020 did the State Supreme Court overrule its 1957 decision in a footnote. The Court noted that "the case is harmful because of Justice Mallery's concurrence, which condemns civil rights and integration." The decision quotes a 2020 letter from the Washington Supreme Court stating: "As judges, we must recognize the role we have played in devaluing Black lives." [137]

### *Open Housing Campaigns*

By the 1960s, housing discrimination (or the fight for "open housing") continued as a major focus of civil rights advocates throughout the state. In December 1961, the Seattle Branch of the NAACP proposed passage of a City of Seattle ordinance to ban discrimination in housing. About six months later, the Mayor appointed a Committee on Minority Housing, which recommended the passage of an open housing ordinance and the creation of a Human Rights Commission in the city. However, the Mayor and City Council failed to act on the recommendations of the Committee

---

[133] Grant, "White Supremacy and Alien Land Laws."

[134] Price v. Evergreen Cemetery Co. of Seattle, December 8, 1960. https://law.justia.com/cases/washington/supreme-court/1960/34854-1.html#:~:text=August%2029%2C%201957%2C%20Milton%20V,informed%20that%20space%20was%20available.

[135] RCW 68.05.260

[136] Wenzelburger, Jared. "The Worst Decisions in the History of the Washington Supreme Court, According to the Chief Justice" The Daily Chronicle, June 14, 2022. https://law.justia.com/cases/washington/supreme-court/1960/34854-1.html#:~:text=August%2029%2C%201957%2C%20Milton%20V,informed%20that%20space%20was%20available.

[137] I 976 Opinion - DocumentCloud

for over a year, leading to civil rights demonstrations in 1963 in front of city hall. Asian activists joined Black civil rights leaders in Seattle to pursue open housing in the city. [138]

The Seattle Human Rights Commission was created by law two weeks later, but the housing ordinance was not drafted for several months. After much debate and protest from civil rights leaders, the City Council presented the ordinance to the voters to decide. In 1964, Seattle voters soundly rejected the open housing ordinance.

Still, advocates continued their efforts to assist people of color to find housing and purchase homes. Advocates organized the Fair Housing Listing Service to work with 24 organizations to bring together White homeowners willing to sell to Black families. The Seattle Urban League launched a three-year program called Operation Equality, to assist Black and other people of color with their housing searches. [139] Seattle's Congress of Racial Equity (CORE) housing committee also conducted paired tests of housing providers during this time by sending both Black and White prospective renters to inquire about an apartment. The testing revealed that White applicants were almost always offered apartments, while not a single Black tester was offered a unit. [140]

In Spokane, civil rights leader and attorney Carl Maxey also documented extensive housing discrimination by real estate agents, who were confining Black families to the East Central neighborhood. The discriminatory tactics they described included increasing the down payment on a house and refusing to show the property altogether. Maxey raised these issues as part of his role on the Washington Committee to the U.S. Commission on Civil Rights and also shared these findings with the Spokane Realty Board. [141]

The WSBAD Investigated charges of discrimination in housing during this time (albeit with more limited authority after the State Supreme Court's decision *O'Meara*). One example was the case of Mrs. Willie Williams, who asserted that a real estate agent had refused to show her and her husband a home that was for sale because they were Black. Although the investigation found the real estate agent and his company liable for discrimination, the remedy provided was that the company post anti-discrimination information in their offices. Without strong state or federal fair housing laws, the WSBAD and other commissions and boards at the time were limited in their ability to prohibit or provide punishment for discriminatory practices that they uncovered. [142]

Despite these setbacks, open housing advocates were ultimately able to pass open housing ordinances in 1968. In Seattle, the open housing ordinance was passed three weeks after the assassination of Dr. Martin Luther King Jr. [143]

In its first report after the ordinance was passed, the City of Seattle Human Rights Commission reported that "there was a total of 39 housing complaints received by the Commission. As of December 31, 1968, 16 were conciliated, 13 were found no probable cause, two were withdrawn,

---

[138] Seattle Civil Rights and Labor History Project. "Seattle's Asian American Movement."
[139] Frantilla, Anne. "The Seattle Open Housing Campaign, 1959-1968 - Detailed Narrative." Seattle Municipal Archives. https://www.seattle.gov/cityarchives/exhibits-and-education/digital-document-libraries/the-seattle-open-housing-campaign/open-housing-narrative.
[140] Silva, "Racial Restrictive Covenants History."
[141] Mack, *Black Spokane*. p. 103
[142] Ibid.
[143] Frantilla, The Seattle Open Housing Campaign.

two were outside Commission jurisdiction and referred to other agencies, three are pending investigation, one has resulted in a conviction in Municipal Court, one is pending court action and one has been referred to the Mayor's Office for enforcement of the ordinance. Of the 39 complaints received, five cases went before the Hearing Board, resulting in one being conciliated, one being dismissed and three being referred to the mayor for enforcement, which he filed in Municipal Court through the Corporation Counsel."

The State of Washington amended its Law Against Discrimination to prohibit housing discrimination in 1969, [144] and the State Real Estate Commission took steps to combat discrimination by real estate agents by finally making it state policy to revoke or suspend the licenses of agents who discriminated based on race, color, religion, or national origin. [145]

The federal Fair Housing Act was passed in 1968 to both prevent acts of housing discrimination and require entities receiving federal funds to take action to address segregation and related barriers for marginalized groups. 42 U.S.C. §3608(e)(5). As a result, HUD has required entities receiving federal funding, like the State of Washington which participates in the Community Development Block Grant program among other federal funding sources, to use those funds in a manner to affirmatively further fair housing. This means that the State must first, identify actions, laws, or policies that violate the fair housing laws and policy; second, identify actions which prohibit people's access to fair housing opportunities and/or perpetuate segregation; and third, "take meaningful actions to overcome patterns of segregation, promote fair housing choice, eliminate disparities in housing-related opportunities, and foster inclusive communities that are free from discrimination." To comply with the affirmatively furthering fair housing mandate, the State of Washington published several Analyses of Impediments to Fair Housing Choice (AI). The 2015 and 2020 AIs identified actions that increased segregation and limited fair housing opportunities and choice including a significant homeownership gap between people of color and White people. However, neither AI laid out specific, measurable, achievable, and time-bound tasks that would address the identified barriers to credit and homeownership for historically marginalized communities in Washington. As a result, historic segregated housing patterns and the homeownership gap have continued. Additionally, barriers to fair housing opportunities have not been fully mitigated.

---

[144] "History of Fair Housing." King County Government.
https://kingcounty.gov/~/media/exec/civilrights/documents/History.ashx?la=en.
[145] Race and Violence in Washington State: Report of the Commission on the Causes and Prevention of Civil Disorder. Washington State. February 1969. P. 31

HOUSING

Deteriorating and segregated housing is one of the most persistent reminders of ghetto hopelessness and an indirect contributor to the causes of civil disorders. Housing can affect a person's health, family life and even mental stability. Indeed, the quality of housing in any neighborhood cannot help but affect the overall economic and social health of the whole community.

The creative effort of the housing industry has gone where the money is: to condominium apartments for the wealthy and tract developments for the middle class. Meanwhile, the vacated inner city is left to the poor and the black. The buildings are cheap enough to buy or rent, but the quality is lower than the price and the supply is limited.

The free market in Washington has failed to provide a sufficient number of low-cost houses and, despite the efforts of the Urban League and others, has failed to make blacks aware of the houses that do exist. The Municipal League of King County, for example, estimates a need for 10,000 new, low-cost houses in King, Pierce and Snohomish counties. Only 2,000 are being produced now. Many of those who will suffer are blacks.

Moreover, even those projects where low-cost houses are built make no solicitations in the ghetto.

Moreover, the poor in the ghetto pay relatively more for housing that they can get than do other citizens elsewhere. If discrimination has kept a poor black family in the ghetto and transportation to work requires a long trip each day, that extra cost can be attributed to the housing problem. Insurance costs for people in the ghetto, a high risk area, are higher than elsewhere, which is an additional burden and often insurance cannot be obtained at all.

Finally, our tax system, in effect, encourages property owners in the ghetto to let their buildings deteriorate further and penalizes them with higher taxes when they make improvements. It is profitable today to generate slums.

*Figure 6 - Excerpt from Race and Violence in Washington State (1969)*

### Recommendations to State Government from the Race and Violence in Washington State Report in 1969

The 1969 report *Race and Violence in Washington State,* authored by the Commission on the Causes and Prevention of Civil Disorder between 1968 and 1969, provides a clear picture of the civil rights concerns of Black Washingtonians at the time. The report describes the underlying causes of racial and cultural conflict and included sections on residential segregation, migration "and ghettoization" as well as broad discussions about disparities in education and health. It describes steps the federal, state, and county governments took to address racial disparities, including investigations of discrimination and resolution by the State Board Against Discrimination.

Finally, it makes recommendations on several topics, including housing. These recommendations focus on open housing laws and enforcement and improving conditions and housing quality in Black neighborhoods.

Importantly, one of the major recommendations of the housing section was to create a State Housing Agency "to promote the establishment of nonprofit development corporations to construct quality housing for the poor (which will mean Blacks) both inside and outside the ghettos." [146] Although this recommendation was made in 1969 by both this Commission and the Urban Affairs Council, Washington's Housing Finance Commission was not created until over a decade later, in 1983. [147]

### Urban Renewal Continues

As actions and protections against housing discrimination finally took root, White families began a steady move to the suburbs. This move was encouraged by federal investments in infrastructure, which supported the development of interstate highways. Highway expansion in the 1950s and 1960s notoriously displaced hundreds of thousands of households, dividing up neighborhoods and isolating residents from community resources such as churches, parks, and small businesses. The affected neighborhoods were mostly the Black, low-income areas created by redlining, zoning and other segregating policies widely used in cities for decades. [148] Influential

---

[146] "Race and Violence in Washington State", P. 45
[147] Washington State Housing Finance Commission. "A Catalyst for Community: The Washington State Housing Finance Commission's First 20 Years." 2003. https://www.wshfc.org/admin/20yearhistory.pdf.
[148] Evans, Farrell. "How Interstate Highways Gutted Communities – and Reinforced Segregation." History. September 21, 2003. https://www.history.com/news/interstate-highway-system-infrastructure-construction-segregation

urban planner at the time, Robert Moses, who led up the New York City Slum Clearance Committee, was a leading voice in this effort. In a 1959 speech, he said, "Our categorical imperative is action to clear the slums. We can't let minorities dictate that this century-old chore will be put off another generation or finally abandoned." [149]

The 1956 Federal Highway Act provided 90 percent of the cost states incurred when building new highways but required that they be built through major cities to connect the suburbs to downtown employment and retail. In this way, the federal government incentivized new infrastructure and removed residents of color from disinvested central areas all at once. [150] The East Central neighborhood in Spokane provides an example of how this happened in Washington. During the 1960s, the neighborhood was intersected by the development of Interstate 90 (I-90). Planners considered three possible routes for I-90 through Spokane but quickly settled on a path through East Central, where Black-owned businesses thrived, and where Black families had owned their homes. The neighborhood was also home to Liberty Park, a vibrant green space that was broken up by the highway's development. I-90 diverted traffic away from the businesses that remained in East Central and decreased the foot traffic they received, which meant most of them had to close their doors. Over a thousand homes were leveled. Although the owners were compensated, many could not afford to buy homes in the same area for the amounts they were given, and many left the neighborhood altogether. [151]



---

[149] Naylor, Brian. "After Dividing for Decades, Highways Are On The Road To Inclusion." NPR. April 28, 2016. https://www.npr.org/2016/04/28/475985489/secretary-foxx-pushes-to-make-transportation-projects-more-inclusive.
[150] Farrell. "How Interstate Highways Gutted Communities – and Reinforced Segregation."
[151] Spokane Regional Health District's Neighborhoods Matter Project, & Frank Oesterheld, "Neighborhoods Matter: The Impact of the I-90 Freeway on the East Central Neighborhood, an Oral History - Introduction," Spokane Historical, accessed March 20, 2024, https://spokanehistorical.org/items/show/468; and Spokane Regional Health District's Neighborhoods Matter Program, & Frank Oesterheld, "Jim Hanley, Resident Since 1942," Spokane Historical, accessed March 20, 2024, https://spokanehistorical.org/items/show/474.

In Seattle, Interstate-5 (I-5) divided the Chinatown-International District , and although the section of I-5 in the wealthier, White neighborhood of Mercer Island was lidded to prevent disruption and preserve connectivity, the Chinatown-International District was denied the same benefit, despite attempts by advocates to add a highway lid to their section as well. [152] Heavy federal investment in highways connecting suburbs to downtown areas further enabled the phenomenon of "White flight" from cities to the suburbs throughout the U.S., and Seattle was no exception.

**SPECIFIC CIVIL RIGHTS ERA ACTIONS TAKEN BY STATE AND LOCAL GOVERNMENTS TO LIMIT HOMEOWNERSHIP AND CREDIT ACCESS BY MARGINALIZED GROUPS**

- The State passed the Omnibus Civil Rights Act prohibiting discrimination in activities that involved state or federal financing, but just several years later, the Superior Court and State Supreme Court ruled that this did not apply in a case involving an FHA-insured property.

- Despite significant findings by advocates, commissions and boards documenting extensive housing discrimination, the City of Seattle avoided deciding on an **open/fair housing ordinance** and deferred to a public vote. Voters rejected the measure, and it took an additional 4 years for the ordinance to pass.

- The State delayed the creation of a housing commission to address the shortage of affordable housing in Washington for over a decade, despite a 1969 recommendation by the Commission on the Causes and Prevention of Civil Disorder.

- The Federal Highway Act and related decisions by local planners ushered in displacement of residents of color, split up neighborhoods where people of color lived, and refused Black and Asian communities the equivalent mitigation received by White communities. These actions were permitted by the State's passage of the 1957 Urban Renewal Law.

*Population and Demographic Snapshot in 1970*

| TOTAL POPULATION | WHITE | BLACK | AMERICAN INDIAN/ ALASKA NATIVE | ASIAN PACIFIC ISLANDER | OTHER RACE | HISPANIC ORIGIN_ [153] |
|---|---|---|---|---|---|---|
| 3,409,169 | 3,251,055 | 71,308 | 33,386 | 44,060 | 9,360 | 57,358 |

*Table 4 - Washington's Population by Race in 1970, Source: U.S. Census Bureau*

---

[152] Brefger, Knute. "The legacy of racism built into Northwest highways and roads," Crosscut, April 27, 2021. https://crosscut.com/opinion/2021/04/legacy-racism-built-northwest-highways-and-roads.
[153] The 1970 census used the term "Persons of Spanish origin." See: https://www2.census.gov/prod2/decennial/documents/31679801n1-40ch03.pdf.

## The 1970s– Redlining by Banks Fuels Disinvestment, Activists Continue to Shed Light on Discrimination

In 1975, a coalition of community associations called the Seattle Community Council Foundation [154] brought attention to the obstacles faced by people of color in Rainier Valley and the Central Area of Seattle. They documented redlining by banks, which they defined as the bank practice of refusing mortgage loans or requiring higher interest rates and larger down payments "to otherwise credit worthy people because they happen to live in a certain area." The report, entitled *"Redlining and Disinvestment in Central Seattle: How the Banks are Destroying Our Neighborhoods,"* reviewed public records to document the disinvestment that occurred based on bank decisions regarding which neighborhoods were worthy of investment and improvement.

The report documented a pattern of banks and mortgage companies failing to provide conventional or FHA loans to individual purchasers in the "Central Area." It also documented that, when available, FHA-insured loans had higher buyer costs. The report called out a failure on the part of regulators to enforce laws that made these sorts of lending patterns illegal, noting that "regulators don't even collect the information they would need to correct these documented abuses." [155]

In response, both the State of Washington and City of Seattle investigated the findings of the report. The newly created Washington State Human Rights Commission began hearings to examine these redlining practices. The Mayor of Seattle also created a Reinvestment Task Force to document the redlining and to make policy recommendations to the City to address the issues raised. The task force held public hearings and found a range of issues around lending, appraisals, and credit allocation, as well as City issues around code enforcement and zoning.

The *Preliminary Report of the Redlining Task Force to the Washington State Human Rights Commission* in 1977 documents lending patterns in Seattle and makes state policy recommendation based on the findings. The study stated: "It is concluded that redlining has occurred at least in the form of markedly low levels of mortgage lending in older residential parts of the city. Moreover, the Central Area comparisons suggest racially disparate effects." [156]

> Most of the homes we had in the central area were worn out when we got them and we had to pay the colored tax when we bought them; the difference between what the house was worth and what we could get for it. And then the freeway and I-90, and everything else comes through and we are shot down again on what we can get. I am led to believe that the central area and other parts of the city are being decimated by design. People have not given up on the city; they want us to believe that they have, but they have not.

*Figure 7 – Quote from Rev. Samuel McKinney on the higher rates Black Seattle residents had to pay to obtain property. Excerpt from a Public Hearing Held in Seattle on Difficulty Obtaining Loans in 1976.*

---

[154] "Seattle Community Council Federation records 1945-2014." ArchiveGrid. Accessed on March 20, 2024. https://researchworks.oclc.org/archivegrid/collection/data/84109253.

[155] Central Seattle Community Council Federation (1975). "Redlining and Disinvestment in Central Seattle." http://archives.seattle.gov/digital-collections/media/collectiveaccess/images/1/9/3/9/43090_ca_object_representations_media_193919_original.pdf

[156] "Patterns of Residential Mortgage Lending and Property Sales in Seattle, 1974, 1975, and 1976." Preliminary Report of the Redlining Task Force to the Washington State Human Rights Commission. January 31, 1977.

Many of the banks named or implicated in these reports, including commercial banks, savings and loan associations, and credit unions, were state-chartered and regulated under the State's Division of Savings and Loan. In a statement for the Mayor's Task Force on reinvestment, William E. Young, Supervisor of the Division of Savings and Loan Association within the State's Department of General Administration, objected to the recommendations for data disclosure and the idea that investments be required in disinvested areas.  He stated:

> One of the recommendations of the committee deals with "disclosure" with the obvious intent of requiring that some significant portion be invested in the specific geographic areas from whence the monies came. Let me tell you that from a regulatory standpoint this is unnecessary and meaningless. In the first place I'm well aware that the financial institutions, along with many other business entities in the country are virtually strangling in a sea of red tape and reporting, requirements for most of which come out of the wonderland of Washington D.C.. Secondly, a logical extension of this would be to cut off investment in our state from institutions in other parts of the country which may enjoy a "capital surplus" situation.  The committee must relate the fact that the institutions which are criticized have been responsible for obtaining of billions of dollars of mortgage money from built up communities in the East… they should continue to do so… as long as governmental interference does not destroy the network of secondary mortgage markets. [157]

Ultimately, a series of actions were taken to address the concerns first raised by the Seattle Community Council Foundation and Redlining Task Force. These included the 1977 Washington State House Bill 323, requiring financial institutions to disclose by census tract where they are making home loans and prohibiting redlining. In addition, the Public Reinvestment Review Board and the Lender Review Board were created to provide an appeal mechanism for rejected loan applicants.

In 1975, the federal government passed the Home Mortgage Disclosure Act to require mortgage and home improvement loan data disclosures by zip code and the Community Reinvestment Act in 1977 which requires financial institutions to lend to low- and moderate-income communities. Also, at the national level, the Senate Committee on Banking, Housing, and Urban Affairs issued a report on Fair Lending Enforcement, which was found to be unsatisfactory, and which noted ample evidence of discrimination in mortgage lending. [158]

### Population and Demographic Snapshot in 1980

| TOTAL POPULATION | WHITE | BLACK | AMERICAN INDIAN/ ALASKA NATIVE | ASIAN PACIFIC ISLANDER | OTHER RACE | HISPANIC ORIGIN | WHITE NON-HISPANIC |
|---|---|---|---|---|---|---|---|
| 4,132,156 | 3,779,170 | 105,574 | 60,804 | 102,537 | 84,071 | 12,016 | 3,725,878 |

Table 5 - Washington's Population by Race in 1980, Source: U.S. Census Bureau.

---

[157] William E Young Statement for Mayor's Task Force on Reinvestment.
[158] "Redlining in Seattle." Seattle Municipal Archives. Accessed on March 20, 2024. https://www.seattle.gov/cityarchives/exhibits-and-education/online-exhibits/redlining-in-seattle.

## Perpetuation of Segregation and Homeownership Disparities in the Modern Era

### *Growth Management Act*

In the 1990s, Washington passed the Growth Management Act (GMA) to guide planning for growth and coordinate development and land use throughout the state. The legislature found that a "lack of common goals expressing the public's interest in the conservation and the wise use of...lands, pose a threat to the environment, sustainable economic development, and the health, safety, and high quality of life enjoyed by residents." It calls for "citizens, communities, local governments, and the private sector" to "cooperate and coordinate with one another in comprehensive land use planning." The GMA was intended to ensure that the public interest is served by guaranteeing that "economic development programs be shared with communities experiencing insufficient economic growth." [159] The law requires fast-growing and high-density jurisdictions to complete comprehensive, 20-year plans to identify how and where growth should occur. These would be implemented through zoning and other regulations that shape where new development could occur.   The GMA also requires local governments to "plan for and accommodate" housing in their jurisdictions that would be affordable to people at all income levels.

Some analysis by researchers found that attempts by state and local regulators to better regulate housing may have resulted in increases in housing costs and the displacement of marginalized communities. For example, one study of housing impacts in Seattle found that between 1989 and 2006, the cost of housing in the city had increased by $200,000 - two times higher than the impact felt by other major U.S. cities. Other elements contributed to the increase in housing costs, including long permitting processes and local pressures impacting land use policies, but the GMA was also cited as a factor. [160] Another analysis conducted by Western Washington University in 2020 found frequent conflict among tribal governments, the state, and local governments. When state and local governments made planning decisions, they did not always consider impacts on tribal nations, resulting in severe impacts for Indian reservations as well as off-reservation ceded lands. The analysis notes that there was a lack of a requirement that tribal concerns be considered or factored in to GMA planning. [161]

Recent changes in 2021 [162] to the statute require jurisdictions to evaluate racially disparate impacts or exclusionary effects, and displacement risks and to adopt policies to mitigate negative impacts. [163] The amendments to the GMA are, in part, designed to address these concerns and develop a more inclusive planning process. While these updates do not provide any remedies for persons who were outpriced, displaced, or lost access to land rights and/or resources, they could protect against future negative impacts on marginalized groups.

---

[159] See, RCW 36.70A.010, available at https://apps.leg.wa.gov/rcw/default.aspx?cite=36.70A
[160] Elizabeth Rhodes. "UW study: Rules add $200,000 to Seattle house price." The Seattle Times. February 15, 2008. https://www.seattletimes.com/business/uw-study-rules-add-200000-to-seattle-house-price/.
[161] "Washington Indian Tribes and the Growth Management Act: Toward Inclusionary Regional Planning." Western Washington University, April 2020. https://www.tulaliptribes-nsn.gov/Base/File/TTT-PDF-WA-Indian-Tribes-and-the-GMA-0916202.1
[162] The GMA was amended in 2021 to strengthen the law and amended the housing goal to "plan for and accommodate" housing affordability for all income levels. See, RCW 36.70A.020 (4), https://app.leg.wa.gov/RCW/default.aspx?cite=36.70A.020
[163]"Guidance to Address Racially Disparate Impacts: Updating Your Housing Element to Address New Requirements." Washington State Department of Commerce. April 2023. https://deptofcommerce.app.box.com/s/1l217l98jattb87qobtw63pkplzhxege.

The 2021 amended statute establishes new requirements for jurisdictions that calls for the establishment of a housing element that:

> *(e) Identifies local policies and regulations that result in racially disparate impacts, displacement, and exclusion in housing, including:*
>
> *(i) Zoning that may have a discriminatory effect;*
>
> *(ii) Disinvestment; and*
>
> *(iii) Infrastructure availability;*
>
> *(f) Identifies and implement policies and regulations to address and begin to undo racially disparate impacts, displacement, and exclusion in housing caused by local policies, plans, and actions;*
>
> *(g) Identifies areas that may be at higher risk of displacement from market forces that occur with changes to zoning development regulations and capital investments; and*
>
> *(h) Establishes anti-displacement policies, with consideration given to the preservation of historical and cultural communities as well as investments in low, very low, extremely low, and moderate-income housing; equitable development initiatives; inclusionary zoning; community planning requirements; tenant protections; land disposition policies; and consideration of land that may be used for affordable housing.*

There is continuing dialogue and extensive discussion in the literature about the need for the GMA to strike a balance between containing development and sprawl and ensuring equitable economic development and affordable housing. [164]

### Patterns of Displacement Continue

In the past few decades, gentrification from escalating housing costs in urban areas in Washington, likely due in part to the effects of the GMA, has displaced lower income residents and residents of color who are priced out of areas that were once affordable and were the only areas where they were allowed to rent or purchase a home.

Research on gentrification patterns and the resulting displacement shows that through the 1970s and 80s, Seattle's growth was relatively slow. Housing costs were still low, and gentrification was occurring mostly in White, non-Hispanic neighborhoods. Seattle's housing costs began to increase in the 1990s and gentrification started to occur in places where the Black population was higher relative to areas around them. This same gentrification was less likely to take place in neighborhoods with higher Asian and immigrant populations. As noted by researcher Jackelyn Hwang, "between 1990 and 2013, a 1 percentage point increase in a potentially gentrifiable neighborhood's share of Asian residents was associated with a 3.9 percent decrease in the odds of a neighborhood gentrifying. In contrast, a 1 percentage point increase in a gentrifiable neighborhood's share of Black residents was associated with a 3.4 percent increase in the odds of a neighborhood gentrifying. Together, these findings suggest that "increased immigration to a

---

[164] Downs, A. (Ed.). "*Growth Management and Affordable Housing: Do They Conflict?* Brookings Institution Press, 2008. http://www.jstor.org/stable/10.7864/j.ctvb1htv3 and http://blogs.gonzaga.edu/gulawreview/files/2011/01/Lloyd1.pdf.

city with a tight housing market may have unintended consequences on Black urban neighborhoods." [165]

The maps below[166] show this pattern of displacement between the 1980s and 2013, with each blue dot representing 25 Black residents, each green dot representing 25 Asian residents, each red dot representing Latino 25 residents, and each orange dot representing 25 White residents. The movement of Black residents, particularly out of the Central District, is starkly clear.

Seattle offers the clearest example of gentrification over several decades, but displacement due to escalating housing costs is beginning to occur in other regions of the state. Spokane is one of the fastest growing cities in the nation, with out-of-town investors moving to the region to escape higher cost coastal cities, and Yakima is also experiencing huge jumps in population growth. [167] [168] These patterns represent a failure on the part of local, state, and federal governments to prevent such displacement.



Figure 9 - Population Shifts by Race/Ethnicity in Seattle between 1980 and 2013.  Source: https://pubmed.ncbi.nlm.nih.gov/33041694/.

[165] Luberoff, David. "Race, Immigration, and Gentrification in Seattle, 1970-2013." Joint Center for Housing Studies of Harvard University. November 19, 2019. https://www.jchs.harvard.edu/blog/race-immigration-and-gentrification-in-seattle-1970-2013.
[166] Hwang, Jackelyn. "Gentrification without segregation? Race, Immigration, and Renewal in a Diversifying City." August 19, 2019. https://pubmed.ncbi.nlm.nih.gov/33041694/.
[167] Dougherty, Conor. "The Next Affordable City is Already Too Expensive." *The New York Times.* February 20, 2022. https://www.nytimes.com/2022/02/20/business/economy/spokane-housing-expensive-cities.html.
[168] Donofrio, Joel. "We're Growing: Census data shows Upper Yakima Valley communities leading the way in population growth." Yakima Herald-Republic, December 20, 2021. https://www.yakimaherald.com/news/local/census-data-shows-upper-yakima-valley-communities-leading-the-way-in-population-growth/article_8168ba5f-6654-59a8-84c5-ca5914141582.html.

### The Ongoing Impacts of Exclusionary Zoning

Zoning principles adopted in the first part of the 20th century continued to shape housing opportunity and segregate cities as they separated higher-cost residential housing from more affordable housing options and other types of buildings and activities. [169]

After the initial 1923 zoning ordinance in Seattle, the next comprehensive rezoning of Seattle was in 1957. The 1957 ordinance divided the city into six single-family zones and two multifamily zones (differentiated by allowed density), three business zones, two commercial zones, a manufacturing zone, and two heavy industrial zones. [170] This shift expanded single-family zoning even further, so that until recently, 75 percent of the land zoned for residential development prevented the new construction of anything other than single-family housing. As noted by the 2018 Seattle Planning Commission, "the growing economic exclusivity of detached housing in single-family zones contributes to disparity along racial lines by continuing the legacy of excluding all but those who have the economic resources to buy a home." [171]

Matthew Desmond, author of *Evicted* and *Poverty, by America, recently* launched a new initiative to reform exclusionary zoning and increase the number of affordable housing units. Using publicly available zoning and land use information, Desmond and his team built the National Zoning and Land Use Database which collects and evaluates key elements of zoning codes and the limitations that municipalities put on housing development. The evaluation resulted in the Zoning Restrictiveness Index (ZRI) which allows users to compare land use policies across municipalities and metropolitan areas. After examining such issues as minimum lot size, maximum density, limitations on multifamily housing as well as parking and open space requirements the researchers gave each entity examined a score. The higher the score, the more restrictive or exclusionary the ordinance. Scores below zero indicate the zoning ordinance is more inclusionary. [172] [173]

Redmond has the highest ZRI score in Washington at 3.28 while Burien has the lowest score at -0.87. Seattle's ZRI score is 1.38. Of the 2,579 municipalities across the nation with data evaluated by the Desmond team, Washington's municipalities occupy five of the top 10 spots for most exclusionary zoning codes: Redmond ranks second; Olympia ranks third with a score of 3.23; Chelan ranks sixth with a score of 3.00; and Kent ranks tenth with a score of 2.96. Given the exclusive nature of many of Washington's municipal zoning codes, it is not surprising that many of the reports which examine impediments to homeownership mention exclusionary zoning as a major impediment. Yet the State has only recently turned legislative attention to addressing the landscape of exclusionary zoning code in the state.

---

[169] See: Rothwell JT, Massey DS. "Density zoning and class segregation in U.S. metropolitan areas. Social Science Quarterly 91(5): 1123–1143.
[170] Twinam, "The Long-Run Impact of Zoning."
[171] Neighborhoods for All: Expanding Housing Opportunity in Seattle's Single-Family Zones. Seattle Planning Commission, Fall 2018. https://www.seattle.gov/documents/Departments/SeattlePlanningCommission/SPCNeighborhoodsForAllFINALdigital2.pdf.
[172] Mleczko, Matt and Matthew Desmond. "Eviction Lab Updates." March 17, 2023. https://evictionlab.org/zoning-restrictiveness-index/.
[173] Ibid.

### Subprime Lending and the Foreclosure Crisis

By the 1990s, despite more robust anti-discrimination laws, buyers of color throughout the country, particularly Black and Latino buyers, remained locked out of affordable mortgage lending options due to ongoing segregation and pervasive lending discrimination. Because they were denied mainstream banking and financial services, families of color relied on subprime mortgages to purchase a home. Subprime lending accounted for 43 percent of the increase in Black homeownership nationwide during the 1990s. [174]

Black and Latino families were deliberately steered into these subprime loans. This practice, called "reverse redlining," was extensive. As a result, by the start of the 2007 foreclosure crisis, the concentration of foreclosures, short sales, negative equity, and the myriad harmful spillover effects on neighborhoods that occur as a result fell disproportionately on Black and Latino communities. From 2005-2009, White households lost 16 percent of their net worth, while Black households lost 53 percent and Latino households lost 66 percent of their net worth. [175] Additionally, the effects on homes around foreclosed properties were estimated to have lost $1.1 trillion in home value. [176]

Although generally below the national average, high-cost lending and subprime lending were prevalent among non-White borrowers in Washington prior to the crisis. Data from 2013 also showed that Washington had similar patterns to the rest of the country when it came to property value losses. Tacoma, Kent, and Everett were listed as top cities with negative equity. In Seattle, Black and Latino residents were more likely to be underwater on their mortgages than their White counterparts. [177]

The gutting of homeownership, wealth, and housing stability among families of color during the foreclosure crisis was a direct result of government failures to act swiftly at all levels. The initial reliance at the federal level on the private finance sector to provide mortgages to families who had been systematically locked out of homeownership led to the boom of subprime lending and eventual crisis. Once the foreclosure crisis and recession hit, government agencies again failed to provide borrower relief in a timely manner, and simultaneously tightened credit standards on access to their own FHA loans. Finally, government interventions to mitigate the harmful effects of foreclosures that were disproportionately concentrated in communities of color fell short, allowing for private equity firms and investors to purchase distressed properties and to benefit from destabilized families and communities. [178]

---

[174] Rugh, Jacob S., and Douglas S. Massey. "Racial Segregation and the American Foreclosure Crisis." American Sociological Review 75, no. 5 (2010): 629–51. http://www.jstor.org/stable/20799483.

[175] Taylor, Paul, Rakesh Kochnar, Richard Fry, Gabriel Velasco, Seth Motel. "Wealth Gaps Rise to Record Highs Between Whites, Blacks and Hispanics," http://www.pewsocialtrends. org/files/2011/07/ SDT-Wealth-Report_7-26-11_FINAL.pdf.

[176] "2013 Update:  The Spillover Effects of Foreclosures," Center for Responsible Lending, August 19, 2023. http://www.responsiblelending.org/mortgage-lending/research-analysis/2013-crl-research-update-foreclosure-spillover-effects-final-aug-19-docx.pdf.

[177] Dreier a. al. "Underwater America." Haas Institute for a Fair and Inclusive Society. https://belonging.berkeley.edu/crisis-washington-Black-and-latino-families-still-suffering-housing-crash.

[178] Reid, Carolina. "Crisis, Response and Recovery: The Federal Government and the Black/White Homeownership Gap." Terner Center for Housing Innovation at UC Berkeley, March 2021. https://ternercenter.berkeley.edu/wp-content/uploads/2021/03/Crisis-Response-Recovery-March-2021-Final.pdf.

## A Look at Washington's Homeownership Rates Over the Years

As outlined in the sections above, housing and lending discrimination against marginalized groups took many forms over the 135 years of land and homeownership history in Washington. The effects of these policies and practices have resulted in persistent gaps between White families in Washington and families who are Black, Latino, Native American, Alaska Native, Native Hawaiian or other Pacific Islander, and members of some Asian subgroups. The graph below [179] shows homeownership by race in Washington beginning in 1970, after decades of racially restrictive covenants, redlining, zoning and other types of housing discrimination. Statewide, the gap in 1970 between the rate of Black homeownership and White homeownership was 17 percentage points and was only slightly wider for Latino homeownership and Asian homeownership. However, in the decades since, that gap widened for Blacks and Latinos, with Black homeownership dropping to 36 percent in 2010 and even further to 34 percent by 2021. Latino homeownership dropped from 55 percent to 47 percent [180] This drop occurred while Indigenous homeownership grew modestly, Asian homeownership rose three percentage points, and the White homeownership rate rose two percentage points.



| | 1970 | 1980 | 1990 | 2000 | 2010 | 2021-22 |
|---|---|---|---|---|---|---|
| Black % owners | 50% | 42% | 38% | 38% | 36% | 34% |
| White % owners | 67% | 68% | 66% | 68% | 68% | 69% |
| Indigenous % owners | 45% | 50% | 50% | 52% | 51% | 55% |
| Latino % owners | 55% | 46% | 40% | 41% | 43% | 47% |
| Asian/PI % owners | 60% | 56% | 54% | 56% | 60% | 63% |

*Figure 10- Homeownership by Race or Ethnicity, Source: University of Washington (2024),*
*https://depts.washington.edu/covenants/homeownership_washington.shtml.*

---

[179] "Homeownership by race 1960-2018 - Washington State." Racial Restrictive Covenants Project.
https://depts.washington.edu/covenants/homeownership_washington.shtml.
[180] Ibid. Note that these numbers represent 5-year averages of annual American Community Surveys (ACS): 2006-10 and 2016-20.
The 5-year averages improve the reliability of these calculations, all of which are based on samples of the full population (5% in
these 5 year averages).

## Conclusion

As the comprehensive examination of historical and literary records summarized in the sections above makes clear, there have been many acts of housing and lending discrimination against specific marginalized groups in Washington. These acts ranged from the passage of discriminatory land laws, the use of restrictive covenants, the limiting of lending opportunities and credit based on race, and many other barriers to land ownership and homeownership for people of color. The State was both an active and passive participant in this well-documented discrimination in a variety of ways.

As the data on homeownership by race since 1970 in Figure 10 demonstrates, this discrimination resulted in lasting disparities in the ability of marginalized groups to own homes and thus build wealth well into the decades after the Fair Housing Act was passed. The next chapter in this study will analyze thep59 persistence of these effects on marginalized groups in the present day.



# CHAPTER 2: CURRENT IMPACTS OF HISTORIC DISCRIMINATION

## Introduction

This chapter specifically addresses whether and to what extent discriminatory practices as well as the impacts of discrimination by the State continue to the present day as well as whether State action, or inaction, contributes in any way to continuing and current inequities. Specifically, Covenant Homeownership Act requires that this study must, among other things, "document past and ongoing discrimination against black, indigenous, and people of color and other historically marginalized communities in Washington and the impacts of this discrimination on homeownership in the state, including access to credit and other barriers to homeownership in the state." [181]

Chapter 1 of this study analyzed the history of the State's actions restricting access to homeownership for people in historically marginalized groups. In Chapter 2, we examine the impacts of that discrimination on Washingtonians today, including disparities in homeownership rates, mortgage lending access, credit access, rates of homelessness, and mortgage and rent burdens.

To undertake this task, the study team, including researchers at the Urban Institute, [182] gathered and reviewed research done by the University of Washington, U.S. Census information, government planning documents, the Home Mortgage Disclosure Act (HMDA) and appraisal research. The team also examined housing-specific data such as real estate market data, rates of homelessness, data on housing cost burdens, gentrification and displacement, and wealth disparities. Additionally, the study team used information gathered from 12 key stakeholder interviews, small group interviews, and 167 survey responses from organizations and residents in the state to understand how historical discrimination continues to impact people in historically marginalized communities today.

The study team found that there are indeed long-term, continuing negative impacts on marginalized groups in the state, including:

(1) continuing patterns of segregation,

(2) disparities in wealth,

(3) disparities in homeownership rates,

(4) inequitable access to credit and mortgage lending opportunities,

(5) disparities in homelessness rates,

(6) disparities in rental housing cost burden,

(7) disparities in access to safe and secure housing, and

(8) disparities in the impact of gentrification and displacement and restrictive zoning.

---

[181] House Bill 1474, codified at Chapter 43.181 RCW.
[182] The Urban Institute is a nonprofit research organization that provides data and evidence to help advance upward mobility and equity.

These disparities are all felt more keenly by people of color.

This qualitative and quantitative analysis revealed that historical discrimination implemented or supported by the State and local governments created clear and lasting disparate impacts on Blacks, Latinos, Native Americans, Alaska Natives, Native Hawaiians and other Pacific Islanders, and two Asian subgroups (Koreans and Asian Indians) in Washington.

## The Continuing Impacts of Discrimination in the Housing Sector

| HISTORIC ACTIONS | TODAY |
|---|---|
| Land Seizures | Persistent Patterns of Segregation |
| Expulsion and Racially Exclusive Laws & Practices | Racial Homeownership Gap |
| Immigration Restrictions | Housing Price Gaps/Appraisal Gaps |
| Exclusionary Zoning | Racial Wealth Gap |
| Racially Restrictive Covenants | Homelessness and Disparities in Access to Housing |
| Public Housing Policies and Placement | |
| Racial Violence | |
| Japanese Internment | |

### Persistent Patterns of Segregation

As documented in Chapter 1, during the beginning of White settlement in the region, discriminatory laws and practices—including racial covenants, zoning ordinances, racial steering, redlining, appraisal bias, housing and lending discriminatory practices, racial and ethnic violence, and other restrictive measures—resulted in extreme racial segregation. Areas where people of color were relegated were disinvested and downzoned, resulting in long-term negative impacts on the communities and people living in them. This includes the undervaluation of properties, diminished homeownership opportunities, and restricted ability to build wealth.



Figure 11- 1940 map of King County depicting the residential location of the non-White population and hyper segregated in the County's urban core.  Source: University of Washington, https://depts.washington.edu/civilr/maps_race_seattle.htm

A closer look at population trends illustrates the continued challenges facing marginalized communities. In King County, the proliferation of discriminatory practices meant that by 1940, almost every person of color in the county lived in a few census tracts in the urban core. (See Figure 11.)



Figure 12  – 1980 Map of the Black population in King County. Source: University of Washington, https://depts.washington.edu/civilr/maps_race_seattle.htm

Figure 12 shows a 1980 map of King County that reveals the migratory patterns and population growth of the Black community. In 1950, there were 16,453 Black people in the county. By 1980, the Black population had grown to 55,950. Discriminatory practices like racial steering, the State of Washington's licensing of real estate professionals who supported the National Association of Realtors® anti-fair housing stances, and restrictive zoning ordinances, helped perpetuate continuing patterns of segregation. [183]

---

[183] *See,* The University of Washington's Seattle Civil Rights & Labor History Project, *https://depts.washington.edu/civilr/maps_race_seattle.htm.*



*Figure 9 – 2020 Map of King County's Black population. Source: University of Washington,*
*https://depts.washington.edu/civilr/maps_race_seattle.htm.*

Today, the Black community in King County is concentrated in the southern part of the county, with the majority located in or near historically Black segregated areas. There are very few or no Black residents in many communities east of Lake Washington and in the western edge of King County. The impact of historic, explicitly racist policies and practices either carried out or supported by the State and the State's failure to mitigate historical discrimination contributed to the lack of diversity throughout the region.



Figure 10 – Washington's Latino population in 2020.  Source: University of Washington.

Washington's Latino population is concentrated in the agricultural central region of the state. As Latino farm workers came to this region for job opportunities, many decided to stay permanently. Reflecting the high Latino concentration, Spanish is the most commonly spoken language in East and Central Washington, including the Tri-Cities - Yakima, Wenatchee, and Walla Walla, after English. For example, in Franklin County, 43.4 percent of people over the age of 5 speak Spanish and 42.7 percent of those speak English "less than very well," while 21.7 percent of the people in Franklin County are foreign born with 18.8 percent of the population born in Latin America. In Adams County, 41.6 percent of people speak Spanish at home as do 41.3 percent of those living in Yakima County. [184] In Grant County, only 34 percent of the population speaks English at home. [185]

---

[184] *See*, U.S. American Community Survey 2022 Census data. Available at https://www.census.gov/programs-surveys/acs/data.html
[185] *See*, U.S. American Community Survey 2020 Census data. Available at https://www.census.gov/programs-surveys/acs/data.html



Figure 11 – Native American Population in Washington in 2020. Source: University of Washington.

Many Native Americans in Washington state reside on reservations designated by the federal government. The Yakama Indian Reservation, located in the southern portion of the state, is the most populous with over 10,000 people. The Colville Indian Reservation, in the north central part of the state, is the second most populous reservation with a population of over 9,000. There are 29 federally recognized tribes in the state and three tribes – Duwamish, Wanapum, and Chinook – that have not yet been recognized by the federal government. According to U.S. Census data, there are 313,633 people who self-identify as American Indian/Alaska Native (AIAN) alone or as having some AIAN heritage, [186] with 90,789 people who identify as AIAN alone. The state's AIAN population has more than doubled over the past decade. The AIAN population identifying as solely AIAN increased by 16.9 percent since the 2010 U.S. Census. [187] Some have argued that the increase in the reported AIAN population is due to increased efforts by AIAN tribes to encourage their members to participate in the U.S. Census.

---

[186] Natasha Brennan, "Native American Population in Washington State Has Grown by More Than Half, The News Tribune," September 24, 2021. https://www.thenewstribune.com/news/state/washington/article254452573.html
[187] Some believe the increase in numbers for the AIAN population is due in part to increased participation in the U.S. Census. *See*, Brennan, *AIAN Population in Washington State has Grown by More Than Half*, https://www.thenewstribune.com/news/state/washington/article254452573.html.



Figure 12 - Washington Tribes, See: https://www.washingtontribes.org/[1]

## Demographic Breakdown

As detailed extensively in Chapter 1, efforts to restrict people of color from migrating to the state had an impact on the state's current demographics. Presently, White households account for 71.2 percent of all households in Washington, compared to 64.4 percent in the U.S. The share of Asian households is also higher — nine percent in Washington and 5.1 percent in the U.S.[188] Meanwhile, Black households and Latino households respectively account for only 3.8 percent and 9.6 percent of the total households in the state, both lower than the national percentages of 11.8 percent and 14.3 percent, respectively. Perhaps the group experiencing the largest upheaval in terms of population are Native Americans. A complex web of federal, state, territorial, and local laws enacted prior to the start of the 20th century concentrated on removing Native Americans

---

[188] Before and after the formation of the Oregon Territory, there were many efforts to exclude Native Americans and other people of color from the region. This information is detailed extensively in chapter 1. For example, the Chinese Exclusion Act, Donation Land Claim Act, Washington Alien Land Law, and Sundown ordinances and practices, as well as violence against and the expulsion of Asian people in the region, restricted Asian immigration to the area. In more recent years, the absence of these racially targeted and motivated practices has widened the opportunity for people from Asian countries to immigrate to Washington. Washington is a natural choice for people coming from Asian nations given the state's proximity to Asia, the prominence and success of Asian in the state, and other considerations." *See, Matthew W. Klingle, "A History Bursting With Telling: Asian Americans in Washington State, A Curriculum Project for Washington Schools, Center for the Study of the Pacific Northwest, University of Washington,* https://www.washington.edu/uwired/outreach/cspn/Website/Classroom%20Materials/Curriculum%20Packets/Asian%20American s/Asian%20American%20Main.html.

from their land. [189] In 1890, just one year after Washington statehood, Native Americans made up 32.69 percent of the total state population. [190] By 2020, that percentage fell to just 1.2 percent.



*Figure 17 – Racial and Ethnic Composition Comparison, Washington compared to the U.S.*

Per U.S. Census data, there are 90,789 AIANs in Washington. [191] In 2021, King County was home to the highest number of AIANs in the state, however, this population is only .60 percent of the County population and .18 percent of the total AIAN population in the state. In Ferry County, home to the Confederate Tribes of the Colville Reservation, AIANs make up 15.8 percent of the County population but only .01 percent of the AIAN population in the state. Federal, state, and local governments took aggressive actions to displace AIAN people from Benton County during the 20th century. In the City of Richland, the federal government displaced AIANs from the Manhattan Project site at Hanford, resulting in only 1,745 AIANs living in the County in 2021, or .02 percent of the total AIAN population in the state. In 2021, slightly more than 50 percent of the AIAN population lived in 12.8 percent of Washington counties.

---

[189] See, summary of Pre-20th Century Actions Taken by Government to Limit Land and Homeownership, at p. 20 above.
[190] 1890 U.S. Census, see: https://www2.census.gov/library/publications/decennial/1890/volume-1/1890a_v1-13.pdf.
[191] According to the U.S. Census ACS, there are 90,789 AIANs alone in Washington state. However, according to Washington Tribes, a publication by the Washington Indian Gaming Association, there are more than 200,000 people with AIAN heritage in the state. Census records show there are 223,318 people who identify as AIAN alone or in combination with one or more other races. See, Final-2020_WA_Indian_Tribes_Today.pdf (washingtontribes.org) Additionally, according to one report, there are 313,633 people in the state who identify as AIAN alone or in combination with one or more races. See, Brennan, "Native American Population in Washington State has grown by More Than Half," https://www.thenewstribune.com/news/state/washington/article254452573.html.

| | NUMBER OF PEOPLE IDENTIFYING AS AIAN ONLY | % OF WA AIAN POPULATION |
|---|---|---|
| King County | 13,687 | 15.08% |
| Pierce County | 10,785 | 11.88% |
| Yakima County | 8,363 | 9.21% |
| Snohomish County | 7,101 | 7.82% |
| Spokane County | 6,167 | 6.79% |
| Total | 46,103 | 50.78% |

*Table 6 – AIAN Population in Washington*

Although Native Hawaiian or other Pacific Islanders (NHPI) make up 1.26 percent of the Washington population, the state has one of the highest populations of Native Hawaiians in the country, outside of Hawaii. [192] The vast majority (96.1 percent) live in urban areas of the state and King County is home to 32 percent of the NHPI population. [193]

## Disparities in Washington's Homeownership Gap Persists

As described in Chapter 1, deliberate discriminatory practices created wide homeownership gaps throughout Washington. These gaps have persisted, leaving significant racial disparities in homeownership deeply cemented throughout Washington.

Washington's homeownership rate is 64 percent, which is slightly lower than the national homeownership rate of 65.5 percent. Although the state has a higher median income than the nation, home prices in Washington are significantly higher than home prices nationwide. Higher home prices have made homeownership difficult to attain, however, there are other barriers, including discrimination and policies that have a disparate impact on certain groups.

The Black-White, Latino-White, and NHPI-White homeownership gaps are the largest gaps in the state. The Black-White homeownership gap is 31.1 percentage points (37.4 percent compared to 68.5 percent), the Latino-White homeownership gap in the state is 21.2 percentage points (47.3 percent compared to 68.5 percent), and the NHPI-White gap is 32.5 percentage points (36 percent compared to 68.5 percent). The state's AIAN-White gap is 14.5 percentage points (68.5 percent compared to 54 percent.)

The Asian-White homeownership gap in Washington of 5.1 percentage points (63.4 percent compared to 68.5 percent) is small relative to other races and ethnicities. When broken down further into subgroups, Indian Asians and Koreans are the only groups with significant

---

[192] "Assessment of the Housing Needs of American Indians, Alaska Natives, and Native Hawaiians in Washington." Washington State Department of Commerce. April 2022. https://www.commerce.wa.gov/wp-content/uploads/2022/04/CommerceReports_2021_CSHD_NA-Housing_4.26.22_Final.pdf.
[193] Ibid

homeownership gaps as when compared to Whites. The gap for Indian Asians is 12.7 percentage points and the gap for Koreans is 8.4 percent. [194]

The Asian subgroups who have had a larger presence in the state prior to the passage of the Fair Housing Act in 1968 have homeownership rates on par with or in some cases, higher than Whites. For example, the homeownership rate for Chinese in the state is 67 percent, the rate for Filipinos is 64 percent, and the rate for Japanese sub groups is 74 percent.



*Figure 18 - Homeownership Rates 2009-2021 Source: U.S. Census Bureau, American Community Survey.*

---

[194] Figures for homeownership rates of Asian subgroups are pulled from ACS 2022-5-year estimates. 5-year estimates were used so that there was a larger sample size to analyze in each Asian subgroup.



*Figure 19 – Homeownership Rates in Washington and Ethnicity by Race in 2021. Source: American Community Survey, 2021.*

| ASIAN SUBGROUP | HOMEOWNERSHIP RATE |
|---|---|
| Asian Indian | 54.7% |
| Cambodian | 66.8% |
| Chinese, except Taiwanese | 67.1% |
| Taiwanese | 67.9% |
| Filipino | 63.8% |
| Japanese | 73.8% |
| Korean | 58.8% |
| Laotian | 66% |
| Pakistani | 62.3% |
| Thai | 61.2% |
| Vietnamese | 68.5% |

*Table 7 - Homeownership Rates in Washington Disaggregated by Asian Subgroup*

**Note**: Bangladeshi, Bhutanese, Burmese, Hmong, Indonesian, Nepalese, and Sri Lankans not included because sample sizes in the 2021 ACS 5-year-data are below 50 households.

### Homeownership Among Blacks in the State has Been in Decline

The homeownership rate for Black Washingtonians today is much lower than it was before passage of the Fair Housing Act. As referenced in Chapter 1, Professor James Gregory of the University of Washington developed the chart below depicting the significant decline in homeownership rates for Blacks between 1970 and 2022.

Black families attempting to purchase homes after the lifting of covenant-restrictions would have faced affordability challenges. For example, in 2018, the median home in King County ($599,000) had appreciated at a rate 26 times that of 1970 home prices ($22,500). [195]  White families, who received significant support to become homeowners when housing costs in the state were much more affordable, have been the greatest beneficiaries. Conversely, Black, Latino, and Native American families, who were precluded from accessing homeownership opportunities when racially restrictive covenants were widely accepted, have been the losers.



| | 1970 | 1980 | 1990 | 2000 | 2010 | 2021-22 |
|---|---|---|---|---|---|---|
| Black % owners | 50% | 42% | 38% | 38% | 36% | 34% |
| White % owners | 67% | 68% | 66% | 68% | 68% | 69% |
| Indigenous % owners | 45% | 50% | 50% | 52% | 51% | 55% |
| Latino % owners | 55% | 46% | 40% | 41% | 43% | 47% |
| Asian/PI % owners | 60% | 56% | 54% | 56% | 60% | 63% |

*Figure 20 -Homeownership by race Washington state 1970-2022. Source: Homeownership by race 1970-2022, https://depts.washington.edu/covenants/homeownership_washington.shtml.*

---

[195] "Homeownership by Race." Racial Restrictive Covenants Project, Washington State. Civil Rights and Labor History Consortium, University of Washington. https://depts.washington.edu/covenants/homeownership_washington.shtml. These statistics are calculated from weighted samples of U.S. Census data produced by the Minnesota Population Center's IPUMS USA

### *Disparities in Home Value and Appraisals*

Finally, segregation, appraisal bias, and other forms of discrimination kept the property values of households of color unduly low. Today, Whites have housing values that far outpace the values of homes owned by marginalized groups. The gap in home price differentiation has ballooned over the decades. As the graphic below illustrates, in 1970, Black homeowners in King County owned homes that were roughly 72 percent of the value of the homes owned by White residents in the county. The difference between the median home values of White and Black residents in the King County in 1970 was $6,250. By 2022, the median value of Black-owned homes in King County was largely unchanged at 75 percent of the value of White-owned homes, with a difference of $200,000 in the median value of the homes.

In 2022, the Clarks, a Black family who purchased and renovated their home in the Columbia City neighborhood of Seattle, requested an appraisal to understand financing options for further renovations of the home they had lived in for four years.

The appraisal came in at a significantly lower number than the family and their agent expected, even though they had renovated and made additions to their home. Their home was valued at $670,000, when according to Zillow data at the time, the typical home value in their neighborhood was over $900,000. After "white-washing" the home, removing African art and family photos and enlisting a white neighbor stand in as the homeowner, a second appraisal several weeks later came back over $300,000 higher than the first appraisal.

Source: Randhawa, PJ. "Black family that 'whitewashed' house gets higher home appraisal." November, 17, 2022. KING5. https://www.king5.com/article/news/community/facing-race/low-home-appraisal-black-family-seattle/281-6fa15484-d9a0-434f-a3e3-c368d6324755.



| | 1970 | 1980 | 1990 | 2000 | 2008 | 2022 |
|---|---|---|---|---|---|---|
| Black median value | $ 16,250.00 | $ 60,000.00 | $ 95,000.00 | $ 187,500.00 | $ 350,000.00 | $ 600,000.00 |
| White median value | $ 22,500.00 | $ 72,500.00 | $ 137,500.00 | $ 225,000.00 | $ 450,000.00 | $ 800,000.00 |
| Latino median value | | | $ 137,500.00 | $ 162,500.00 | $ 350,000.00 | $ 600,000.00 |
| Asian median value | | | $ 137,500.00 | $ 225,000.00 | $ 450,000.00 | $ 800,000.00 |

*Figure 21- University of Washington, Racial Restrictive Covenants Project: Washington State*

As illustrated below under the section on "***Mortgage Denial Disparities***", lack of collateral is a top reason for credit denials for borrowers of color in the state. Research suggests that appraisal bias is partially responsible for the gap in median home value and the disparate treatment experienced by Black and Latino mortgage applicants. If a property is under-appraised, the borrower likely will be unable to secure a loan, unless they can come up with more funds for a higher down-payment. Which is less likely for Black, Latino, and AIAN borrowers are less likely to be able to come up with more funds given lower levels of household wealth. Yet, the State only began licensing appraisers in 1989. Recent research findings include:

- **Overt Discriminatory Statements**: The Federal Housing Finance Agency found, in a national review, that thousands of appraisal reports contained race-related red flags in the free form text fields of the appraisal report, suggesting the continued presence of appraisal bias. [196] Examples of inappropriate and potentially discriminatory language included in appraisal reports examined included:

---

[196] "Reducing Valuation Bias by Addressing Appraiser and Property Valuation Commentary," Federal Housing Finance Agency, FHFA Insights Blog. December 14, 2021, https://www.fhfa.gov/Media/Blog/Pages/Reducing-Valuation-Bias-by-Addressing-Appraiser-and-Property-Valuation-Commentary.aspx

- ▪ "Black race population above state average."

- ▪ "there is more Asian influence of late"

- ▪ "predominantly Hispanic" explaining that residents have "assimilated their culture heritage" into the community.

- ▪ "Koreatown is considered 'highly diverse' ethnically," and describing the number of foreign-born people in the neighborhood as being "considered high compared to the city as a whole."

- ▪ Documentation of ethnic groups having moved into the area over the years and describing the community as "one spicy neighborhood."

- ▪ Describing a community as originally being "White-Only" before experiencing a "White-Flight Red-Zone" and now being mostly "Working-Class Black."

- ▪ "decline in population, which transitioned from being predominately Eastern European to having a substantial amount of Black and Hispanic people."

- ▪ "commercial strip featuring storefronts supplying Jewish Households."

- ▪ "'not especially diverse' ethnically, with a high percentage of White people."

- **Appraisal Bias in Home Purchases:** Researchers at Freddie Mac analyzed millions of purchase transaction appraisals and found unexplained disparities in the percentage of properties that received an appraisal value lower than the contract price in Black or Latino census tracts versus White census tracts. [197]

- **Appraisal Bias in Home Refinancings:** Fannie Mae researchers analyzed refinancing transaction appraisals and found that appraisers were more likely to overvalue White-owned homes in majority-Black neighborhoods by relying on comparable sales from outside of the subject property's immediate area. [198]

- **Inequitable Appraisals:** Dr. Junia Howell and Dr. Elizabeth Korver-Glenn analyzed millions of appraisals throughout the nation and found that appraisers valued homes in White communities 200 percent higher than comparable homes in similar neighborhoods of color. [199] In 2021, in the Seattle-Tacoma-Bellevue, Washington Metropolitan Statistical Area, the mean appraised value for a home in a predominately White community was $944,097, 22 percent more than the mean appraised value of homes in communities of color ($773,481). In the Spokane-Spokane Valley, Washington Metropolitan Statistical Area, the mean appraised value for a home in a predominately White community was $459,679, 123 percent higher than the mean appraised value of homes in communities of color ($206,055). [200]

---

[197] Narragon, Melissa et al. "*Racial and Ethnic Valuation Gaps in Home Purchase Appraisals, Freddie Mac Economic and Housing Research Note,*" September 2021. https://www.freddiemac.com/research/insight/20210920-home-appraisals.
[198] Jake Williamson and Mark Palim, *Appraising the Appraisal*, Fannie Mae (February 2022), https://www.fanniemae.com/media/42541/display.
[199] Junia Howell and Elizabeth Korver-Glenn, *Appraised: The Persistent Valuation of White Neighborhoods as More Valuable than Communities of Color*, Eruka (2022). https://www.eruka.org/appraised.
[200] *Ibid.*

- **Appraisal Bias Impacts Racial Wealth Gaps:** Dr. Andre Perry of Brookings Institute and his peers conducted research that revealed that appraisals in majority-Black areas are almost twice as likely to be valued under a home's contract price than appraisals for homes in majority-White areas. Researchers performed a conservative analysis by comparing comparable neighborhoods based on a variety of factors, including neighborhood walkability, access to jobs, crime rates, and other factors. They found homes in Black neighborhoods are undervalued to the tune of $162 billion representing a huge loss of wealth for these households. [201]

## Home Purchase Pricing Trends

Median property values of purchased homes have also increased in recent years for all racial and ethnic groups in Washington, reflecting rising home prices. Although property values in the state are slightly higher, Latino households are more likely to buy less expensive homes, while Black and White buyers purchase homes of similar value. This trend is likely due to Latinos being more dispersed throughout the state while Blacks are more concentrated in Seattle which is a much higher cost market. Asian buyers bought substantially more expensive homes than other race and ethnic groups, on average. In the state, the median purchase price for Black and White households increased by 28 percent (about $120,000 in value) between 2020 and 2022, a moderately greater rate than for Latino households (about $90,000 in value).

**Median Property Values for New Purchases, by Race or Ethnicity**





**Source**: 2020–2022 Home Mortgage Disclosure Act data.
**Notes**: Values are in 2021 inflation-adjusted dollars. Original, unadjusted reported values rounded to the midpoint of the nearest $10,000 interval.

---

[201] Johnathan Rothwell and Andre M. Perry, *How Racial Bias in Appraisals Affects the Devaluation of Homes in Majority-Black Neighborhoods*, Brookings (December 5, 2022), https://www.brookings.edu/articles/how-racial-bias-in-appraisals-affects-the-devaluation-of-homes-in-majority-black-neighborhoods/.

"Now I want to tell you about a decorated soldier, survived four tours and landed in Fort Lewis to retire master sergeant nearly unheard of at the time. He went on to build a second career and became one of the first black Boeing employees to earn the same wage as his white machinist counterparts. Wester Bradley Jefferson, son to Darthilla and Thomas Jefferson. Both who were born as children to ancestors held as chattel slaves: Tom, Liza, Sam and Harriet.  Wester is my grandfather. He was not given the opportunity to use his G.I bill. And he was not given the option to purchase a home in a neighborhood of his white counterparts. Instead, in 1963 he built a home in an all-black part of town in what is now Tacoma's eastside Cloverdale neighborhood. I now lovingly own this home, and today it would fetch approximately two hundred thousand dollars or more in equity in a different neighborhood, a couple miles north."

**Jasmyn Jefferson,** Designated Broker and an Owner of Windermere Abode Lakewood

## Washington's Wealth Disparities

A report from the Office of Lieutenant Governor Denny Heck and a report issued by the Homeownership Disparities Work Group (the Work Group) both conclude that the racial wealth gap is responsible for the homeownership gap in Washington. [202] Accumulation of wealth is affected by the historic actions set out in Chapter 1.

Wealth is typically measured by calculating the amount of assets (the value of stocks, business ownership, housing, and liquid assets) less debts. [203] Between 2019 and 2022, wealth rose dramatically for each race and ethnicity nationally. For Black and Latino families, the largest contributor to wealth growth was an increase in housing equity with the value of stocks and business ownership contributing much less. [204] Because the Black and Latino homeownership rates are so low, the opportunity to grow wealth is smaller and, as a result, the racial wealth gap is widening.

 State-specific data on the demographics of wealth in Washington is limited, but recent study by the Institute on Taxation and Economic and Policy reveals that Washington is one of a few states with a high concentration of people with wealth in excess of $30 million. [205] In Washington, wealth is segregated. Extreme wealth is concentrated near the State's urban centers. King County has nearly 10,000 taxpayers with wealth of $15 million or more. Pierce and Snohomish Counties each

---

[202] Logani, Ilina. *The Racial Wealth Gap Is the Housing Gap. 2021.* Accessed on March 20, 2024 at: https://www.ltgov.wa.gov/s/The-Racial-Wealth-Gap-is-the-Housing-Gap.pdf;  and Lisa Brown et al." Improving Homeownership Rates for Black, Indigenous, and People of Color in Washington  https://www.commerce.wa.gov/wp-content/uploads/2022/09/Homeownership-Disparities-Recommendations-Report-FINAL-Sep2022.pdf.
[203] "Homeownership, racial segregation, and policy solutions to racial wealth equity," Brookings, September 1, 2021. https://www.brookings.edu/articles/homeownership-racial-segregation-and-policies-for-racial-wealth-equity/.
[204] Bhutta, Neil, et al. "Disparities in Wealth by Race and Ethnicity in the 2019 Survey of Consumer Finances." http://www.federalreserve.gov/econres/notes/feds-notes/disparities-in-wealth-by-race-and-ethnicity-in-the-2019-survey-of-consumer-finances-20200928.htm; "The Racial Wealth Gap" page 5.
[205] Davis, Carl, Emma Sifre and Spandan Marasini. "Estimating Wealth Levels and Potential Wealth Tax Bases Across States." Institute on Taxation and Economic Policy, October 2022. https://itep.org/the-geographic-distribution-of-extreme-wealth-in-the-u-s/.

have more than 1,000 taxpayers with more than $15 million in wealth. Seven counties have no taxpayers with more than $15 million in wealth. [206]

The Washington Future Fund Committee's 2022 report to the legislature notes that "there is a consistent disadvantage among Black, Latino and Native American households, all of which experience higher asset poverty and liquid asset poverty and are more likely to have zero or negative net worth than White households." It goes on to state that all households of color in Washington have lower wealth than their White counterparts, and that the wealth divide for every racial and ethnic group in Washington is larger than the gaps seen in national averages. [207] In 2019, White households in Washington had an estimated net worth of $286,200 as compared to households of color in the state, whose estimated net worth was over four times less ($67,600).

> In 2019, White households in Washington had an estimated net worth of $286,200 as compared to households of color in the state, whose estimated net worth was over four times less ($67,600)

The wealth gap is linked to a myriad of consequences. Lack of current wealth impacts intergenerational wealth. Research has shown that the homeownership status of parents is highly correlated with a child's ability to obtain homeownership. [208] This is because the wealth of parents can be used to fund such things as a college education which leads to higher wages and lower student debt. [209] As we will detail later in this chapter, the most frequent reason for a loan denial is an applicant's debt-to-income (DTI) ratio which includes student debt.

Blacks, Latinos, and other students of color disproportionately attend schools with fewer resources. In fact, in the U.S., school systems spend $23 billion more each year to educate students in predominately White districts than they do in districts that predominately educate children of color even though the latter educate slightly more students. As a result, children of color do not receive the same level and quality of education as do their White peers and they enter college at a disproportionate disadvantage, requiring them to take more remedial classes and/or stay in school longer. Coupled with the lower wealth of these families, the result is that these students will have higher student debt. Once they graduate, become employed and apply for a mortgage, they have higher levels of debt than their White counterparts. In Washington, 43.7 percent of people who are Black and 42 percent of people who are Latino are denied a mortgage

---

[206] Brotherton, Carolyn. "Where is the Wealth in Washington?" Economic Opportunity Institute, October 25, 2022. https://www.opportunityinstitute.org/blog/post/where-is-the-wealth-in-washington/.

[207] "2022 Washington Future Fund Committee: A Report to the Legislature ESSB 5693 Sec. 123(3)." Office of the State Treasurer. December 1, 2022. https://app.leg.wa.gov/ReportsToTheLegislature/Home/GetPDF?fileName=2022%20WFF%20Committee%20Report_Submitted%2011.30.22_6247bd26-23ae-46ff-9723-905e60ee2cd4.pdf

[208] Choi, Jung Hyun et al. "Intergenerational Homeownership: The Impact of Parental Homeownership and Wealth on Young Adults' Tenure Choices." October 2018. https://www.urban.org/sites/default/files/publication/99251/intergenerational_homeownership_0.pdf.

[209] ""Improving Homeownership Rates for Black, Indigenous, and People of Color in Washington," https://www.commerce.wa.gov/wp-content/uploads/2022/09/Homeownership-Disparities-Recommendations-Report-FINAL-Sep2022.pdf, 20.

based on DTI compared to 39.8 percent of Whites. These groups also had much higher DTIs as compared to their White counterparts.

Parental wealth can also be used to fund down payments for children. The Federal Reserve found that White families are more likely to receive an inheritance compared to Black or Latino families. [210] Inheriting money for a down payment or receiving a downpayment as a gift from parents shortens the time needed to save for a down payment. Freddie Mac calculated the portion of the Seattle population that was "mortgage-ready." According to that data, it would take people who were Black or Latino nearly six years to save a 3 percent down payment compared to only 4.9 years for people who are White or Asian. [211] In addition, lower down payment amounts result in higher cost mortgages making people of color less likely to remain homeowners. Fewer than half of low-income homeowners of color still owned homes four years after becoming homeowners. In contrast, 60 percent of White homeowners at similar income levels remained owners four years later. [212]

> "I want to note these headlines from the Seattle times that reflect the continuing legacy of that discrimination. Headline number one: in Seattle area, 'Rentals racially divides neighborhoods.' The date on that headline, September 7, 2020. 'Black Neighborhood Home appraisal gap is real'. The date here: September 24, 2021. 'The Black home ownership rate is lower than it was in 1968,' September 17, 2022.
>
> There is, however, a much more subtle legacy not reflected in active discrimination. Yes, we still have active discrimination as these headlines reflect. But there is a much larger issue, and it is a consequence of more than the century of the devaluing housing in the inner cities of the state leading to inter-generational poverty that affects far too many people of color in the state today. There is…a palpable wealth gap between African Americans and other Washingtonians today, and that wealth gap I believe …is almost a direct consequence of decades of housing discrimination."
>
> **Professor Quintard Taylor**, Scott and Dorothy Bullitt Professor of American History at the University of Washington

In addition, higher down payments can be used to lower the loan-to-value (LTV) ratio for homebuyers. As noted above, Black and Latino borrowers generally had lower down payments than their White counterparts and therefore had higher LTVs. A high LTV results in a longer time to build wealth through equity and accessing the full wealth-generating advantages of homeownership. [213] High LTVs also result in a greater vulnerability to housing instability as the owner has less equity to cover the cost of emergency repairs or other catastrophic events.

---

[210] Disparities in Wealth by Race and Ethnicity in the 2019 Survey, http://www.federalreserve.gov/econres/notes/feds-notes/disparities-in-wealth-by-race-and-ethnicity-in-the-2019-survey-of-consumer-finances-20200928.htm
[211] Choi, "Intergenerational Wealth," page 25.
[212] "How does homeownership contribute to wealth building?" Habitat for Humanity. Accessed on March 20, 2024. https://www.habitat.org/sites/default/files/Evidence-Brief_Wealth-building-for-homeowners.pdf.
[213] "The Racial Wealth Gap" page 12.

"I was born in Seattle, and I lived in the Rainer Valley area forever. My parents shared the difficulties they experienced while trying to purchase a home in Seattle and none of it involved their income. It was based on their race. They're black. Even when it was technically illegal, they mostly found housing in historically red lined areas in Seattle which were deemed undesirable. Now today, if you drive down Rainier Avenue style or Martin Luther King, there are brand new homes that I would never be qualified to purchase because they're just too expensive. [This is] because of tools of discrimination like racially restrictive housing covenants. It had a generational impact on my family from my grandparents even to my parents struggling not being able to assist me with a down payment or anything like that."

**LeChelle Lucas,** West Seattle Resident

## Access to Credit Gaps & Mortgage Lending Access

Washington's racial homeownership gaps may be partly explained by differences in access to home mortgages.

### *Disparities in Mortgage Applications*

Blacks, Native Americans, and Latinos purchase homes and apply for mortgage loans at much lower rates than would be expected, particularly since these groups are disproportionately represented among renter households. Although Blacks and Latinos have very high rental rates − 62.6 percent and 52.7 percent respectively −only 3.4 percent of all Black households in the state applied for a mortgage loan in 2021 and only 4.3 percent of Latino households applied for a loan. Alternatively, although White households have the lowest rental rate at 31.5 percent, 3.6 percent of White households applied for a mortgage loan in 2021. Moreover, 11.3 percent of all White renter households applied for a mortgage and 21.2 percent of all Asian renter households applied for a mortgage. Conversely, 8.2 percent of Latino renters applied for a mortgage loan and only 5.5 percent of Black renters applied for a loan. People in the AIAN population had the lowest percentage of mortgage loan applications with just 0.5 percent of the AIAN population applying for a mortgage.

**Mortgage Application Rate Relative to the Total Household Population**

| Area | Asian | Black | Latino | White | Total |
|------|-------|-------|--------|-------|-------|
| Washington State | 7.8% | 3.4% | 4.3% | 3.6% | 4.0% |
| United States | 4.7% | 2.4% | 3.3% | 3.7% | 3.5% |

*Source: 2021 Home Mortgage Disclosure Act data and the American Community Survey.*
Notes: MSA = metropolitan statistical area. Data are for purchase loans only.

**Mortgage Application Rate Relative to the Total Renter Population**

| Area | Asian | Black | Latino | White | Total |
|---|---|---|---|---|---|
| Washington State | 21.2% | 5.5% | 8.2% | 11.3% | 11.4% |
| United States | 12.0% | 4.1% | 6.4% | 13.4% | 9.6% |

*Source: 2021 Home Mortgage Disclosure Act data and the American Community Survey and the Urban Institute.*
Notes: MSA = metropolitan statistical area. Data are for purchase loans only. Rates calculated for purchase applications per renter include only renters.

## *Mortgage Denial Disparities*

Black and Latino and AIAN borrowers are also denied mortgage loans at rates higher than their White counterparts in Washington. Latino applicants had the highest denial rate based on the 2022 Home Mortgage Disclosure Act (HMDA) data, followed closely by Black applicants and AIAN applications with loan rejection rates of 12 percent and 11.9 and 11.1 percent respectively. Asians had a denial rate of 7.9 percent. This compares to a loan rejection rate of only 6.6 percent for White applicants. Overall, the loan denial rates for applicants in Washington were lower than national rates. This may be largely due to Washingtonians having a much higher median income as compared with that of the U.S. as well as an applicant pool with a slightly better financial profile as compared to applicants generally at the national level.



**Denial Rates, by Race or Ethnicity**

*Figure 22 – Denial Rates by Race or Ethnicity.*

As with national statistics, the top three reasons for mortgage loan denials in Washington were Debt-to-Income (DTI) ratio, credit history, and collateral. For Whites, Asians, Latinos, Blacks, and AIANs, the top reason, by far, for loan denials was DTI ratio. It accounted for over 66 percent of loan denials for Asian, Black, Latino, and AIAN applicants. The second highest reason for mortgage denials was credit history. A large share of Black, Latino, and AIAN (13.6 percent) applicants were denied based on credit history. The higher rate of denials based on credit history

for these borrowers is not a surprise given these consumers are disproportionately credit invisible [214] due to systemic redlining, credit discrimination, and because these groups disproportionately live in credit deserts due to segregation. The third most frequent reason for denials was collateral, which likely means that appraised value of the property did not match the seller's asking price or that there was some other issue related to the property that caused the lender to believe the home would not be sufficient to collateralize the loan.

### Reason for Denial

| | Washington State | | | | US | | | |
| Reason | Asian | Black | Latino | White | Asian | Black | Latino | White |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| DTI ratio | 41.3% | 43.7% | 42.0% | 35.6% | 39.8% | 34.8% | 37.8% | 31.6% |
| Credit history | 6.1% | 14.6% | 17.0% | 14.1% | 6.9% | 29.3% | 20.9% | 24.4% |
| Collateral | 14.1% | 10.4% | 10.8% | 16.8% | 12.5% | 8.5% | 11.6% | 13.4% |
| Application incomplete | 14.3% | 7.5% | 8.0% | 11.6% | 13.0% | 7.3% | 7.6% | 9.1% |
| Others | 24.2% | 23.8% | 22.1% | 21.8% | 27.8% | 20.1% | 22.0% | 21.4% |

*Table 2 – Reason for Denial.*

Source: 2022 Home Mortgage Disclosure Act data and Urban Institute.
Notes: DTI = debt-to-income; MSA = metropolitan statistical area. Data are for purchase loans only.

### Debt-to-Income

The DTI ratio reflects how much debt the borrower will have if they are successful in obtaining a mortgage loan as compared with the borrower's income. The ratio is calculated by dividing monthly debt payments by the monthly income. Generally, lenders consider a DTI of over 43 percent as too high, although some lenders will allow DTIs above 43 percent in the right circumstances. Loan applicants with higher home sales prices and higher mortgage payments will likely have higher DTIs. Given the median home price in Washington is roughly $200,000 higher than the average national home price, it is understandable that DTIs will be higher in the state, even though people in the state earn more income, on average, as compared to the rest of the nation.

---

[214] The term "credit invisible" is defined by the Consumer Finance Protection Bureau as consumers who do not have credit records maintained by Experian, Transunion, or Equifax, the three major nationwide credit reporting agencies (NCRAs). NCRAs receive information from creditors about the payment patterns of consumers. When there are no creditors reporting any information about a consumer to the NCRAs, that consumer is defined as "credit invisible." The term "credit invisible" does not mean that a consumer has not obtained credit. It does mean that the credit the consumer has obtained is not reported on a regular basis to the NCRAs. NCRAs use data from a consumers file to generate a credit score. For this reason, consumers who have too little data contained in the NCRAs' files, such that a credit scoring algorithm cannot generate a score for the consumer, are deemed to be "unscorable." *See,* Kenneth P. Brevoort, Philipp Grimm, and Michelle Kambara, "Data Point: Credit Invisibles," CFPB, May 2015. Available at https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf



*Figure 23 – DTI Ratio Distribution Comparison*

As the chart above shows, a larger share of applicants in Washington had DTIs above 40 percent. Over 52 percent of homebuyers in Washington had DTIs over 40 percent. Comparatively, less than 47 percent of homebuyers in the U.S. had a DTI over 40 percent. Black and Latino borrowers had DTI ratios that were higher than their White counterparts largely because these consumers have less intergenerational wealth and thus have lower down payments meaning they must borrow more money to purchase a home. In some cases, a low down payment might result in a higher interest rate for the borrower. Additionally, Blacks and Latinos have slightly lower credit scores and are likely charged a higher interest rate, which means their mortgage payment will be higher, thereby elevating their DTI. These consumers also earn lower incomes than their White counterparts which might result in higher DTIs.

While a high DTI ratio was the number one reason for mortgage denial for AIAN borrowers in Washington, AIAN borrowers are more likely to be denied because of insufficient cash (10.2 percent of AIAN denials) than AIAN borrowers in the US. Additionally, compared to White borrowers in Washington, AIAN borrowers have a lower share of those who are denied because of the DTI ratio and a higher share due to reasons that are not in the top four categories (32.2 percent of AIAN denials vs. 21.8 percent of White denials). These include "Employment History," "Insufficient Cash for Downpayment and Closing Costs," "Mortgage Insurance Denied," and "Unverifiable Information."



*Figure 24 – DTI Ratio Distribution by Race or Ethnicity*

## Collateral (Loan-to-Value Ratio and Other Issues)

When a loan is denied due to collateral issues, this generally means the appraised value for the property is too low to collateralize the mortgage and the Loan-to-Value (LTV) ratio would exceed the lender's standards. For example, if a person was seeking to purchase a home for $500,000 and had only a 5 percent ($25,000) down payment, the borrower would need to borrow $475,000. In this case, the home would need to appraise for at least $500,000 for the lender to be assured that the home could serve as sufficient collateral for the mortgage loan. If the home appraised for $500,000, the LTV would be 95 percent, that is $475,000 is 95 percent of the value of the home ($500,000). However, if the appraisal comes in at a lower amount, $450,000 for example, the LTV would increase to 106 percent since the loan amount of $475,000 would exceed the home value of $450,000. Most lenders have policies that prohibit them from making a loan in which the LTV exceeded 100 percent. In fact, many lenders have policies that prohibit them from making any loans in which the LTV exceeds 97 percent.

As mentioned above, Black and Latino borrowers in the state generally had lower down payments than their White counterparts and therefore had higher Loan-to-Value (LTV) ratios. The LTV is directly related to how much money a borrower can put toward their down payment. In 2022, 56 percent of Black and 52.9 percent of Latino borrowers had LTVs of 90 percent or higher. This stands to reason since these consumers generally have little inter-generational wealth and benefit less from parental assistance. Moreover, homebuyers with higher LTVs can expect to be charged a higher interest rate than homebuyers with lower LTVs because some investors and lenders add a surcharge based on the LTV and/or a combination of the LTV and credit score. The surcharge, or credit overlay, depends on the investor and lender. However, these types of surcharges will have a discriminatory effect on Black and Latino borrowers in particular. State financial regulators can limit the ability of lending institutions to apply surcharges or credit overlays to consumers if those surcharges will result in an arbitrary discriminatory effect. However, the State has not restricted this practice among the lenders it regulates.



*Figure 25 – LTV Ratio Distribution by Race or Ethnicity.*

## Lack of Credit

As referenced above, Latino and Black mortgage applicants are denied at higher rates than Asian and White applicants based on credit scores. A credit score is a number generated by a corporation that develops the scoring models (i.e., FICO, VantageScore, etc.) The models or algorithms these companies use to generate the credit score are hidden, but companies report generally on how the score is calculated. These companies develop their models based on historical data they purchase to run tests and regression analyses to determine if there are variables or data points that can predict a consumer's risk profile. The Classic FICO score, which is the credit score required by Fannie Mae, Freddie Mac, FHA, and other entities, was built using data and models estimated from the late 1990s. [215] Studies have revealed that credit scores generally carry discriminatory impacts and artificially lower the credit score of people of color, [216] particularly for Black, Latino, and AIAN borrowers. [217]

Traditional credit scoring models can often manifest widespread bias that includes both historical and current harmful practices. That is, the scores often reflect discriminatory policies and practices that, combined, result in generally lower scores for people of color and generally higher scores for White consumers. For example, scoring models project a person's inability or ability to inherit wealth from their ancestors. One of the major components of credit scoring models is determining how much credit a person has available on their credit accounts. Low wealth

---

[215] Goodman, Laurie. "In Need of an Update: Credit Scoring in the Mortgage Market," Urban Institute, July 2017, https://www.urban.org/sites/default/files/publication/92301/in-need-of-an-update-credit-scoring-in-the-mortgage-market_2.pdf
[216] *See,* Testimony of Lisa Rice before U.S. House Committee on Financial Services, "Missing Credit: How the U.S. Credit System Restricts Access to Consumers of Color," https://nationalfairhousing.org/wp-content/uploads/2019/04/Missing-Credit.pdf.
[217] "Past Imperfect: How Credit Scores and Other Analytics "Bake In" and Perpetuate Past Discrimination," National Consumer Law Center, May 2016, https://www.nclc.org/wp-content/uploads/2022/09/Past_Imperfect.pdf.
Rice, Lisa and Deidre Swesnik, Discriminatory Effects of Credit Scoring on Communities of Color, Suffolk Press, 2012, https://nationalfairhousing.org/wp-content/uploads/2021/12/NFHA-credit-scoring-paper-for-Suffolk-NCLC-symposium-submitted-to-Suffolk-Law.pdf.

consumers are more likely to utilize more of the debt available to them whereas consumers with more wealth are more likely to utilize less of the debt available to them. This does not in and of itself mean that people with lower wealth will not pay their bills on time. Quite the contrary, most do pay their obligations in a timely manner. Nevertheless, scoring models lower the scores of people who carry higher balances on their credit accounts. [218] As discussed throughout this chapter, people of color are much more likely to have lower wealth than their White counterparts and therefore will be more likely disadvantaged by credit scoring models.

Credit scores can also perpetuate systemic bias in other ways. These scores can reflect whether a person lives in a credit desert, whether that person has accessed credit from a high-cost lender (who disproportionately target borrowers of color), the impact of redlining, and other discriminatory practices like predatory lending. [219] Even if the borrower regularly pays their debts on time, the scoring model can lower a consumer's score by up to 19 points simply because the consumer accessed credit from a finance company. [220] Consumers of color, who disproportionately live in credit deserts and access credit from non-traditional banks will be negatively impacted by this feature of the credit score model. [221]

Even young people are impacted by this barrier. Beginning at the age of 18, Latino and Black consumers start with credit scores that are lower than their White peers and the divergence in scores deepen as young people age. [222] Young Black and Latino borrowers are often disadvantaged because their parents are less able to lend financial support and advice to their children as their White counterparts.

Studies also show that using non-traditional credit data, like cash flow analysis, is a better predictor of borrower risk than credit score models. [223] Moreover, enhancing traditional credit scores with non-traditional data, like rental housing payment information, yields more refined results in the analysis of a borrower's risk. Adding non-traditional data reveals that some borrowers with lower FICO scores are less risky than those with higher FICO scores.

While Washingtonians, on average, have higher credit scores than the nation as a whole, the impact of discriminatory practices and segregation shows clearly in the data. Blacks have the lowest credit scores both at the national and state levels. Latinos have the next to lowest credit scores, and Whites and Asians have the highest credit scores. The lower credit scores for Blacks and Latinos explain why these groups have higher mortgage denials despite credit scores not being the best arbiter of a borrower's creditworthiness. These borrowers will be charged higher interest rates based on their lower credit scores making their eligibility for a mortgage loan even more untenable. The Washington Department of Financial Institutions has not implemented any policies or guidance directing lenders who issue credit in the state to avoid an over-reliance on

---

[218] Rice, Lisa and Deidre Swesnik, "Discriminatory Effects of Credit Scoring on Communities of Color," Suffolk University Press, June 2012, https://nationalfairhousing.org/wp-content/uploads/2021/12/NFHA-credit-scoring-paper-for-Suffolk-NCLC-symposium-submitted-to-Suffolk-Law.pdf.

[219] Campisi, Natalie. "From Inherent Racial Bias to Incorrect Data – The Problems With Current Credit Scoring Models" *Forbes*. February 26, 2021. https://www.forbes.com/advisor/credit-cards/from-inherent-racial-bias-to-incorrect-data-the-problems-with-current-credit-scoring-models/.

[220] Rice, Swesnik "Discriminatory Effects"

[221] *See*, Access to Credit, National Fair Housing Alliance, https://nationalfairhousing.org/issue/access-to-credit/.

[222] Garon, Thea. "Young Adults' Credit Trajectories Vary Widely by Race and Ethnicity." The Urban Institute. August 22, 2022. https://www.urban.org/urban-wire/young-adults-credit-trajectories-vary-widely-race-and-ethnicity.

[223] FinRegLabs. "The Use of Cash-Flow Data in Underwriting Credit." July, 2019. https://finreglab.org/wp-content/uploads/2019/07/FRL_Research-Report_Final.pdf.

credit scores for underwriting and pricing purposes. The lack of such guidance continues to exacerbate racially disparate outcomes in the lending sector. Washington State's Homeownership Disparities Working Group identified credit score requirements as a distinct barrier to homeownership for people of color.

**Median Credit Score, by Race and Ethnicity**

|  | Asian | Black | Latino | White | Total |
|---|---|---|---|---|---|
| **Washington State** | 768 | 726 | 736 | 763 | 762 |
| **United States** | 772 | 699 | 726 | 756 | 750 |

**Source**: 2021 Home Mortgage Act Data and Black Knight Data Matched by Urban Institute
**Notes**: MSA = metropolitan statistical area. Data are for purchase loans only.



*Figure 26 – Credit Score Distribution by Race or Ethnicity. Source: 2021 Home Mortgage Disclosure Act and Black Knight Matcha Data by Urban Institute.*

## *Mortgage Loan Channel Trends Vary by Race and Ethnicity*

In Washington state, as in the nation as a whole, Black and Latino borrowers are disproportionately served by FHA and VA mortgage programs. This data point is illustrated in the chart below, which shows that 18.7 percent of loans held by Black borrowers and 18.3 percent of loans held by Latino borrowers are FHA loans, compared to only 8.4 percent of loans held by White borrowers and 3.4 percent held by Asian borrowers. Because FHA loans cost the borrowers more over time than conventional loans, this higher percentage indicates that higher cost financing falls on Black borrowers more than any other race or ethnicity.

Similarly, Black borrowers held the highest percentage of VA loans in the state, with 17.3 percent of all loans held by Black borrowers and 11.3 percent of Latino borrower loans being VA loans. This compares to VA loans comprising 10.1 percent of loans held by White borrowers and 3.1 percent of loans held by Asian borrowers.



**Loan Channel, by Race or Ethnicity**

*Source*: 2022 Home Mortgage Disclosure Act data.
*Notes*: FHA = Federal Housing Administration; VA = US Department of Veterans Affairs. Data are for purchase loans only.

*Figure 27 – Loan Channel by Race or Ethnicity. Source: 2022 Home Mortgage Disclosure Act data.*

## Homelessness Disparities & Access to Safe and Secure Housing

A direct line can be drawn from historical discriminatory policies such as urban renewal implemented by state and local actors to the disparities in homelessness throughout Washington today. The majority of the groups that were denied housing and land ownership opportunities via explicitly racist policies and practices are disproportionately represented in groups experiencing higher rates of homelessness and have less access to safe and secure housing opportunities.

Unfair policies created a wealth and homeownership divide that still exists in the state. People most negatively impacted by these policies do not have the ability to pass on wealth to future generations. This, along with a lack of equal education, employment, and housing opportunities as well as continuing patterns of discrimination in labor, education, and housing markets, drives higher rates of poverty, lower incomes, and lower wealth among marginalized groups. Moreover, exclusionary zoning policies, a dearth of policies and programs that provide housing and credit opportunities for marginalized groups, and a lack of support for affordable housing developments in well-resourced neighborhoods, have impeded people's ability to gain secure and sustainable housing opportunities leaving these residents vulnerable to stints of homelessness.



"Native people were never homeless before 1492."

Derrick Belgarde, Deputy Director, Chief Seattle Club

People who live without shelter have higher levels of other debilitating impacts, including being disproportionately targeted for murder and other forms of violence, arrest and incarceration, unemployment, negative health outcomes, lack of access to educational opportunities, and higher mortality rates.

At the national level, Native Hawaiians and Pacific Islanders have the highest rate of homelessness; 121.2 of every 10,000 people in this group are not housed. For Black and AIAN populations, 48.2 and 44.9 out of every 10,000 respectively are homeless. For Latino, White, and Asian groups, 22.4, 11.6, and 4.1 out of every 10,000 respectively are homeless. [224]



**Total or Rate / Rate Per 10,000** Data Source: U.S. Department of Housing and Urban Development, 2022 Annual Homeless assessment Report to Congress (AHAR); U.S. Census Bureau, 2022 Populations Estimates.

*Figure 28 – Counts and Rates by Race and Ethnicity in 2022.   Adapted from a Graph by the National Alliance to End Homelessness.*

At the state level, 60.7 and 60.6 of every 10,000 Native Americans and Blacks respectively are considered homeless. For Latinos, Whites, and Asians, 18.6, 12.7, and 7.3 out of every 10,000 persons, respectively, in each group are homeless.

---

[224] "State of Homelessness: 2023 Edition," National Alliance to End Homelessness. Accessed on March 20, 2024, https://endhomelessness.org/homelessness-in-america/homelessness-statistics/state-of-homelessness/.



*Figure 29 – Washington State Counts by Race and Ethnicity 2022.*

The chart below illustrates homelessness from an alternative perspective by gauging a racial or ethnic group's representation in a given system in proportion to their representation in the overall population. An index of 1 indicates equal representation. An index above 1 indicates a group's overrepresentation while an index below 1 indicates a group's underrepresentation in a particular system. The information in the chart was generated from the Corporation for Supportive Housing's (CSH's) Racial Disparities and Disproportionality Index (RDDI). [225] The RDDI is designed to disaggregate data by race and ethnicity to provide policy makers and other practitioners the ability to better understand how different groups are impacted by certain systems. The RDDI does not use White as a baseline for comparative analysis, rather it compares each racial or ethnic group to the total or aggregation of all other groups. CSH describes the index as the "likelihood of one group experiencing an event, compared to the likelihood of another group experiencing that same event." [226]

The RDDI analysis reveals that Blacks and AIANs in the state have an outsized representation among those who are chronically homeless, non-chronically homeless, homeless veterans, and families who are experiencing homelessness with Black residents being most impacted in all four categories. Hispanic/Latino persons also have higher representation among chronic, non-chronic, and family groups experiencing homelessness. Latinos have lower representation as compared to all other groups when it comes to Veteran homelessness. Whites and Asian residents in the state have lower levels of representation among all homelessness categories measured by CSH.

---

[225] *See*, "Racial Disparities and Disproportionality Index," Corporation for Supportive Housing, https://www.csh.org/supportive-housing-101/data/.
[226] *See*, "Racial Disparities and Disproportionality Index." Corporation for Supportive Housing. Accessed on March 20, 2024. https://www.csh.org/wp-content/uploads/2020/04/RDDI_OverviewHowTo.pdf.



*Figure 30 – Racial Disparities and Disproportionality Index Homelessness.*

According to an analysis of the housing needs of AIANs in the state [227], there are several major drivers of housing insecurity that lead to this group's outsized representation among those who are not housed. Tribal Designated Housing Entities (TDHEs) do not have sufficient funds to build new and maintain existing housing units. Nor do they have sufficient resources to help transition members of the tribes into homeownership opportunities. Moreover, Tribes are often not included in the planning processes by jurisdictions throughout the state, further frustrating their ability to meet their communities' needs. For urban Native housing providers, there is a dire need for emergency, transitional, and permanent affordable housing opportunities. A lack of funds and restrictions on available funds impede the ability of Native housing providers to develop culturally relevant housing facilities. This leads to AIANs being significantly over-represented among the homeless population. For example, while AIANs only make up about 1 percent of the population in King County, they represented 15 percent of all who were homeless in the County.

Point-in-Time counts of homeless persons specific to several regions of the state also speak to outsized representation of Native Hawaiians and Other Pacific Islanders in the homeless population. In 2020, Native Hawaiians and other Pacific Islanders made up about four percent of the population experiencing homelessness in King County, as compared to making up only one percent of the overall population of King County. In Spokane County, Native Hawaiians and other

---

[227] Kramer et. Al, "Assessment of the Housing Needs," https://www.commerce.wa.gov/wp-content/uploads/2022/04/CommerceReports_2021_CSHD_NA-Housing_4.26.22_Final.pdf .

Pacific Islanders made up 2.9 percent of the homeless population but make up 0.5 percent of the county's population. In Whatcom County, Hawaiians and other Pacific Islanders make up only 0.1 percent of the population of the county but comprise one percent of the county's homeless population. [228]

## Housing Cost Burden Among Homeowners

The housing cost burden is a measurement of the monthly costs homeowners must pay toward their housing expenses – mortgage payment, property taxes, insurance, and utility payments – over monthly household income. Generally, a household with a housing cost burden of over 30 percent, meaning housing costs exceed 30 percent of the homeowner's monthly income, is housing cost burdened. As mortgage interest rates declined in the years after the Great Recession, including more recent years of record low interest rates, the share of consumers' monthly income paid toward housing costs declined both nationally and in Washington. From 2009 to 2021, Washington experienced a 9-percentage point decrease in the share of homeowners who were housing cost-burdened. This trend has changed, however, as the Federal Reserve pulled back on its strategy of quantitative easing (QE). [229]  The Federal Reserve began raising interest rates in March 2022 resulting in significant increases in mortgage interest rates essentially more than doubling the cost of buying a house for most consumers.  For the week of November 5, 2020, the Freddie Mac Primary Mortgage Market Survey® documented mortgage interest rates at 2.78 percent. Comparatively, for the week of November 2, 2023, the rate was 7.76 percent. [230]  The increase in interest rates will undoubtedly increase the number and percentage of housing cost-burdened households in the state making the need for the state to take aggressive measures to support the development of affordable housing, particularly in well-resourced communities, even more critical.

---

[228] Kramer, et. Al. "Assessment of the housing needs," pages 124-125.

[229] In response to the COVID pandemic, in March 2020, the Federal Reserve changed the objective of quantitative easing (QE) to support the economy. Two years later in March 2022, the Fed pulled back on its accommodative monetary policy in response to rising inflation and began increasing interest rates.  *See, What did the Fed do in Response to the COVID-19 Crisis?*, Brookings Institute, https://www.brookings.edu/articles/fed-response-to-covid19/#:~:text=On%20March%2015%2C%202020%2C%20the,QE%20to%20supporting%20the%20economy and The *Fed Is Shrinking Its Balance Sheet. What Does That Mean?*, Federal Reserve Bank of Richmond, https://www.richmondfed.org/publications/research/econ_focus/2022/q3_federal_reserve.

[230] *See,* Freddie Mac Primary Mortgage Market Survey®, https://www.freddiemac.com/pmms.



*Figure 31 – Housing Cost Burden Comparison among Homeowners.*

Black and Latino households experience housing cost burden at higher rates than the overall population. In 2021, the percentage of households that were housing cost-burdened stood at 23.8 percent. However, 33.7 percent of Black and 27.5 percent of Latino households were housing cost burdened. The housing cost-burden rates for Black and Latino households were 41.6 percent and 15.5 percent higher respectively than the rate for all households in the state. Asian households were 1.7 percent more likely than all households in the state to be housing cost burdened. White households are less likely than all households in the state to be housing cost burdened. White households have a housing cost-burden rate that is 3.9 percent lower than the rate for all households in the state. The housing cost-burden rate for Black households is 32 percent higher than that for White households.



*Figure 32 – Housing Cost Burden among Homeowners by Race or Ethnicity.*

AIAN and White homeowners have lower shares of cost-burdened households than renters in these groups. There was not much difference in the share of housing cost-burdened White and AIAN homeowners until 2021, when the share of cost-burdened AIAN homeowners rose faster than that of White homeowners. This is likely reflective of population size differences. In other words, because the number of AIAN homeowners is smaller, small changes in the number of housing cost-burdened AIAN homeowners likely increase the share of cost-burdened households higher than for White homeowners.

## Rental Housing Burden

Similar to homeowner households, renter households are cost-burdened if they spend more than 30 percent of their monthly income on rental housing expenses including utility payments. The portion of renters in the state experiencing housing cost-burden is substantially higher than the share of homeowners who are housing cost-burdened, suggesting that the more fixed cost of homeownership leads to greater housing stability and may likely enable homeowner households to save for the future. In Washington state, 47.5 percent of renter households are cost-burdened as compared to 23.8 percent of homeowner households. The share of renter households who are cost-burdened is 99.6 percent higher than the share of homeowner households who are cost-burdened. Black and Latino renters in Washington are especially rent-burdened. In 2021, 59.0 percent of the state's Black renters and 48.2 percent of Latino renters were rent-burdened.



*Figure 33 – Housing Cost Burden among Renters by Race or Ethnicity.*

The housing cost burden of AIAN renters in Washington shows large fluctuations over time. The most recent numbers show that about 36 percent of AIAN renters pay more than 30 percent of their household income on rent. This share is lower than the share of cost-burdened white renters in Washington state and is lower than the share of cost-burdened AIAN renters nationally.

Additionally, 37.4 percent of NHPI, whether renters or owners, were cost-burdened throughout the state. [231]

## Conclusion

Historical discriminatory policies implemented or supported by the State and local government officials created clear and lasting disparate impacts among people of color, with the deepest impacts being felt by Blacks, Latinos, Native Americans, Native Alaskans, Native Hawaiians and other Pacific Islanders, and members of two Asian subgroups (Koreans and Asian Indians). These groups not only have lower homeownership rates than their White counterparts, but they are also more likely to have lower levels of wealth, be denied for mortgage loans, experience higher housing rental and homeownership cost burdens, and experience homelessness and housing insecurity at much higher rates.

The State will need to significantly increase its efforts to remedy the present-day impacts of its unlawful discrimination. [232] The next chapter in this study will examine whether race-neutral programs can sufficiently remedy the documented discrimination that has impacted current residents.

While all people of color and Jewish and Hindu residents in Washington experienced well-documented, egregious acts of discrimination, the present-day data on various indicators show that Black, Latino, Native American, Native Alaskan, Native Hawaiian and other Pacific Islander Washingtonians are the subsets of the population that are still being impacted most deeply. Additionally, the homeownership gap experienced by Asian Indians and Koreans in Washington is notable.

In its effort to remediate homeownership and credit gaps left by historic discrimination, the Covenant Homeownership Act requires the creation of an SPCP. Under ECOA, an SPCP authorized by law must be for "the benefit of an economically disadvantaged class of persons." [233] SPCPs rely on present-day data to establish the group of disadvantaged people, and then craft a program to meet the special credit needs of that group of disadvantaged people. Because the data outlined in Chapter 2 shows the disparities most in need of remediation are experienced by Black, Latino, Native American, Native Alaskan, Native Hawaiian and other Pacific Islander and Asian Indian and Korean residents of Washington, the analysis in the following chapters will be limited to these racial and ethnic groups.

However, we acknowledge that the data available to document the lasting impacts of historical discrimination is limited. Available data on homeownership does not disaggregate for Jewish persons, nor does it detail the current rates of mortgage denials or wealth accumulation for the Asian, Hindu and Jewish individuals who experienced housing discrimination and their descendants. That said, the data as outlined in this chapter does not preclude any future programs and efforts that assist those who make the case that they were subject to discriminatory acts, and we recommend that there be further exploration of this possibility.

---

[231] "Assessment of the housing needs of American Indians, Alaska Natives and Native Hawaiians in Washington." Page 4.
[232] Lisa Brown, et. al, "Improving Homeownership Rates" at https://www.commerce.wa.gov/wp-content/uploads/2022/09/Homeownership-Disparities-Recommendations-Report-FINAL-Sep2022.pdf.
[233] 12 C.F.R. § 1002.8(a)(1)-(2); further explanation of the definition of an "economically disadvantaged class of persons" is discussed on page 111 in Chapter 4.

# CHAPTER 3: ANALYSIS OF EXISTING PROGRAMS AND RACE NEUTRAL AND RACE CONSCIOUS APPROACHES

## Introduction

As shown in the preceding chapters, Black, Latino, Native American, Alaska Natives, Native Hawaiian and other Pacific Islander, Asian Indian, and Korean residents continue to be negatively impacted by past discrimination by Washington state as expressed in the current homeownership rates of households in these racial and ethnic groups (collectively, "impacted residents.") [234] Throughout Washington, while more than two dozen homeownership programs help families overcome barriers to homeownership, additional support could be added by expanding these programs or creating new ones. In theory, such programs can address the present-day inequities resulting from past government discrimination identified in the preceding chapters. The goal of this chapter, as outlined in outlined in RCW 43.181 and in the Washington State Housing Finance

---

### KEY FINDINGS

*Existing programs and other race-neutral approaches are insufficient to remedy the discrimination by Washington State described in Chapter 1 and the current impacts on residents identified in Chapter 2. A race-conscious approach is necessary to expand homeownership opportunities to impacted residents.*

- Nearly all existing homeownership programs in Washington state use race-neutral approaches; in the aggregate, they primarily aid households who are **not** impacted residents.

- Policy scenario modeling shows that potential additional homeownership support programs that use a race-neutral approach would likewise primarily aid households who are **not** impacted residents.

- Policy scenario modeling shows that a narrowly tailored race-conscious approach would be far more efficient in reaching impacted residents than a race-neutral approach. Assuming a constant funding level, a race-neutral down payment assistance program similar to the one modeled in this chapter would reach roughly one-quarter the number of target group members as would be reached by a race-conscious approach.

- With a cost to reach all impacted residents through a race-neutral approach of about $6 billion, it would take decades to serve them all based on expected fee revenue for the Covenant Homeownership Fund (which is expected to be ~$75M to $100M/year).

---

[234] While households that include an Asian Indian or Korean adult are included within the scope of eligible households for the Covenant Homeownership Program implementation recommended in this report, the modeling and analysis in Chapters 3 and 4 focus only on households that include a Black, Latino, Native American, Alaska Native, Native Hawaiian, or other Pacific Islander adult. This is because there were relatively few Asian Indian or Korean residents of Washington state in 1968 and eligibility for the Covenant Homeownership Program is limited by statute to individuals who were living in Washington in 1968 or descended from someone living in Washington State in 1968. RCW 43.181.040(4)(c). The economic characteristics of today's population of households headed by an Asian Indian or Korean adult is thus of less utility to understanding the economic characteristics of households eligible for the Covenant Homeownership Program than the characteristics of the other racial and ethnic groups included within the definition of impacted residents.

Commission's (WSHFC's) Request for Proposals, [235] is to analyze whether and to what extent existing programs and other race-neutral approaches could effectively remedy the impacts of the discrimination described in Chapter 1 on Black, Latino, Native American, Alaska Natives, Native Hawaiian and other Pacific Islander, Korean, and/or Asian Indian residents of Washington. [236]

This chapter has two main sections. Section 1 describes 27 existing homeownership programs in Washington and the characteristics of the individuals who benefit from them. Section 2 uses publicly available data to model the potential beneficiaries of three additional homeownership interventions that could be layered on top of existing programs: down payment assistance, reductions in interest rates, and credit counseling. The analyses in both sections of this chapter help identify the extent to which existing and prospective homeownership programs are effective in remedying the documented discrimination by expanding homeownership opportunities for impacted residents.

## Section 1 – Existing Homeownership Programs in Washington State and their Beneficiaries

### Overview of Existing Homeownership Programs

This section describes the current landscape of race-neutral homeownership programs within Washington, with the goal of understanding how they serve prospective buyers from racial and ethnic groups that have been adversely impacted by the discrimination described in Chapters 1 and 2.

The research team identified a large illustrative subset of programs available to homebuyers in the state, based on consultation with WSHFC and other community stakeholders, the study subcontractors' own knowledge, and the results of a web search. The team sought to identify programs that are well-established, replicable, and scalable, and that represent a diverse range of homeownership interventions. This list is not intended to be exhaustive; rather, it is intended to illustrate the range of programs that have already been implemented to facilitate homeownership within the state. Most of the programs identified have race-neutral eligibility criteria, though two small programs have race-conscious criteria. For each program, the research team reviewed key details including program design features and eligibility criteria. The following sections describe these programs organized into four categories: down payment assistance (DPA), first mortgages, education and counseling, and alternative homeownership models.

### Down Payment Assistance (DPA) Programs

For many households, a down payment is the single biggest barrier to purchasing a home. This is especially true for impacted residents, who, on average, have lower household incomes and less accumulated generational wealth than White homebuyers (as discussed in more detail in Chapter 2). DPA programs offer eligible households funding that they can use to purchase a home. DPA is sometimes structured as a grant or a forgivable loan, in which households do not need to pay back the funds or only need to repay (all or a portion of) the funds if they move within a certain

---

[235] "Request for Proposals (RFP). NO. WSHFC_HOCV23." Washington State Housing Finance Commission. April 21, 2023. https://wshfc.org/admin/20230503RFPCPAddendumPostingPacket.pdf

[236] Chapter 2 identified populations in Washington that were subject to past discrimination that continues to impact their ability to become homeowners. These groups are Black, Hispanic, Native American, Alaska Natives, Native Hawaiian and other Pacific Islander, Asian Indian, and Korean residents, referred to as "impacted residents" in this chapter.

period of time. It can also be structured as a low- or no-interest loan, with payments due monthly (referred to as an amortizing loan) or in a lump sum upon sale of the home or at the end of the loan period (referred to as payment-deferred loans.)

DPA programs are, by far, the most common type of existing homeownership programs the research team identified in Washington. State and local agencies and nonprofit organizations throughout Washington offer a variety of DPA programs that vary in terms of the borrowers they serve and the levels of assistance they offer. Nonetheless, DPA programs in Washington share some common features. DPA programs in Washington are generally structured as a no- or low-interest payment-deferred loans. Most programs require homebuyer education or counseling, such as through a first-time homebuyer class. Finally, programs frequently combine DPA with a complementary first mortgage that offers an advantageous interest rate and/or more lenient qualification criteria and sometimes combine DPA funds from multiple programs. The goal of layering assistance in this way is to bring the upfront cost of homeownership to a level that is affordable for buyers at the target income level. The following are some key examples of existing race-neutral DPA programs available in Washington.

- **WSHFC's DPA programs.** WSHFC offers two main DPA programs. The largest program, *Home Advantage DPA*, offers DPA through a zero-interest, payment-deferred second mortgage as a companion to WSHFC's Home Advantage Loan program (described in a subsequent section). Home Advantage DPA is available to borrowers throughout Washington whose household income falls below the statewide limit of $180,000; borrowers do not need to be first-time homebuyers. The maximum level of assistance is 3 percent or 4 percent of the first mortgage value; the maximum increases to 5 percent for borrowers using Federal Housing Administration (FHA) or conventional first mortgages rather than WSHFC's own loans. For example, if a borrower has a $250,000 first mortgage, then they can receive $7,500, $10,000, or $12,500 in DPA through this program, depending on the type of mortgage they have.

  The second-largest WSHFC DPA program, *Opportunity DPA,* is a companion to the Opportunity Loan program (discussed in a subsequent section). Opportunity DPA is significantly more targeted than the Home Advantage DPA program. The program is available to first-time borrowers *or* borrowers who are purchasing properties in certain targeted areas that are economically distressed. Income limits vary by geography and household size; the maximum limit for a two-person household is $80,750 in King and Snohomish counties. Borrowers can receive up to $15,000 in DPA based on need. Assistance is structured as a low-interest (1 percent) payment-deferred loan.

  Both programs require borrowers to attend a WSHFC-sponsored seminar on the homebuying process. In addition to the two larger programs, WSHFC offers a range of more targeted DPA programs, including one for veterans and one for people with disabilities; both programs can be combined with one of WSHFC's first mortgage programs. WSHFC also administers location-specific programs for Clark County, East King County, and the City of Bellingham.

- **HomeSight's DPA programs.** HomeSight is a nonprofit mission-driven lender based in Washington state that provides multiple DPA programs for homebuyers. HomeSight's *Statewide DPA* program serves borrowers located outside of King and Snohomish Counties. Borrowers can receive up to $25,000 as a low-interest (3 percent) loan. Under this program, DPA is structured as a payment-deferred loan for borrowers earning below 80 percent AMI or amortizing loan for borrowers earning between 80 percent to 120 percent of AMI. HomeSight also offers an additional $25,000 in DPA to households earning below 60 percent AMI, for a total cap of $50,000. In addition to the statewide program, HomeSight administers location-specific DPA programs in collaboration with the City of Seattle, King County, and Snohomish County; for borrowers in these higher-cost localities, the maximum DPA amount ranges from $45,000 to $80,000. For all HomeSight programs, borrowers must be first-time homebuyers and must complete a homebuyer education class and attend a financial assessment session.

- **Other locally-administered programs.** Aside from the location-specific programs administered by WSHFC and HomeSight, several localities operate their own DPA programs for residents. For example, the Tri-Cities HOME Consortium offers a DPA program for first-time homebuyers in the towns of Kennewick, Pasco, or Richland; borrowers can receive up to $10,000 as a zero-interest forgivable loan, which essentially means the assistance is converted from a loan to a grant after six years. Other local programs are available in the City of Tacoma, in Kitsap County (administered by local nonprofit Community Frameworks), and on the Spokane Indian Reservation (administered by the Spokane Indian Housing Authority).

Although nearly all DPA programs within the state are race-neutral, in 2021 HomeSight added two race-conscious programs. The first program, the *Social Justice DPA* program, serves homebuyers who identify as Black, Indigenous, or Person of Color (BIPOC) throughout Washington. Social Justice DPA is structured as a zero-interest, payment-deferred loan of up to $10,000. Funds are available to households earning below 80 percent AMI. The second program, the *Sam Smith Homeownership Fund,* is available to individuals who identify as Black/African-American. DPA offered through the Sam Smith program is structured as a low-interest (3 percent) payment-deferred loan of up to $12,000. In contrast to the Social Justice DPA program, the Sam Smith DPA program targets moderate-income borrowers with incomes up to 120 percent AMI. These programs are frequently stacked on top of other DPA programs offered by HomeSight or other organizations.

### First Mortgage Programs

WSHFC offers several mortgage products that are tailored to low- and moderate-income buyers. These first mortgage programs typically offer flexible underwriting criteria to allow lower-income households or those with limited credit history to qualify; they also frequently offer reduced interest rates and lower overall borrowing costs to enhance affordability. Key mortgage programs include:

- **Home Advantage Loans.** WSHFC's largest first mortgage program, the *Home Advantage Loan*, is available to buyers statewide. The loan is meant to be combined with the Home Advantage DPA program (described above) and has similar eligibility criteria: borrowers

must have incomes below $180,000, but do not need to be a first-time homebuyer. Borrowers who are purchasing an energy-efficient home with a Home Advantage Loan can receive a further interest rate reduction through WSHFC's *EnergySpark* companion loan. Borrowers are required to complete a WSHFC-sponsored homebuyer education seminar.

- **House Key Opportunity Loans.** WSHFC also offers the more targeted *House Key Opportunity Loan* product, available to first-time homebuyers or buyers purchasing property in certain targeted areas. Maximum household income varies by household size and geography but is more stringent than the Home Advantage Loan; for a two-person household, the maximum income ranges from $100,000 to $150,000. Borrowers using the House Key Opportunity Loan must have received DPA from the corresponding Opportunity DPA program (described above) or one of WSHFC's other location-specific or specialty DPA programs. Borrowers are required to complete a WSHFC-sponsored homebuyer education seminar.

In addition to WSHFC's statewide offerings, nonprofit organizations and local mission-driven lenders offer a range of specialized home loan products designed to meet the needs of borrowers with specific barriers to credit. Some of these programs support specific populations, such as Latino or Native American homebuyers. [237]

### *Alternative Homeownership Models*

Alternative homeownership models, such as shared equity homeownership, reduce the costs of a home to make it more affordable to income-eligible buyers and preserve the long-term affordability of that home for future buyers. In a shared equity model, homebuyers can purchase their homes at a below-market price from a sponsoring organization or a homebuyer who previously received assistance through that organization. When the home is sold, the seller receives an amount determined by the program's resale formula that generally includes a share of home price appreciation, and the home is sold at a level that is affordable to future buyers. These models can be particularly useful in regions where housing values are increasing, as they ensure that homes remain affordable long-term. Some key examples operating in Washington include:

- **Community Land Trust model.** In this model, homebuyers purchase a property on land owned by a nonprofit Community Land Trust (CLT). By separating the cost of the property from the cost of the land, homes can be sold for below-market prices to income-qualified buyers. Owners can later sell the home at a restricted price to another income-qualified buyer. Several organizations in Washington promote affordable homeownership using a

---

[237] Examples include:
- HomeSight ITIN Loans. Many borrowers who do not have a Social Security Number (for example, resident aliens) face difficulty in securing a conventional mortgage. HomeSight offers a specialized loan product for individuals who have been issued an Individual Taxpayer Identification Numbers (ITIN) by the IRS. Borrowers using ITIN loans must be able to provide a minimum of 5% down payment, but can access other DPA funds once this threshold is met.
- Section 184 Loans. The federal Section 184 Indian Home Loan is a mortgage product available to members of federally recognized tribes. The product offers lower down-payment requirements, lower interest rates, and a flexible underwriting criteria. While Section 184 loans are available to tribal members throughout Washington, a key benefit of Section 184 loans is that they can be used to purchase property on tribal lands held in trust, a tenure arrangement that is typically not permitted by more conventional mortgage products.

CLT model, including Homestead CLT in King County and Opal CLT on Orcas Island.

- **Deed restricted homeownership model.** An affordability deed restriction is a legal instrument that places limits on the price that a home can be sold for, or on the income level of subsequent buyers, or both, to maintain long-term affordability. A Regional Coalition for Housing (ARCH), a coalition of fifteen cities in East King County working with the County, operates a homeownership program using this model. Homes are created through the cities' inclusionary zoning policies, and then offered for sale to income-qualified buyers at below-market rates with a deed restriction that ensures the homes remain affordable over the long term.

- **Sweat equity model.** In this model, homebuyers commit to doing some of the labor to construct their home in exchange for purchasing the home at a more affordable price. Under certain versions of this model, homeowners may only sell the home to another income-qualified borrower at a restricted price. In other versions, there are no such limits or the limits disappear after a period of time. One well-known organization that often requires sweat equity as a condition for receiving homeownership assistance is Habitat for Humanity, which has chapters throughout Washington, including in Seattle-King County and Snohomish County.

### Homebuyer Education & Counseling Programs

To access DPA funds and other homeownership programs, most homebuyers must complete education and/or counseling. Homebuyer education classes provide an overview of the homebuying process in a group setting; in contrast, homebuyer counseling generally offers one-on-one support in assessing an individual's readiness to purchase and in navigating loan and DPA options. Some examples of homebuyer education and counseling offerings within Washington include:

- **WSHFC Homebuyer Education Seminars.** These seminars, available for free in-person or online, introduce prospective homebuyers to the process of purchasing a home and provide an overview of key topics such as choosing a loan product, finding a home, the loan closing process, and options for foreclosure prevention. WSHFC does not directly lead seminars; instead, it works with nonprofit organizations, lenders, and other community partners to deliver the curriculum. This seminar is required for all borrowers receiving DPA or first mortgages from WSHFC, and generally meets the educational requirements for loan programs offered by other affordable housing programs.

- **HUD-certified homeownership counseling.** The Department of Housing and Urban Development (HUD) sponsors organizations to deliver one-on-one counseling to prospective and current homeowners. Pre-purchase counseling may focus on helping prospective buyers determine the financial feasibility of purchasing a home and choose among available mortgage and DPA options; counseling may also address post-purchase needs such as foreclosure prevention. In Washington, homeownership counseling is delivered by a range of nonprofit community organizations, including HomeSight and Community Frameworks.

## Demographics of Borrowers in Existing Race-Neutral Programs

To better understand the extent to which existing race-neutral homeownership programs in Washington are serving prospective buyers from racial and ethnic groups that have been adversely affected by the discrimination described in Chapters 1 and 2, the research team analyzed loan records from existing race-neutral programs sponsored by WSHFC and HomeSight. In this section, we describe the participant demographics of these organizations' programs and the characteristics of loans they offer borrowers.

### *Washington State Housing Finance Commission (WSHFC) Programs*

The research team obtained deidentified loan records for WSHFC's programs, covering all of the loans issued between June 30, 2018 and June 30, 2023 through WSHFC's first mortgage programs (Home Advantage, House Key Opportunity) and DPA programs (Home Advantage, House Key Opportunity, location-specific and other specialized programs). The dataset represents over 66,000 loans in over 33,000 transactions. While different loan types are recorded separately, a loan made to the same borrower on the same day for the same property is considered to be a single 'transaction' for the purpose of these analyses. Most WSHFC borrowers received both a first mortgage and DPA funds structured as a second or third mortgage.



*Figure 34: Racial and ethnic composition of WSHFC borrowers (2018-2023). n=33,794.*

As shown in Figure 34 above, nearly two-thirds of WSHFC program participants between 2018 and 2023 were White. [238] White borrowers comprised 66 percent of program participants overall. Hispanic/Latino borrowers made up the second-largest group, 15 percent of program participants. Black borrowers made up only seven percent of program participants, while four percent of borrowers were Asian, two percent were American Indian or Alaska Native/Native Hawaiian or Pacific Islander (AIAN/NHPI), and seven percent were multiracial or some other race. Compared with heads of household aged 25-55 who rented their homes in Washington in 2022 (a group the research team identifies as "potential first-time homebuyers" in the modeling section of this chapter), [239] the borrowers served by WSHFC were less likely to be Asian. The share of White participants in WSHFC homeownership programs declined over the five years and the share of Black and Hispanic/Latino participants increased. WSHFC over the past five years has made efforts to build relationships and increase outreach to Black and Hispanic/Latino homebuyers, which could help explain this change.

| County | Potential First-Time Homebuyers who are impacted residents (2022) | Share of State's Potential First-Time Homebuyers, impacted residents (2022) | Number of WSHFC Transactions (2018-2023) | Share of WSHFC's Total Transactions (2018-2023) |
|---|---|---|---|---|
| King | 91,130 | 39% | 3,453 | 10% |
| Pierce | 33,915 | 15% | 7,038 | 21% |
| Snohomish | 23,509 | 10% | 3,002 | 9% |
| Spokane | 10,223 | 4% | 3,517 | 10% |
| Clark | 10,678 | 5% | 2,438 | 7% |
| Thurston | 6,242 | 3% | 1,581 | 5% |
| Whatcom | 3,680 | 2% | 802 | 2% |
| Kitsap | 4,812 | 2% | 1,173 | 4% |
| Yakima | 13,920 | 6% | 1,325 | 4% |
| Benton | 6,976 | 3% | 1,713 | 5% |
| All other counties | 27,790 | 12% | 7,752 | 23% |
| **Total** | **232,875** | **100.0%** | **33,794** | **100.0%** |

*Figure 35: Number and share of potential first-time homebuyers who are impacted residents by county, and number and share of WSHFC transactions by county. Potential first-time homebuyers from Public Use Microdata Sample (PUMS) 2022 one-year sample.*

---

[238] WSHFC's borrower data combines race and ethnicity into a single field. Borrowers can select more than one category, but for the most part borrowers who identified as Hispanic/Latino ethnicity did not identify their race. Where borrowers selected more than one race or ethnicity (for example, Black and Hispanic/Latino), they are counted under the "Other or Multi" category.

[239] For purposes of this chapter, "potential first-time homebuyer" refers to heads of household aged 25-55 who rented their homes in Washington state in 2022. Among potential first-time homebuyers, 57% are White, 17% are Hispanic, 7% are Black, 10% are Asian, and 2% are American Indian, Alaskan Native, Native Hawaiian, or Pacific Islander, and 7% are multiracial. See section 2 of this chapter for more information on the potential first-time homebuyer population.

Figure *35* above shows the geographic distribution of potential first-time homebuyers who are impacted residents, and the geographic distribution of WSHFC transactions. There are over 230,000 potential first-time homebuyers who are impacted residents within Washington. Of these, over 90,000 – nearly 40 percent of the statewide total – reside within King County. However, only 10 percent of WSHFC transactions in the 2018-2023 period took place within King County. The relatively low share of WSHFC transactions in King County is likely driven by the county's high housing costs since the amount of DPA provided in King County is often not sufficient to allow a homebuyer to afford a home. This suggests that a deeper level of down payment assistance may be needed to reach impacted residents than is provided through currently available programs.

### *HomeSight Programs*

The research team also obtained deidentified loan records from HomeSight that included DPA loans issued from October 2019 to November 2023. The dataset included 136 loans from the race-neutral statewide DPA program, as well as 62 loans from HomeSight's two race-conscious programs, Sam Smith DPA and Social Justice DPA for a total of 198 loans. [240]



*Figure 36: Racial composition of HomeSight race-neutral and race-conscious programs (2019-2023). Race neutral programs n=136, race-conscious programs n=62.*

---

[240] HomeSight data did not include borrower IDs, so we are unable to determine whether a single borrower received loans from multiple programs in a single transaction.

Figure 36 compares the racial composition of HomeSight's race-neutral program, Statewide DPA, to their race-conscious programs, Sam Smith DPA and Social Justice DPA. Notably, even the race-neutral programs serve a large share of non-White borrowers: 51 percent of borrowers are Black, 18 percent are Asian, 5 percent are Hispanic/Latino, 5 percent are AIAN/NHPI, and 2 percent are multiracial or some other race. [241] This may be related to HomeSight's focus on serving homebuyers in the Seattle region, where there is a large concentration of impacted residents. It may also be related to the level of subsidy provided by HomeSight's programs; the average loan amount for the HomeSight Statewide DPA program is more than twice that of the WSHFC DPA program. By providing a deep level of subsidy, Homesight's programs are able to serve lower-income borrowers, who are more likely to be impacted residents than borrowers with higher incomes.

As expected, the race-conscious programs overwhelmingly serve non-White borrowers. Seventy percent of borrowers are Black, 18 percent are Asian, 5 percent are AIAN/NHPI, and 5 percent are Hispanic/Latino. [242] Although both programs are relatively new and have served a small number of borrowers so far, the racial distribution of borrowers indicates they are meeting their intended purpose of supporting homeownership among impacted residents.

Since there are more than 150 times more WSHFC loans (33,794 between 2018-2023) than HomeSight loans (198 between 2019-2023), the disproportionate share of the latter loans that go to impacted residents does not alter the fundamental conclusion that the vast majority of the beneficiaries of the studied race-neutral homeownership programs are not impacted residents.

## Section 2 – Comparison of race-neutral and race-conscious approaches

To better understand how the racial and ethnic composition of program beneficiaries vary between race-neutral and race-conscious implementations of different forms of homeownership assistance, we conducted a policy simulation of several potential homeownership assistance programs that could be used to address the disparities in homeownership discussed in Chapter 2. The analyses focus on how the racial/ethnic composition of potential homeownership assistance program beneficiaries changes when applying race-neutral and race-conscious eligibility criteria to determine if a race-neutral approach is sufficient to remedy the documented discrimination.

### Data Sources and Methodology

This section describes the data sources for the policy simulations, the definition of the population of potential first-time homebuyers, and the approach to estimate the number of people who can afford to buy a home in Washington. The section describes the methodology used to estimate how many potential first-time homebuyers could afford a home with no assistance, with currently accessible amounts of DPA, and with various types of potential additional assistance that could be provided through the Covenant Homeownership Fund.

---

[241] Homesight's borrower data combines race and ethnicity into a single field. While borrowers can select more than one category, nearly all borrowers who identified as Hispanic/Latino ethnicity did not identify their race. Where borrowers selected more than one race or ethnicity (for example, Black and Hispanic/Latino), they are counted under the "Other or Multi" category.
[242] One of the borrowers in Homesight's data was designated as White. It is not clear whether this borrower identified as multiracial or qualified for the program some other way.

## Data Sources

The 2022 American Community Survey 1-Year Public Use Microdata Sample (ACS PUMS) [243] is the source of information on the characteristics of potential first-time homebuyers in Washington. Key variables from the ACS PUMS included race/ethnicity, household income, and age. The 2022 HUD Section 8 Income Limits [244] are the source of data on Area Median Incomes (AMIs). Housing value data from Zillow Research [245] provide property values in Washington at the county level. Geographic correspondences from the Missouri Census Data Center [246] allow crosswalks between the Public Use Microdata Areas (PUMAs) in ACS PUMS and counties. [247]

## Methodology

### Population Definition

This analysis applied the following definition of potential first-time homebuyers to households in the 2022 ACS PUMS dataset [248]:

- Lives in Washington state
- Head of Household
- Renter
- Prime home-buying age (25-55 years old)

### Affordability Calculations

Using property values estimated by Zillow, the research team calculated loan amounts, monthly mortgage payments, and additional monthly costs required to buy a modest-cost home in the potential first-time homebuyer's current county of residence. The Zillow modest-cost home value is the typical value for homes within the 5th to 35th percentile in a certain geographic area. This analysis uses modest-cost home values as of September 30, 2023. The research team calculated the average **loan amount** [249] for a modest-cost home for each Washington county assuming a 3.5 percent down payment, then used it to estimate the **monthly mortgage payment** assuming a 6.0 percent annual interest rate. [250] An estimate of the **monthly additional costs** for a modest-cost

---

[243] "PUMS Data," U.S. Census Bureau. https://www.census.gov/programs-surveys/acs/microdata/access.html.

[244] HUD USER Office of Policy Development and Research. https://www.huduser.gov/portal/datasets/il.html#data_2022.

[245] Zillow. "Housing Data." https://www.zillow.com/research/data/

[246] Missouri Census Data Center. Geocorr 2022: Geographic Correspondence Engine. https://mcdc.missouri.edu/applications/geocorr2022.html

[247] Public Use Microdata Areas (PUMAs) are the smallest geographic identifiers reported in ACS PUMS. PUMAs divide states into geographic areas containing approximately 100,000 people each. Since PUMA boundaries do not align with county boundaries, we apportioned each ACS PUMS survey respondent into counties using the proportion of PUMA residents in each county. For example, if 45% of PUMA 1 residents are in County A, 30% are in County B, and 25% are in County C, we would assign 45% of each PUMA 1 survey respondents to County A, 30% to County B, and 25% to County C. It is necessary for the analysis to apportion ACS PUMS respondents into counties because property values and income eligibility criteria vary by county. For more information on PUMAs, see https://www.census.gov/programs-surveys/geography/guidance/geo-areas/pumas.html.

[248] The PUMS data does not identify if the household has owned a home in the prior three years, which is a common definition of first-time homebuyer.

[249] The research team estimated loan amount by taking 99.5% of the typical modest-cost home price per county. The research team assumes a 3.5% down payment is required and 3.0% closing costs are rolled into the loan.

[250] The research team used the standard formula for monthly mortgage payments (M): $M = P\left[\frac{r(1+r)^n}{((1+r)^n)-1}\right]$, where r = monthly interest rate, n = loan term (in months), and P = loan amount. The research team assumed a 30-year fixed-rate loan with a 6.0% annual interest rate. These parameters are similar to characteristics of 203(b) FHA loans. The 6.0% interest rate is an average of the September 18, 2023 30-year fixed rate mortgage forecast from the Mortgage Bankers Association for 2023 Q3 through 2024 Q4 (https://www.mba.org/docs/default-source/research-and-forecasts/forecasts/2023/mortgage-finance-forecast-sep-2023.pdf?sfvrsn=6b08f6a5_1).

home (mortgage insurance, property insurance, and property tax) [251] was added to the monthly mortgage payment to estimate a total **monthly payment**. The research team then estimated how many potential first-time homebuyers could afford the total monthly payment for a modest-cost home in their county, using a 31 percent front-end ratio. [252]

Since down payments are another potential barrier to homeownership, the research team estimated how many potential homebuyers could save for a 3.5 percent down payment on a modest-cost home within two years. [253] Among potential homebuyers who can afford the monthly payment on a modest-cost home and can save for a down payment within two years, the research team estimated the proportion who have a sufficiently high credit score to be likely to qualify for a mortgage. The research team used Washington estimates by race and ethnicity from 2021 Home Mortgage Act Data and Black Knight Data matched by the Urban Institute to estimate the proportion of potential first-time homebuyers with qualifying credit scores (660 or above). [254] Estimates of the proportion of Washington homebuyers with qualifying credit scores are 93.5 percent of White homebuyers, 98.1 percent of Asian homebuyers, 87.7 percent of Latino homebuyers, and 84.3 percent of Black homebuyers. For potential first-time homebuyers of other races, the research team used the average of the proportion for Black and Latino homebuyers (86.0 percent). [255]

### Policy Scenario Definitions

The five policy scenarios modeled in this section are:

1. No assistance scenario
2. Baseline scenario (assumes $10,000 DPA available from existing sources)
3. DPA scenario
4. Interest rate reduction scenario
5. Credit counseling scenario

In all scenarios, eligibility for homeownership assistance is limited to potential first-time homebuyers in low-cost counties with household incomes below 100 percent AMI and to potential first-time homebuyers in high-cost counties with household incomes below 140 percent AMI. High-cost counties are Clark, King, Pierce, San Juan, Snohomish, and Whatcom. All other counties in Washington are considered low-cost. The research team used separate income eligibility thresholds for low-cost and high-cost counties to reflect location-specific income-eligibility rules for existing homebuying assistance programs in Washington (described in section

---

[251] The research team estimated monthly additional costs (C) for a modest-cost home using $C = (P * MI + Value * (PI + PT))/12$, where MI = mortgage insurance rate (annual), PI = property insurance rate (annual), PT = county average property tax rate (annual), Value = home value.

[252] The research team used 31 percent of gross income as the threshold for affordability (i.e., a 31% front-end ratio). This aligns with the standard requirement for an FHA loan.

[253] The research team used the average personal savings rate as of July 2023: 3.5% of net income, per https://fred.stlouisfed.org/series/PSAVERT. To approximate net income from the gross household income reported in ACS PUMS, the research team applied estimated tax rates including Federal income tax (https://www.irs.gov/pub/irs-drop/rp-21-45.pdf, married filing jointly or head of household, depending on marital status) and FICA (1.45% Medicare + 6.2% Social Security). Washington does not have a personal income tax (https://dor.wa.gov/taxes-rates/income-tax).

[254] These data represent the characteristics of recent mortgage borrowers and therefore exclude potential homebuyers who were denied a mortgage or chose not to apply for one. While not a perfect proxy, the population of mortgage borrowers is the best available proxy for renters who meet the monthly payment and down payment constraints. Source: Walsh, J., Choi, J. H., Pruitt, M., Mehrotra, A. (in press). *Washington State Market*. Washington, DC: Urban Institute.

[255] The Urban Institute study includes credit score information for White, Asian, Latino, and Black homebuyers only.

1 of this chapter). This section refers to potential first-time homebuyers with household incomes below 100 percent or 140 percent AMI as "income-eligible" for homeownership assistance.

The no assistance scenario estimates how many potential first-time homebuyers can afford a home (i.e., pass the monthly payment, down payment savings, and credit constraints) without any homeownership assistance.

The baseline scenario estimates how many potential first-time homebuyers can afford a home if $10,000 of DPA were available to all income-eligible potential first-time homebuyers. [256] This baseline scenario approximates the level of DPA widely available within Washington today. [257]

The DPA scenario adds $50,000 of DPA for income-eligible potential first-time homebuyers in low-cost counties and adds $120,000 of DPA for income-eligible potential first-time homebuyers in high-cost counties. [258] Total DPA in this scenario is $60,000 ($10,000 baseline plus $50,000) for income-eligible potential first-time homebuyers in low-cost counties and $130,000 ($10,000 baseline plus $120,000) for income-eligible potential first-time homebuyers in high-cost counties.

The interest rate reduction scenario reduces the estimated annual interest rate for income-eligible potential first-time homebuyers by 200 basis points, from 6.0 percent to 4.0 percent, but does not add any DPA above the baseline level of $10,000.

For the credit counseling scenario, the research team assumes that 40 percent of potential first-time homebuyers with credit scores below 660 can reach qualifying credit scores with counseling. Figure 4 shows the proportion of income-eligible potential first-time homebuyers estimated to have credit scores of 660 or above before and after credit counseling. The credit counseling scenario also assumes the availability of the $10,000 of DPA included in the baseline scenario.

| Race/Ethnicity | Credit Score 660+ (no credit counseling) | Credit Score 660+ (with credit counseling) |
|---|---|---|
| White | 93.5% | 96.1% |
| Asian | 98.1% | 98.9% |
| Hispanic/Latino | 87.7% | 92.6% |
| Black | 84.3% | 90.6% |
| AIAN/NHPI | 86.0%[a] | 91.6%[a] |
| Other or Multi | 86.0%[a] | 91.6%[a] |

*Figure 37: Potential Washington First-Time Homebuyer Credit Score Estimates by Race/Ethnicity*
[a] Credit scores for AIAN/NHPI and Other and Multi homebuyers are not provided, so this analysis averages the Latino and Black percentages.

---

[256] The income eligibility criteria is 100% AMI for low-cost counties, 140% AMI for high-cost counties.
[257] Some of WSHFC's programs provide a greater amount of assistance; $10,000 in assistance is consistent with the data reviewed in section 1 of this chapter.
[258] This level of DPA eliminates the down payment savings requirement, as the DPA exceeds the minimum required down payment for a modest-cost home in all Washington counties. This level of DPA also likely eliminates the MI payment. The impact on MI costs is not modeled because it would be fairly complex to do so. The cost of MI is estimated to be 0.85% of the mortgage value annually (0.07% mortgage value per month), so it is a relatively small part of the monthly payment, especially when a large DPA reduces the mortgage amount. For a $300,000 mortgage, the MI is $210 a month.

*Eligibility Criteria Definitions*

For each policy scenario, the research team modeled the impact of race-neutral eligibility criteria and race-conscious eligibility criteria on the racial composition of potential beneficiaries. Race-neutral eligibility criteria include:

- **Income-Restricted:** to receive assistance, beneficiaries must be income-eligible by having household income that is below 100 percent AMI in low-cost counties or below 140 percent AMI in high-cost counties.
- **Minority County, Income-Restricted:** to receive assistance, beneficiaries must be income-eligible potential first-time homebuyers (see above) living in counties with a majority of minority census tracts. [259]
- **First-Generation Homebuyer, Income-Restricted:** to receive assistance, beneficiaries must be income-eligible potential first-time homebuyers (see above) who would be first-generation homebuyers. [260]

We also modeled each scenario with the following race-conscious eligibility criteria that explicitly target residents adversely affected by the discrimination described in Chapters 1 and 2:

- **Minority, Income-Restricted:** To receive assistance, beneficiaries must be income-eligible potential first-time homebuyers (see above) who are impacted residents. As described in Chapter 2 and above, these include potential first-time homebuyers who are Black, Latino, American Indian or Alaska Native, Native Hawaiian or other Pacific Islander, or some combination of these groups. [261]

It is important to note that the modeling here and in Chapter 4 is based on the current population of impacted residents and not limited to those impacted residents who meet the pre-1968 requirement referenced in the Covenant Homeownership Act at RCW 43.181.040(4)(c). [262] This is because the ACS data used for this modeling do not include information about individual households sufficient to determine if they meet the pre-1968 residency requirement. Chapter 4 includes a rough estimate of the total number and racial and ethnic composition of Washington residents who meet these pre-1968 criteria to provide more information about the characteristics of those potential applicants (see Figure 60 on Page 140.)

---

[259] The research team used a county-census tract crosswalk to identify counties in Washington where a majority of census tracts meet the FHFA definition of "minority census tract" ("a census tract that has a minority population of at least 30 percent and a median income of less than 100 percent of the AMI"). Five of the 39 Washington counties (Adams, Franklin, Okanogan, Pierce, and Yakima) meet this definition. See https://www.fhfa.gov/DataTools/Downloads/Pages/Underserved-Areas-Data.aspx for more information on the minority census tract definition.

[260] The research team used national estimates of first-generation homebuyers by race/ethnicity from the National Fair Housing Alliance (NFHA): 20% White, 64% Black, 36% Latino, and 25% Other (https://nationalfairhousing.org/wp-content/uploads/2021/06/crl-nfha-first-generation-jun21.pdf, Appendix C).

[261] As noted at the beginning of this chapter, although this study recommends that households that include an Asian Indian or Korean adult be included within the scope of eligible households for the Covenant Homeownership Program, the modeling and analysis in Chapters 3 and 4 focus only on households that include a Black, Latino, Native American, Alaska Native, Native Hawaiian or other Pacific Islander adult because few Asian Indian or Korean households will likely meet other eligibility criteria in the Covenant Homeownership Act. For purposes of analysis, households designated as "some other race" and multiracial are also included.

[262] RCW 43.181.040(4)(c)identifies a subset of impacted residents who the statute authorizes to receive assistance through a special purpose credit program. Eligibility for this program is limited to a resident who: "(A) Was a Washington state resident on or before the enactment of the federal fair housing act (Title VIII of the civil rights act of 1968; P.L. 90–284; 82 Stat. 73) on April 11, 1968, and was or would have been excluded from homeownership in Washington state by a racially restrictive real estate covenant on or before April 11, 1968; or (B) Is a descendant of a person who meets the criteria in (c)(i)(A) of this subsection.")

It is also important to note that the majority of potential Asian homebuyers are not impacted residents. As explained above in footnote 260, the modeling here and in Chapter 4 does not separately address the two impacted subgroups – Asian Indian and Korean – due to the relatively small number of residents in these subgroups who would likely be eligible for the Homeownership Covenant Program.

## Policy Scenario Results

This section describes the racial and ethnic composition of the potential beneficiaries of each policy scenario under both race-neutral and race-conscious eligibility criteria. It also shows the number of potential beneficiaries that can be served by an annual $100 million down payment assistance program under race-neutral and race-conscious eligibility criteria. [263] This analysis illustrates which approach best serves impacted residents and can address the racial gap in homeownership caused by government discrimination. Full tables of policy scenario results are provided in Appendix E.

### Population of Potential Beneficiaries

Using the definition of potential first-time homebuyers described in the methodology above, there are approximately 700,000 potential first-time homebuyers in Washington (see Figure 38). [264] Approximately three-fifths of potential first-time homebuyers in Washington are White, about one-fifth are Hispanic/Latino, ten percent are Asian, seven percent are Black, and two percent are AIAN/NHPI.

| Race/Ethnicity | Number | Percent |
|---|---|---|
| White | 401,357 | 57% |
| Asian | 74,291 | 10% |
| Hispanic/Latino | 117,402 | 17% |
| Black | 49,710 | 7% |
| AIAN/NHPI[a] | 14,648 | 2% |
| Other or Multi | 51,106 | 7% |
| **Total** | **708,514** | **100%** |

*Figure 38: Potential Washington First-Time Homebuyers by Race/Ethnicity*

---

[263] $100 million was selected for this analysis because it is the anticipated annual funding level for the SPCP. The number of beneficiaries served by $100 million is estimated through the following steps:
1. Calculate the cost of down payment assistance to serve all potential beneficiaries in a racial or ethnic group (e.g., $50 million for White potential beneficiaries).
2. Calculate the proportion of the total cost of down payment assistance for each racial and ethnic group (e.g., 50% for White potential beneficiaries).
3. Calculate the amount of down payment assistance available to each racial and ethnic group with a $100 million program budget by multiplying the result of Step 2 by $100 million (e.g., 50% * $100 million = $50 million for White potential beneficiaries).
4. Calculate the average cost of down payment assistance per potential beneficiary in each racial and ethnic group (e.g., $100,000 for White potential beneficiaries).
5. Estimate the number of beneficiaries served by $100 million by dividing the result of Step 3 by the result of Step 4 (e.g., $50 million / $100,000 = 500 White beneficiaries served by $100 million).

[264] We used ACS PUMS household weights (WGTP) to estimate the number of households in Washington with particular characteristics. For more information on PUMS weighting, see Chapter VII of https://www2.census.gov/programs-surveys/acs/tech_docs/pums/2022ACS_PUMS_User_Guide.pdf.

With no assistance, approximately 14,000 potential first-time homebuyers can afford to buy a home (i.e., pass the monthly payment, down payment savings, and credit constraints). This represents only two percent of potential first-time homebuyers, and one percent of potential first-time homebuyers who are impacted residents. Figure 39 shows that 88 percent of potential first-time homebuyers who can afford a home without assistance are White or Asian.

| Race/Ethnicity | Number who can afford a home | Percent who can afford a home |
|---|---|---|
| White | 10,287 | 74% |
| Asian | 1,936 | 14% |
| Hispanic/Latino | 730 | 5% |
| Black | 464 | 3% |
| AIAN/NHPI | 109 | 1% |
| Other or Multi | 319 | 2% |
| Total[a] | 13,844 | 100% |

*Figure 39: Potential Washington First-Time Homebuyers who can Afford a Home by Race/Ethnicity: No Assistance Scenario*
[a] Columns may not sum to totals due to rounding.

As described in the landscape analysis of existing homeownership programs, $10,000 of DPA is broadly available to income-eligible potential first-time homebuyers through existing programs. Approximately 33,000 potential first-time homebuyers can afford to buy a home assuming those who are income-eligible receive $10,000 in DPA (see Figure 40). This represents only 5 percent of all potential first-time homebuyers and 2 percent of potential first-time homebuyers who are impacted residents. Even though the number of potential first-time homebuyers who can afford a home is more than double that of the no assistance scenario, the population is primarily White or Asian (86 percent).

| Race/Ethnicity | Number who can afford a home | Percent who can afford a home |
|---|---|---|
| White | 22,885 | 69% |
| Asian | 5,640 | 17% |
| Hispanic/Latino | 2,203 | 7% |
| Black | 1,119 | 3% |
| AIAN/NHPI | 240 | 1% |
| Other or Multi | 960 | 3% |
| Total[a] | 33,046 | 100% |

*Figure 40: Potential Washington First-Time Homebuyers who can Afford a Home by Race/Ethnicity: Baseline Scenario*
[a] Columns may not sum to totals due to rounding.

The remainder of this section compares the impact of adding other types of assistance (higher levels of DPA, interest rate reduction, and credit counseling) to the assistance available in the

baseline scenario. All other scenarios assume that $10,000 in DPA is available to income-eligible potential first-time homebuyers in addition to the assistance provided.

## Assistance Scenario Comparisons

In this chapter, the study team modeled three scenarios that provide different types of assistance to potential first-time homebuyers (see methodology above): down payment assistance (DPA), interest rate reduction, and credit counseling. Of the three options, the DPA scenario increased the number of potential first-time homebuyers who can afford a home the most compared to the baseline scenario (see Figure 41). Under this scenario, the number of potential first-time homebuyers who can afford a home is over 90,000, nearly triple that of the baseline scenario. [265] Under the interest rate reduction scenario, approximately 50,000 potential first-time homebuyers can afford a home. The interest rate reduction scenario increases the proportion of potential first-time homebuyers who can afford a home compared to the baseline scenario only modestly, adding 16,500 net beneficiaries. Under the credit counseling scenario, approximately 34,000 potential first-time homebuyers can afford a home, which is only slightly more than the number who can afford a home without credit counseling. There are fewer than 600 potential beneficiaries of the credit counseling program when offered as a standalone intervention without additional DPA beyond that included in the baseline scenario. [266]

| Scenario | Number of Potential First-Time Homebuyers who can afford a home | Change Compared to Baseline |
|---|---|---|
| Baseline Scenario | 33,046 | --- |
| DPA Scenario | 92,030 | 58,984 |
| Interest Rate Reduction Scenario | 49,546 | 16,500 |
| Credit Counseling Scenario | 33,607 | 561 |

*Figure 41: Potential Washington First-Time Homebuyer Beneficiaries for Different Policy Scenarios*

The DPA scenario also has the potential to assist the greatest number of impacted residents, as shown in Figure 42 For example, there are a total of 3,059 potential beneficiaries who are Black under the DPA scenario compared to 496 under the interest rate reduction scenario and 49 under the credit counseling scenario.

---

[265] The numbers presented in Figure 8 assume all programs use race-neutral, income-restricted eligibility criteria. Results showing the number of potential beneficiaries and their racial/ethnic composition under different eligibility criteria are provided in the Appendix and discussed in the following sections. The DPA scenario results in the greatest number of potential beneficiaries under all eligibility criteria.
[266] The credit counseling scenario has no appreciable impact on the proportion of potential first-time homebuyers who can afford a home because the research team assumes that credit score is not a limiting factor for many potential first-time homebuyers who can afford monthly payments and can save for a down payment. See Figure 4 for detailed assumptions.

| Race/Ethnicity | Number of Beneficiaries by Racial/Ethnic Group (Race-neutral, income restricted eligibility criteria) | | |
|---|---|---|---|
| | DPA Scenario | Interest Rate Reduction Scenario | Credit Counseling Scenario |
| White | 32,977 | 10,881 | 350 |
| Asian | 9,262 | 1,196 | 29 |
| Hispanic/Latino | 7,626 | 2,078 | 83 |
| Black | 3,059 | 496 | 49 |
| AIAN/NHPI | 1,535 | 750 | 9 |
| Other or Multi | 4,525 | 1,100 | 42 |
| **Total** | **58,984** | **16,500** | **561** |

*Figure 42: Potential Washington First-Time Homebuyer Beneficiaries for Different Policy Scenarios by Race/Ethnicity*

Because of these results, the next section focuses on the DPA assistance scenario when comparing the effects of different eligibility criteria, including race-neutral and race-conscious approaches. Appendix D provides tables that show the results of applying race-neutral and race-conscious approaches for all three policy scenarios.

### Eligibility Criteria Comparisons

Under the DPA scenario, which provides $50,000 of DPA for income-eligible potential first-time homebuyers in low-cost counties and $120,000 of DPA for income-eligible potential first-time homebuyers in high-cost counties, approximately 92,000 potential first-time homebuyers can afford a home (Figure 41). This nearly triples the proportion of potential first-time homebuyers who can afford a home relative to the baseline scenario, from 5 percent of potential first-time homebuyers to 13 percent. The effect is even greater for the racial and ethnic groups included within impacted residents: the proportion of potential first-time homebuyers in these groups who can afford a home quintuples from 2 percent to 10 percent (See Appendix D, Figure 15).

The number of potential beneficiaries of a particular policy is the number of potential first-time homebuyers who can afford a home under the scenario but could not afford a home under the baseline scenario. In other words, it is the difference in the number of potential first-time homebuyers who can afford a home between the baseline and tested scenario. Using this definition, there are nearly 59,000 potential beneficiaries of the DPA program: 92,030 who could afford a home with the DPA program - 33,046 who could afford a home in the baseline scenario = 58,984 beneficiaries of the DPA program (see Figure 41).

It would cost over $6.6 billion to provide DPA to all 58,984 potential beneficiaries (the number who could benefit using income-restricted race-neutral eligibility criteria). Since this sum far exceeds the expected annual funding available for the SPCP, Figure 43 compares the number of potential beneficiaries who could be served with $100 million (the anticipated annual funding for the SPCP) under a race-neutral, income-restricted approach versus a race-conscious, income-restricted approach. As shown here, under income-restricted, race-conscious eligibility criteria (see the last two columns of Figure 43), the number of beneficiaries who are members of impacted groups

who can be served with $100 million under the race-conscious approach (894) is almost four times that of the race-neutral approach (252). [267] Half of potential DPA beneficiaries are Latino, one-fifth are Black, one-tenth are American Indian, Alaska Native, Native Hawaiian or other Pacific Islander, and one-fifth are multiracial or some other race. [268]

| Race/Ethnicity | Race-Neutral, Income-Restricted | | Race-Conscious, Income-Restricted | |
| --- | --- | --- | --- | --- |
| | Number of Beneficiaries Served with $100 million | Percent of Beneficiaries in Racial/Ethnic Group | Number of Beneficiaries Served with $100 million | Percent of Beneficiaries in Racial/Ethnic Group |
| White | 496 | 55% | 0 | 0% |
| Asian | 139 | 16% | 0 | 0% |
| Hispanic/Latino | 115 | 13% | 442 | 48% |
| Black | 46 | 6% | 177 | 21% |
| AIAN/NHPI | 23 | 2% | 89 | 9% |
| Other or Multi | 68 | 8% | 186 | 21% |
| Total | 887 | 100% | 894 | 100% |

*Figure 43: Potential Washington First-Time Homebuyer Beneficiaries by Race/Ethnicity: DPA Scenario, $100 Million Program*

Figure 44 illustrates the difference in the racial/ethnic composition of DPA scenario beneficiaries under the race-neutral and race-conscious eligibility criteria, documenting the much higher percentage of impacted residents served by the race-conscious approach.

---

[267] The slight difference in the total number of households that can be served under a race-neutral approach (887) and race-conscious approach (894) is related to the relative proportion of beneficiaries located in high-cost counties under each approach, as the DPA provided in high-cost counties ($120,000) is higher than the DPA provided in low-cost counties ($50,000).
[268] "Some other race" is a category in the 2020 Decennial Census. This category is made up mostly of people who report Hispanic/Latino as their ethnicity.



*Figure 44: Racial/Ethnic Composition of Potential Washington First-Time Homebuyer Beneficiaries: DPA Scenario, $100 Million Program*

Income limits are not the only possible race-neutral criteria for homebuying assistance. Figure 45 below shows potential beneficiaries of the DPA scenario under two additional race-neutral criteria layered on top of income eligibility restrictions: minority county and first-generation homebuyer. Applying these additional race-neutral eligibility criteria on top of income eligibility shifts the racial/ethnic composition of beneficiaries towards impacted residents, but not as efficiently as under race-conscious eligibility criteria. Under the minority county eligibility criteria with a $100 million annual program budget, 65 percent of potential DPA beneficiaries are White or Asian. Under the first-generation eligibility criteria, 59 percent of potential DPA beneficiaries are White or Asian. The first-generation, income-restricted approach shifts beneficiaries towards impacted residents most among race-neutral approaches. However, impacted residents still make up less than half of likely beneficiaries.

| Race/Ethnicity | Race-Neutral (Minority County, Income-Restricted) | | Race-Neutral (First-Generation, Income-Restricted) | |
|---|---|---|---|---|
| | Number of Beneficiaries Served with $100 million | Percent of Beneficiaries in Racial/Ethnic Group | Number of Beneficiaries Served with $100 million | Percent of Beneficiaries in Racial/Ethnic Group |
| White | 567 | 63% | 386 | 43% |
| Asian | 21 | 2% | 135 | 16% |
| Hispanic/Latino | 176 | 17% | 161 | 18% |
| Black | 43 | 5% | 113 | 14% |
| AIAN/NHPI | 49 | 5% | 22 | 2% |
| Other or Multi | 76 | 7% | 66 | 7% |
| **Total** | **931** | **100%** | **883** | **100%** |

*Figure 45: Potential Washington First-Time Homebuyer Beneficiaries by Race/Ethnicity: DPA Scenario (Alternate Race-Neutral Criteria).*

Figure 46 illustrates how the racial/ethnic composition of DPA scenario beneficiaries under the two additional race-neutral eligibility criteria differ from that of the race-conscious eligibility criteria. Note that the total number of beneficiaries served by $100 million annual funding under the first-generation and race-conscious eligibility criteria are nearly identical, but under the race-conscious eligibility criteria all beneficiaries are impacted residents. [269]



*Figure 46: Racial/Ethnic Composition of Potential Washington First-Time Homebuyer Beneficiaries: DPA Scenario (Alternative Race-Neutral Criteria), $100 Million Program.*

---

[269] The racial/ethnic composition of beneficiaries for the additional race-neutral eligibility criteria is similar for all policy scenarios, so this chapter only presents it for the DPA scenario. See Appendix D for data tables for all scenarios and eligibility criteria.

## Conclusions

The core conclusion of these analyses is that race-neutral homeownership programs are far less efficient than race-conscious approaches in expanding the homeownership opportunities in Washington for impacted residents.

As shown in section 1, existing race-neutral programs primarily aid households who are not impacted residents. Black, Latino, Native American, Alaskan Native, Native Hawaiian or other Pacific Islander borrowers comprised about 30 percent of all participants in WSHFC programs that the research team analyzed. In contrast, about two-thirds of participants were White. While a larger share of HomeSight's borrowers are impacted residents, the number of loans provided through that organization's programs is extremely small compared with the number provided by WSHFC and does not alter the fundamental conclusion that current programs are insufficient to close the persistent homeownership gaps documented in Chapter 2. [270]

As reflected in the policy scenarios modeled for this report, additional income-restricted race-neutral programs that could be introduced in Washington are also likely to provide support primarily to White borrowers, help only a modest number of impacted residents, and do little to close persistent homeownership gaps in the state between White and non-White residents. The research team modeled three different income-restricted race-neutral eligibility criteria and applied these criteria to hypothetical programs that provided different kinds of assistance (DPA, a reduction in the mortgage interest rate, and credit counseling). In all these scenarios, White participants comprised the greatest share of program beneficiaries. Of the income-restricted race-neutral eligibility criteria, only the first-generation approach resulted in more non-White beneficiaries than White beneficiaries, but only modestly so. Compared to the race-neutral approaches, the race-conscious approach was a far more efficient way of reaching impacted residents and reaches more impacted residents when funding constraints are considered. The race-conscious approach also would be more effective at closing the racial homeownership gap caused by the State's historic discrimination. This is particularly important given the given the Act's remedial objective.

As shown in section 2, assuming no limit to the amount of funds available to provide assistance, race-neutral approaches have a higher number of potential beneficiaries compared to race-conscious approaches. Fully funding a race-neutral approach would therefore be a much more costly approach to reaching impacted residents. For example, it would cost over $6.6 billion to provide DPA to all potential beneficiaries using the income-restricted race-neutral approach described in section 2 compared with $1.7 billion using an income-restricted race-conscious approach, yet both approaches would reach the same number of impacted residents. These amounts far exceed expected fee revenue for the Covenant Homeownership Fund (which is expected to be ~$75M to $100M/year [271]). Under the assumptions modeled here, with $100 million, a race-neutral approach to DPA would reach only about one-quarter of the number of

---

[270] The larger share of HomeSight program beneficiaries who are impacted residents appears to be due to the fact that HomeSight operates only within the Seattle region (where there is a large concentration of impacted residents) and provides a deeper level of subsidy to homebuyers.

[271] Washington State Housing Finance Commission (2023). "Covenant Homeownership Program." https://www.wshfc.org/covenant/

Black, Latino, Native American, Alaska Natives, Native Hawaiian and other Pacific Islander beneficiaries as would be reached by a race-conscious approach.

**For these reasons, existing programs and other race-neutral approaches are insufficient to remedy the discrimination described in Chapter 1 and the impacts on residents identified in Chapter 2.**

In addition, the results of the policy scenarios emphasize the challenge low- and moderate-income renters face attaining homeownership in Washington. Only two percent of all potential first-time homebuyers and one percent of potential first-time homebuyers who are impacted residents can afford to buy a modest-cost home in their county without assistance. Assuming a baseline availability of $10,000 of DPA that is available to all low- and moderate-income renters, five percent of all potential first-time homebuyers and two percent of potential first-time homebuyers who are impacted residents can afford to buy a home. A substantially larger DPA amount would nearly triple the proportion of potential first-time homebuyers who can afford a home relative to the baseline scenario and would quintuple the proportion of potential first-time homebuyers who are impacted residents who can afford a home. However, even the larger DPA amounts modeled here fail to reach the vast majority of potential first-time homebuyers. While not all renter households necessarily want to become homeowners, it is nevertheless worth considering whether higher levels of assistance might help more families who wish to become homeowners do so in a stable manner that further narrows the racial and ethnic homeownership gaps in Washington.

The next chapter evaluates potential programmatic and policy changes, including the creation of one or more SPCPs, that could remedy the documented discrimination and its impacts.



## CHAPTER 4: POLICY SCENARIOS AND RECOMMENDATIONS

## Introduction

The goal of this chapter, as outlined in the Washington State Housing Finance Commission's (WSHFC) Request for Proposals [272] and the Washington State Covenant Homeownership Act (House Bill 1474, codified at Chapter 43.181 RCW), is to evaluate and recommend potential programmatic and policy changes, including creation of one or more Special Purpose Credit Programs (SPCPs), to remedy the impacts of the discrimination identified in Chapter 1 on the currently impacted residents identified in Chapter 2. [273]

Congress authorized SPCPs under the Equal Credit Opportunity Act (ECOA) to counteract centuries of unfair laws and policies that deprived millions of consumers access to fair mortgage and credit opportunities. SPCPs are targeted lending products designed specifically to help an economically disadvantaged group of people who, under customary standards of creditworthiness, probably would not receive credit or would receive it on less favorable terms than are ordinarily available to other consumers applying for a similar type and amount of credit. Congress ensured that these programs serving an economically disadvantaged group can

### RECOMMENDATIONS

- Implement the SPCP as outlined in RCW 43.181.040(3) for economically disadvantaged households with Black, Hispanic, Native American, Alaska Native, Native Hawaiian, Other Pacific Islander, Korean, or Asian Indian heads of household.

- Provide customized amounts of down payment assistance that enable households with incomes between 80 and 100 percent of area median income (AMI) to afford a modest-cost home in their county. Consider one of two models that effectively balance program cost and housing choice.

- Provide down payment assistance as a zero-interest loan.

- Consider new legislation to allow for different types of assistance and eligibility criteria:

  - To avoid trapping households in their homes and encourage wealth building, consider allowing them to re-use some or all of their assistance to purchase subsequent homes and/or alternative repayment options.

  - Consider expanding eligibility for the SPCP to impacted residents with incomes up to 140 percent of AMI given the large number with incomes between 100 and 140 percent of AMI who need assistance to afford a modest-cost home.

  - Consider expanding eligibility for the SPCP to other households who can prove they were impacted by racially restrictive covenants or other discrimination by the state, as documented in Chapters 1 and 2.

---

[272] "Request for Proposals (RFP). NO. WSHFC_HOCV23." Washington State Housing Finance Commission. April 21, 2023. https://wshfc.org/admin/20230503RFPCPAddendumPostingPacket.pdf.
[273] Chapter 2 identified populations in Washington state that were subject to past discrimination that continues to impact their ability to become homeowners. These groups are Black, Latino, Native American, Alaska Native, Native Hawaiian or other Pacific Islander, Korean and Asian Indian residents, referred to as "impacted residents" in this chapter.

consider race or ethnicity without violating ECOA's prohibition on discrimination in order to "increase access to the credit market by persons previously foreclosed from it." [274]

SPCPs authorized by law, like those detailed in this study pursuant to Washington State legislation, must be "for the benefit of an economically disadvantaged class or classes of persons." [275] Consistent with ECOA, the regulations under ECOA specify that "all program participants may be required to share one or more common characteristics (for example, race, national origin, or sex) so long as the program was not established and is not administered with the purpose of evading the requirements of [ECOA] or this part." [276] The regulations do not specifically define "economically disadvantaged class or classes of persons." However, in in the context of small business owners, the U.S. Small Business Administration's regulations define "economically disadvantaged individuals" as "socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially disadvantaged." [277] Similarly, in the context of an SPCP to increase homeownership, an "economically disadvantaged class or classes of persons" would include people with one or more common characteristics whose ability to buy a home has been impaired due to diminished capital and/or credit opportunities as compared to similarly situated people who are not in an economically disadvantaged class. This study focuses on considering whether there is an "economically disadvantaged class of persons" warranting an SPCP authorized under ECOA and its implementing regulations.

As set out in Chapter 1, Washington State has an obligation to affirmatively further fair housing, which means it must first identify actions, laws, or policies which violate the fair housing laws and policy; second, it must identify actions which prohibit people's access to fair housing opportunities and/or perpetuate segregation; ; and third, it must "take meaningful actions to overcome patterns of segregation, promote fair housing choice, eliminate disparities in housing-related opportunities, and foster inclusive communities that are free from discrimination.". The 2015 and 2020 Analysis of Impediments for Fair Housing Choice (AIs) determined that there were impediments to fair housing choice in housing finance, including high denial rates for people in historically marginalized communities, lack of access to conventional mortgages, and predatory lending. During this same time period, WSHFC created several race-neutral down payment assistance programs designed to assist any otherwise eligible low-income household to buy homes. Yet, according to the data cited in the 2020 AI and in this report, homeownership rates for people of color have been falling since at least 2012, whereas the rates for White people have increased, reinforcing this study's findings that race-neutral programs are insufficient to close the homeownership gap caused by the State's discriminatory acts.

As shown in Chapter 3, a race-neutral approach is unlikely to be an effective or workable means of addressing the past discrimination and ongoing impacts described in Chapters 1 and 2 of this study. The analyses presented in Chapter 3 demonstrate the strong advantage that down payment assistance has over other forms of assistance in helping impacted residents achieve

---

[274] 15 U.S.C. § 1691(c)(1); Senate Report 94-589, 1976 U.S.C.C.A.N. at 409.
[275] 12 C.F.R. § 1002.8(a)(1).
[276] 12 C.F.R. § 1002.8(b)(2).
[277] https://www.law.cornell.edu/cfr/text/13/124.104.

homeownership in Washington. Accordingly, this chapter focuses on options for structuring an SPCP providing down payment assistance.

This chapter has five main sections.

- Section 1 describes the approach used to assess different options for structuring a down payment assistance program that could be incorporated into a SPCP to address the homeownership gaps resulting from the discrimination described in earlier chapters. The approach includes metrics to help illuminate the degree to which different options maximize the number of households who benefit, effectively serve people in different locations and impacted racial/ethnic groups and allow for housing choice.

- Section 2 presents the results of the models for each of the down payment options assessed. The model results for households with 80-100 percent AMI and analysis of options are discussed first, followed by an analysis of the full group of impacted residents who are economically disadvantaged (including residents with incomes above 100 percent AMI).

- Section 3 identifies administrative challenges WSHFC may need to consider when developing the Covenant Homeownership Program.

- Section 4 identifies additional policies and programs that would complement a down payment assistance program by addressing other housing challenges that limit homeownership opportunities in the state.

- Section 5 recommends specific elements of an SPCP– including the type and amount of assistance and criteria for determining eligibility – that most effectively and efficiently address the inequities resulting from past government discrimination. This section also discusses the program design elements required under RCW 43.181.040, and how the recommendations in this study align with those identified in the Covenant Homeownership Act.

One of the key findings from the modeling results is that capping the amount of down payment assistance available at a fixed amount throughout the state is not an effective approach for meeting the down payment needs of economically disadvantaged persons. Housing prices are highly variable across the state. Setting a fixed down payment assistance amount at a level that works well in lower-cost counties would not provide enough assistance to enable economically disadvantaged households in higher-cost counties to have a reasonable choice of homes. Alternatively, setting the down payment assistance amount at a high enough level to meet the needs of economically disadvantaged households in higher-cost counties would lead to larger than necessary down payment levels in other parts of the state.

A fixed level of down payment assistance for the entire state would also interfere with efforts to aid households within all of the racial and ethnic groups included in the class of impacted residents. As discussed in Chapter 2, impacted residents live in concentrated areas in the state. For example, Latino residents reside disproportionately in the central region of the state, whereas

Black and Asian Indian residents reside disproportionately in King County. To reach households in all of the racial and ethnic groups included within the class of impacted residents it will be important for the down payment assistance program to work equally well throughout the state.

In addition to varying by county (and by city within each county), down payment assistance needs also vary substantially by household income, with households at 80 percent AMI needing a larger amount of down payment assistance and households at 100 percent AMI needing a somewhat smaller amount to afford the same home. [278] A needs-based approach to providing down payment assistance (as described in section 2 of this chapter) accounts for both the diversity in housing prices across the state and the diversity of incomes, allowing economically disadvantaged impacted residents to benefit from the program no matter where they live.

## Section 1: Modeling Approach

This chapter models the potential impacts of different programmatic options for structuring a down payment assistance program for economically disadvantaged members of the racial and ethnic groups identified in Chapters 1 and 2 as having experienced past discrimination that impacted current homeownership rates: households with Black, Latino, Native American, Alaska Native, Native Hawaiian or other Pacific Islander heads of household in Washington (collectively, impacted residents). [279] In this chapter, the term down payment assistance is inclusive of assistance for both a down payment and closing costs.

While the analyses presented in Chapter 2 demonstrate ongoing challenges facing impacted Washington residents as broadly defined above, the Covenant Homeownership Act (H.B. 1474, codified at ch. 43.181 RCW) [280] defines a subset of impacted residents that are eligible to participate in an SPCP established under the Act. These are economically disadvantaged households with:

- Incomes below 100 percent AMI (RCW 43.181.040(4)(a)),

- Who are first-time homebuyers (RCW 43.181.040(4)(b)), and

- Who meet the eligibility requirements related to residency in the state before enactment of the Federal Fair Housing Act in 1968 (RCW 43.181.040(4)(c)).

The available data sources do not allow for the identification of the specific subgroup of impacted residents that meet all these criteria. [281] The models thus provide results for impacted residents

[278] Impacted residents with higher incomes need even less assistance per household. However, the legislature specifies in the Covenant Homeownership Act that the program should assist those with AMI of 100% or below.
[279] Although households that include an Asian Indian or Korean adult are included within the scope of eligible households for the Covenant Homeownership Program implementation recommended in this report, the modeling and analysis in Chapters 3 and 4 focus only on households with a Black, Latino, Native American, Alaska Native, Native Hawaiian or other Pacific Islander borrower or a borrower who identifies as a combination of these groups. For purposes of analysis, households designated as "some other race" and multiracial are also included. This is because there were relatively few Asian Indian or Korean residents of Washington state in 1968 and eligibility for the Covenant Homeownership Program is limited by statute to individuals who were living in Washington state in 1968 or descended from someone living in Washington state in 1968. The economic characteristics of today's population of households headed by an Asian Indian or Korean adult is thus of less utility to understanding the economic characteristics of households eligible for the Covenant Homeownership Program than the characteristics of the other racial and ethnic groups included within the definition of impacted residents.
[280] Full text of the Act can be found here: 1474-S2.PL.pdf (wa.gov).
[281] The American Community Survey data do not identify if a respondent is a first-time homebuyers or if they are or are descended from a resident from one of the impacted groups who lived in Washington state prior to 1968.

with incomes below 100 percent AMI who are renters, which provides a reasonable basis for understanding the economic characteristics of eligible households, even if the criteria are more inclusive than those in the Covenant Homeownership Act. The modeling conducted here with the larger group of impacted residents provides the data and analysis needed to understand the impacts of different down payment assistance options and construct a program that meets the state's needs. Results for impacted residents with incomes above 100 percent AMI are also shown. In addition to the model results, this section also includes a rough estimate of the total number and racial composition of Washington residents who are likely to meet the pre-1968 residency criteria alone (that is without consideration of their income, location, or ability to afford homeownership) to provide more information about the characteristics of potential applicants (See Figure 60, Page 140).

## KEY TERMS

**Impacted Residents:** This term refers to all residents of Washington who identify as a member of one or more of the populations that were subject to past discrimination that continues to impact their ability to become homeowners. These populations are identified at the end of Chapter 2, based on the data and analysis presented in that chapter. The populations are Black, Latino, Native American, Alaska Native, Native Hawaiian or other Pacific Islander, Korean or Asian Indian residents.

**Economically Disadvantaged:** Special Purpose Credit Programs are required to be narrowly tailored to a class or classes of economically disadvantaged individuals. As explained above, in the context of an SPCP to increase homeownership, an "economically disadvantaged" class would include individuals with one or more common characteristics whose ability to buy a home has been impaired due to diminished capital and/or credit opportunities as compared to similarly situated people who are not in an economically disadvantaged class. For the analysis in this chapter, we assume households are economically disadvantaged when they are unable to afford to purchase a reasonable choice of homes in their county without down payment assistance.

**Eligible Homebuyers/Households:** This term refers to households determined to be eligible for the SPCP recommended in this study. Although this chapter focuses primarily on homebuyers that meet the eligibility criteria set forth in the Homeownership Covenant Act, the chapter also examines the question of whether to recommend legislative changes that would expand eligibility.

**Potential Beneficiaries**: This term refers to impacted residents who could afford a mortgage under the assumptions provided in section 2 with the assistance being modeled.

## Types of down payment assistance programs modeled

The models in this chapter consider multiple approaches to providing down payment assistance to potential beneficiaries. The models vary the amount of assistance available and the way in which the amount of assistance is determined.

**Conventional Levels of Fixed Down Payment Assistance.** As discussed in Chapter 3, many down payment assistance programs provide a small amount of funds, such as $10,000 or $15,000, to cover the minimum down payment needed to overcome the down payment requirement on a mortgage. Programs that go beyond this minimum level tend to provide a somewhat larger amount, such as $25,000, $50,000, or $75,000. To better understand whether this type of program will be effective in redressing the discrimination faced by impacted residents, this analysis models the effects of providing varying down payment assistance levels on the ability of impacted resident potential homebuyers in different Washington counties to purchase a home. This analysis focuses on households with income between 80 and 100 percent of AMI. (The rationale for this income range is discussed below.)

**Customized Down Payment Assistance.** An alternative approach is to customize the amount of down payment assistance provided to each eligible household. Several different options for structuring a customized down payment assistance program are modeled. In these models, an eligible household may receive a down payment assistance amount that covers the difference between what they can afford and the price of the home they are purchasing, up to a maximum price (the subsidy standard). Results are shown first for households with incomes of 80 to 100 percent of AMI and then 100 to 140 percent of AMI.

## Evaluating down payment assistance options

The analyses in this chapter are designed to inform a decision by WSHFC about how to structure the Covenant Homeownership Program to achieve the goals outlined in the Covenant Homeownership Act. The primary goal is to remedy discrimination to which the state government was an active or passive participant and the ongoing impacts of that discrimination on access to credit and homeownership and, in so doing, to help reduce racial disparities in homeownership in the state. While not explicitly stated in the Covenant Homeownership Act, WSHFC has made clear that a third programmatic goal is to ensure that implementation of the program does not inadvertently contribute to residential segregation.

The analyses in this chapter are guided by these overarching goals. To effectively remedy the discrimination outlined in Chapters 1 and 2 and help reduce the resulting racial disparities in homeownership, the Covenant Homeownership Program should:

- Ensure that eligible households receive a large enough down payment to afford to purchase a home of decent quality.
- Serve as many eligible households as feasible.
- Not advantage any particular racial or ethnic group among eligible households.

To ensure that implementation of the program does not inadvertently contribute to racial segregation, the Covenant Homeownership Program should:

- Provide homebuyers with a reasonable choice of homes.
- Work well in high-cost counties as well as other parts of the state.

WSHFC will need to balance these goals. For example, a policy that strictly seeks to maximize the number of eligible households that benefit might not effectively serve households on the lower end of the targeted income spectrum or provide a reasonable degree of housing choice. To help

WSHFC evaluate tradeoffs and ensure the program achieves a balance of the goals noted above, this analysis uses the following metrics for each of the modeled program options. These metrics assess the potential costs of the program, the total number of potential eligible households who could benefit and the racial/ethnic makeup of these households, and the degree to which the program enables these households to have housing choice within the state.

- **Average down payment assistance amount** – This is an average of the down payment assistance amounts estimated to be needed to serve impacted residents with the identified characteristics. A smaller number allows the program to serve more eligible households and more efficiently address the discrimination identified in Chapters 1 and 2, and close the racial homeownership gap caused by that discrimination.

- **Number of potential beneficiaries** – This is the number of impacted residents that can be served. For some of the analyses, the number of potential beneficiaries is evaluated within the context of a funding cap of $100 million as a rough approximation of the expected amount of annual funding for the program. A larger number reflects a greater contribution to addressing the discrimination identified in Chapters 1 and 2, and closing the racial homeownership gap caused by that discrimination.

- **Attainability percentage** – This metric quantifies the extent to which eligible households have a choice of locations in which to purchase a home within their county of residence. It reflects the share of owner-occupied homes that are located in a city where an eligible household can afford to purchase a modest-cost home under the program rules. A higher attainability percentage reflects greater housing choice and reduces the likelihood that the program contributes to racial segregation. Attainability percentages are reported for the state as a whole and for the group of high-cost counties to allow for an examination of whether the options are effective in different housing conditions.

The down payment assistance program will need to balance these metrics to effectively meet the goals identified above.

## Methodology

The models in Chapter 4 use the same data sources and methodology described in Chapter 3 to model the level of assistance needed to assist any eligible household in Washington to become homeowners, with several adjustments:

- Although Chapter 3 focused on heads of household of prime homebuying age—ages 25-55 [282]—the models in this chapter raise the maximum age to 70 to ensure they capture the range of households that might apply for assistance.

- Although Chapter 3 presented results for Washington residents of all racial and ethnic groups, the analyses in this chapter are limited to residents who identify as Black, Latino, Native American, Alaska Native, Native Hawaiian or other Pacific Islander. As noted above (see footnote 278), these are the racial and ethnic groups whose current economic

---

[282] Very few first-time homebuyers are over age 55 – in 2022, 78% of home purchase loan applications in Washington state were made by applicants with ages between 25 and 55, see https://ffiec.cfpb.gov/data-browser/.

characteristics are likely to be most relevant for understanding the economic characteristics of households eligible for the SPCP recommended in this study.

- The Chapter 3 simulations assess how many impacted residents can purchase a modest-cost home in their county with a fixed amount of down payment assistance. In addition to that approach, the models in this chapter also estimate how much down payment assistance would be needed for impacted residents to be able to afford both a down payment and a monthly payment for homes of different values (as discussed above). For a home to be considered affordable to a renter, the models use the following conventions which approximate the underwriting criteria used to underwrite FHA mortgages:

    o 3.5 percent down payment

    o 3.0 percent closing costs rolled into the loan

    o 30-year fixed-rate loan with a 6.0 percent annual interest rate

    o Monthly payments (mortgage, mortgage insurance, [283] property insurance, and property tax) less than or equal to 31 percent of gross income

- The Chapter 3 simulations use an income eligibility threshold of 100 percent AMI in low-cost counties and 140 percent AMI in high-cost counties. [284] The models in this chapter focus primarily on households with incomes between 80 and 100 percent of AMI, reflecting the income cutoff of 100 percent of AMI required under RCW 43.181.040(4)(a), with 80% of AMI as the bottom threshold of the income tier to approximate the population of households with incomes sufficient to afford homeownership. [285] Given the widespread discrimination documented in Chapters 1 and 2, results for households with incomes between 100 and 140 percent of AMI and households with incomes above 140 percent of AMI are shown to assess whether down payment assistance is needed to remedy the documented discrimination by the state on this broader class of economically disadvantaged, impacted residents. This section also responds to the direction in RCW 43.181.030(1)(a)(iii)(B) that this study "identify through evidence-based documentation the economically disadvantaged class or classes of persons that require down payment and closing cost assistance in order to reduce racial disparities in homeownership in the state."

- All of Chapter 3's simulations use the Zillow bottom-tier [286] home value at the county level, which this study terms a "modest-cost" home. The models in this chapter use a variety of home values: modest-cost home at the county level, modest-cost home at the city level, [287]

---

[283] Mortgage insurance is generally not required for mortgages where the down payment exceeds 20% of the purchase price (https://www.consumerfinance.gov/ask-cfpb/what-is-mortgage-insurance-and-how-does-it-work-en-1953/). For simplicity, the models in this chapter assume mortgage insurance is required for all mortgages.
[284] As in Chapter 3, counties designated as high-cost are Clark, King, Pierce, San Juan, Snohomish, and Whatcom.
[285] The models presented use 80% as a lower bound for estimating costs and number of potential beneficiaries. The Covenant Homeownership Act does not include a lower bound on income for households, however, lower income impacted residents would require larger amounts of assistance than the amounts presented in this section.
[286] The Zillow bottom-tier home value is the typical value for homes within the 5th to 35th percentile within a certain geographic area. These models use bottom-tier home values as of 9/30/23.
[287] These models use the Census definition of Places, which include incorporated cities, towns, and villages as well as unincorporated Census-designated places (CDPs).

and Zillow typical-cost home [288] at the county level, which this study terms a "mid-level" home.

## Section 2: Modeling Results

### Fixed Down Payment Assistance Models

The first set of down payment assistance programs modeled provide a fixed amount of down payment assistance, regardless of where someone lives in Washington. Figure 48 shows the total number of potential beneficiaries – that is renter households among the impacted residents in Washington who could afford to purchase a home – with four levels of fixed down payment assistance: $25,000, $50,000, $75,000, and $100,000. Figure 48 includes information on the total number of potential beneficiaries as well as the number with incomes between 80 and 100 percent of AMI. The Figure also shows the attainability percentage that would be achieved at each level of down payment assistance for households at 80 and 100 percent of AMI for the state as a whole and for high-cost counties. As noted above, the attainability percentage quantifies the extent to which potential beneficiaries have a choice of communities in which to live if they receive assistance. Finally, Figure 47 shows the number of households that could be served with $100 million.

| Average DPA amount (fixed) | Number of potential beneficiaries | | Attainability Percentage (Statewide) | | Attainability Percentage (High-Cost Counties) | | Number of potential beneficiaries served with $100 million |
|---|---|---|---|---|---|---|---|
| | Total (no income limit) | # Between 80% and 100% of AMI | For 80% AMI | For 100% AMI | For 80% AMI | For 100% AMI | Total |
| $25,000 | 32,657 | 1,232 | 3% | 21% | 1% | 13% | 4,000 |
| $50,000 | 37,329 | 2,162 | 4% | 30% | 1% | 20% | 2,000 |
| $75,000 | 43,148 | 2,970 | 12% | 47% | 3% | 37% | 1,333 |
| $100,000 | 49,167 | 4,676 | 18% | 53% | 8% | 39% | 1,000 |

*Figure 47: Beneficiaries and Attainability for Different Fixed DPA Amounts by Income Range*

As Figure 47 shows, a key advantage of fixed down payment assistance is its relatively low cost, which allows the program to serve a large number of households – between 1,000 and 4,000 households with $100 million. However, the numbers of impacted residents with incomes between 80 and 100 percent AMI who would be able to purchase a home with these levels of assistance are relatively small, suggesting that these assistance levels are not large enough to be effective in an SPCP subject to the Covenant Homeownership Act's income restrictions. All four options have very low attainability percentages for households at 80 percent of AMI (18 percent or less), a sign that the amounts of assistance are not sufficient to enable households at

---

[288] The Zillow typical home value is the smoothed, seasonally adjusted typical value for homes within the 35th to 65th percentile within a certain geographic area. These models use typical home values as of 9/30/23.

this income level to have a significant degree of housing choice in their counties. While attainability percentages rise for households at 100 percent AMI, who can afford somewhat larger mortgages, and reach 53 percent statewide for $100,000 of assistance, the attainability percentages are significantly lower in high-cost counties, where larger amounts of assistance are needed to provide households with adequate housing choice. [289]

Figure 48 shows the share of impacted residents in different racial and ethnic groups who are able to purchase a home with each of the four down payment assistance levels modeled. Fixed statewide down payment assistance caps of this nature help a much smaller share of potential Black homebuyers than potential Latino or Native American homebuyers in Washington. This is likely because potential Black homebuyers are disproportionately located in higher-cost counties, like King County, where $100,000 is not a deep enough subsidy.

| Average DPA amount (fixed) | Number of potential beneficiaries (no income limit) | Share of impacted residents who are potential beneficiaries (no income limit) | | | |
|---|---|---|---|---|---|
| | | Black | Hispanic/Latino | AIAN/NHPI | Other or Multi |
| $25,000 | 32,657 | 7% | 15% | 16% | 11% |
| $50,000 | 37,329 | 8% | 17% | 20% | 13% |
| $75,000 | 43,148 | 9% | 20% | 22% | 16% |
| $100,000 | 49,167 | 10% | 23% | 24% | 18% |

*Figure 48: Beneficiaries and Attainability for Different Fixed DPA Amounts by Race/Ethnicity*

The discrepancy is even greater for potential Black renters with incomes between 80 and 100 percent of AMI. Figure 49 shows that zero percent of Black renters in this income range can afford a home with $75,000 of down payment assistance or less and only four percent of Black renters in this income range can afford a home with $100,000 of down payment assistance. [290]

| Average DPA amount (fixed) | Number of potential beneficiaries 80-100% AMI | Share of impacted residents 80-100% AMI who are potential beneficiaries | | | |
|---|---|---|---|---|---|
| | | Black | Hispanic/Latino | AIAN/NHPI | Other or Multi |
| $25,000 | 1,232 | 0% | 8% | 5% | 0% |
| $50,000 | 2,162 | 0% | 11% | 20% | 3% |
| $75,000 | 2,970 | 0% | 15% | 26% | 5% |
| $100,000 | 4,676 | 4% | 23% | 26% | 12% |

*Figure 49: Beneficiaries and Attainability for Different Fixed DPA Amounts by Race/Ethnicity and Income Range*

---

[289] Appendix E Figure E1 shows the number of beneficiaries and attainability percentages for higher income ranges (100-140% AMI and above 140% AMI). There are a larger number of beneficiaries in these higher income ranges, and attainability is higher.
[290] Appendix Figures A3-1 and A3-2 shows the share of impacted residents who are potential beneficiaries for higher income ranges (100-140% AMI and above 140% AMI). Discrepancies by race/ethnicity are smaller and less systematic.

A key finding from these analyses is that conventional levels of down payment assistance are insufficient to help impacted residents with incomes below 100% of AMI to afford a modest-cost home in many counties. To better understand what level of assistance *would* be effective, the next set of analyses identify how much is needed in each county to enable a household to afford to buy a modest-cost home. Figure 50 shows the amount of assistance, on average, that impacted residents with incomes between 80 and 100 percent of AMI would need to receive to afford to purchase a modest-cost home in their county.  This amount varies substantially across counties, ranging from less than $5,000 in Garfield and other small rural counties to over $150,000 in King and adjacent counties, with a maximum of $238,664 in Jefferson County. [291]

| County | Modest-cost home value | Average DPA needed to assist households with 80-100% AMI to afford a modest-cost home | Estimated total number of potential beneficiaries (80%-100% AMI) | Estimated cost of providing assistance to all potential beneficiaries with income between 80% and 100% of AMI) |
|---|---|---|---|---|
| Adams | $196,313 | $28,662 | 24 | $686,206 |
| Asotin | $207,115 | $2,999 | 36 | $106,953 |
| Benton | $325,156 | $87,123 | 872 | $75,936,007 |
| Chelan | $320,265 | $107,666 | 170 | $18,337,961 |
| Clallam | $345,007 | $140,753 | 156 | $21,978,587 |
| Clark | $423,273 | $121,286 | 1,537 | $186,369,735 |
| Columbia | $171,814 | $1,495 | 2 | $2,256 |
| Cowlitz | $304,597 | $107,754 | 22 | $2,370,530 |
| Douglas | $334,376 | $128,487 | 92 | $11,882,589 |
| Ferry | $166,990 | $2,680 | 4 | $11,071 |
| Franklin | $320,873 | $73,917 | 648 | $47,872,529 |
| Garfield | $144,294 | $801 | 4 | $2,932 |
| Grant | $237,663 | $61,063 | 25 | $1,553,970 |
| Grays Harbor | $193,749 | $2,383 | 104 | $247,518 |
| Island | $434,163 | N/A | 0 | N/A |
| Jefferson | $421,487 | $238,664 | 89 | $21,127,480 |
| King | $541,229 | $161,797 | 8,810 | $1,425,501,339 |
| Kitsap | $413,041 | $136,369 | 614 | $83,714,310 |
| Kittitas | $354,213 | $124,168 | 99 | $12,285,754 |
| Klickitat | $251,920 | $28,333 | 24 | $685,918 |
| Lewis | $311,453 | $92,637 | 105 | $9,728,816 |
| Lincoln | $175,571 | N/A | 0 | N/A |
| Mason | $308,359 | $90,958 | 13 | $1,214,471 |
| Okanogan | $163,533 | $2,559 | 24 | $61,982 |
| Pacific | $222,056 | $9,589 | 5 | $44,519 |
| Pend Oreille | $211,164 | $13,348 | 16 | $218,500 |
| Pierce | $418,531 | $135,689 | 4,524 | $613,823,454 |
| San Juan | $551,260 | N/A | 0 | N/A |
| Skagit | $408,560 | $182,821 | 490 | $89,624,084 |
| Skamania | $371,485 | $96,536 | 3 | $259,664 |
| Snohomish | $520,875 | $144,076 | 2,158 | $310,917,601 |

[291] Appendix Figure A4 shows the amount of assistance that renters with incomes between 100% and 140% of AMI would need to afford to purchase a modest-cost home in their county. This amount also varies substantially by county, but the average is lower ($33,423).

| | | | |
|---|---|---|---|
| Spokane | $302,082 | $78,410 | 578 | $45,333,376 |
| Stevens | $229,345 | $20,553 | 65 | $1,331,541 |
| Thurston | $404,936 | $121,907 | 560 | $68,251,625 |
| Wahkiakum | $249,366 | $34,377 | 1 | $30,179 |
| Walla Walla | $279,657 | $39,836 | 171 | $6,820,882 |
| Whatcom | $407,209 | $145,418 | 497 | $72,333,599 |
| Whitman | $242,474 | $4,237 | 77 | $325,225 |
| Yakima | $231,855 | $26,768 | 1,497 | $40,076,497 |
| **Washington** | **N/A** | **$131,495** | **24,116** | **$3,171,069,657** |

*Figure 50: Cost by County*

The amount needed to afford a modest-cost home also varies for households of different incomes within each county – those with lower incomes (80 percent AMI) need more down payment assistance than those with higher incomes (100 percent AMI) in each county. To illustrate, if a program were structured to provide down payment assistance equal to the **average amount that a potential beneficiary with incomes between 80 and 100 percent of AMI would need** to purchase a modest-cost home in their county, the average down payment assistance amount would be **$131,495**, and the program could serve about **760** households with $100 million. By contrast, if a program were to provide all potential beneficiaries with **the amount that a renter at 80 percent of AMI needs** to afford to purchase a modest-cost home in their county – essentially, a fixed down payment assistance level for each county that would ensure that everyone in the 80 to 100 percent AMI range can afford a modest-cost home in their county – the average down payment assistance amount would be **$168,322** and the program could serve about **594** households with $100 million. The larger amount of down payment assistance required in the latter case is due to the fact that a renter at 80 percent of AMI requires a higher level of down payment assistance than the average renter with incomes between 80 and 100 percent of AMI to purchase a modest-cost home in their county. [292]

Given the cost savings associated with tailoring the level of down payment assistance to the individual applicant's actual income, and the substantial variation in home prices across counties, the next section models several options for customizing down payment assistance to account for each applicant's location and income.

## Customized Down Payment Assistance

This section evaluates options for structuring a customized down payment assistance program where the amount each eligible household receives varies based on housing prices in their county and their income. In each option, the amount of down payment assistance that an eligible household receives represents the difference between (a) the amount the household can afford based on their income and assumed savings and (b) the purchase price of their home, up to a cap identified here as a "subsidy standard." For example, if an eligible household can afford a $200,000 mortgage and is assumed to our calculation assumes they have $15,000 in savings and the subsidy standard in their area is $300,000, the household would be entitled to request down payment assistance up to a maximum of $85,000 ($300,000 minus $215,000). If the actual price of the home were less than the subsidy standard, the household would receive a lower amount. For example, if the costs to purchase a home were $280,000, the household's down payment

---

[292] Since all impacted residents would be assisted under these scenarios, the racial distribution of potential beneficiaries is equal to the racial distribution of Washington residents that meet the race/ethnicity and income criteria.

assistance would be $65,000 ($280,000 minus $215,000). (The models use an assumption about savings levels. As noted below, in designing the final program, WSHFC can decide whether to use the household's actual savings in place of the assumed savings in the calculation or ignore savings altogether.) [293]

Setting the subsidy standard requires balancing choice and cost. Consider a program in which the subsidy standard is set at the county-level median home price. This standard would allow an eligible household to afford to purchase a modest-cost home in much of the county, achieving a high attainability percentage. But it would do so at a high per-household cost, reducing the number of households that can be assisted. In addition, because home prices often vary by city, especially in higher-cost counties, a program using this subsidy standard could allow households to buy some of the most expensive homes in cities where housing costs are low relative to the county median, providing more subsidy than households need to afford a modest-cost home in these localities.

The following five options for setting the subsidy standard are modeled below. They include two options in which the subsidy standard is set at the county level and three options in which the subsidy standard is set at the city level. The analysis below walks through the strengths and weaknesses of each of the models.

**County-Level Subsidy Standards**

1. **Modest-cost home in county.** All eligible homebuyers receive assistance up to the amount required to purchase a typical home within the 5th to 35th percentile of home prices in the county.

2. **Mid-level home in county.** All eligible homebuyers receive assistance up to the amount required to purchase a typical home within the 35th to 65th percentile of home prices in the county.

**City-Level Subsidy Standards**

3. **Modest-cost home in city.** All eligible homebuyers receive assistance up to the amount required to purchase a typical home within the 5th to 35th percentile of home prices in the city in which they are purchasing.

4. **Modest-cost home in city, capped at mid-level home in county.** All eligible homebuyers receive assistance up to the amount required to purchase a typical home within the 5th to 35th percentile of home prices the city in which they are purchasing. However, the amount of down payment assistance a household can receive is capped by the amount needed to purchase the typical mid-level home in the county.

5. **Modest-cost home in city, capped at level sufficient to afford modest-cost home in at least 50% of county.** All eligible homebuyers receive assistance up to the amount required to purchase a typical home within the 5th to 35th percentile of home prices the

---

[293]   This is a somewhat simplified version of the model used here. The model also ensures that households can afford have saved the 3.5 percent minimum down payment assistance level, even if the amount they need to afford a home at the subsidy standard is lower.

city in which they are purchasing. However, the amount of down payment assistance a household can receive is capped by an amount sufficient to afford a typical modest-cost home in cities that include at least 50 percent of the owner-occupied units in the county.

To illustrate the effects of the different subsidy standards, Figure 51 shows the cost of a typical modest-cost and mid-level home in each city in King County, and the average amount of down payment assistance needed to assist households with incomes between 80 and 100 percent of AMI to afford these homes. Housing costs and the amount of assistance eligible households need vary considerably by county (see Figure 50 in this chapter). This section uses King County as an example since it is home to the largest share of impacted residents (see Figure *35* in Chapter 3). In lower-cost counties, the amount of DPA would be lower than the amounts given in the examples in this section.

| City | Modest-cost home value | Average DPA needed to assist households with 80-100% AMI to afford a modest-cost home | Mid-level home value | Average DPA needed to assist households with 80-100% AMI to afford a mid-level home |
|---|---|---|---|---|
| Skykomish | $319,124 | $4,711 | $411,131 | $20,491 |
| Tukwila | $371,364 | $6,659 | $533,861 | $153,116 |
| Federal Way | $401,692 | $15,427 | $553,110 | $175,796 |
| Algona | $414,886 | $22,803 | $490,812 | $102,395 |
| Des Moines | $427,807 | $32,324 | $561,208 | $185,338 |
| SeaTac | $436,429 | $40,208 | $540,866 | $161,370 |
| Auburn | $438,332 | $42,093 | $565,504 | $190,400 |
| Pacific | $442,440 | $46,239 | $513,122 | $128,681 |
| Kent | $458,185 | $63,952 | $598,782 | $229,609 |
| Burien | $468,168 | $75,714 | $600,126 | $231,192 |
| White Center | $470,347 | $78,282 | $584,312 | $212,560 |
| Enumclaw | $479,278 | $88,805 | $603,666 | $235,363 |
| Bryn Mawr-Skyway | $479,337 | $88,874 | $624,828 | $260,297 |
| Covington | $499,039 | $112,088 | $610,502 | $243,417 |
| Renton | $506,023 | $120,317 | $693,990 | $341,786 |
| Seattle | $567,240 | $192,445 | $819,937 | $490,181 |
| Black Diamond | $567,448 | $192,690 | $731,909 | $386,463 |
| Ravensdale | $576,245 | $203,054 | $842,598 | $516,881 |
| Shoreline | $582,222 | $210,097 | $752,905 | $411,202 |
| Maple Valley | $599,003 | $229,869 | $745,434 | $402,399 |
| Issaquah | $611,138 | $244,166 | $1,028,104 | $735,452 |
| Vashon | $640,581 | $278,857 | $867,302 | $545,990 |
| Carnation | $647,662 | $287,201 | $909,873 | $596,148 |
| Kirkland | $649,792 | $289,711 | $1,079,895 | $796,474 |
| Kenmore | $653,097 | $293,604 | $931,209 | $621,287 |
| North Bend | $666,298 | $309,159 | $913,423 | $600,331 |
| Snoqualmie | $683,616 | $329,563 | $986,281 | $686,175 |
| Lake Forest Park | $705,433 | $355,269 | $928,269 | $617,822 |
| Duvall | $712,943 | $364,118 | $897,091 | $581,088 |
| Normandy Park | $720,025 | $372,462 | $947,008 | $639,902 |
| Bellevue | $731,161 | $385,583 | $1,283,898 | $1,036,837 |
| Fall City | $737,537 | $393,094 | $1,066,587 | $780,794 |
| Redmond | $756,412 | $415,334 | $1,222,993 | $965,077 |

| | | | |
|---|---|---|---|
| Newcastle | $781,601 | $445,013 | $1,184,744 | $920,011 |
| Woodinville | $846,183 | $521,106 | $1,207,179 | $946,445 |
| Sammamish | $1,018,654 | $724,318 | $1,441,319 | $1,222,317 |
| Mercer Island | $1,345,769 | $1,109,737 | $2,030,521 | $1,916,538 |
| Beaux Arts Village | $2,028,779 | $1,914,485 | $2,536,782 | $2,513,033 |
| Medina | $2,832,402 | * | $4,162,825 | * |
| Clyde Hill | $2,908,862 | * | $3,828,566 | * |
| Yarrow Point | $2,920,095 | * | $4,050,317 | * |
| Hunts Point | $3,140,776 | * | $7,423,622 | * |

*Figure 51: Cost by City in King County*
* The average household in this income range could not afford the property insurance and property tax on a home of this value, even without a mortgage.

Figure 52 shows the approximate subsidy standard that would apply in King County under each of the five options: [294]

| Options for Setting the Subsidy Standard Used to Calculate Down Payment Assistance (DPA) | Subsidy Standard for King County | Maximum Subsidy Standard that applies within King County, depending on location |
|---|---|---|
| **County-Level Subsidy Standards** | | |
| 1. Modest-cost home in county | $541,229 | $541,229 |
| 2. Mid-level home in county | $798,125 | $798,125 |
| **City-Level Subsidy Standards** | | |
| 3. Modest-cost home in city | Varies by city | Up to $3,140,776 |
| 4. Modest-cost home in city, capped at mid-level home in county | Varies by city | Up to $798,125 |
| 5. Modest-cost home in city, capped at level sufficient to afford modest-cost home in at least 50% of county | Varies by city | Up to $567,240 |

*Figure 52: Subsidy Standards in King County*

To illustrate, under subsidy standard 1 – a modest-cost home in King County – a household would be eligible to receive down payment assistance that covers the difference between

---

[294] As discussed under Administrative Considerations, the actual subsidy standards would likely be somewhat higher. The values shown here represent the cost of a typical home in each category, but to generate an average purchase price equal to cost of a typical home, the subsidy standard would need to be set at a somewhat higher level.

> -- the home value they can afford with their income and assumed savings and
> -- the lower of (i) the purchase price of the home they select or (ii) $541,229 (the subsidy
> standard). [295]

A participating household could purchase a home in any part of the county but would likely have a much greater chance of finding a home they can afford in the lower-cost cities in the county, such as Auburn and Kent. Subsidy standard 2 would allow a household to afford a home of up to $798,125, providing a wide choice of homes in most of the county. But it would also give a household more money than needed to have a good choice of homes in many of the cities within the county.

By switching to a city-level subsidy, standard 3 ensures that households get the amount they need to afford a modest-cost home in each city. Since there is no cap, however, households would be eligible to buy homes of up to $3 million or more in the highest-cost cities, which raises questions of fairness and would severely limit the number of impacted residents who could be assisted. To address this problem, subsidy standards 4 and 5 introduce caps on the amount of the subsidy standard. To illustrate, under subsidy standard 4, a household would be eligible for down payment assistance that covers the difference between:

> -- the home value they can afford with their income and assumed savings and
> -- the lowest of (i) the purchase price of the home they select; (ii) the cost of a modest-
> cost home in that city; and (iii) $798,125, which is the cost of a mid-level home in the
> county.

If the household chooses to purchase a home in Kent, they would be able to afford a home of up to $458,185, and if the household chooses to purchase a home in Shoreline, they would be able to afford a home of up to $$582,222, as these are the costs of a modest-cost home in each city. However, if they choose to purchase in Sammamish, where a modest-cost home sells for just over $1 million, they would only be able to receive assistance to purchase a home up to a price of $798,125, which is the cap.

Finally, subsidy standard 5 sets the cap at the level needed to afford a modest-cost home in at least half the county. Under this approach, a household would be eligible for down payment assistance that covers the difference between:

> -- the home value they can afford with their income and assumed savings and
> -- the lowest of (i) the purchase price of the home they select; (ii) the cost of a modest-
> cost home in that city; and (iii) $567,240, which is the cost of a modest-cost home in
> Seattle.

The price of a modest-cost home in Seattle was selected because that level ensures that a household can afford a modest-cost home in cities that include at least half of the owner-occupied units in the county, ensuring a good degree of housing choice. (Since Seattle is so large and the costs of homes vary considerably across different neighborhoods, WSHFC could consider

---

[295] As noted above, under the models used here, they would be eligible for a higher amount if needed to make the minimum 3.5% down payment.  The same caveat applies to the other examples.

splitting Seattle into regions and treat each region as a separate city. This would allow for a finer-grained approach that would increase housing choice in Seattle.)

Figure 53 shows how each of five subsidy standards performs at the state level on key metrics: per-household cost (average down payment assistance needed), number of households that can be served with a fixed program budget, and attainability percentage. As with the earlier analysis, the attainability percentage is shown for the state as a whole and for high-cost counties only. For all subsidy standards, the attainability percentage in high-cost counties is similar to that for the state as a whole. This is because the assistance levels are customized to each county or city, ensuring the models work equally well in each county.

| Options for Setting the Subsidy Standard Used to Calculate Down Payment Assistance (DPA) | Average DPA to serve 80-100% AMI | Maximum DPA to serve 80-100% AMI | Number served with $100 Million | Attainability Percentage (State) | Attainability Percentage (High-Cost Counties) |
|---|---|---|---|---|---|
| **County-Level Subsidy Standards** | | | | | |
| 1. Modest-cost home in county | $131,495 | $265,153 | 760 | 43% | 40% |
| 2. Mid-level home in county | $329,304 | $512,869 | 304 | 94% | 92% |
| **City-Level Subsidy Standards** | | | | | |
| 3. Modest-cost home in city | $168,402 | $3,273,068 | 594 | 100% | 100% |
| 4. Modest-cost home in city, capped at mid-level home in county | $152,977 | $512,869 | 654 | 94% | 92% |
| 5. Modest-cost home in city, capped at level sufficient to afford modest-cost home in at least 50% of county | $115,009 | $300,562 | 869 | 63% | 61% |

Figure 53: Cost and Attainability Under Different Subsidy Standards

The following is a brief analysis of how each of the models performs on these metrics.

## County-Level Subsidy Standards

### Subsidy Standard #1. Modest-cost home in county

This approach produces the second-lowest per-household cost ($131,495) and the second-highest number of households that can be served with $100 million (760). However, it has an attainability percentage at the state-level of only 43%, since there are many parts of each county in which households will not have a wide selection of homes.

*Subsidy Standard #2: Mid-level home in county*

Raising the subsidy standard to the cost of a typical home in the county (roughly the median) increases the state-level attainability percentage substantially (up to 94%), but sharply increases per-unit costs to the highest level of the options considered ($329,304) and the lowest number of households that can be served with $100 million (304).

## City-Level Subsidy Standards

*Subsidy Standard #3: Modest-cost home in city*

This subsidy standard is tailored to city-level home prices and includes no county-wide cap, ensuring a household has a reasonable selection of homes in every city in the county, resulting in an attainability percentage of 100 percent. However, this comes at the cost of allowing down payment assistance of up to $3,273,068, which is the amount required to purchase a modest-cost home in the most expensive city in the state. If one assumes that program beneficiaries purchase homes following the distribution of current homeowners in cities across the state, this approach increases average costs by about 28 percent relative to the county-level modest-cost home (subsidy standard #1). However, costs could climb quickly if people decide to purchase homes disproportionately in the most expensive parts of their county. It would raise questions of fairness and limit the reach of the program if a small number of beneficiaries receive very large amounts, as may be possible with this approach.

*Subsidy Standard #4: Modest-cost home in city, capped at mid-level home in county*

If the city-level subsidy standard were capped at the county-level typical-cost home, and program beneficiaries purchase homes following the distribution of current homeowners in cities across the state, average costs ($152,977) would be somewhat higher than under subsidy standard #1 but much lower than under subsidy standard #3. The state-wide attainability percentage is also very high (94 percent.)

*Subsidy Standard #5: Modest-cost home in city, capped at level sufficient to afford modest-cost home in at least 50 percent of county*

This subsidy standard has the lowest per-household cost ($115,009) and the highest number of households that can be served with $100 million (869) of any of the options considered, with a state-wide attainability percentage of 63%. Again, costs are estimated assuming program beneficiaries purchase homes following the distribution of current homeowners in cities across the state.

## Subsidy Standard Summary

All five of the customized models provide enough down payment assistance to enable all renters with incomes between 80 and 100% of AMI to afford to purchase a home at or below the subsidy standard in their county. Accordingly, the share of households within each racial and ethnic category included among impacted residents who could afford to purchase a home with the program is equal to the share who have a sufficient credit profile, or between 84 and 88 percent of impacted residents, depending on the race/ethnicity category (see Figure 54). This compares favorably to the conventional down payment assistance models.

| Average DPA amount (fixed) | Number of potential beneficiaries 80-100% AMI | Share of impacted residents 80-100% AMI who are potential beneficiaries | | | |
|---|---|---|---|---|---|
| | | **Black** | **Hispanic/ Latino** | **AIAN/NHPI** | **Other or Multi** |
| **County-Level Subsidy Standards** | | | | | |
| 1. Modest-cost home in county | 24,116 | 84% | 88% | 86% | 86% |
| 2. Mid-level home in county | 24,116 | 84% | 88% | 86% | 86% |
| **City-Level Subsidy Standards** | | | | | |
| 3. Modest-cost home in city | 24,116 | 84% | 88% | 86% | 86% |
| 4. Modest-cost home in city, capped at mid-level home in county | 24,116 | 84% | 88% | 86% | 86% |
| 5. Modest-cost home in city, capped at level sufficient to afford modest-cost home in at least 50% of county | 24,116 | 84% | 88% | 86% | 86% |

*Figure 54: Beneficiaries and Attainability for Different Customized DPA Standards by Race/Ethnicity and Income Range*

Of the five customized subsidy standards considered, subsidy standards 4 and 5 appear to represent the best balance between choice and cost. Both standards tailor the amount of down payment assistance households receive to the city in which they are purchasing and reduce the chance that households get more assistance than they need to purchase a modest-cost home in that city while allowing households substantial choice of cities in which to purchase. To allow more households to be served, the subsidy standard is capped at either the price of a mid-level home in the county (subsidy standard 4) or a price sufficient to afford a modest-cost home in at least 50 percent of the county (subsidy standard 5). Subsidy standard 4 achieves a higher attainability percentage at the expense of somewhat higher per-household costs. Subsidy

standard 5 achieves the lowest per-household costs of the models studied but with an attainability percentage (63 percent) that is substantial but less than that of standard 4. [296]

While the models for options 4 and 5 use the price of a typical modest-cost home (approximately the 20th percentile) within each city as the basis for setting the subsidy standard, these approaches could be implemented using any percentile of home prices. To illustrate the effects of raising the home price thresholds, the table below shows the estimated cost and number of households that could be served implementing these models using the price of a typical mid-level home within each city (approximately the median home price) as the basis for the subsidy standard.

| Options for Setting the Subsidy Standard Used to Calculate Down Payment Assistance (DPA) | Average DPA to serve 80-100% AMI | Maximum DPA to serve 80-100% AMI | Number served with $100 Million | Attainability Percentage* (State) | Attainability Percentage* (High-Cost Counties) |
|---|---|---|---|---|---|
| **City-Level Subsidy Standards** | | | | | |
| 4A. Mid-level home in city, capped at mid-level home in county | $280,083 | $512,869 | 357 | 50% | 46% |
| 5A. Mid-level home in city, capped at level sufficient to afford mid-level home in at least 50 percent of county | $279,016 | $538,568 | 358 | 66% | 65% |

*Figure 55: Beneficiaries and Attainability for Different Customized DPA Standards for Mid-Level Homes by Race/Ethnicity and Income Range*

* For this table only, the attainability percentage is based on the share of owner-occupied homes located in cities where the typical price of a mid-level home falls at or below the subsidy standard for that city.

As Figure 55 shows, basing the subsidy standard on the typical price of a mid-level home, rather than a modest-cost home, would more than double the average cost of the program per participant and reduce the number of households that can be served by more than half. However, it would greatly expand the housing choices of participating households.

### Assessing population in need of down payment assistance

The Covenant Homeownership Act specifies that this study should "identify through evidence-based documentation the economically disadvantaged class or classes of persons that require down payment and closing cost assistance in order to reduce racial disparities in homeownership in the state." Chapter 2 documents the racial and ethnic groups with significantly lower than average homeownership rates in Washington, which include Black, Latino, Native American, Alaska Native, and Native Hawaiian or other Pacific Islander households. Chapter 3 documents

---

[296] Subsidy standards 4 and 5 represent the best balance between choice and cost for households in the 100% to 140% AMI income range as well. See Appendix Figure E7 for details.

that very few households in these racial and ethnic categories can afford a modest-cost home in their county without down payment assistance in excess of the $10,000 generally available.

Figure 56 and Figure 57 consider the dimension of income, documenting the number and percent of impacted residents in each of three income groups that require down payment assistance to afford a modest-cost home in their county. The income groups are: 80-100% AMI (a group that meets the income eligibility guidelines set by the legislature in the Covenant Homeownership Act), 100-140% AMI, and >140% of AMI. Figure 56 first shows the estimated number and percent of impacted residents that need **any** level of down payment assistance to afford a modest-cost home in their county.

| Race/ Ethnicity | 80-100% AMI | | 100-140% AMI | | >140% AMI | |
|---|---|---|---|---|---|---|
| | Number | Percent who need assistance | Number | Percent who need assistance | Number | Percent who need assistance |
| Black | 6,562 | 100% | 4,802 | 100% | 2,757 | 84% |
| Hispanic/ Latino | 14,300 | 100% | 17,944 | 100% | 10,398 | 90% |
| AIAN/NHPI | 2,146 | 100% | 1,704 | 100% | 2,662 | 95% |
| Other or Multi | 4,880 | 100% | 4,272 | 100% | 4,703 | 95% |
| **Total** | **27,888** | **100%** | **28,722** | **100%** | **20,520** | **91%** |

Figure 56: Number of Households Requiring Any Down Payment Assistance to Afford a Modest-Cost Home

Figure 57 shows the estimated number and percent of impacted residents in different racial and ethnic groups that need more than $15,000 in down payment assistance to afford a modest-cost home in their county. This is important to consider since $15,000 in down payment assistance is fairly widely available through existing programs (see Chapter 3) and, in any event, could be provided through simpler mechanisms than a customized down payment assistance program.

| Race/ Ethnicity | 80-100% AMI | | 100-140% AMI | | >140% AMI | |
|---|---|---|---|---|---|---|
| | Number | Percent who need assistance | Number | Percent who need assistance | Number | Percent who need assistance |
| Black | 6,562 | 100% | 3,221 | 67% | 516 | 16% |
| Hispanic/ Latino | 13,896 | 97% | 9,249 | 52% | 1,431 | 12% |
| AIAN/NHPI | 2,073 | 97% | 1,073 | 63% | 393 | 14% |
| Other or Multi | 4,876 | 100% | 3,107 | 73% | 714 | 14% |
| **Total** | **27,407** | **98%** | **16,649** | **58%** | **3,053** | **14%** |

Figure 57: Number of Households Requiring More than $15,000 of Down Payment Assistance to Afford a Modest-Cost Home

As shown in this analysis, although there is a large number of impacted residents in the 140%+ of AMI category who need up to $15,000 in down payment assistance, there are very few who need more than that amount, which suggests their need could be adequately met by making them

eligible for $15,000 of down payment assistance through existing programs or households could be assisted to save more for a down payment through a matched savings program, etc. By contrast, there are about two-thirds as many households in the 100 to 140 percent of AMI category that need more than $15,000 as there are in the 80 to 100 percent of AMI category, suggesting that households with incomes between 100 and 140 percent of AMI could benefit from a program like that explored in this study.

Given the finding that there is a substantial need for down payment assistance in excess of $15,000 among impacted residents with incomes between 100 and 140 percent of AMI, it is worth considering the costs to serve these households. Figure 58 replicates the Figure 54 above documenting the estimated per-household down payment assistance amount for each of the five options for setting customized down payment assistance for impacted residents with incomes between 100 and 140 percent of AMI.

| Options for Setting the Subsidy Standard Used to Calculate Down Payment Assistance (DPA) | Average DPA to serve 100-140% AMI | Maximum DPA to serve 100-140% AMI | Number served with $100 Million | Attainability Percentage (State) | Attainability Percentage (High-Cost Counties) |
|---|---|---|---|---|---|
| **County-Level Subsidy Standards** | | | | | |
| 1. Modest-cost home in county | $33,423 | $278,095 | 2,992 | 43% | 40% |
| 2. Mid-level home in county | $197,692 | $666,024 | 506 | 94% | 92% |
| **City-Level Subsidy Standards** | | | | | |
| 3. Modest-cost home in city | $59,664 | $3,167,341 | 1,676 | 100% | 100% |
| 4. Modest-cost home in city, capped at mid-level home in county | $48,113 | $666,024 | 2,078 | 94% | 92% |
| 5. Modest-cost home in city, capped at level sufficient to afford modest-cost home in at least 50% of county | $26,086 | $265,514 | 3,833 | 63% | 61% |

Figure 58: Cost and Attainability Under Different Subsidy Standards for Households 100-140% AMI

As this figure shows, the average costs of helping households with incomes between 100 and 140 percent of AMI to purchase a modest-cost home are far less than the costs to assist households with incomes between 80 and 100 percent of AMI. For example, the average down

payment assistance levels for models 4 and 5 are $48,113 and $26,086 for households with incomes between 100 and 140 percent of AMI, in contrast to $152,977 and $115,009 to serve households with incomes between 80 and 100 percent of AMI.

In sum, impacted residents with incomes between 100 and 140 percent of AMI have a significant need for down payment assistance and they can be served effectively for a cost that is significantly lower than the cost of serving lower-income households. Extending a down payment assistance program to households with incomes up to 140 percent of AMI would therefore help the state to more quickly and efficiently assist economically disadvantaged impacted residents and close the racial homeownership gap.

## Estimating the racial composition and size of the eligible applicant pool

The models in this chapter are based on characteristics of all economically disadvantaged impacted residents who are currently living in Washington. However, not all of these residents are likely to be eligible for the Covenant Homeownership Program since many will not meet the pre-1968 residency requirements identified in the Act (RCW 43.181.040(4)(c)). The data used to develop these economic models does not include information that would allow these households to be identified. However, analysis of past and current population data suggests that the racial and ethnic composition of eligible applicants is likely to differ from that of today's impacted residents.

The racial and ethnic composition of Washington residents has changed substantially over time. As shown in Figure 59, two-thirds of impacted resident renter heads of household in 1970 were Black. This compares with approximately one-fifth of the population of current impacted resident renter heads of household.

| Race/Ethnicity | Impacted resident renter heads of household (1970 Census) | Share of impacted resident renter heads of household (1970 Census) | Impacted resident renter heads of household (2022 ACS) | Share of Impacted resident renter heads of household (2022 ACS) |
|---|---|---|---|---|
| Black | 8,700 | 66% | 61,364 | 21% |
| Hispanic/Latino | 1,400 | 11% | 130,994 | 44% |
| AIAN/NHPI | 2,600 | 20% | 18,558 | 6% |
| Asian Indian | 0 | 0% | 26,272 | 9% |
| Korean | 0 | 0% | 10,396 | 4% |
| Other or Multi | 400 | 3% | 48,112 | 16% |
| **TOTAL** | **13,100** | **100%** | **877,941** | **100%** |

Figure 59: Impacted resident renter head of household populations in 1970 and 2022

Washington has experienced a high degree of migration out of the state since 1970, including a large out-migration in the late 1960s and early 1970s related to the "Boeing Bust," [297] that likely means the racial and ethnic composition of impacted residents in 1970 is not a perfect proxy for the composition of households eligible for the Covenant Homeownership Program. To better

---

[297] See Office of Financial Management. Population change: natural increase and net migration. https://ofm.wa.gov/washington-data-research/statewide-data/washington-trends/population-changes/population-change-natural-increase-and-net-migration. As reflected in this analysis, in- and out-migration have been driven largely by the relative economic conditions in Washington and the country.

understand the rough size and racial and ethnic composition of eligible households, data on the proportion of current Washington residents that were born in state, paired with estimates of the proportion of their parents' generation that were born in state, have been used to estimate the proportion of likely homebuyers who would meet the residency requirements. [298] Figure 60 shows the number and racial and ethnic composition of households that are estimated to meet the 1968 criteria. Based on this estimate, other or multiracial residents are likely to comprise the greatest share of eligible applicants, followed by Latino and Black residents. The greatest share, approximately a third, of AIAN/NHPI households are estimated to meet the 1968 criteria, followed by 27 percent of other or multiracial households and 15 percent of Black households are likely to meet this criteria.

| Race/Ethnicity | Total number of renter households | Estimated number of renter households that also meet pre-1968 criteria | Estimated share of renter households in each racial/ethnic group that also meet pre-1968 criteria | Share of of all households estimated to meet pre-1968 criteria |
|---|---|---|---|---|
| Black | 61,364 | 8,939 | 15% | 23% |
| Hispanic/Latino | 130,994 | 10,717 | 8% | 27% |
| AIAN/NHPI | 18,558 | 6,236 | 34% | 16% |
| Asian Indian | 26,272 | 243 | 1% | 1% |
| Korean | 10,396 | 153 | 1% | 0.4% |
| Other or Multi | 48,112 | 13,049 | 27% | 33% |
| **TOTAL** | **295,696** | **39,338** | **13%** | **100%** |

*Figure 60: Estimate of households that meet pre-1968 residency requirements by race/ethnicity.*

Data Source: Steven Ruggles, Sarah Flood, Matthew Sobek, Daniel Backman, Annie Chen, Grace Cooper, Stephanie Richards, Renae Rogers, and Megan Schouweiler. IPUMS USA: Version 14.0 [dataset]. Minneapolis, MN: IPUMS, 2023. https://doi.org/10.18128/D010.V14.0

Given the many factors that can affect population change, this is a rough estimate only and not a precise one. It does confirm, however, that the race and ethnicity of residents eligible for the Covenant Homeownership program is likely somewhat different from the racial and ethnic composition of all eligible impacted residents today.

---

[298] As described in greater detail in Appendix B, the research team approximated the proportion of potential homebuyers who would meet statute's residency requirements based on state of birth and the assumption that the average generation spacing is 25 years. For instance, using data from the 2021 American Community Survey, the research team calculated the proportion of Washington state residents who were born in state for each race/ethnicity group. For those who are approximately age 50 or older, the research team assumed all are eligible because they were born in Washington in approximately 1970 or earlier. For those who were between the ages of 25 and 49 in 2021, the research team based its adjustment on the proportion who were born in state combined with the probability that at least one of their parents was born in state (using data for those who were approximately 25 years old in Washington state in the year that the focal individual was born). For those who were 20 to 24 in 2021, the research team followed the same approach to estimate the eligibility probability based on their state of birth and the estimated probability that at least one parent and at least one grandparent was born in Washington.

## Section 3: Administrative Challenges

There are several administrative challenges that WSHFC will need to consider in determining whether to accept the recommendations in this study, and if so, how to implement them. While WSHFC has decades of experience running down payment assistance programs, some aspects of the recommendations in this study pose unique administrative challenges that WSHFC will need to consider.

### Setting the Subsidy Standard

As described above, the level of down payment assistance needed to help households with incomes between 80 and 100 percent of AMI afford a home is quite large, particularly in the higher-cost counties. With per-household levels of assistance so high, the specific parameters used to determine the down payment assistance level become especially important, with a large effect on the number of households that can be served and the extent to which those households have meaningful housing choice. To optimize the number of households served and those households' housing choices, the models in Section 2 include options where WSHFC would provide a customized amount of down payment assistance to each households reflecting what an applicant needs to bridge the gap between (a) the mortgage the resident is eligible to receive based on their income (and savings if WSHFC decides to consider it) and (b) the cost of a modest-cost home in their area.

Section 2 presents multiple options for setting the subsidy standard, including two options (subsidy standards 4 and 5) that appear to represent a good balance between maximizing the number of households that can be served and achieving a high attainability percentage. In addition to deciding between subsidy standards 4 and 5, a key step needed to finalize a customized down payment assistance program is to determine the specific percentile of home sales prices to be used in setting the subsidy standard. The models described in section 2 focus on the price of a modest-cost home (approximately the 20th percentile home price) because those

### SETTING THE SUBSIDY STANDARD BASED ON ZILLOW SALES PRICE DATA

The home value figures used in the models in Section 2 represent the costs of a typical home in each category − the typical home in the 5th to 35th percentile for modest-cost homes and the typical home in the 35th to 65th percentile for mid-level homes. An additional step is required to translate these home values into subsidy standards.

For example, if WSHFC wishes to produce an average home purchase price through its program that is roughly equal to that of a typical modest-cost home as reported by Zillow, the subsidy standard will need to be somewhat higher than the Zillow typical home price, since the typical price reflects an average of actual home prices that are both above and below the value Zillow specifies. The Zillow data for modest-cost homes and mid-level homes can be used to interpolate to find the right percentage. One option, for example, would be this: two times the modest-cost typical home price plus the mid-level home price divided by 3. This will produce a maximum subsidy standard of roughly the 30th percentile, leading to purchases at a range of prices up to the 30th percentile with an average somewhat lower than that level, such as the 25th percentile.

data are easily available, but before finalizing the approach, additional analyses are needed to determine which percentile is optimal for achieving WSHFC's goals.

For example, subsidy standard 4 or 5 could be modeled using thresholds that tie the subsidy standard to the approximate 30th, 40th or 50th percentiles of home sales. [299] WSHFC could look at recent sales to ensure that reasonable-quality homes are available on the market at the selected percentile value. One way to assess this would be to examine the characteristics of the actual homes that have sold within the past year at the subsidy standard that would have been in effect at different percentiles and determine whether these homes are of sufficient quality. By examining real homes that sold for under each of these percentiles, this analysis would provide valuable information about housing quality and housing type that can help WSHFC finalize the threshold to be used in the final program.

The optimal choice would be the lowest percentile that provides participating households a reasonable selection of decent-quality homes in each city in which the cost of a typical home at the designated percentile falls below the county-wide cap for that subsidy standard. [300] This analysis may also raise a policy question about whether it is acceptable for condos, town homes, and other lower-cost housing types to represent a significant share of the attainable stock under a new program as a way of achieving lower per-household costs. If desired, separate subsidy standards could be set for condos vs. other homes, though this would add complexity and could end up raising the program costs.

Whatever approach is selected, it will be important to update the approach using real-world experience once the program is launched. If households and lenders report that it is difficult to find a home at the specific level selected, the level could be adjusted upwards using a different interpolation percentage.

One additional point: the Zillow Sales Price data do not include closing costs. To ensure that participants have enough down payment assistance to afford closing costs, the subsidy standard should optimally be increased by an amount sufficient to cover closing costs on the home.

## Communicating the Amount of Assistance Available to Homebuyers and Lenders

Customizing the amount of assistance increases the efficiency of the down payment program by ensuring that recipients receive only the amount they need and allows homebuyers to purchase homes throughout the state despite variation in home prices. However, it introduces the administrative challenge of how to communicate to lenders and homebuyers the level of assistance each household has available as it undertakes a home search. In addition, if WSHFC were to base the amount of assistance on market prices, it would need to update the amounts as market sales prices change.

---

[299] If WSHFC is using Zillow data, the 30th percentile can be approximated by this formula: two times the modest-cost home price plus the mid-level home price divided by three. The 40th percentile can be approximated by this formula: two times the mid-level home price plus the modest-cost home price divided by three. The 50th percentile is approximately the same as the mid-level home price.

[300] The cap for subsidy standard 4 is the cost of a typical mid-level home for the county. The cap for subsidy standard 5 is the level that ensures that participating households can afford the cost of a typical home at the designated home sales price percentile in cities representing at least half of the county.

One way to address these challenges would be to develop a calculator or app that WSHFC makes available on its website to share with lenders and the public. The calculator could be designed to specify the subsidy standard that applies to whatever city the user specifies along with estimates of the mortgage amount the household could borrow given their income and debt levels and the amount of down payment assistance the household could access given their subsidy standard, savings, and estimated mortgage amount. For example, assume a household specifies that they are searching for a home in Renton and enters in their annual income and savings. If the subsidy standard at the time for Renton is $506,000, the app could return output that looks something like this:

- Based on recent sales data for Renton, you may be eligible for assistance to purchase a home that costs up to $506,000.

- Based on your income and savings, the maximum amount of down payment assistance for which you would be eligible to purchase a home up to that price is $120,000.

- The final amount of down payment assistance you are eligible to receive will depend on the final sales price and your verified income and savings levels.

- The amount may differ in other cities. Click here for information on subsidy levels in other cities.

The calculator or app could also allow users to enter a specific home sales price and produce a customized quote specifying the level of down payment assistance the borrower could be eligible for given that sales price in the city in which they are purchasing.

The calculator or app might encourage the lender or homebuyer to save or print out this quote and specify that it is valid for a certain length of time (such as 60 days) to give the homebuyer and lender certainty as to the resources available. For lenders, the app could have them specify the mortgage amount, rather than estimating it. This process would not replace a review of each individual application for down payment assistance, as is the current practice for down payment programs administered by WSHFC. It would, however, be designed to give lenders and the public an idea of how much assistance is available before applying. WSHFC could also publish the subsidy standards for each city on its website and explain that this represents the maximum level of home sales price the program is prepared to support through down payment assistance.

Behind the scenes, WSHFC would need to develop and maintain data about the home prices in the state. The models in section 2 use publicly available data from Zillow Research that are updated monthly. To simplify administration of the program, WSHFC may want to update the data and calculator on a periodic basis, such as quarterly or semi-annually.

## Adjusting Based on Homes Purchased

Families will make individual housing choice decisions, within the program parameters, that could change the expected cost of the program and how many eligible households receive assistance. For example, if households can afford to purchase in any city in the county, or in a broad range of cities, they may gravitate toward purchasing in the most expensive cities or, alternatively, they may purchase in a range of areas including in mid- and low-cost cities. The models of the costs for subsidy standards #3 through #5 discussed in section 2 assume that the distribution of home

purchases matches the distribution of where owner-occupied homes are currently located. However, if households gravitate toward more expensive localities, these cost estimates may be too low, resulting in fewer households served for $100 million. Subsidy standard #3 has the greatest risk of leading to higher costs, since there is no county-wide cap. The risks of sharply higher costs are lower for subsidy standards #4 and lowest for subsidy standard #5, since there are correspondingly lower county-wide caps in each of these standards.

It will be important to monitor the distribution of home sales locations to determine whether changes are needed in the program.

## Documenting Eligibility

WSHFC will need to determine how applicants will document their status for each of the eligibility criteria it adopts for the program. WSHFC already administers programs that verify a homebuyer applicant's income, but not ones that verify a homebuyer applicant's race or ethnicity or the residency of their ancestors. RCW 43.181.040(c)(ii) specifies that applicants furnish "genealogical records, vital records, church records, military records, probate records, public records, census records, newspaper clippings, and other similar documents" to demonstrate that they or their ancestor was a "Washington state resident on or before the enactment of the federal Fair Housing Act (Title VIII of the civil rights act of 1968; P.L. 90−284; 82 Stat. 73) on April 11, 1968, and was or would have been excluded from homeownership in Washington state by a racially restrictive real estate covenant on or before April 11, 1968." It may be challenging for applicants to furnish such records. WSHFC may want to consider offering support to potential homebuyers in locating sufficient documentation to demonstrate program eligibility.

## Structuring Repayment

The amount of down payment assistance provided to impacted residents could be a substantial share of the value of the home, due to the combination of renters' low incomes and high housing prices in many parts of Washington. In some cases, impacted residents may receive assistance that totals more than 50 percent of the cost of the home. In these cases, structuring down payment assistance as a loan repayable upon the sale of the property or upon refinancing of the first mortgage − as required by the Covenant Homeownership Act, RCW 43.181.040(3)(b) − may result in unintended constraints on a household's ability to refinance or move to a location of their choice.

For example, assume a household purchases a home in Seattle for $567,240 with $240,832 in down payment assistance, which is the level that the model calculates a household at 80% of AMI would receive under subsidy standards 3, 4 or 5. If down payment assistance funds were structured as a no-interest loan, a homeowner who received the maximum assistance would owe $240,832 if they sold or refinanced their property. This could provide a barrier to move or refinance. Even if the home were to appreciate, many homeowners would be unlikely to be able to purchase another home of equal value. They would need to repay most of the value of their first home and be left with an amount that is insufficient to serve as a down payment on another home and/or a much larger balance on their first mortgage, resulting in a higher monthly payment. Some households − for example those whose income rose during the time they owned the home, or in cases where home values had appreciated very substantially and/or many years had passed so the household had paid down a significant portion of the principal balance of their mortgage

– may be able to afford this. But many would not, and therefore may end up feeling they have no realistic choice but to stay in their home, even when they no longer wish to.

Figure 57 illustrates the challenge, showing that, even when households realize a significant amount of sales proceeds, they may not be able to afford a subsequent home without assistance. In this example, a household that sells their home after seven years realizes net sales proceeds after a real estate commission of $122,354. While this is a significant sum that will lower the mortgage amount the household needs to purchase a subsequent home, without down payment assistance, the household's new mortgage would be about $270,000 larger than their prior mortgage. This is because the same home price appreciation that helped generate the sales proceeds also increased the price of their next home.

| Parameters for financing the initial home (with DPA) | Initial home price | $567,240 |
|---|---|---|
| | Amount of DPA received | $240,832 |
| | Amount of first mortgage | $326,408 |
| Sales assumptions | Estimated value of home at sale | $697,634 |
| | Estimated amount of sale proceeds[a] | $122,354 |
| Parameters for purchasing a new home | Estimated new home price | $697,634 |
| | Share of new home to be financed[b] | 82% |
| | Estimated new first mortgage amount[c] | $596,210 |

Figure 61: Example of Possible Home Resale

[a] Assumes a 6% real estate sales fee, home price appreciation of 3% per year for 7 years, and repayment of principal after 7 years on a fully-amortizing 30-year fixed rate mortgage of $326,408 with a 6.0% interest rate.
[b] Assumes the entirety of the sale proceeds are applied to the down payment of the new home.
[c] Assumes 3% closing costs rolled into the mortgage.

There are a number of different ways to address this issue. One option may be to allow households to apply all or a portion of their down payment assistance to a subsequent home purchase. Alternatively, WSHFC could consider alternative repayment approaches in cases when impacted residents receive large amounts of down payment assistance – for example not tying repayment to the sale of the house or forgiving some portion of the assistance amount. This would need to be balanced against other program objectives since it would limit the amount of assistance available to new applicants. A determination would also be needed as to whether the options become available only after the family spends some minimum length of time in the home. These options would require new legislation because the Covenant Homeownership Act, RCW 43.181.040(3)(b), requires participants to "repay loans for down payment and closing cost assistance at the time that the house is sold."

## Adjusting for Existing Savings

Applicants to the program may or may not have savings to contribute towards the purchase of a home. WSHFC will need to determine whether the individual households' existing savings level should be considered in determining the amount of down payment assistance the applicant can receive. The models in this study assume that applicants will have a limited amount of savings

(3.5% of income saved for 2 years, see Chapter 3) that will be contributed to the down payment. However, many applicants may not have this amount saved, and some may have saved considerably more. Moreover, the amount of savings that individual applicants have available to them may be affected by some of the discrimination identified in Chapters 1 and 2, such as discrimination affecting their parents' ability to purchase a home and build equity in that home to pass onto their children.

There are three main choices that WSHFC could make regarding applicant savings. One option is to adjust the amount of down payment assistance based on applicants' actual savings. A second option is to calculate the amount of down payment assistance based on an assumption that all applicants have savings equal to a limited amount of their income (such as the 3.5% used in the models). A third option is to calculate the amount of down payment assistance based on an assumption that applicants have no savings. Under the second and third options, all households purchasing in the same city at the same time with the same income are eligible for the same maximum amount of down payment assistance. Families whose savings exceed the assumed amount could apply some or all to purchase a more expensive home. This approach modestly increases costs, however, slightly reducing the number of households that can be served relative to the first option. While somewhat more expensive, the third option would work for all households, be less complicated to administer for WSHFC, and avoid penalizing households with larger amounts of savings.

## Section 4: Alternative / Additional Policies

Down payment assistance is likely to help many impacted residents achieve homeownership. Additional programs and policies could complement this assistance by addressing the barriers renters face to accessing homeownership in other ways. There are, broadly, three categories of complementary policies and programs that could increase the effectiveness of the Covenant Homeownership Program that the state may want to consider: those that 1) increase the supply of modest-priced homes for sale, 2) help individuals households build credit and assets, and 3) support existing homeowners to sustain homeownership. Such programs and policies could help residents who receive down payment assistance as well as residents who do not.

### Increase the supply of modest-priced homes for sale

For the down payment program to be successful, households that are eligible for assistance will need to be able to find modest-priced homes for sale. However, the supply of such homes in Washington is limited. There are a number of different ways that the State and other organizations in Washington could help support the creation of new affordable housing units. One possibility is to provide subsidies or tax abatements to housing developers who produce affordable units for sale. These financial incentives can help to reduce the cost of development. Another promising approach is to make an equity investment in a manufacturer that uses off-site construction (like modular or manufactured housing) and/or to enter into a bulk agreement with such a manufacturer. Off-site construction facilitates economies of scale to lower the cost of building new homes, and equity investments and bulk purchase agreements provide the State with leverage to ensure the lower costs of producing the homes are translated into lower home prices for consumers. The State and local governments can also examine land use and other restrictions to identify opportunities for increasing housing development overall, especially the development

of modest-priced housing. For example, increasing the number of housing units that may be built in a specified area can allow for denser construction that lower production costs through the use of lower-cost housing types (such as townhomes and multifamily construction) and the amortization of land costs over a larger number of units. Because zoning changes can take time to implement and then shift builder behavior, it may take some number of years for this mechanism to influence the housing supply.

### Help residents build credit and assets

Many impacted residents lack the financial assets to afford a down payment and the credit characteristics that mortgage lenders require. Policies and programs that help residents build assets and credit could increase the number of those who can take advantage of the down payment assistance program and the number of those who could afford to purchase a home without financial assistance. For example, credit counseling and financial coaching programs work one on one with residents to understand their circumstances and financial goals and help them make and execute plans to achieve their financial goals. Other programs, such as individual development accounts, provide opportunities to build savings by offering matches or other incentives to magnify an individual's saving contributions and build a practice of saving. Policies like baby bonds and child savings accounts for children born in the state can further increase individual savings.

### Support existing homeowners to sustain homeownership

Finally, to truly benefit, those who receive assistance from the Covenant Homeownership Program will need to sustain homeownership over the long-term. Policies and programs that support existing homeowners would complement the program by ensuring that those who receive down payment assistance can continue to live in their homes. For example, post-purchase counseling programs can help homeowners understand their options and work with their loan servicer if they fall behind on loan payments. Other programs help homeowners make needed upgrades or repairs to their homes following a natural disaster or to adapt the space to meet an owner's physical needs as they age.

## Section 5: Conclusions and Recommendations for SPCP

As described in earlier chapters of this study, impacted residents of Washington face ongoing challenges stemming from discriminatory acts that have not been addressed through race-neutral programs. A narrowly tailored SPCP has the potential to redress that discrimination and its ongoing impact by providing the financial support impacted residents need to become homeowners. The modeling results presented in section 2 of this chapter tested various approaches to structuring an SPCP to determine how such a program could be designed to maximize its effectiveness. This section summarizes recommendations – based on these results and those from earlier chapters – to help WSHFC develop one or more SPCPs narrowly tailored to addressing historic discrimination.

**Recommendation 1: Implement the SPCP as outlined in RCW 43.181.040 for households where the borrower or co-borrower identifies as one or more of the following: Black, Latino, Native American, Alaska Native, Native Hawaiian or Other Pacific Islander, Korean, or Asian Indian.**

The Covenant Homeownership Act authorizes WSHFC to create an SPCP that provides down payment and closing cost assistance in the form of a loan repayable at the time the home is sold to eligible applicants who have a household income below 100 percent AMI, are first time homebuyers, and are Washington residents who meet the eligibility requirements related to residency in the state before enactment of the Federal Fair Housing Act in 1968. [301] The results presented in this study demonstrate that there is a substantial need for such a program for impacted residents – households with Black, Latino, Native American, Alaska Native, Korean, Asian Indian, Native Hawaiian or other Pacific Islander heads of household in Washington.

As discussed in section 2, very few impacted residents meeting the eligibility criteria in RCW 43.181.040 could afford to purchase a modest-priced home in their county without assistance or with the type of assistance that is already available on a race-neutral basis throughout the state. Without assistance, no Latino, Black, or AIAN/NHPI renters with a household income between 80 and 100 percent of AMI could afford to purchase a modest-cost home in their county, assuming they financed the purchase of a home with an FHA-like mortgage (see Figure 54). If renters with incomes between 80 and 100 percent of AMI were provided with $15,000 in down payment assistance (simulating the type of race-neutral assistance that is available across the state) the share of those who could afford a mortgage rises to 3 percent for Latino and AIAN/NHPI renters but remains at 0 percent for Black renters (see Figure 55).

As demonstrated in the modeling results presented in section 2 above, providing down payment assistance is an effective approach for supporting impacted residents to achieve homeownership. If the amount of assistance is tailored to the impacted resident's household income and the cost of a modest-priced home in their county, the models that best balance per-household cost and housing choice could help approximately 650-900 impacted residents annually who meet the criteria outlined in RCW 43.181.040 to achieve homeownership with an investment of $100 million per year. The number of households that can be served is highly affected by the legislature's decision to limit eligibility to those with incomes of at or below 100% AMI. Impacted residents with incomes at this level require large amounts of down payment assistance in high-cost counties to afford a reasonable choice of homes. As discussed in recommendation 4, the average costs of down payment assistance could be significantly reduced by a legislative change that would expand eligibility to households with incomes between 100 and 140 percent AMI that need down payment assistance. Eligible homebuyers would include households with at least one adult that identifies as one or more of the following: Black, Latino, Native American, Alaska Native, Native Hawaiian or other Pacific Islander, Korean, or Asian Indian. This adult could be the head of household or another adult in the household as long as the impacted resident is a borrower or co-borrower on the note and deed of trust who occupies the property.

---

[301] See RCW 43.181.040(3)(a-c).

**Recommendation 2: Provide customized amounts of down payment assistance sufficient to enable participating households to afford a reasonable selection of modest-cost homes in their county.**

As demonstrated in the model results in section 2, WSHFC has many options for setting the amount of down payment assistance it makes available through the SPCP. Determining how much assistance an applicant is eligible for requires WSHFC to make tradeoffs between different program priorities.

A conventional approach to providing down payment assistance – where households receive a flat $25,000 to $75,000 across all parts of the state – would likely not meet the needs of most low-income impacted residents and those that could benefit would have significantly limited housing choice. For example, as shown in section 2, approximately 2,162 low-income Black, Latino, or AIAN/NHPI renters could afford homeownership if provided fixed down payment assistance of $50,000. These households would be able to find homes they could afford in just 4 to 30% of the cities in Washington overall and 1 to 20 percent of cities in high-cost counties, depending on income (see Figure 47). Such a program would reach some lower-income Latino and AIAN/NHPI renters (who tend to live in the low-cost counties in the state). Very few, if any, lower-income Black residents could be served with such a program (see Figure 49). A key conclusion from these results is that the amount of assistance provided should be sufficient to make the homes that are available in a renter's county affordable. As shown in Figure 50 the average amount of assistance low-income impacted residents would need varies widely by county – ranging from less than $5,000 to a maximum of $238,664.

In addition to varying the level of assistance provided by location within Washington, it is also important to vary the level of assistance based on the income of each eligible household. This is because the level of down payment assistance needed to help someone at 80 percent of AMI to afford to purchase a modest-cost home in their county is much higher than the level of assistance that someone at 100 percent of AMI needs. As shown earlier, if all impacted residents with incomes between 80 and 100 percent of AMI in the state were entitled to the level of assistance needed to help someone at 80 percent of AMI to afford a modest-cost home in their county, the average per-household cost would be $**168,322**. By contrast, if the assistance level were customized to each household's income, the per-household assistance level would be $**131,495**, allowing the state to serve substantially more households with a fixed funding level.

Therefore, the most effective and efficient way to remedy the impacts of the State's discriminatory acts and enable impacted residents to become homeowners is to take a customized approach to providing down payment assistance that gives impacted residents the amount of assistance they need, depending on their income and location. Section 2 presents multiple approaches to calculating the amount of assistance impacted residents need, weighing the competing goals of increasing the number of beneficiaries (lowering the per household cost) and increasing households' degree of housing choice (which can increase the per household costs). In all scenarios, the amount a household is eligible for is determined to be the amount needed such that the household can afford the monthly mortgage payment that approximates an FHA loan. [302]

---

[302] The underwriting criteria are described in more detail Chapter 3. They include a front-end DTI of 31%, a loan amount of 99.5% of the home value (assuming a down payment of 3.5% and closing costs of 3%), an interest rate of 6%, and monthly additional costs that account for insurance and taxes.

The scenarios vary the subsidy standard – used to determine the maximum amount a household could receive – based on their income, assumed savings and location.

Of the various subsidy standards tested in the models, two appear to best balance the goals of cost and choice. These models provide homebuyers with an amount of down payment assistance sufficient to enable them to afford a modest-cost home in each city within the county, capped at either the level needed to afford a mid-level home in their county (subsidy-standard #4) or the level needed to afford a modest-cost home in cities that represent at least half of the homeowner population in the county (subsidy standard #5). Utilizing one of these models will ensure that households have a reasonable choice of homes in at least half of each county, without paying more than households need to purchase in lower-cost parts of the county. Subsidy standard 4 has a higher attainability percentage but a higher per-household cost, while subsidy standard 5 has a somewhat lower attainability percentage but a lower per-household cost.

In addition to choosing which subsidy standard to use (such as subsidy standard 4 or 5), WSHFC will need to select the specific percentile of home sales prices that will be used to calculate the city subsidy standards. As discussed in section 3, in making this decision, it may be valuable to examine the type and quality of homes that sold recently under the threshold for several different percentiles of home sales prices, such as the 30th, 40th and 50th percentiles. The optimal choice would be the lowest percentile that provides participating households a reasonable selection of decent-quality homes in each city in which the cost of a typical home at the designated percentile falls below the county-wide cap for that subsidy standard. [303]

As discussed in section 3, customizing the amount of assistance based on income and location may make it hard for applicants and lenders to determine how much assistance a homebuyer could receive in advance of applying. To address this issue, WSHFC could create a calculator and/or app that makes it easy for households and lenders to understand the amount of assistance a household is eligible to apply for in different locations given their income and assets.

## Recommendation 3: Provide down payment assistance as a zero-interest loan and consider repayment flexibility

Structuring down payment assistance as a loan allows the state to recycle the funds and assist more impacted residents with the same amount of funds. Many down payment assistance programs, including those currently administered by WSHFC, structure down payment assistance as a no-interest rate loan. As households pay down their first mortgage and homes appreciate, households build equity and can afford to repay the down payment assistance they received when the home is sold or refinanced. However, as described in section 3, households who receive large amounts of down payment assistance may find the requirement to repay the assistance at the time of sale creates a financial barrier to refinance or move.

To balance the goals of helping individuals and maximizing the number of eligible households, WSHFC should structure down payment assistance as a zero-interest loan repayable at time of sale. In future legislation, the state also could consider allowing households who wish to move to

---

[303] The county-wide cap for subsidy standard 4 is the cost of a typical mid-level home for the county. The county-wide cap for subsidy standard 5 is the level that ensures that participating households can afford the cost of a typical, mid-level home at the designated home sales price percentile in cities representing at least half of the county.

a different home to use a portion of the down payment assistance amount to purchase a subsequent home. For example, the household's down payment assistance level for a subsequent move could be reduced by 50 to 80 percent of the net sales proceeds realized by the household on resale of the first home. Such an approach would help remedy the low levels of wealth caused by prior discrimination by enabling impacted residents to build some level of wealth over time and sustain homeownership if their circumstances change (for example, they need to move for a new job or to accommodate a growing family). The State could also consider alternative repayment approaches in cases when impacted residents receive large amounts of down payment assistance – for example, forgiving all lor some portion of the assistance amount over time.

## Recommendation 4: Consider expanding eligibility to impacted residents with incomes up to 140 percent of AMI

The analyses presented in section 2 demonstrate that impacted residents with incomes between 100 and 140 percent AMI could also benefit from down payment assistance. Many renters in this income category face the same challenges as lower-income renters affording the costs of even a modest-cost home in their county (see Figure 54 and Figure 55).

Since these households have higher incomes, they also need less assistance per household to achieve homeownership. If the State were to expand eligibility to include those who are otherwise eligible but have incomes between 100 and 140 percent AMI using subsidy standard #4, the average cost per household would be $48,113 and households would have a very high degree of housing choice across the state (See Figure 56). If the State expanded eligibility and the Commission decided to use subsidy standard #5, the average cost per household would be even lower for this group ($26,086) while maintaining a relatively high degree of housing choice (See Figure 56). The comparative per-household costs of serving households in this income range means that the State could make a larger dent in providing a remedy to impacted residents and decreasing the homeownership gap with the same amount of investment.

For example, if eligibility were extended to impacted residents with incomes up to 140 percent of AMI and half of applicants had incomes between 80-100 percent of AMI and half had incomes between 100-140 percent of AMI, approximately 2,351 households could be served with $100 million using subsidy standard 5, nearly three times the 869 that could be served if all households had incomes between 80 and 100 percent of AMI. This calculation assumes the subsidy standard is calculated using the price of a modest-cost home (approximately the 20th percentile).

## Recommendation 5: Consider further study to identify and serve other impacted residents

The SPCP recommended in this study would serve economically disadvantaged Washington residents who continue to be impacted by unlawful discrimination in which the State was an active or passive participant. But it would not serve all residents impacted by such discrimination. For example, in addition to otherwise qualifying individuals whose income exceeds the specified income limits (see Recommendation 4 above), the Covenant Homeownership Act limits the SPCP to residents or their descendants who can show they were Washington residents on or before April 11, 1968. Chapter 1, however, documents unlawful discrimination after that date.

Further, this study recommends limiting the SPCP to households with a head of household within impacted racial or ethnic groups —specifically, Black, Latino, Native American, Alaska Native, Native Hawaiian or other Pacific Islander, Asian Indian and Korean residents– based on an analysis of current racial and ethnic homeownership gaps. Other households, however, may have experienced adverse impacts from unlawful discrimination in which the State was an active or passive participant notwithstanding their membership in a racial or ethnic group whose homeownership rate is not substantially below that of White households.

In light of these limitations, the State may want to commission an additional study to consider the scope and feasibility of an SPCP that would support other economically disadvantaged households adversely impacted by the State's unlawful discrimination. A future study could consider the documentary basis for and practical issues with expanding eligibility, including how to design and implement objective and workable criteria to determine whether a particular household that was subject to unlawful discrimination by the State and is economically disadvantaged, even though the household does not meet all eligibility requirements of the SPCP that will be established by WSHFC under the Act.

# CHAPTER 5: EVALUATION APPROACH RECOMMENDATIONS

## Introduction

IIn addition to requiring an initial study documenting the need for a Covenant Homeownership Program, the Washington State Covenant Homeownership Act motivating this study (H.B. 1474, chapter 43.181 RCW) requires the Washington State Housing Finance Commission (WSHFC) to produce an updated evaluation of the program every five years. The purpose of this chapter, as outlined in the Act and WSHFC's Request for Proposals, is to describe potential approaches to conducting an evaluation of the Covenant Homeownership Program. An evaluation of the Covenant Homeownership Program can serve multiple purposes. These may include:

- Monitoring the program's effectiveness and the extent to which the program has made progress towards stated objectives;

- Assessing the program's performance, including who is being served by the program and the resources used in administering the program;

- Identifying ways to strengthen the program's operations;

- Understanding the experiences of the program's participants and how the program has influenced them; and

### KEY FINDINGS

- Evaluation of the Covenant Homeownership Program could serve multiple purposes including monitoring the program's effectiveness and identifying ways to strengthen the program.

- Different evaluation approaches, including Outputs Evaluation, Outcomes Evaluation, Impact Evaluation and Qualitative Evaluation, can help answer different research questions of interest to the Commission and the Oversight Committee.

- Establishing program targets – such as the volume of applications and change in the homeownership rate for impacted residents over time – can help the Oversight Committee monitor the program and determine if there is an ongoing need for it.

- Examining whether there is a continued need for the Covenant Homeownership Program to achieve its statutory purposes, in order to identify a logical endpoint for the program.

This chapter provides a high-level framework for an evaluation of the Covenant Homeownership Program. The first section presents a logic model for the program. The next four sections discuss approaches for evaluating various aspects of the program, including:

- Outputs Evaluation
- Outcomes Evaluation
- Impact Evaluation
- Qualitative Evaluation

WSHFC could choose to pursue an evaluation that focuses on only one of these dimensions, several, or all of them, depending on its goals and budget. The final section discusses program targets and monitoring.

The evaluation framework described in this chapter reflects the potential design of the program based on the requirements in the Covenant Homeownership Act, this study's recommendations, and discussions with WSHFC's priorities. As the program is finalized and implemented, WSHFC's priorities, and those of program partners, may evolve. It would be useful for WSHFC to continue to refine the logic model, evaluation approaches, and program targets over time. The aim of this chapter is to provide an overview of potential approaches for WSHFC to refine in developing a final methodology for evaluating the Covenant Homeownership Program.

## Logic Model

A logic model is a representation of the relationship between program activities and the expected results of the program. It is a valuable tool for guiding evaluation efforts because it facilitates a shared understanding of the program's aims and processes. This can help evaluators and other partners define the scope of the evaluation and key research questions, clarify appropriate measures to use, and identify differences between the program design and its actual implementation. [304]

Figure 62 presents a preliminary logic model for the Covenant Homeownership Program, based on initial discussions with WSHFC and other partners. The logic model below incorporates five components:

- *Inputs:* This refers to the resources that support the program. In the case of the Covenant Homeownership Program, the key program input is the state-funded Down Payment Assistance (DPA). This includes direct assistance to homebuyers and administrative funding to operate the program.

- *Outputs:* These are the direct results of the program activities, and often provide an early indication of program reach and implementation progress. For the Covenant Homeownership Program, key outputs include prospective participants learning about and applying for the program, and receiving assistance through the program.

- *Short-term outcomes:* These are changes that occur within the first three years of program operations, and typically reflect changes experienced by individuals or households. For the Covenant Homeownership Program, expected short-term outcomes include the ability to purchase a home; the ability to secure affordable mortgage payments; and access to homes in a variety of locations with amenities that meet participants' needs.

- *Long-term outcomes:* These are the changes that occur more than three years after program operations. These are typically community- or state-level outcomes, which can take many years to realize. For the Covenant Homeownership Program, expected long-term outcomes include supporting generational wealth-building through homeownership; reducing racial disparities in homeownership; and not contributing to patterns of residential segregation.

- *Context:* This refers to the external factors outside of the scope of the program that nonetheless influence how the program operates and the degree to which the program achieves its desired outcomes. In Washington, a tight housing market and shifting economic conditions could complicate efforts to support homeownership. In addition, the Covenant

---

[304] For further information on using logic models, see the Center for Disease Control's resource guide: Framework Step 2 Checklist | Program Evaluation | CDC

Homeownership Program will be available alongside a suite of existing homebuyer education and homeownership assistance programs (see Chapter 3) which may influence its effectiveness.



*Figure 62 – Preliminary Logic Model for Covenant Homeownership Program.*

## Evaluation of Program Outputs

An evaluation of the outputs of the Covenant Homeownership Program would capture the progress of the program and whether it produces the outputs expected per the program logic model (see Figure 62). For the Covenant Homeownership Program, this evaluation component would be a valuable first step towards understanding the extent to which the program effectively serves impacted residents and whether any modifications are needed to better reach impacted residents. An evaluation of the outputs of the Covenant Homeownership Program could answer the following research questions:

- How many participants have been served?

- What is the demographic/income profile of the participants served?

- What proportion of economically disadvantaged impacted residents within the state have received assistance?

- How many applications have been received?

- How many applications have been denied and why?

- What is the total amount of down payment assistance provided?

- What was the distribution of down payment assistance amounts provided?

Answering these research questions would require tracking information on program progress, including the number of applications received and the total funds distributed. Quantitative data could be extracted from the data system used to administer the program. Figure 63 below summarizes the approaches and measures that could be used to analyze program data and address each research question.

| Proposed Question | Approach | Measures |
|---|---|---|
| How many participants have been served? | • Descriptive analysis of participants receiving assistance since inception and by quarter and year | • Number of households assisted |
| What is the demographic/income profile of the participants served? What proportion of economically disadvantaged impacted residents have received assistance? | • Descriptive analysis of demographic and economic characteristics of participants since inception and by quarter and year | • Participant race<br>• Participant ethnicity<br>• Participant age<br>• Participant location<br>• Participant employment status<br>• Household income as a % of area median income |
| How many applications were received? How many applications were denied and why? | • Descriptive analysis of applications received since inception and by quarter and year | • Applications received<br>• Accepted applications<br>• Denied applications<br>• Reason for denial |
| What is the total amount of down payment assistance provided? What is the distribution of down payment assistance amounts provided? | • Descriptive analysis of assistance distributed since inception and by quarter and year | • Total assistance distributed<br>• Assistance per participant<br>• Assistance per participant by location, income, and race/ethnicity |

*Figure 63 - Preliminary research questions, analysis approach, and measures for process evaluation.*

## Outcomes Evaluation

An outcomes evaluation provides insight into whether the program is achieving the expected or desired short- and long-term outcomes, as defined in the program logic model (see Figure 62). This evaluation component can contribute to WSHFC's understanding of the program's efficacy and impacts. An outcomes evaluation of the Covenant Homeownership Program could address a range of research questions, depending on WSHFC's goals.

Potential questions to include in an outcomes evaluation include:

- Were participants able to purchase a home with an affordable monthly payment?

- Where did program participants purchase homes? Were they able to purchase homes in areas of opportunity? Did they purchase in areas with a higher opportunity score than where they were previously living?

- Did participants build wealth through homeownership over time? How did participants' home values change over time?

- Did participants sustain homeownership over time? How many participants experienced delinquency or foreclosure over time?

- Have homeownership rates among impacted residents in Washington increased? Have there been changes in the racial/ethnic homeownership gap in Washington since launching the program?

- Have there been changes in patterns of residential segregation in Washington since launching the program?

The primary goal of the outcomes-based evaluation is to summarize the short- and long-term outcomes of the program, typically using descriptive analysis. This section describes approaches for addressing the questions, organized into three groups of outcomes: home purchases, wealth-building, and racial disparities. Each subsection briefly describes the approach, data sources and measures, and additional considerations.

## Home purchase outcomes

WSHFC will likely want to assess home purchase outcomes for participants as a short-term indicator of the program's efficacy. These outcomes include the location and affordability of homes purchased by program participants. To address these questions, the evaluation could incorporate a descriptive analysis of loan-level data collected from the program's lending partners. This analysis would provide insight into the characteristics of homes purchased using program funds and the characteristics of neighborhoods in which the homes are located. This type of data is likely to be very timely and can be valuable for monitoring program performance over time.

Figure 64 below summarizes the approach, measures, and data sources that could be used to address each question related to home purchase outcomes.

| Proposed Questions | Approach | Measures (Data Source) |
|---|---|---|
| Were participants able to purchase a home with an affordable monthly payment? | • Estimate the proportion of borrowers meeting affordability threshold (e.g., spending <30% income on housing) | • Borrower income *(loan data)*<br>• Monthly PITI (principal, interest, taxes, and insurance) *(loan data)* |
| Where did program participants purchase homes?<br><br>Were they able to purchase homes in a variety of areas? | • Geographic analysis of newly purchased homes<br>• Assessment of neighborhood social, economic, and demographic characteristics | • Property address or ZIP *(loan data)*<br>• Borrower address at time of application *(loan data)*<br>• Neighborhood demographic, social, and economic characteristics *(American Community Survey)* |

*Figure 64 - Preliminary research questions, approach, and measures for evaluation of home purchase outcomes.*

## Wealth-building outcomes

While wealth-building is not an explicit statutory goal of the program, WSHFC may nonetheless be interested in exploring the extent to which the program contributes to participants' ability to build wealth through homeownership. There are two ways for homeowners to build wealth: They build wealth as they pay off the principal balance of their mortgage, and they may also be able to build wealth through home price appreciation. [305]

It is important to note that outcomes related to wealth-building will not be apparent for several years after participants purchase a home. The Covenant Homeownership Act requires an evaluation to be conducted every five years, but a significant portion of wealth accumulation will occur after the first five years, as homeowners with fixed mortgages pay down more of their principal balance and home price appreciation accumulates over time.

There are several sources of data that could be useful in addressing questions related to wealth-building. To assess the extent to which owners have paid down the principal balance of their mortgage, the evaluation could analyze the terms of the initial mortgage to estimate their remaining principal balance. This would also require determining whether the original program participant has remained in their home or sold their home, which could be determined through a review of data provided by loan servicers or through a review of property tax records. If neither of these data sources is feasible, electronic databases such as Accurint could be used to track current locations. Another option is a periodic web survey of program participants to confirm whether they have remained in their home. Such a survey could also gather other useful information, such as participant satisfaction with their homes and neighborhoods.

---

[305] Burnett, K., Cohen, R., Kumar, N., Lubell, J., Whitlow, S., and Wolff, S. (2022). *Using Homeownership to Advance Economic Well-Being and Health Equity in Low-Income Communities and Communities of Color.* Abt Associates.

To understand whether participants' homes increase in value, the evaluation could examine information from a real estate valuation service such as CoreLogic or Zillow to determine whether the properties purchased through the program are located in neighborhoods that have experienced home price appreciation. This would provide insight into whether participants are likely to realize wealth gains if they choose to sell their home. A limitation of this approach is that it may provide data at the census tract or neighborhood level, rather than data specific to the property. Another alternative approach would be to review local tax assessor records to track changes in the assessed value of the property over time; while this approach would provide property-specific estimates of value, as noted above, assessed values often lag behind market values.

The evaluation could also examine loan servicer data to identify the number of participants who faced foreclosure or delinquency; these outcomes likely indicate that the participant did not build significant wealth through homeownership but will hopefully be infrequent. If loan servicer data is not readily available, tax records or a web survey to program participants could be used.

Figure 65 below summarizes each approach and options for data sources related to wealth building outcomes.

| Proposed Questions | Approach | Measures (Data Source) |
|---|---|---|
| Did participants build wealth through homeownership over time?<br><br>How did participants' home values change over time? | • Descriptive analysis estimating the amount of principal paydown of mortgages<br>• Descriptive analysis of changes in home values over time | • Estimated amount of principal paydown of mortgage (based on mortgage terms)<br>• First mortgage terms and date *(lender data)*<br>• Home sales *(loan servicer data; tax records; survey)*<br>• Change in average home price by census tract *(CoreLogic, Zillow)*<br>• Change in assessed property value *(tax records)* |
| Did participants sustain homeownership over time?<br><br>How many participants experienced foreclosure or delinquency over time? | • Estimated number of borrowers who experienced foreclosure<br>• Estimated number of borrowers who became delinquent on their mortgage. | • Delinquency status *(loan servicer data; tax records; survey)*<br>• Foreclosure status *(loan servicer data; tax records; survey)* |

*Figure 65 - Preliminary research questions, approach, and measures for evaluation of wealth-building outcomes*

## Racial disparities outcomes

One of the central goals of the Covenant Homeownership Program is to remedy the present-day impacts of ongoing discrimination in which the State was an active or passive participant and, in so doing, help reduce racial disparities in homeownership in Washington. As such, it will be critical to evaluate outcomes related to homeownership disparities at the community level and the state level. A key outcome of interest is differences in homeownership rates across racial and ethnic groups (also referred to as the 'racial homeownership gap'). WSHFC may also be interested in understanding whether the program has influenced geographic patterns of racial segregation. As with the wealth-building outcomes described above, outcomes related to racial disparities will take several years to become apparent, and many data sources have a significant time lag; it may not be feasible to present results on these outcomes in the first five-year study.

To address questions related to racial disparities in homeownership, the evaluation could incorporate a descriptive analysis of data from the American Community Survey (ACS). This survey, fielded annually by the Census Bureau, provides detailed information on demographics and homeownership status. [306] The ACS produces two datasets annually, one covering a single year and one covering the preceding five years. The one-year estimates are timelier but are only reliable for larger levels of geography. [307] The five-year estimates have a longer time-lag but are reliable at smaller levels of geography.

The one-year estimates could be used to describe changes in homeownership statewide. The five-year estimates could be used to understand changes in homeownership trends at the county or municipal level. For example, it would be possible to examine whether counties that received a larger share of assistance through the program saw a larger increase in the homeownership rate among impacted groups. This data could also be used to describe changes in the racial composition of homeowners in a specific geographic area, such as neighborhoods where racially restrictive covenants were commonly enforced.

Using this data, the evaluation could also examine whether the program has influenced patterns of racial segregation in the state. Furthermore, the evaluation could calculate a racial dissimilarity index to determine whether patterns of segregation have changed. A racial dissimilarity index measures the geographic distribution of different groups; it represents the proportion of individuals from one group that would need to move to achieve an even distribution across the entire geography. It can be used to measure the level of segregation statewide or within specific counties.

Figure 66 below summarizes how ACS data could be used to address questions related to racial disparities in homeownership.

---

[306] For a full list of topics covered by the American Community Survey, see: Subjects Included in the Survey (census.gov)
[307] For additional discussion of ACS samples, see: When to Use 1-year or 5-year Estimates (census.gov)

| Potential Questions | Approach | Measures (Data Source) |
|---|---|---|
| Have homeownership rates among impacted groups in Washington increased?<br><br>Have there been changes in the racial/ethnic homeownership gap in Washington since launching the program? | • Descriptive analysis of homeownership rate by race/ethnicity over time<br>• Descriptive analysis of racial composition of homeowners by geography | • Change in homeownership rate by race and ethnicity for Washington (*ACS one-year sample*)<br>• Change in homeownership rate by race and ethnicity by county, municipality, or ZIP (*ACS five-year sample*) |
| Have there been changes in patterns of residential segregation in Washington since launching the program? | • Racial dissimilarity index | • Change in racial dissimilarity index statewide or by county (*ACS five-year sample*) |

*Figure 66 - Preliminary research questions, approach, and measures for evaluation of racial disparities outcomes.*

## Impact Evaluation

A program impact is an effect caused specifically by a program. An impact evaluation assesses the effectiveness of the program in achieving desired impacts. Unlike an outcomes evaluation, which simply reports on how outcomes have changed over time, an impact evaluation seeks to prove a causal link between the program and specific effects. An impact evaluation of the Covenant Homeownership Program could answer the following research questions:

• To what extent did the program lead to increases in homeownership, wealth accumulation, and improvements in housing location for participants?
• To what extent did the program lead to a reduction in (the) racial homeownership gap(s) in Washington?

To answer the first research question, researchers could utilize a quasi-experimental analysis that evaluates a sample of homeowners participating in the program and a sample of similar renters who did not participate in the program. The comparison group could include, for example, impacted residents within Washington who were not eligible for the program because they were not living, or descended from those living, in the state prior to 1968. To account for local market conditions, researchers could identify and match renters who live in the same geographic areas as participants. [308] The evaluation team could then track both groups of renters to identify differences in outcomes and then assess whether program participants were more likely than non-participants to purchase a home or build wealth over time. This approach would help isolate the impact of the program on individual outcomes. One important limitation of this approach is that since the comparison group is not eligible for the program, the two groups are not truly comparable, which limits the rigor of the design and the persuasiveness of the study findings.

---

[308] A similar matching technique was using during the 2007 evaluation of the Self-Help Ventures Fund's Community Advantage Program.

This approach is also resource-intensive, as the evaluation team would need to identify, enroll, and track a comparison group.

A second approach would be to identify the impact of the program in reducing the racial homeownership gaps in Washington by comparing changes in the racial homeownership gaps in Washington to those of a comparable state or set of states. In this approach, the evaluation team could consider whether Washington state has experienced a faster increase in homeownership among groups of impacted residents and a faster narrowing of racial homeownership gaps than other states. Optimally, the comparison states would offer only race-neutral homeownership programs. This approach would be a much less resource-intensive way than the quasi-experimental analysis described above. However, it would be solely focused on statewide indicators and would not provide insight on individual outcomes.

Figure 67 below summarizes the approaches and measures that could be used to address each research question.

| Question | Approach | Measures (data source) |
|---|---|---|
| To what extent did the program lead to increases in homeownership, wealth accumulation, and improvements in housing location? | • Quasi-experimental analysis of program's effect on short- and long-term outcomes over time | • Property address or ZIP (*loan data*)<br>• Borrower address at time of application (*loan data*)<br>• Neighborhood characteristics (*American Community Survey; Opportunity Index*)<br>• Estimated amount of principal paydown of mortgage (based on mortgage terms)<br>• Change in average home price by census tract (*CoreLogic, Zillow*)<br>• Participant self-reported wealth (*survey*)<br>• Foreclosure status (*loan data*) |
| To what extent did the program lead to a reduction in racial homeownership gap(s) in Washington? | • State-level comparative analysis of homeownership rates by race/ethnicity over time | • Change in homeownership rate by race and ethnicity for Washington and comparable states (*ACS one-year sample*) |

*Figure 67 - Preliminary research questions, approach, and measures for impact evaluation*

## Qualitative Evaluation

Incorporating qualitative data collection into an evaluation would provide insights into how the program is operating in practice by examining the experiences of program participants and staff. While an outcomes- or impact-focused evaluation can measure whether the program is achieving

its aims, a qualitative evaluation can generate more in-depth insights into *how* the program is achieving its aims, allowing WSHFC and program partners to identify the program's strengths and weaknesses. Potential questions of interest for a qualitative evaluation include:

- What was the experience of program participants? How did the program influence their homebuying experience?

- For individuals who did not participate in the program, what was their experience in purchasing a home?

- How did program administrators implement the program? What are the successes and challenges in implementation?

A qualitative evaluation would likely involve one-on-one interviews or focus groups with individuals involved in the program. These strategies would allow the evaluation team to flexibly explore a wide range of topics, depending on the interests and priorities of the Commission and other partners. Qualitative analysis typically involves reviewing and 'coding' transcripts of the conversations to identify common themes across respondents.

For program participants, these conversations might focus on their experiences with homebuying prior to the program; how they learned about and accessed the program; how their participation in the program influenced their decisions about purchasing a home; and any issues that they have encountered during or after purchasing a home. For program staff, these conversations can focus on the practical aspects of program administration, such as marketing and staffing, and could also explore aspects of program design, such as loan underwriting practices. Insights from both program participants and staff can help highlight opportunities to make the program more efficient and effective.

It would also be valuable to engage individuals from impacted groups who are *not* participating in the program. This would provide an opportunity to examine whether the program's marketing and outreach efforts are effectively reaching members of impacted groups. While many members of impacted groups will not ultimately be eligible, if they demonstrate a high level of awareness and understanding of the program, it is likely that the subset of who are eligible for the program has received adequate communication about the program. If non-participants are aware of the program and believe they are eligible, these conversations could explore why they have not applied for the program. These discussions could highlight issues with the application process that are making it difficult for individuals to apply, such as documentation requirements, or other motivations, such as a lack of interest in homeownership.

Some of this information could potentially be collected using a survey fielded to participants, non-participants, or program staff. Surveys may be less costly to conduct than interviews and focus groups, and analysis is often more straightforward. However, surveys do not provide the same level of depth, and they offer less flexibility to explore topics that are raised by respondents.

Figure 68 below summarizes potential approaches and topics that could be incorporated into a qualitative evaluation of the Covenant Homeownership study.

| Potential Questions | Approach | Topics |
| --- | --- | --- |
| What was the experience of program participants?<br><br>How did the program influence their homebuying experience? | • Qualitative interviews or focus groups with participants<br>• Survey of participants | • Prior experience with homebuying<br>• Experience with the program, process of engaging with the program<br>• Influence of the program on homebuying decisions and outcomes |
| For individuals who did not participate in the program, are they aware of the program? What is their understanding of the program? | • Survey of non-participants<br>• Qualitative interviews or focus groups with non-participants | • Awareness of and understanding of program<br>• If likely eligible, reasons for not applying for the program |
| How did program administrators implement the program? What are the successes and challenges in administering the program? | • Qualitative interviews or focus groups with program staff<br>• Survey of program staff | • Staff and organizational capacity<br>• Program marketing and outreach efforts<br>• Administrative processes<br>• Program eligibility and design considerations |

*Figure 68. Preliminary research questions, approach, and measures for qualitative evaluation.*

## Program Targets and Monitoring

Program targets can be used in different ways to facilitate program monitoring. Often, program targets are adopted to identify thresholds that indicate a program is on track and succeeding in achieving its initial goals. An example would be serving at least X households within a year and Y households within five years. WSHFC may wish to set one or more such targets as a way of monitoring progress towards stated goals.

A second type of program target, which is addressed more fully below, is a target that would indicate when a program has achieved its stated goals and can be discontinued. Unlike the evaluation strategies discussed in the preceding sections, the purpose of such a target is not to measure the efficacy or overall success of the program, but rather to establish a clear basis and justification for continuing or ending the program. This is an important consideration for time-limited programs like special purpose credit programs and can be a key component of an overall monitoring and evaluation strategy.

This section presents two potential targets for the Covenant Homeownership Program that could be used to determine when the program is no longer needed: one based on application volume, and one based on statewide racial disparities in homeownership. As with other aspects of this evaluation framework, WSHFC will want to refine these targets as the program design is finalized.

## Target for application volume

The Covenant Homeownership Program is intended to serve a narrow subset of Washington's current population: members of the impacted groups who resided, or are descended from those who resided, in the state prior to the passage of the federal Fair Housing Act in 1968 (see RCW 43.181.040). At some point, this pool of applicants could be exhausted. WSHFC could establish a target that the program will be discontinued when no new applications that meet the program's eligibility standards are received over a certain period of time. A lack of applications would likely indicate that all, or nearly all, interested individuals have already applied to the program.

This target would be straightforward to implement, as application volume is easily measured and is already incorporated into annual program reports (see Outputs-Based Evaluation on p. 144.) However, it is critical that this target is implemented in such a way that prospective participants have ample opportunity to learn about and apply for the program. First, there should be an adequate time period – at least six months – with no new applications to the program. Second, during this time period, WSHFC and program partners should continue actively advertising the program to impacted groups. These two considerations will provide assurance that the lack of applications is not driven by a lack of awareness on the part of potential applicants.

## Target for racial disparities in homeownership

A second option that WSHFC and program partners could consider is establishing a specific target for reducing racial disparities in homeownership within Washington. This is one of the key long-term outcomes of the program (see Figure 63) and can be monitored using public data (see Outcomes-Based Evaluation on p. 146).

There are a number of factors that contribute to racial disparities in homeownership in Washington, including the legacy of unlawful discrimination as well as ongoing differences in income, wealth, and other economic characteristics. All these factors may be of concern to WSHFC. However, as noted in Chapter 4, the Covenant Homeownership Program is very narrowly focused on remedying the impacts of unlawful discrimination in which the State was an active or passive participant. For the purpose of monitoring the program, it will therefore be important to set a target that reflects this narrowly defined scope, rather than aiming to eliminate racial disparities in homeownership altogether. This would require estimating what portion of the disparity in homeownership rates is attributable to the State's discriminatory actions.

One approach to estimating the effects of the State's role is to first quantify the effects of the other observable characteristics that influence financial circumstances like household wealth, income, education, employment, and marital status. After accounting for these observable characteristics, the remaining disparity may reflect, in part, the legacy of discrimination. This approach was recently employed in a research study that explored disparities in homeownership between Black and White households nationally. [309] The study findings indicate that, at a national level, roughly 17 percent of the disparity between Black and White homeownership rate is unexplained by observable characteristics.

---

[309] For an example of this approach, see: Choi, J., McCargo, A., Neal, M., Goodman, L., and Young, C. (2019). *Explaining the Black-White Homeownership Gap: A Closer Look at Disparities Across Local Markets.* Urban Institute.

If the Covenant Homeownership Program (and any future special purpose credit programs that are established to address state-sponsored discrimination) were to create enough homeowners in impacted groups to close that residual gap, it might be appropriate to pause and determine whether such programs are still needed to address this discrimination. To operationalize this, it would be useful to estimate the number of homeowners needed to eliminate this residual gap and monitor progress toward this benchmark.

To illustrate: in 2021, the Black-White homeownership gap in Washington was 31.1 percent. Assuming that the national estimates regarding the residual racial homeownership gap cited above hold true for Washington, eliminating the residual homeownership gap for Black households would require an additional 5.3 percent of Black households (17 percent of 31.1 percent) to become homeowners. The Latino-White homeownership gap in Washington was 21.2 percent in 2021, so elimination of the estimated residual gap would require an additional 3.6 percent of Latino households (17 percent of 21.2 percent) to become homeowners. The AIAN-White homeownership gap in Washington was 14.5 percent in 2021, so elimination of the estimated residual gap would require an additional 2.5 percent of AIAN households (17 percent of 14.5 percent) to become homeowners. As shown in Figure 69, closing this gap for all impacted residents would require the addition of 22,506 new homeowners in impacted groups. [310]

| Race/Ethnicity | Number of Impacted Residents | Residual Homeownership Gap (in percentage points) | Target Number of Impacted Residents Served |
|---|---|---|---|
| Hispanic/Latino | 294,932 | 3.6 | 10,618 |
| Black | 108,188 | 5.3 | 5,734 |
| AIAN/NHPI | 38,538 | 2.5 | 963 |
| Other or Multi[a] | 136,609 | 3.9 | 5,191 |
| Total | 578,267 | 3.9 | 22,506 |

*Figure 69 Residual Homeownership Gap (17% of full homeownership gap)*
[a] The residual homeownership gap for adults of some other race and multiracial adults is estimated as the weighted average of the residual homeownership gap for Latino, Black, and AIAN/NHPI adults.

These targets are estimates only and could potentially overestimate or underestimate the number of homeowners in impacted groups needed to address the impacts of state-sponsored discrimination on the homeownership rates of impacted residents. The targets could overestimate this number by attributing all of the residual homeownership gap to state-sponsored discrimination, as opposed to other factors, such as private discrimination or individual preference. Alternatively, the targets could underestimate this number by ignoring the potential impacts of prior discrimination such as on the educational attainment and incomes of impacted residents. This could occur, for example, if the inability to purchase homes in earlier generations of impacted residents affected the ability of parents to use accumulated wealth to pay for their children to attend college.

---

[310] This analysis assumes the total population remains constant and that the homeownership rate for White residents remains constant.

Since the factors that lead the estimates to be alternatively under- or over-inclusive may offset each other to a significant extent, it would be reasonable for WSHFC to decide to use this approach to monitor the continued need for the program. To do this, targets for the number of new homeowners created through the program(s) could be established along with regular monitoring of progress toward the targets. To the extent the target is met for certain groups rather than others, the program could potentially be narrowed to focus only on the remaining racial and ethnic groups.

Additionally, it is important to note that the figures above reflect national estimates. In applying this approach to Washington, it would be optimal before setting the targets to replicate this analysis using current data from Washington, rather than relying on national trends. [311] It would also be important to repeat the analysis for all impacted groups that are to be served by the program, as the homeownership gap and the factors contributing to the gap will likely be different for each. This exercise would allow WSHFC to set data-driven targets that reflect the distinct context of Washington.



---

[311] The Urban Institute analysis referenced above relies on publicly available data from the US Census and American Community Survey.

## Appendix A - Select Accounts of Housing Discrimination in Washington (Chapter 1)7

| Select Accounts of Housing Discrimination in Washington | |
|---|---|
| **Year(s)** | **Account** |
| 1940s, Spokane | "During the 1940s, James and Lydia Sims encountered resistance from Spokane's [real estate agents]. Oftentimes, after inquiring about a home, the Simses were told that they could not see the property they desired. On one occasion, the realtor flat out told them, "I would like to sell you this, but there is a covenant." The agent then allowed them to view the covenant. As a result of restrictive covenants, it took them, like so many other Black families, several years to purchase a house." [312] |
| 1940s, Tri-Cities Area | Edmon Daniels shared his family's experience in the Tri-Cities, where police, employers, and banks all played a role in segregating the area: "There was a sign on the Cable Bridge that said, "No Blacks after sundown." Which is why Kennewick, was known as a "sundown town," meaning Black people were not allowed to be in an area once it got dark, or else they could face violent persecution. "I remember one time we didn't have any bread. But the only convenience store open late was the market in Kennewick. So my dad and I went before sundown, but the police followed us the entire time until we went back to Pasco." |
| | He also shared his cousin's experience being harassed by the police: "He was coming home from working at Hanford. But he was with some white boys, and they wanted to go to a local Tavern. He couldn't go in because he was Black, so he had to walk home. But then the police stopped him and handcuffed him to a stop sign to mess with him." |
| | "If someone wanted to buy a home in West Pasco, Kennewick, or Richland, a $16,000 house could be bumped up to $40,000 if they saw you were Black." He shared that his father could not get a bank to give him a loan. "They didn't care where we built our homes - whether they were shacks or not. They just wanted them to be in East Pasco." [313] |
| 1940s, Bainbridge Island | Fumiko Nishinaka Hayashida, one of the members of the first group of Japanese families taken to internment camps from Bainbridge Island, recalled in testimony to Congress that "On the morning of March 30, 1942, the Army trucks rounded us up with soldiers armed with rifles and bayonets. We could only take |

---

[312] Mack, *Black Spokane.* Interview with Lydia Sims.

[313] Hernandez, Xochitl. "Black History Month: The history behind how the Black community helped build Tri-Cities despite segregation and racism." *NBC Right Now. February 15, 2022.* https://www.nbcrightnow.com/tricities/black-history-month-the-history-behind-how-the-black-community-helped-build-tri-cities-despite/article_1fb7cf80-8eb6-11ec-8291-97def23baf9c.html

| | |
|---|---|
| | what we could carry or wear, so we layered up our clothes and had to make hard choices on what items we could fit into a single suitcase." <br><br> She shared that three years later, the family finally returned to Bainbridge Island, but found they had lost everything. They tried to farm once again but eventually moved after her husband started working for Boeing. [314] |
| **1940s, Seattle** | Carl Brooks, a civil rights activist, purchased a home in the deed-restricted neighborhood of Lago Vista in Shoreline, north of Seattle's city limits. Instead of going to court, the Lago Vista Community Club organized a campaign of harassment to force the Black family to leave. <br><br> According to one source, the County sheriff supported the campaign -- an indication that his office treated Shoreline and other northern suburbs as "sundown zones" -- until the violence escalated. The *Washington New Dealer* reported the rest: "The campaign of intimidation and violence to force the Negro family to leave the modest home they purchased last October was climaxed on the night of Wednesday, February 26, when dynamite was thrown at the house in which two children were sleeping." [315] |
| **1940s, Tri-Cities** | In an interview Atomic Heritage Foundation, [316] Gabriel Bohnee shares his experience of the land from which his tribe, the Nez Perce, were displaced during the Manhattan Project. "The Hanford site was the traditional spot for the Nez Perces to come trade and visit with our sister tribes, the Umatillas, the Yakamas, and the Colvilles. The Columbia River was a mecca for Northwest tribes. It supplied the fish and the resources that brought the people together." <br><br> The head of the Confederate Tribes and Bands of the Yakama Nation, Jim Russell also interviewed with the Atomic Heritage Foundation that the Yakama previously used Hanford and the Columbia Basin area for their wintering grounds. "The Manhattan Project was justified here, and everyone was moved out, including the Yakama Nation people." The Wanapum tribe were also forced to resettle. |
| **1950s, West Seattle** | Longtime King County Council member Larry Gossett, a Black man, recalls that when his father, also a Black man, wanted to buy a house in West Seattle in 1956, a female real estate agent told him she would be "run out" if she tried to help him do so. [317] |

[314] Kelly, Brian. "Oldest remaining survivor of Japanese American concentration camps passes away." *Nichi Bei.* November 20, 2014. https://www.nichibei.org/2014/11/oldest-remaining-survivor-of-japanese-american-concentration-camps-passes-away/

[315] Gregory, James. "Understanding Racial Restrictive Covenants and their Legacy." https://depts.washington.edu/covenants/segregation.shtml.

[316] Atomic Heritage Foundation. "Interview with Gabriel Bohnnee," *Voices of the Manhattan Project.* https://ahf.nuclearmuseum.org/voices/oral-histories/gabriel-bohnees-interview/.

[317] Honig, Doug. "Redlining in Seattle." *History Link.* October 29, 2021. https://www.historylink.org/File/21296.

| 1950s, Seattle | In the 1950s, a Jewish refugee from Austria, abandoned his effort to buy a house in Sand Point after he received repeated threats from a neighborhood leader. [318] |
|---|---|
| 1950s, West Seattle | When Walter Hubbard, a Black Veteran, went to purchase a house in West Seattle in the 1950s, a real estate agent told him, "Well you know, I can't sell you this house." When he asked why, the agent eventually said "I can't sell the houses to negros." He said that was the second occasion that he had attempted to purchase a home in the area. [319] |
| 1950s, Tacoma | In a News Tribune Article, Harold Moss describes searching for a home with his then wife, Bil, after returning from the Korean War. "When you called a real estate office, you used what I call your 'white voice,'" Harold Moss shared. They heard excuses from owners and agents such as: "They would hate me if I sold this house to a Negro," or, "I don't think you could get a loan." Bil Moss shared they had more than was needed for the down payment but were also discouraged by neighbors in the areas where they sought to purchase a home. |
| | In the same article, Freddie Mae Barnett, a long-time member of Tacoma's Colored Women's Club, shared that she experienced a similar pattern at Fort Lewis in the 1950s. She was turned down for a dozen homes before finding a place to live. [320] |
| 1950s, Seattle | Marion West, a white woman whose husband Ray West was Black veteran, shared in an interview with the Seattle Civil Rights and Labor History Project that she and her husband had purchased an old fraternity building to house Black, Asian and other students in the segregated North End of Seattle. "I think the Realtor got in trouble for it. It was a scandal, or a disgrace." In her account, she noted that another Realtor in West Seattle was put out of the realty board because he was selling to "mixed groups." |
| | She and her family and tenants endured harassment once they moved into their North End home. "We got eggs thrown out us, firecrackers thrown into the house, and even a cross burned in our yard at one time," she shared. [321] |
| 1950-60s, Spokane | Jerrelene Williamson, the 84-year-old author and historian, shared in a 2016 news article that said that growing up in Spokane, it was always clear that certain places and parts of town were off-limits to Black |

[318] Ibid.
[319] Seattle Civil Rights and Labor History Project. "Trying to buy a house in West Seattle in the early 1950s." See recording online at: https://www.youtube.com/watch?v=gTR_TMfCD-0
[320] Martin, Kate. "How racism kept black Tacomans from buying houses for decades." *The News Tribune.* December 1, 2021. https://www.thenewstribune.com/news/business/real-estate-news/article216269965.html
[321] Seattle Civil Rights and Labor History Project (2005), "West, Marion. Oral History Interview." https://youtu.be/6VwuWH9Rn2g?list=PLrnclw6j_Mi9J1-jI-T2FbkJR2FOIzVwF

| | |
|---|---|
| | people– "whether it was stated explicitly or not." When she and her husband were looking to buy a home in the late 1950s, "they just wouldn't show you certain properties." When buying their second home in the 1960s, they learned much later that the real estate company had approached the neighbors and asked them if they were okay to sell the home to a Black family. [322] |
| 1960s, Seattle | Alan Sugiyama, a Japanese American activist, describes the segregated conditions he experienced growing up in Seattle. He describes joining his brother while he was looking for a home in the Capitol Hill neighborhood, which is now a diverse area: "Back then in the late 60s and early 70s, it was a very segregated area.  They didn't accept minorities. All of the places he went to, they wouldn't rent to him." He ended up finding a place in a different neighborhood. |
| 1970s, Pasco | In his article on housing discrimination in Pasco, attorney George Critchlow tells the story of his clients, a Black couple, Sam and Dorothy. Sam and Dorothy were told several lots that they hoped to purchase in Pasco were unavailable or had already sold.<br><br>"Depositions and informal interviews with witnesses had shown what I believed was a shared understanding among corporate officers and employees that they would not let Black people buy into the development for fear that it would gain a reputation as a "Black development." No one would admit this squarely, but several people opined that Black folks would have no problem buying lots once the majority were sold first to white buyers. I also discovered there was no impediment to selling my clients any of the lots in which they had expressed interest." |
| 1960s      /<br>1990s<br>onward,<br>Seattle | Ruby Holland, a Black woman who had moved to Atlanta for three decades, recently returned to her childhood home in Seattle's Central District. She said: "I was like, 'Where are the Black people?' Nobody knew. I was surprised."<br><br>Holland lived in the home their mom bought in 1963. "When my mom bought her house, this was the only place she could buy it," Holland said in a recent *Crosscut* article. "Because of racial restrictions barring people of color from buying homes in most of the city, the Central District became Seattle's Black neighborhood. Growing up a few blocks east of Martin Luther King Way and south of Jackson Street in the '60s and '70s, Holland says all her neighbors were Black. Today, most of them are white." [323] |

---

[322] Vestal, Shawn. "Whites-only covenants still exist in many mid-century Spokane neighborhoods." *The Spokesman Review.* December 4, 2016. https://www.spokesman.com/stories/2016/dec/04/whites-only-covenants-still-exist-in-many-mid-cent/#/0

[323] Cohen, Josh. "'Where are the Black people?' Central District residents get creative to fight displacement." *Crosscut. January 2019.* https://crosscut.com/2019/01/where-are-Black-people-central-district-residents-get-creative-fight-displacement.

| 1900s through early 2000s, Seattle | "My grandparents and great aunt, with whom I lived as a child, routinely had to borrow from a hard money lender more than 20+ miles away from our home because the local institutions would not lend to the Black community. There was a Seafirst Bank (Bank of America), First Interstate (Wells Fargo), and KeyBank <2 miles away from our home, and routinely they would deny my grandparents and great-aunt loans for home improvements, and they all banked at these institutions. |
|---|---|
| | My father, who was a real estate broker for 45+ years, worked tirelessly in the Central District where I grew up, and where the community was redlined. He was relegated to working in that community and South Seattle for most of his career. He lost his own home during the recession due to predatory lending because, although he was a real estate broker, he didn't have the depth of knowledge one would need to understand lending and its predatory nature in the Central District. |
| | "The discrimination suffered in the Central District of Seattle was insidious and widespread. I have dozens of stories of the residence who were family, friends, and neighbors who lost their homes because of the discrimination sanctioned specifically by the state of Washington and city of Seattle; particularly the police department, assessor's office, and office of housing. There isn't enough space on this survey to tell them all." |
| | - Nicole R. Bascomb Green, Owner and Designated Broker at Bascomb Real Estate Group, SVP, Head of Community Lending at Umpqua Bank, and Chair of WSHFC. (Survey Respondent) |

## Appendix B.  Contemporary Stories on the Lingering Impacts of Historic Housing Discrimination in Washington (Chapter 2)

The following testimonials and stories illustrate the lingering impacts of discrimination on people of color and their communities. These stories were collected through the authors' online survey, small group sessions, recorded testimony for the Covenant Homeownership Act, and news articles.

In a 2019 speech, **Sandy Williams**, editor and publisher of The Black Lens newspaper based in Spokane, noted:

"Homeownership among African Americans is about 42 percent -- more than 20 points behind the average overall rate of 64 percent. Something is not working if the goal is to help people with homeownership," tying homeownership to other indicators affected by housing insecurity such as education, transportation, healthy food, health care, access to credit, living wage jobs and wealth are all adversely affected.

"Wealth is the big one," she said. "Housing generates wealth. … We didn't have that to pass down to our kids to generate wealth. My dad died in 2015, and one of the last things he said to me was, 'Do not get rid of the house.'"

She concluded her remarks by saying: "It was policies that got us here. It wasn't just bad people doing bad things. It was governmental policy, and it's going to take policy to get us out."

"There has been significant displacement impact for the urban Black American previously redlined to the central district of Seattle and other areas in Seattle and now the urban Black American data is commingled with African data.  The displacement from Seattle of Black urban Americans is shameful. And we have to start listening to Black Americans real and lived experience and not guessing or assuming that black Americans are satisfied with rental and black Americans don't want to develop their existing property for intergenerational living and to co-house family members."

**Anonymous Black Female Survey Respondent**

"I want to note these headlines from the Seattle times that reflect the continuing the continuing legacy of that discrimination. Headline number one: in Seattle area, 'Rentals racially divides neighborhoods.' The date on that headline, September 7, 2020. 'Black Neighborhood Home appraisal gap is real'. The date here: September 24, 2021. 'The Black home ownership rate is lower than it was in 1968,' September 17, 2022.

There is, however, a much more subtle legacy not reflected in active discrimination. Yes, we still have active discrimination. as these headlines reflect. But there is a much larger issue, and it is a consequence of more than the century of the devaluing housing in the inner cities of the state leading to inter-generational poverty that affects far too many people of color in the

state today. There is…a palpable wealth gap between African Americans and other Washingtonians today, and that wealth gap I believe …is almost a direct consequence of decades of housing discrimination."

**Professor Quintard Taylor**, Scott and Dorothy Bullitt Professor of American History at the University of Washington, (during public testimony for the Covenant Homeownership Act, 2023)

"I was born in Seattle, and I lived in the Rainer Valley area forever. My parents shared the difficulties they experienced while trying to purchase a home in Seattle and none of it involved their income. It was based on their race. They're black. Even when it was technically illegal, they mostly found housing in historically red lined areas in Seattle which were deemed undesirable. Now today, if you drive down Rainier Avenue style or Martin Luther King, there are brand new homes that I would never be qualified to purchase because they're just too expensive. [This is] because of tools of discrimination like racially restrictive housing covenants. It had a generational impact on my family from my grandparents even to my parents struggling not being able to assist me with a down payment or anything like that."

**LeChelle Lucas**, West Seattle Resident (during public testimony for the Covenant Homeownership Act, 2023)

"Years ago, I worked with a family whose home I listed for sale in North Tacoma. Reading the title report, I saw this home had been in the family for sixty years at a time when Black people were not permitted to live in this area. I learned that in order for the family to own here, they had to have a person passing as white assist with the process of purchasing. Had this home closed in the Hilltop neighborhood of Tacoma, it would have sold for approximately three hundred thousand less than what it did."

"Now I want to tell you about a decorated soldier who survived four tours and landed in Fort Lewis to retire master sergeant nearly unheard of at the time. He went on to build a second career and became one of the first black Boeing employees to earn the same wage as his white machinist counterparts. Wester Bradley Jefferson, son to Darthilla and Thomas Jefferson. Both who were born as children to ancestors held as chattel slaves: Tom, Liza, Sam and Harriet.  Wester is my grandfather. He was not given the opportunity to use his G.I bill. and he was not given the option to purchase a home in a neighborhood of his white counterparts. Instead, in 1963 he built a home in an all-black part of town in what is now Tacoma's eastside Cloverdale neighborhood. I now lovingly own this home, and today it would fetch approximately two hundred thousand dollars or more in equity in a different neighborhood, a couple miles north."

**Jasmyn Jefferson,** Designated Broker and an Owner of Windermere Abode Lakewood (During public testimony for the Covenant Homeownership Act, 2023)

**Stories of Ongoing Housing Discrimination**

While instances of housing discrimination that are still occurring today cannot be fully separated from the historical reasons for racial residential segregation and bias in lending, the following stories reflect that discrimination is an ongoing barrier to homeownership, access to credit, wealth building, and housing security. These stories illustrate a failure on the part of the state government to properly regulate the rental, lending, and real estate industry and enforce the Fair Housing Act.

"An instance of discrimination occurred when I found an apartment that I thought would be perfect for me. The landlord seemed friendly during our initial phone conversation, but when I met him in person, his demeanor shifted. He started asking invasive and unnecessary questions about my background and criminal history. I was honest and he then seemed to be hesitant about renting to me once he learned about my background. Ultimately, he told me that the apartment was no longer available when I expressed my interest in applying for it.

Additionally, I encountered discrimination through other subtle biases. Some landlords or property managers would mention that they preferred "quiet tenants," which often meant they were trying to exclude individuals with small children or anyone who didn't fit their ideal image. I also noticed that certain neighborhoods seemed to be off-limits to me, as I received negative responses or were outright ignored when inquiring about available properties in those areas.

Throughout my housing search, it became evident that housing discrimination wasn't always overt or explicit but often subtle and insidious. It left me feeling frustrated, marginalized, and disheartened. I knew that I was being judged and treated unfairly based on factors beyond my control."

**Anonymous Black Survey Respondent**

"[We receive] the lowest appraisals when my African American husband [is] present."

**Anonymous Black Female Survey Respondent**

"When my wife and I started looking for homes some of the real estate places told us that there were areas that we would not be able to afford to live and they would point us to areas that were depressed."

**Anonymous Latino Survey Respondent**

"I was a mortgage underwriter for 15 years and knew how lending worked from beginning to end, including appraisals. I refinanced my home and provided the appraiser multiple comparables that were within the acceptable radius for a home with the amenities I had. He came to my home and as soon as he saw my face, his whole demeaner changed. He would not speak to me during the entire process and did not accept all the upgrades I had made to my home. He ultimately completed the appraisal, and it came in $40K - $55K lower than I had expected. He also used comps that were older, smaller,

and not upgraded to render my value. I submitted a rebuttal, but to no avail. This happened to me on two separate occasions which cost me because the LTV was now higher, subsequently my rate was higher, and I was unable to borrower what I needed, and the cost was far greater than it would have been had my home been appraised properly. I also lost valuable equity with the low appraisals I received."

"I witnessed many of my underwriting colleagues deny Black borrowers who had similarly situated loan profiles as white borrowers. I witness neighbor after neighbor come to my grandparents' home and discuss how their assessed values had been increased out of nowhere, and subsequently their taxes, to the point where they could no longer pay them because they were in excess of their fixed incomes. We then saw white individuals come knocking on doors, including ours, offering to purchase properties for cash not soon after these tax hikes. I had a client with an obviously Black sounding name have her offer rejected with no real reason given. One home didn't even take an offer on their home and stayed active after our offer was provided. These instances of racism are hard to prove, but fairly easy to spot. The stories go on and on."

"We live in a high-cost area that makes it difficult for people in the Black community to buy in. Many are income rich, but asset poor and have pressures on their credit scores that make it difficult to qualify for a mortgage that would have favorable pricing. The lower scores increase the rate, and subsequently, they are approved for less than what they need. DPA programs, though widely available, can't help a buyer if they can't qualify for the first mortgage. There needs to be products that are structured to take into consideration other factors that show the capacity of a buyer, particularly a Black buyer, ability to repay a mortgage. The current credit box is insufficient and the amount of DPA needs to be deeply subsidized to allow for more support to offset the cost to buy. In addition, there needs to be an adjustment to underwriting to allow for the utilization of other factors in reviewing someone's credit. These steps together can help lower some of the barriers we face here in a high-cost market."

**Nicole R. Bascomb-Green,** Owner and Designated Broker at Bascomb Real Estate Group SVP, Head of Community Lending at Umpqua Bank, and Chair of WSHFC. (Survey Response)

---

"Over the course of my 28 years in real estate, I have many times heard people say they will not rent to Hispanics, most commonly citing "they will move in the whole family." Also, I see sellers with lower end and even damaged houses tell agents to find Hispanic buyers. As if Hispanic buyers do not want nice houses and are limited to the cheapest houses."

**Debra White**, Real Estate Agent in Central Washington (Survey Response)

## Appendix C: Program Listing (Chapter 3)

This appendix lists the programs included in the landscape analysis.

| Program Name | Administering Organization | Program Type | More info |
|---|---|---|---|
| ARCH East King County DPA Loan Program | WSHFC | DPA | https://www.wshfc.org/buyers/arch.htm |
| Bellingham DPA Loan Program | WSHFC | DPA | https://www.wshfc.org/buyers/Bellingham.htm |
| Clark County DPA Loan Program | WSHFC | DPA | https://www.wshfc.org/buyers/ClarkCounty.htm<br><br>https://proudground.org/properties/affordable-available/90000-clark-county-down-payment-assistance-grant/166<br>https://www.wshfc.org/buyers/ClarkCounty.htm<br><br>https://proudground.org/properties/affordable-available/90000-clark-county-down-payment-assistance-grant/166 |
| Home Advantage DPA | WSHFC | DPA | WSHFC | Home Advantage Downpayment Assistance Program |
| Home Advantage DPA - Needs Based | WSHFC | DPA | WSHFC | Home Advantage Need Based Downpayment Assistance Program |
| HomeChoice | WSHFC | DPA | WSHFC | HomeChoice Program |
| Opportunity DPA | WSHFC | DPA | WSHFC | Opportunity Downpayment Assistance Loan Program |

| Veterans DPA Program | WSHFC | DPA | WSHFC | Veterans Downpayment Assistance Loan Program |
|---|---|---|---|
| Tri-Cities HOME Consortium DPA Program | Tri-Cities HOME Consortium | DPA | https://www.go2kennewick.com/DocumentCenter/View/14327/2023-DPA-Guidelines-and-Application-English?bidId= |
| Spokane Indian Housing Authority DPA Program | Spokane Indian Housing Authority | DPA | https://spokaneiha.com/public-doc/admissions-and-occupancy-policy-low-income-rentals/ |
| Sam Smith "Hi Neighbor" Homeownership Fund | HomeSight, Windermere Real Estate, US Bank | DPA | Microsoft Word - WA State Loan Matrix 6.6.23 (homesightwa.org) |
| HomeSight Statewide DPA Program | HomeSight | DPA | Purchase Assistance | HomeSight (homesightwa.org) |
| Social Justice Down Payment Program | HomeSight | DPA | Purchase Assistance | HomeSight (homesightwa.org) |
| HomeStarts | Community Frameworks | DPA | https://communityframeworks.org/homeownership-in-kitsap-county/ |
| City of Tacoma DPA Program | City of Tacoma | DPA | https://usahomefinancing.com/tacoma-wa-first-time-home-buyer/ |

| | | | |
|---|---|---|---|
| Housing Trust Fund | Department of Commerce | DPA | https://www.commerce.wa.gov/building-infrastructure/housing/housing-trust-fund/applying-to-the-housing-trust-fund/ |
| Pre-Purchase Program | Parkview Services | DPA | https://www.parkviewservices.org/homeownership-program/pre-purchase-program/ |
| Section 184 Loan | HUD Office of Public & Indian Housing | First mortgage | Mutual \| HUD.gov / U.S. Department of Housing and Urban Development (HUD) |
| EnergySpark | WSHFC | First mortgage | WSHFC \| EnergySpark Homeownership Program |
| Home Advantage Loan | WSHFC | First mortgage | WSHFC \| Home Advantage Program |
| House Key Opportunity Program | WSHFC | First mortgage | WSHFC \| Opportunity First Mortgage Loan Program |
| VISTA/ITIN Loans | HomeSight | First mortgage | Purchase Assistance \| HomeSight (homesightwa.org) |
| Homestead CLT | Homestead | Alternative Homeownership | https://www.homesteadclt.org/ |
| ARCH Homeownership Program | ARCH | Alternative Homeownership | https://www.archhousing.org/arch-homeownership-program |

| Amazon Homeownership Initiative Pilot | African Community Housing & Development (Puget Sound) | Alternative Homeownership | https://nationalhousingtrust.org/our-work/lending/amazon-homeownership-initiative-pilot |
|---|---|---|---|
| Opal CLT | Opal CLT | Alternative Homeownership | http://www.opalclt.org/buy-your-home/affordability-and-more/ |
| Habitat for Humanity | Habitat for Humanity | Alternative Homeownership | https://www.habitatskc.org/what-we-do/homeownership/ |

# Appendix D: Policy Scenario Results (Chapter 3)

This appendix section presents full results tables for the policy scenarios in Chapter 3.

## Potential First-Time Homebuyers, No Assistance Scenario, and Baseline Scenario

The table below shows the number and racial/ethnic composition of potential first-time homebuyers. It also shows the number and racial/ethnic composition of potential first-time homebuyers in Washington who can afford a home without assistance and under the baseline scenario ($10,000 of DPA to income-eligible borrowers). See section 2 of this chapter for definitions of potential first-time homebuyers and the baseline scenario and the assumptions modeled for estimating homeownership qualification.

| | Potential Homebuyers | First-Time | No Assistance | | Baseline Scenario | |
| --- | --- | --- | --- | --- | --- | --- |
| Race/Ethnicity | Number | Percent | Number who can afford a home | Percent who can afford a home | Number who can afford a home | Percent who can afford a home |
| White | 401,357 | 57% | 10,287 | 74% | 22,885 | 69% |
| Asian | 74,291 | 10% | 1,936 | 14% | 5,640 | 17% |
| Hispanic/Latino | 117,402 | 17% | 730 | 5% | 2,203 | 7% |
| Black | 49,710 | 7% | 464 | 3% | 1,119 | 3% |
| AIAN/NHPI | 14,648 | 2% | 109 | 1% | 240 | 1% |
| Other or Multi | 51,106 | 7% | 319 | 2% | 960 | 3% |
| **Total[b]** | **708,514** | **100%** | **13,844** | **100%** | **33,046** | **100%** |

*Figure D1: Policy Scenario Results by Race/Ethnicity: No Assistance and Baseline Scenarios*

[a] AIAN/NHPI: American Indian, Alaska Native, Native Hawaiian or other Pacific Islander
[b] Columns may not sum to totals due to rounding.

## DPA Scenario

The tables below show the number and racial/ethnic composition of potential first-time homebuyers who can afford a home under the DPA scenario using three different income-restricted race-neutral eligibility criteria. The figures also show the number of potential beneficiaries of each program, which is the difference in the number of people who can afford a home under the baseline and down payment assistance scenarios.

| Race/Ethnicity | Baseline Scenario | | DPA Scenario (Race-Neutral, Income-Restricted) | | | |
|---|---|---|---|---|---|---|
| | Number who can afford a home | Percent who can afford a home | Number who can afford a home | Percent who can afford a home | Number of Beneficiaries | Percent of Beneficiaries |
| White | 22,885 | 69% | 55,862 | 61% | 32,977 | 56% |
| Asian | 5,640 | 17% | 14,902 | 16% | 9,262 | 16% |
| Hispanic/Latino | 2,203 | 7% | 9,829 | 11% | 7,626 | 13% |
| Black | 1,119 | 3% | 4,178 | 5% | 3,059 | 5% |
| AIAN/NHPI[a] | 240 | 1% | 1,775 | 2% | 1,535 | 3% |
| Other or Multi[b] | 960 | 3% | 5,485 | 6% | 4,525 | 8% |
| **Total[c]** | **33,046** | **100%** | **92,030** | **100%** | **58,984** | **100%** |

*Figure D2: Policy Scenario Results by Race/Ethnicity: DPA Scenario (Race-Neutral, Income-Restricted)*

[a] AIAN/NHPI: American Indian, Alaska Native, Native Hawaiian or other Pacific Islander
[b] The difference in the number of Other or Multi beneficiaries under the race-neutral and race-conscious eligibility criteria is due to multiracial potential first-time homebuyers who are White and Asian only. These potential homebuyers are eligible under race-neutral criteria but not eligible under race-conscious criteria.
[c] Columns may not sum to totals due to rounding.

| Race/Ethnicity | Baseline Scenario | | DPA Scenario (Race-Neutral, Minority County, Income-Restricted) | | | |
|---|---|---|---|---|---|---|
| | Number who can afford a home | Percent who can afford a home | Number who can afford a home | Percent who can afford a home | Number of Beneficiaries | Percent of Beneficiaries |
| White | 22,885 | 69% | 31,215 | 67% | 8,330 | 61% |
| Asian | 5,640 | 17% | 5,945 | 13% | 305 | 2% |
| Hispanic/Latino | 2,203 | 7% | 4,795 | 10% | 2,592 | 19% |
| Black | 1,119 | 3% | 1,751 | 4% | 632 | 5% |
| AIAN/NHPI[a] | 240 | 1% | 956 | 2% | 716 | 5% |
| Other or Multi[b] | 960 | 3% | 2,079 | 4% | 1,118 | 8% |
| Total[c] | 33,046 | 100% | 46,740 | 100% | 13,694 | 100% |

Figure D3: Policy Scenario Results by Race/Ethnicity: DPA Scenario (Race-Neutral, Minority County, Income-Restricted)
[a] AIAN/NHPI: American Indian, Alaska Native, Native Hawaiian or other Pacific Islander
[b] The difference in the number of Other or Multi beneficiaries under the race-neutral and race-conscious eligibility criteria is due to multiracial potential first-time homebuyers who are White and Asian only. These potential homebuyers are eligible under race-neutral criteria but not eligible under race-conscious criteria.
[c] Columns may not sum to totals due to rounding.

| Race/Ethnicity | Baseline Scenario | | DPA Scenario (Race-Neutral, First-Generation, Income-Restricted) | | | |
|---|---|---|---|---|---|---|
| | Number who can afford a home | Percent who can afford a home | Number who can afford a home | Percent who can afford a home | Number of Beneficiaries | Percent of Beneficiaries |
| White | 22,885 | 69% | 29,480 | 61% | 6,595 | 44% |
| Asian | 5,640 | 17% | 7,955 | 17% | 2,316 | 15% |
| Hispanic/Latino | 2,203 | 7% | 4,948 | 10% | 2,745 | 18% |
| Black | 1,119 | 3% | 3,046 | 6% | 1,927 | 13% |
| AIAN/NHPI[a] | 240 | 1% | 623 | 1% | 384 | 3% |
| Other or Multi[b] | 960 | 3% | 2,091 | 4% | 1,131 | 7% |
| Total[c] | 33,046 | 100% | 48,144 | 100% | 15,099 | 100% |

Figure D4: Policy Scenario Results by Race/Ethnicity: DPA Scenario (Race-Neutral, First-Generation, Income-Restricted)
[a] AIAN/NHPI: American Indian, Alaska Native, Native Hawaiian or other Pacific Islander
[b] The difference in the number of Other or Multi beneficiaries under the race-neutral and race-conscious eligibility criteria is due to multiracial potential first-time homebuyers who are White and Asian only. These potential homebuyers are eligible under race-neutral criteria but not eligible under race-conscious criteria.
[c] Columns may not sum to totals due to rounding.

The table below shows the number and racial/ethnic composition of potential first-time homebuyers who can afford a home under the DPA scenario with income-restricted race-conscious eligibility criteria. It also shows the number of potential beneficiaries of the program.

| Race/Ethnicity | Baseline Scenario | | DPA Scenario (Race-Conscious, Income-Restricted) | | | |
|---|---|---|---|---|---|---|
| | Number who can afford a home | Percent who can afford a home | Number who can afford a home | Percent who can afford a home | Number of Beneficiaries | Percent of Beneficiaries |
| White | 22,885 | 69% | 22,885 | 47% | 0 | 0% |
| Asian | 5,640 | 17% | 5,640 | 12% | 0 | 0% |
| Hispanic/Latino | 2,203 | 7% | 9,829 | 20% | 7,626 | 49% |
| Black | 1,119 | 3% | 4,178 | 9% | 3,059 | 20% |
| AIAN/NHPI[a] | 240 | 1% | 1,775 | 4% | 1,535 | 10% |
| Other or Multi[b] | 960 | 3% | 4,179 | 9% | 3,219 | 21% |
| Total[c] | 33,046 | 100% | 48,485 | 100% | 15,439 | 100% |

*Figure 70: Policy Scenario Results by Race/Ethnicity: DPA Scenario (Race-Conscious, Income-Restricted)*
[a] AIAN/NHPI: American Indian, Alaska Native, Native Hawaiian, or other Pacific Islander
[b] The difference in the number of Other or Multi beneficiaries under the race-neutral and race-conscious eligibility criteria is due to multiracial potential first-time homebuyers who are White and Asian only. These potential homebuyers are eligible under race-neutral criteria but not eligible under race-conscious criteria.
[c] Columns may not sum to totals due to rounding.

## Interest Rate Reduction Scenario

The tables below show the number and racial/ethnic composition of potential first-time homebuyers who can afford a home under the interest rate reduction scenario with various income-restricted race-neutral eligibility criteria. It also shows the number of potential beneficiaries of the program.

| Race/Ethnicity | Baseline Scenario | | Interest Rate Reduction Scenario (Race-Neutral, Income-Restricted) | | | |
|---|---|---|---|---|---|---|
| | Number who can afford a home | Percent who can afford a home | Number who can afford a home | Percent who can afford a home | Number of Beneficiaries | Percent of Beneficiaries |
| White | 22,885 | 69% | 33,766 | 68% | 10,881 | 66% |
| Asian | 5,640 | 17% | 6,836 | 14% | 1,196 | 7% |
| Hispanic/Latino | 2,203 | 7% | 4,281 | 9% | 2,078 | 13% |
| Black | 1,119 | 3% | 1,614 | 3% | 496 | 3% |
| AIAN/NHPI[a] | 240 | 1% | 989 | 2% | 750 | 5% |
| Other or Multi[b] | 960 | 3% | 2,060 | 4% | 1,100 | 7% |
| **Total[c]** | **33,046** | **100%** | **49,546** | **100%** | **16,500** | **100%** |

*Figure D6: Policy Scenario Results by Race/Ethnicity: Interest Rate Reduction Scenario (Race-Neutral, Income-Restricted)*
[a] AIAN/NHPI: American Indian, Alaska Native, Native Hawaiian, or Other Pacific Islander
[b] The difference in the number of Other or Multi beneficiaries under the race-neutral and race-conscious eligibility criteria is due to multiracial potential first-time homebuyers who are White and Asian only. These potential homebuyers are eligible under race-neutral criteria but not eligible under race-conscious criteria.
[c] Columns may not sum to totals due to rounding.

| Race/Ethnicity | Baseline Scenario | | Interest Rate Reduction Assistance Scenario (Race-Neutral, Minority County, Income-Restricted) | | | |
|---|---|---|---|---|---|---|
| | Number who can afford a home | Percent who can afford a home | Number who can afford a home | Percent who can afford a home | Number of Beneficiaries | Percent of Beneficiaries |
| White | 22,885 | 69% | 27,491 | 68% | 4,606 | 60% |
| Asian | 5,640 | 17% | 5,945 | 15% | 305 | 4% |
| Hispanic/Latino | 2,203 | 7% | 3,261 | 8% | 1,058 | 14% |
| Black | 1,119 | 3% | 1,571 | 4% | 453 | 6% |
| AIAN/NHPI[a] | 240 | 1% | 786 | 2% | 547 | 7% |
| Other or Multi[b] | 960 | 3% | 1,640 | 4% | 680 | 9% |
| Total[c] | 33,046 | 100% | 40,694 | 100% | 7,648 | 100% |

*Figure D7: Policy Scenario Results by Race/Ethnicity: Interest Rate Reduction Scenario (Race-Neutral, Minority County, Income-Restricted)*
[a] AIAN/NHPI: American Indian, Alaska Native, Native Hawaiian, or Other Pacific Islander
[b] The difference in the number of Other or Multi beneficiaries under the race-neutral and race-conscious eligibility criteria is due to multiracial potential first-time homebuyers who are White and Asian only. These potential homebuyers are eligible under race-neutral criteria but not eligible under race-conscious criteria.
[c] Columns may not sum to totals due to rounding.

| Race/Ethnicity | Baseline Scenario | | Income Rate Reduction Scenario (Race-Neutral, First-Generation, Income-Restricted) | | | |
|---|---|---|---|---|---|---|
| | Number who can afford a home | Percent who can afford a home | Number who can afford a home | Percent who can afford a home | Number of Beneficiaries | Percent of Beneficiaries |
| White | 22,885 | 69% | 25,061 | 68% | 2,176 | 54% |
| Asian | 5,640 | 17% | 5,939 | 16% | 299 | 7% |
| Hispanic/Latino | 2,203 | 7% | 2,951 | 8% | 748 | 19% |
| Black | 1,119 | 3% | 1,431 | 4% | 312 | 8% |
| AIAN/NHPI[a] | 240 | 1% | 427 | 1% | 187 | 5% |
| Other or Multi[b] | 960 | 3% | 1,235 | 3% | 275 | 7% |
| Total[c] | 33,046 | 100% | 37,044 | 100% | 3,998 | 100% |

*Figure D8: Policy Scenario Results by Race/Ethnicity: Interest Rate Reduction Scenario (Race-Neutral, First-Generation, Income-Restricted)*
[a] AIAN/NHPI: American Indian, Alaska Native, Native Hawaiian, or Other Pacific Islander
[b] The difference in the number of Other or Multi beneficiaries under the race-neutral and race-conscious eligibility criteria is due to multiracial potential first-time homebuyers who are White and Asian only. These potential homebuyers are eligible under race-neutral criteria but not eligible under race-conscious criteria.
[c] Columns may not sum to totals due to rounding.

The table below shows the number and racial/ethnic composition of potential first-time homebuyers who can afford a home under the interest rate reduction scenario with income-restricted race-conscious eligibility criteria. It also shows the number of potential beneficiaries of the program.

| Race/Ethnicity | Baseline Scenario | | Interest Rate Reduction Scenario (Race-Conscious, Income-Restricted) | | | |
|---|---|---|---|---|---|---|
| | Number who can afford a home | Percent who can afford a home | Number who can afford a home | Percent who can afford a home | Number of Beneficiaries | Percent of Beneficiaries |
| White | 22,885 | 69% | 22,885 | 62% | 0 | 0% |
| Asian | 5,640 | 17% | 5,640 | 15% | 0 | 0% |
| Hispanic/Latino | 2,203 | 7% | 4,281 | 12% | 2,078 | 54% |
| Black | 1,119 | 3% | 1,614 | 4% | 496 | 13% |
| AIAN/NHPI[a] | 240 | 1% | 989 | 3% | 750 | 19% |
| Other or Multi[b] | 960 | 3% | 1,489 | 4% | 529 | 14% |
| **Total[c]** | **33,046** | **100%** | **36,898** | **100%** | **3,852** | **100%** |

*Figure D9: Policy Scenario Results by Race/Ethnicity: Interest Rate Reduction Scenario (Race-Conscious, Income-Restricted)*
[a] AIAN/NHPI: American Indian, Alaska Native, Native Hawaiian, or Other Pacific Islander
[b] The difference in the number of Other or Multi beneficiaries under the race-neutral and race-conscious eligibility criteria is due to multiracial potential first-time homebuyers who are White and Asian only. These potential homebuyers are eligible under race-neutral criteria but not eligible under race-conscious criteria.
[c] Columns may not sum to totals due to rounding.

## Credit Counseling Scenario

The tables below show the number and racial/ethnic composition of potential first-time homebuyers who can afford a home under the credit counseling scenario with various income-restricted race-neutral eligibility criteria. It also shows the number of potential beneficiaries of the program.

| Race/Ethnicity | Baseline Scenario | | Credit Counseling Scenario (Race-Neutral, Income-Restricted) | | | |
|---|---|---|---|---|---|---|
| | Number who can afford a home | Percent who can afford a home | Number who can afford a home | Percent who can afford a home | Number of Beneficiaries | Percent of Beneficiaries |
| White | 22,885 | 69% | 23,235 | 69% | 350 | 62% |
| Asian | 5,640 | 17% | 5,668 | 17% | 29 | 5% |
| Hispanic/Latino | 2,203 | 7% | 2,286 | 7% | 83 | 15% |
| Black | 1,119 | 3% | 1,167 | 3% | 49 | 9% |
| AIAN/NHPI[a] | 240 | 1% | 248 | 1% | 9 | 2% |
| Other or Multi[b] | 960 | 3% | 1,002 | 3% | 42 | 7% |
| **Total[c]** | **33,046** | **100%** | **33,607** | **100%** | **561** | **100%** |

*Figure 71: Policy Scenario Results by Race/Ethnicity: Credit Counseling Scenario (Race-Neutral, Income-Restricted)*
[a] AIAN/NHPI: American Indian, Alaska Native, Native Hawaiian, or Other Pacific Islander
[b] The difference in the number of Other or Multi beneficiaries under the race-neutral and race-conscious eligibility criteria is due to multiracial potential first-time homebuyers who are White and Asian only. These potential homebuyers are eligible under race-neutral criteria but not eligible under race-conscious criteria.
[c] Columns may not sum to totals due to rounding.

| | Baseline Scenario | | Credit Counseling Scenario (Race-Neutral, Minority County, Income-Restricted) | | | |
|---|---|---|---|---|---|---|
| Race/Ethnicity | Number who can afford a home | Percent who can afford a home | Number who can afford a home | Percent who can afford a home | Number of Beneficiaries | Percent of Beneficiaries |
| White | 22,885 | 69% | 22,955 | 69% | 70 | 61% |
| Asian | 5,640 | 17% | 5,643 | 17% | 4 | 3% |
| Hispanic/Latino | 2,203 | 7% | 2,217 | 7% | 14 | 12% |
| Black | 1,119 | 3% | 1,119 | 3% | 0 | 0% |
| AIAN/NHPI[a] | 240 | 1% | 241 | 1% | 1 | 1% |
| Other or Multi[b] | 960 | 3% | 987 | 3% | 27 | 23% |
| **Total[c]** | **33,046** | **100%** | **33,161** | **100%** | **115** | **100%** |

*Figure 72: Policy Scenario Results by Race/Ethnicity: Credit Counseling Scenario (Race-Neutral, Minority County, Income-Restricted)*
[a] AIAN/NHPI: American Indian, Alaska Native, Native Hawaiian, or Other Pacific Islander
[b] The difference in the number of Other or Multi beneficiaries under the race-neutral and race-conscious eligibility criteria is due to multiracial potential first-time homebuyers who are White and Asian only. These potential homebuyers are eligible under race-neutral criteria but not eligible under race-conscious criteria.
[c] Columns may not sum to totals due to rounding.

| | Baseline Scenario | | Credit Counseling Scenario (Race-Neutral, First-Generation, Income-Restricted) | | | |
|---|---|---|---|---|---|---|
| Race/Ethnicity | Number who can afford a home | Percent who can afford a home | Number who can afford a home | Percent who can afford a home | Number of Beneficiaries | Percent of Beneficiaries |
| White | 22,885 | 69% | 22,955 | 69% | 70 | 47% |
| Asian | 5,640 | 17% | 5,647 | 17% | 7 | 5% |
| Hispanic/Latino | 2,203 | 7% | 2,233 | 7% | 30 | 20% |
| Black | 1,119 | 3% | 1,149 | 3% | 31 | 20% |
| AIAN/NHPI[a] | 240 | 1% | 242 | 1% | 2 | 1% |
| Other or Multi[b] | 960 | 3% | 971 | 3% | 10 | 7% |
| **Total[c]** | **33,046** | **100%** | **33,196** | **100%** | **150** | **100%** |

*Figure 73: Policy Scenario Results by Race/Ethnicity: Credit Counseling Scenario (Race-Neutral, First-Generation, Income-Restricted)*
[a] AIAN/NHPI: American Indian, Alaska Native, Native Hawaiian or other Pacific Islander
[b] The difference in the number of Other or Multi beneficiaries under the race-neutral and race-conscious eligibility criteria is due to multiracial potential first-time homebuyers who are White and Asian only. These potential homebuyers are eligible under race-neutral criteria but not eligible under race-conscious criteria.
[c] Columns may not sum to totals due to rounding.

The table below shows the number and racial/ethnic composition of potential first-time homebuyers who can afford a home under the credit counseling scenario with income-restricted race-conscious eligibility criteria. It also shows the number of potential beneficiaries of the program.

| Race/Ethnicity | Baseline Scenario | | Credit Counseling Scenario (Race-Conscious, Income-Restricted) | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Number who can afford a home | Percent who can afford a home | Number who can afford a home | Percent who can afford a home | Number of Beneficiaries | Percent of Beneficiaries |
| White | 22,885 | 69% | 22,885 | 69% | 0 | 0% |
| Asian | 5,640 | 17% | 5,640 | 17% | 0 | 0% |
| Hispanic/Latino | 2,203 | 7% | 2,286 | 7% | 83 | 50% |
| Black | 1,119 | 3% | 1,167 | 4% | 49 | 30% |
| AIAN/NHPI[a] | 240 | 1% | 248 | 1% | 9 | 5% |
| Other or Multi[b] | 960 | 3% | 986 | 3% | 25 | 15% |
| **Total[c]** | **33,046** | **100%** | **33,211** | **100%** | **165** | **100%** |

*Figure 74: Policy Scenario Results by Race/Ethnicity: Credit Counseling Scenario (Race-Conscious, Income-Restricted)*
[a] AIAN/NHPI: American Indian, Alaska Native, Native Hawaiian or other Pacific Islander
[b] The difference in the number of Other or Multi beneficiaries under the race-neutral and race-conscious eligibility criteria is due to multiracial potential first-time homebuyers who are White and Asian only. These potential homebuyers are eligible under race-neutral criteria but not eligible under race-conscious criteria.
[c] Columns may not sum to totals due to rounding.

# Appendix E. Policy Scenario Results (Chapter 4)

This appendix provides detailed results for the analyses presented in section 2 of Chapter 4 for those with incomes between 100 and 140% of AMI. Appendix figures are numbered to match the corresponding figure in the narrative. For example, Figure E1 supplements Figure 1 and Figure E3-1 and E3-2 supplement Figure 3.

Figure E1 shows the number of renter households between 100% and 140% AMI and over 140% AMI among the impacted residents in Washington state who could afford to purchase a home with three levels of fixed down payment assistance. The Figure also shows the attainability percentage for households at each income range for the state as a whole and for high-cost counties. All three options have very high attainability percentages for households above 140% of AMI, both statewide and in high-cost counties.

| Average DPA amount (fixed) | Number of potential beneficiaries | | Attainability Percentage (Statewide) | | Attainability Percentage (High-Cost Counties) | |
|---|---|---|---|---|---|---|
| | # Between 100% and 140% of AMI | # Above 140% of AMI | For 100% AMI | For 140% AMI | For 100% AMI | For 140% AMI |
| $25,000 | 13,878 | 17,466 | 21% | 82% | 13% | 78% |
| $50,000 | 17,342 | 17,484 | 30% | 86% | 20% | 84% |
| $75,000 | 21,276 | 17,484 | 47% | 88% | 37% | 86% |
| $100,000 | 24,140 | 17,484 | 53% | 91% | 39% | 88% |

*Figure E1: Beneficiaries and Attainability for Different Fixed DPA Amounts by Income Range*

In contrast to the 80 to 100 percent AMI range, differences in the share of impacted residents between 100 and 140 percent AMI who are potential beneficiaries of different levels of down payment assistance do not vary much by race/ethnicity (see Figure E3-1). However, a larger share of Hispanic/Latino households than Black households can still afford homes at each down payment assistance level.

i

| Average DPA amount (fixed) | Number of potential beneficiaries 100-140% AMI | Share of impacted residents 100-140% AMI who are potential beneficiaries | | | |
|---|---|---|---|---|---|
| | | Black | Hispanic | AIAN/NHPI | Other or Multi |
| $25,000 | 13,878 | 45% | 54% | 37% | 34% |
| $50,000 | 17,342 | 54% | 65% | 60% | 49% |
| $75,000 | 21,276 | 71% | 75% | 66% | 75% |
| $100,000 | 24,140 | 79% | 86% | 81% | 83% |

*Figure E3-1: Beneficiaries and Attainability for Different Fixed DPA Amounts by Race/Ethnicity and Income Range 100-140% AMI*
ª AIAN/NHPI: American Indian, Alaska Native, Native Hawaiian or other Pacific Islander

Figure E3-2 demonstrates that a majority of households with incomes above 140 percent of AMI are potential beneficiaries of each level of down payment assistance. However, only around two-thirds of Black households are potential beneficiaries, compared to four-fifths of households of other races and ethnicities.

| Average DPA amount (fixed) | Number of potential beneficiaries >140% AMI | Share of impacted residents >140% AMI who are potential beneficiaries | | | |
|---|---|---|---|---|---|
| | | Black | Hispanic/ Latino | AIAN/NHPI | Other or Multi |
| $25,000 | 17,466 | 68% | 78% | 81% | 80% |
| $50,000 | 17,484 | 68% | 78% | 81% | 81% |
| $75,000 | 17,484 | 68% | 78% | 81% | 81% |
| $100,000 | 17,484 | 68% | 78% | 81% | 81% |

*Figure E3-2: Beneficiaries and Attainability for Different Fixed DPA Amounts by Race/Ethnicity and Income Range > 140% AMI*
ª AIAN/NHPI: American Indian, Alaska Native, Native Hawaiian or other Pacific Islander

Figure E4 shows the amount of assistance that renters with incomes between 100 and 140 percent of AMI would need to afford to purchase a modest-cost home in their county.

| County | Modest-priced home value | Average DPA needed to assist households with 100-140% AMI to afford a modest priced home | Estimated total number of beneficiaries | Estimated cost (all potential beneficiaries) |
|---|---|---|---|---|
| Adams | $196,313 | $2,570 | 41 | $104,965 |
| Asotin | $207,115 | $2,072 | 19 | $39,386 |
| Benton | $325,156 | $13,989 | 620 | $8,671,448 |
| Chelan | $320,265 | $24,791 | 412 | $10,216,018 |
| Clallam | $345,007 | $88,406 | 60 | $5,336,073 |
| Clark | $423,273 | $41,289 | 951 | $39,256,372 |
| Columbia | $171,814 | $303 | 2 | $564 |
| Cowlitz | $304,597 | $5,408 | 205 | $1,109,529 |
| Douglas | $334,376 | $42,248 | 224 | $9,452,955 |
| Ferry | $166,990 | $1,723 | 18 | $31,715 |
| Franklin | $320,873 | $6,914 | 430 | $2,974,338 |
| Garfield | $144,294 | $532 | 1 | $465 |
| Grant | $237,663 | $3,889 | 778 | $3,027,042 |
| Grays Harbor | $193,749 | $1,583 | 283 | $447,918 |
| Island | $434,163 | $140,786 | 220 | $30,910,582 |
| Jefferson | $421,487 | $177,666 | 26 | $4,582,744 |
| King | $541,229 | $37,455 | 7,574 | $283,700,730 |
| Kitsap | $413,041 | $27,615 | 717 | $19,797,023 |
| Kittitas | $354,213 | $32,890 | 448 | $14,728,805 |
| Klickitat | $251,920 | $4,281 | 10 | $42,515 |
| Lewis | $311,453 | $24,859 | 18 | $456,555 |
| Lincoln | $175,571 | $1,844 | 22 | $39,726 |
| Mason | $308,359 | $18,335 | 331 | $6,067,496 |
| Okanogan | $163,533 | $1,864 | 72 | $135,014 |
| Pacific | $222,056 | $2,516 | 40 | $99,643 |

| Pend Oreille | $211,164 | $3,037 | 25 | $74,522 |
|---|---|---|---|---|
| Pierce | $418,531 | $55,241 | 2,778 | $153,471,298 |
| San Juan | $551,260 | $267,873 | 45 | $12,046,090 |
| Skagit | $408,560 | $108,425 | 235 | $25,476,271 |
| Skamania | $371,485 | $6,075 | 4 | $24,670 |
| Snohomish | $520,875 | $44,663 | 2,126 | $94,940,992 |
| Spokane | $302,082 | $9,104 | 716 | $6,514,900 |
| Stevens | $229,345 | $3,344 | 83 | $277,095 |
| Thurston | $404,936 | $44,348 | 822 | $36,438,709 |
| Wahkiakum | $249,366 | $3,475 | 8 | $28,449 |
| Walla Walla | $279,657 | $5,200 | 492 | $2,560,156 |
| Whatcom | $407,209 | $72,729 | 669 | $48,666,621 |
| Whitman | $242,474 | $3,310 | 41 | $135,415 |
| Yakima | $231,855 | $3,322 | 3,359 | $11,160,294 |
| **Washington** | **N/A** | **$33,423** | **24,924** | **$833,045,103** |

*Figure E4: Cost by County*

# Appendix F. Methodology for Estimating the Racial Composition and Size of the Eligible Applicant Pool (Chapter 4)

This appendix provides details on the approach used to estimate the racial composition and size of the eligible applicant pool, as discussed in Section 2 and presented in Figure 60.

The research team used Census data to estimate the proportion of Washington State renter heads of household who meet the 1968 resident or descendent requirements under the Covenant Homeownership Account and Program Act. The research team used data from the 2021 American Community Survey (ACS) to identify the proportion of people from each race/ethnicity group who were born in Washington State. The research team estimated this proportion separately by age range, using five-year age bins. People who were 50 or older in 2021 likely meet the 1968 resident or descendent requirement because they were born in Washington State (and therefore resided there) in 1971 or earlier. [324]

For Washington-born residents who were between ages 25 and 49 in 2021 (born between 1972 and 1996), the research team used information from historical Census surveys to estimate the probability that one of their parents was also born in Washington state. For each five-year age band between 25 and 49, the research team used data for Washington state residents of the same race/ethnicity in the approximate year of the individual's birth as an estimate of the probability that each of their parents was born in Washington State. For instance, for those who are 40 to 44 years old in 2021 (born between 1977 and 1981), the research team used 1980 Census data on state of birth for adults living in Washington State who were between the ages of 20 and 29 (on average approximately 25). [325] The research team then estimated the probability that the given Washington State resident in 2021 meets the 1968 resident or descendent requirement by multiplying the probability that they were born in Washington State by the probability that at least one of their parents was born in Washington State. For Washington-born residents who were between 20 and 24 in 2021 (born between 1997 and 2001), the research team estimated the probability that one of their parents and one their grandparents were also born in Washington.

---

[324] The research team used the 2021 ACS in lieu of the 2020 ACS because of data weighting concerns in the 2020 ACS arising from the COVID-19 pandemic. For more detail, see https://www.census.gov/newsroom/blogs/random-samplings/2021/10/pandemic-impact-on-2020-acs-1-year-data.html.
[325] In the US this median age for mothers was 27 in 1990 and 30 in 2019 ("Fertility Rates: Declined for Younger Women, Increased for Older Women", Anne Morse, US Census Bureau, April 6,2022, Fertility Rates: Declined for Younger Women, Increased for Older Women (census.gov)). Although mothers' and fathers' ages at first birth are well documented (and have risen substantially during the timeframe of this analysis), there is less complete information reported for average age at any birth. These ages also vary by race. For the purpose of this analysis, however, the research team assumes the same average age at birth across all races, and approximate this to 25 years old because it simplifies the calculation using five-year age bands. Because historical Census data is available in 10-year increments, the research team estimated data for 1975, 1985, and 1995 by using the average of the rates from the flanking census years (1970, 1980, 1990, and 2000).