UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FOUNDATION AGAINST INTOLERANCE AND RACISM, INC., | CASE NO. 24-cv-01770-JHC |
| Plaintiff, | ORDER RE: PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| STEVE WALKER, in his official capacity as Executive Director of the Washington State Housing Finance Commission, | |
| Defendant. | |

# I
## INTRODUCTION

This matter comes before the Court on Plaintiff's Motion for Preliminary Injunctive Relief. Dkt. # 30. Plaintiff, Foundation Against Intolerance and Racism, Inc., claims that the Covenant Homeownership Program—a special purpose credit program administered by the Washington State Housing Finance Commission and designed to reduce racial disparities in homeownership—violates the Equal Protection Clause of the Fourteenth Amendment and that an injunction is necessary to prevent further injury to the constitutional rights of Plaintiff's members and other homebuyers. *Id.* Defendant Steve Walker, Executive Director of the Washington

State Housing Finance Commission, again (*see* Dkt. # 14), seeks dismissal under Federal Rules of Civil Procedure 12(b)(1), arguing of lack of standing.  Dkt. # 36.  Defendant further argues that the Court should deny Plaintiff's request for injunctive relief.  *Id.*

For the reasons discussed below, the Court DENIES Plaintiff's motion but declines to dismiss this matter on standing grounds.

## II
### BACKGROUND

A.    Factual Background

On May 8, 2023, Washington Governor Jay Inslee signed HB 1474, the Covenant Homeownership Act (the Act).  Dkt. # 31-1 at 12; 2023 Wash. Sess. Laws ch. 340.[1]  The Legislature passed the Act "to address the history of housing discrimination."  *Id.*  The Act directed the Washington State Housing Finance Commission (the Commission) to conduct a study (the Study) to document past and ongoing discrimination, analyze the effect of existing race-neutral programs, and recommend potential policy changes to better reduce discrimination. *Id.*; *see* RCW 43.181.900.

The Study found that there was historic and ongoing discrimination and that current race-neutral programs had been ineffective at addressing this discrimination.  Dkt. # 31-1 at 10-12; Dkt. # 38 at 7-18; *see generally* Dkt. #31-2 (the Study).[2]  As a result, on July 1, 2024, the Commission launched the Covenant Homeownership Program (the Program) to provide downpayment and closing cost assistance for first-time homebuyers in the form of a zero-interest loan that works alongside a primary mortgage loan.  Dkt. # 37 at 8.

---

[1] The Court grants Plaintiff's unopposed request to judicially notice House Bill 1474.  *See* Dkt. # 30 at 5 n.1.

[2] Both parties provided the Study.  For consistency, the Court cites Docket 31-2, the Study as attached to the Declaration of Andrew R. Quinio in support of Plaintiff's Motion for Preliminary Injunction.

An applicant must meet several eligibility requirements to use the Program.  Dkt. # 31-1 at 5-9; Dkt. # 37 at 8-12.  First, the applicant must have a household income at or below 120% of the area median income for the county where the home is located (previously this income limit was 100%); second, the applicant must be a first-time homebuyer, as defined by the Program; third, the applicant or their parent, grandparent, or great-grandparent must have lived in Washington state before April 1968; and fourth, the applicant or their parent, grandparent, or great-grandparent must be Black, Hispanic, Native American/Alaskan Native, Native Hawaiian or other Pacific Islander, Korean, or Asian Indian.[3]  Dkt. # 31-1 at 5-9; Dkt. # 37 at 8-12.  The applicant must provide documentation as to the third and fourth prong, but no proof is required to show the applicant or their relatives personally experienced racial discrimination when trying to buy a home.  Dkt. # 31-1 at 8-9; Dkt. # 37 at 10-11.  As with the Commission's other homebuying assistance programs, to use the Program, the applicant must qualify for a primary mortgage secured through a Commission-supplied loan provider and take a homebuyer education class.  Dkt. # 31-1 at 7-8; Dkt. # 37 at 9.

The program has assisted over 600 people in becoming a homeowner and has more than 100 people currently in the process of purchasing a home with the Program's assistance.  Dkt. # 37 at 12.

B.     Procedural History

On October 29, 2024, Plaintiff brought this suit under 42 U.S.C. § 1983, claiming a violation of the Equal Protection clause.  *See* Dkt. #1.  On motion from Defendant, the Court dismissed the Complaint without prejudice for lack of standing.  Dkt. # 24 at 9.  The Court held

---

[3] Both parties, the Legislature, and the Commission frequently refer to "race" when discussing the Program, and so this Order does the same.  But the Court acknowledges that Program eligibility does not necessarily turn on race in all instances, but rather the eligibility is better characterized as turning on race or ethnicity.

ORDER RE: PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 3

Plaintiff must show that Member A, with respect to whom Plaintiff alleged associational standing, must show she "qualifies for the sort of primary mortgage that can be used in combination with the Program to demonstrate she is 'able and ready' to apply for the Program's benefits."  Dkt. # 24 at 9.

On July 22, 2025, Plaintiff filed its First Amended Complaint (FAC), again identifying "Member A" and alleging that she wished to buy a home with help from the Program, but could not due to her race.  Dkt. # 28.  The FAC alleges that Member A qualifies for a primary mortgage and, but for her race, she is able and ready to use the Program.  *Id.*  Plaintiff then filed this Motion for Preliminary Injunction.  Dkt. # 30.

### III

#### DISCUSSION

A.    Standing

Defendant challenges Plaintiff's associational standing through its individual members, and thus request that the FAC be dismissed under rule 12(b)(1).[4]  Dkt. # 36 at 19-21.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Ordinarily the plaintiff's factual allegations will be accepted as true.  *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).  But "[w]hen the defendant raises a factual attack, the plaintiff must support her jurisdictional allegations with 'competent proof,' under the same evidentiary standard that governs in the summary judgment context."  *Id.* (citing *Hertz Corp. v. Friend*, 559 U.S. 77, 96-

---

[4] This standing challenge was not raised in a separate motion to dismiss but in Defendant's Response to Plaintiff's Motion for Preliminary Injunction.  Even so, as Plaintiff does not raise a procedural challenge to the request to dismiss, the Court considers the request as a motion to dismiss.  *See generally* Dkt. # 41.

97 (2010) (applying the rule to a "procedurally analogous context" to subject matter jurisdiction under rule 12(b)(1)).  "The plaintiff bears the burden of proving by a preponderance of the evidence that each of the requirements for subject-matter jurisdiction has been met."  *Leite*, 749 F.3d at 1121-22.  "[I]f the existence of jurisdiction turns on disputed factual issues, the district court may resolve those factual disputes itself."[5]  *Id.*

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."  U.S. Const., Art. III, § 2.  The doctrine of standing defines these constitutional limits and "identif[ies] those disputes which are appropriately resolved through the judicial process."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted).  If a plaintiff lacks standing to sue, the court lacks subject-matter jurisdiction and the complaint must be dismissed in its entirety.  *Id.*; *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

Organizations can assert standing on their own right or on behalf of their members.  *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021).  Plaintiff asserts standing on behalf of its members.  Dkt. # 28 at 3; Dkt. # 30 at 8.  To show it meets the requirements of associational standing, Plaintiff must establish (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests at stake are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citation omitted).

Defendant challenges only whether Plaintiff's members have individual standing (i.e., the first requirement).  Dkt. # 36 at 19-20.  To demonstrate individual standing, a plaintiff must show

---

[5] Where "the issue of subject-matter jurisdiction is intertwined with an element of the merits of the plaintiff's claim" "a court must leave the resolution of material factual disputes to the trier of fact."  *Leite*, 749 F.3d at 1122, n.3.  That is not the case here.

(1) she "has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "the injury is fairly traceable to the challenged action of the defendant"; and (3) "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth*, 528 U.S. at 180-81 (citing *Lujan*, 504 U.S. at 560-61).

Here, the standing determination turns on whether there was an "injury in fact" that is "fairly traceable" to the defendant and redressable by a favorable decision. When a plaintiff seeks to challenge a government program under the Equal Protection Clause, they must show the individual is "able and ready" to apply for the Program's benefits, but that an allegedly discriminatory policy prevents her from doing so on an equal basis. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville Fla*., 508 U.S. 656, 666 (1993). As determined in this Court's previous order, to make such a showing Plaintiff must show that their individual members are eligible for the Program (but for the challenged section of the Program) and qualify for a primary mortgage from a Commission-approved lender. *See* Dkt. # 24 at 8-9.

As mentioned above, to qualify for the Program, the applicant must meet these eligibility requirements:  (1) they must have a household income at or below 120% of the area median income for the county where the home is located; (2) they must be a first-time homebuyer, as defined by the Program; (3) they or their parent, grandparent, or great-grandparent must have lived in Washington state before April 1968; and (4) they or their parent, grandparent, or great-grandparent must be Black, Hispanic, Native American/Alaskan Native, Native Hawaiian or other Pacific Islander, Korean, or Asian Indian. Dkt. # 31-1 at 5-9; Dkt. # 37 at 8-12. The applicant must provide documentation as to the third and fourth criteria. *Id.* Additionally, homebuyers using the Program must do so alongside a primary mortgage secured through Commission-approved lenders, which consequently requires meeting the qualifications of third-

ORDER RE: PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 6

party lending institutions, which might involve checking credit scores and homes inspections. Dkt. # 37 at 9.  Dkt. # 31-1 at 5-8.  Finally, the applicant must take a homebuyer education class. *Id*.

Taken as true and viewed in light most favorable to Plaintiff, the facts alleged in the FAC suffice to establish standing as to Member A.  Aside from the race requirement, Member A is eligible.  Member A's income is at or below the median income of the county where she is interested in buying a home; she is a first-time homebuyer; and she and her parents lived in Washington before April 1968.  Dkt. # 28 at 3.  Also, the FAC alleges that she took a commission-sponsored education class and prequalified for a primary mortgage loan that can be used alongside the Program.  *Id*.

Defendant seeks to raise a factual attack as to Member A's ability to qualify for a primary mortgage by challenging Member A's ability to pre-qualify for a mortgage.  But Defendant does not introduce evidence to support this claim.  Its only support is a declaration stating the general requirements to qualify for a primary mortgage, which does not contradict Plaintiff's claim that Member A is pre-qualified for a primary mortgage.  *See* Dkt. # 36 at 20-21; Dkt. # 37 at 9. Plaintiff has said Member A pre-qualifies, provided the terms of the mortgage for which she qualifies, and taken the required Commission-sponsored homebuyer education class.  Dkt. # 37 at 9.  Plaintiff reinforces the claim that Member A qualifies for a primary mortgage by providing Member A's income and credit score.  Dkt. # 41 at 6; Dkt. # 43 at 2.

To the extent Defendant argues that Member A must be pre-*approved* (rather than just pre-qualified) for a primary mortgage, they apparently seek to require too much.  *See* Dkt. # 36 at 20-21.  The Court agrees with Plaintiff that requiring Member A to complete the underwriting process for a primary mortgage, which seems likely to require time-consuming exchanges for both Member A and the lender (only to have Member A be inevitably denied), is not what the

Court's prior order or Article III requires. *See Ne. Fla. Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 666.

Defendant also says Plaintiff cannot establish standing for two other reasons. First, because Plaintiff did not specify the county in which Member A seeks to buy a property, and therefore cannot show that her income is at or below the threshold, which differs by county. Dkt. # 36 at 21. But Plaintiff alleges Member A's income is $71,300, which is below the median income for all counties in Washington, so this argument lacks merit. Dkt. # 43; Dkt. # 42-4. Second, Defendant points out that Plaintiff did not specifically say Member A can provide documentation that she and her parents lived in Washington before April 1968. Dkt. # 36 at 21. While this may be the case, the Program's "FAQ" specifically says the lender will help gather these documents and that the Commission "intends to be as flexible as possible in accepting documentation." Dkt. # 31-1 at 8-9.

At this stage, Plaintiff has shown that Member A is eligible and is "able and ready" to apply for the Program.[6] Thus, the Court declines to dismiss the FAC on standing grounds.[7]

B.    Preliminary Injunction

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008). "A plaintiff seeking a preliminary injunction must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the

_____

[6] Because the Court has determined that Member A has standing, it does not (and need not) evaluate standing as to Member B. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (associational standing requires "at least one identified member [who] had suffered or would suffer harm").

[7] The Court denies Plaintiff's request to strike the Harris Declaration and Supplemental Declaration. *See* Dkt. # 44. Upon further examination of the language therein, as well as applicable caselaw (including *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412 (9th Cir. 1995)), the Court concludes the declarations are admissible. There may also be an issue as to whether Defendant even raises a valid factual attack; but Plaintiff does not make this argument.

absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Id*. at 20.  The Ninth Circuit has adopted a "sliding scale approach," which may allow for a preliminary injunction when a plaintiff can only show there are "serious questions going to the merits," but "'the balance of hardships tips sharply in the plaintiff's favor.'"  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

1.    Likelihood of success on the merits

Both parties agree the appropriate standard to apply to the Program is strict scrutiny. Dkt. # 30 at 9; Dkt. # 36 at 22.  To satisfy strict scrutiny, Defendant must show that the Program (1) furthers a compelling government interest, and (2) is narrowly tailored to further that interest. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll*., 600 U.S. 181, 206-207 (2023).

a.    Compelling government interest

As both parties acknowledge, the Supreme Court has recognized "remediating specific, identified instances of past discrimination that violated the Constitution or a statute" as a compelling interest.  *Students for Fair Admissions*, 600 U.S. at 207; *see* Dkt. # 30 at 10; Dkt. # 36 at 22.  It is not enough to "merely intone the mantra of 'discrimination' to satisfy the 'searching examination' mandated by equal protection."  *W. States Paving Co., Inc. v. Washington State Dep't of Transp.*, 407 F.3d 983, 991 (9th Cir. 2005).  Courts must "evaluate the evidence that [the government] considered in enacting [the program] to ensure that it had a 'strong basis in evidence for its conclusion that remedial action was necessary.'"  *Id.* (quoting *City of Richmond v. J.A. Croson Co*., 488 U.S. 469, 500 (1989)).

Defendant asserts its interest is to remedy the "widespread discriminatory barriers to homeownership, implemented through active and passive State government policies and practices," with lasting impacts felt today.  Dkt. # 36 at 8, 22-26, 30-31; *see also* RCW

1  43.181.900 ("The legislature declares that the state has a compelling interest in remedying past

2  and ongoing discrimination and its impacts on access to credit and homeownership for black,

3  indigenous, and people of color and other historically marginalized communities in

4  Washington.").  Plaintiff argues the Program seeks to remedy racial disparities rather than

5  specific, identified instances of discrimination perpetrated by the state in violation of the law.

6  Dkt. # 30 at 10-13.

7       At the start, Plaintiff says that "increasing the representation of certain racial groups in a

8  particular socioeconomic category (such as homeowners) has never been recognized as a

9  compelling government interest."[8]  Dkt. # 30 at 10.  Yet there is no categorical exclusion of

10 remedial programs just because they might target a socioeconomic goal.  The Ninth Circuit has

11 repeatedly found there to be a compelling interest related to race-conscious remedial programs

12 aimed towards increasing representation of certain groups in socioeconomic categories where

13 there have been identified, specific instances of discrimination.  *See, e.g.*, *W. States Paving Co.*,

14 407 F.3d at 992 (road construction contracts); *Associated Gen. Contractors of Am., San Diego*

15 *Chapter, Inc. v. California Dep't of Transp.*, 713 F.3d 1187, 1195-96 (9th Cir. 2013) (bid

16 preference in city contracts).  Second, Plaintiff relies on *Students for Fair Admissions* to paint the

17 Program as "reducing [a] historic deficit" without cause, but this ignores Defendant's evidence

18 of discrimination and its impact on disparate homeownership rates.  Dkt. # 30 at 10.  To

19 determine whether there is a compelling government interest, this evidence must be considered.

20      Here, in passing the Act, the Legislature directed the Commission to conduct a study to

21 evaluate past discrimination and, if necessary, inform the development and continued

22 implementation of the Program.  RCW 43.181.030.  The Study presents historical examples and

23

24 _____
     [8] Plaintiff does not cite authority to support such a claim.

ORDER RE: PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 10

data of racial discrimination in housing, credit lending, and other sectors that would impair a person's ability to own a home. It then discusses the current statistical disparities in homeownership based on race, evaluates current race-neutral programs, and makes recommendations on future programing to address the disparity caused by the past discrimination.[9]  *See generally* Dkt. # 31-2.

The Study goes beyond generalized mantras of discrimination. These are a few examples of the "specific, identified instances of past discrimination that violate the Constitution or a statute" the Study identifies (*see Students for Fair Admissions*, 600 U.S. at 207):

*Racially restrictive covenants* in property deeds or related records prevented certain groups of people, usually based on race or religion, from buying or occupying land or housing. Racially restrictive covenants have been illegal since 1968 with the passage of the Fair Housing Act, and under the Fourteenth Amendment's Equal Protection clause have been unenforceable since 1948. Dkt. # 31-2 at 26-29; *see also Shelley v. Kraemer*, 334 U.S. 1 (1948). The Study notes that, in Washington, racially restrictive covenants appeared as early as 1907 up until 1967. While these covenants took many forms and originated from private actors, the state and local government played a role in their continued use even after the Supreme Court deemed them unenforceable.

Even after 1948, the state kept licensing for real estate agents whose associational board's policy encouraged the use of racially restrictive covenants, and county auditors continued to

---

[9] To complete the Study, "the research team reviewed historical records from the State of Washington's archives, information from the U.S. federal government, historical legislation and policies implemented in Washington before and after statehood, legislation and policies passed by the U.S. federal government that were implemented in the region, studies, surveys, documentation from universities throughout the state, U.S. Census records, newspaper reports, documents from housing industry groups as well as civil society organizations, transcripts of public hearings, and records from various state agencies. The team also consulted academic researchers and reviewed information from interviews conducted with Washington residents and key stakeholders in the state."  Dkt. # 31-2 at 15.

ORDER RE: PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 11

record racially restrictive covenants.  Dkt. # 31-2 at 26-29; *see W. States Paving Co.*, 407 F.3d at

992 (considering a report that "found that discrimination by trade unions and financial lenders

often precludes racial minorities from obtaining the experience and capital necessary to start

businesses" and the effect of "discrimination by prime contractors, business networks, suppliers,

and bonding companies").[10]  The use, and government's continued passive support, of racially

restrictive covenants even after the Supreme Court found them unenforceable is a specific,

identified instance of past discrimination violating the law.

     *Zoning as a tool to reinforce and expand racial segregation* occurred on the local level

across the state starting in the 1920s.  This zoning power was originally found in the state

Constitution and then twice delegated to local governments by the state legislature in 1935 and

again in 1959.  Dkt. # 31-2 at 22-24.  By 1917, racial zoning ordinances were invalidated by the

Supreme Court.  *See Buchanan v. Warley*, 245 U.S. 60 (1917).  Still, in Washington, facially

non-racial zoning was used for discriminatory purposes.  As an example, the civil engineer who

developed Seattle's zoning plan said, albeit about a different city, that a goal of zoning was to

inhibit the movement into "'finer districts . . . by colored people.'"  Dkt. # 31-2 at 22.  His

ultimate plan for Seattle involved "first" and "second" residential zones.  "First residential zones

were allocated for single-family homes, churches, parks, libraries, schools, and rail stations.

Multi-family dwellings, 'flats, apartments, boarding, or lodging houses, and hotels,' were limited

to second residential zones."  Dkt. # 31-2 at 23.  Because primarily Black families already lived

---

[10] Both parties cite *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 172 (1972), to support their positions on the State's involvement in the licensing.  Yet this case arose from a different posture and concerns enjoining a private actor from performing discriminatory conduct where the only "state action" was its involvement in licensing that private actor rather than looking back at the State's former actions or "'passive participa[tion]' in a system of racial exclusion," which might allow for a remedial race-conscious program.  *Id.*; *Croson*, 488 U.S. at 492.  For the same reason, the Court need not consider *Reitman v. Mulkey*, 387 U.S. 369 (1967), which was decided before the Supreme Court's precedents on race-conscious remedial programs and considers a different question.

in the areas now zoned as "second" residential zones, that is where they primarily stayed.  *Id.*

The Study's review of zoning laws used across Washington supports a conclusion that these laws

had a wide, sweeping effect on communities of color, including contributing to the racial wealth

gap and keeping people of color out of more high value neighborhoods and stuck in lower priced

neighborhoods.  Dkt. # 31-2 at 23-24, 56-57; *see id.* at 25 (comparing 1940 and 1950 maps with

those from 1970 showing little change in the census tract disbursement of white/non-white

population).  Even after the Supreme Court struck down racial zoning, local governments in

Washington actively zoned in a way that enforced racial segregation and the state government

continually delegated this authority to local governments, and did not intervene when they used

that power in a discriminatory manner therefore allowing for discrimination.  Dkt. # 31-2 at 22-

24.

    *State sponsored segregation and discrimination with a lasting impact on housing

ownership* is shown throughout the Study.  As one example, in the Tri-Cities region, a sign on a

bridge to enter the area stated that Black people were not allowed in Kennewick after sunset, and

accounts from the time confirm that this was an enforced policy during the 1940s.  Dkt. # 31-2 at

36-37.  It is hard to see how a Black person could safely own property in the Tri-Cities region

with such a sign present.  This is but another specific, instance of discrimination.  And it is not an

isolated incident: the Study has several examples showing either the state's active participation

or acknowledgment of such discrimination but failure to act—thereby showing passive support.

*See id*. at 34-35, 43-50.

    *Governmental takings* also feature in the Study.  As an example, during World War II,

the Hanford site was built in the Tri-Cities area, displacing around 2,300 people.  Those who

owned and farmed land were given compensation, but the Native Americans from four local

tribes who accessed or lived on the land per an 1855 treaty were not compensated.  Dkt. # 31-2 at

37.  The tribal members were eventually granted visitation rights and, after the State prosecuted Native individuals for fishing on the land, those visitation rights were upheld by the state's high court under the original treaty.  Dkt. # 31-2 at 37; *see State v. Satiacum*, 50 Wash. 2d 513, 514 (1957).  Again, the Study shows this is not an isolated incident.  *See* Dkt. # 31-2 at 34-35.  Where Native people were displaced without compensation and then for years could not live on, use, or occupy land, the impact on housing ownership is clear, and it is but another specific, instance of discrimination.

The Court does not accept Plaintiff's theory that these past acts of discrimination do not support a compelling interest because they were not actions taken by the State but a showing of "societal discrimination."  *See* Dkt. # 30 at 10-11 (citing *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274 (1986) (plurality opinion).  First, many of these acts were taken by the State, or local government after being delegated power by the State.  Second, while it is true that the Supreme Court "never has held that societal discrimination *alone* is sufficient to justify a racial classification," it only "insisted upon *some showing* of prior discrimination by the governmental unit involved."  476 U.S. at 274 (emphasis added).  And as the Court later explained, "a state or local subdivision (if delegated the authority from the State) has the authority to eradicate the effects of private discrimination within its own legislative jurisdiction," and therefore, if the relevant government unit, here the State, "had essentially become a 'passive participant' in a system of racial exclusion" practiced by the relevant third party actors, then they can "take affirmative steps to dismantle such a system."  *Croson*, 488 U.S. at 491-92.  As shown, the Study provides a showing of both active and passive acts of prior discrimination by the State.[11]

---

[11] There is even less support for Plaintiff's argument that certain acts of discrimination were on their face race-neutral and thus cannot be a specific, identified example of discrimination.  *See* Dkt. # 30 at 12 n.3.  Plaintiff's argument cites no caselaw, is summarily stated in a footnote, and "overlooks the

The examples listed in the Study go beyond "an amorphous claim" that there has been past discrimination in connection with accessing homeownership. *Croson*, 488 U.S. at 499. Thus, remediating past racial discrimination is a compelling interest, and at this preliminary stage, the evidence the Commission considered in designing and implementing the Program suffices as a basis on which to conclude that remedial action was necessary. Nothing Plaintiff has put forward conflicts with this conclusion.[12] To determine whether the Program is an appropriate tool to address this compelling government interest, the Court turns to the next element.

b.     Narrowly tailored

A program is narrowly tailored if it is necessary to achieve the stated compelling interest. *Students for Fair Admissions*, 600 U.S. at 207. The Ninth Circuit has developed a two-prong test to determine whether a program is narrowly tailored: "(1) the state must establish the presence of discrimination within" the relevant area of focus, and "(2) the remedial program must be 'limited to those minority groups that have actually suffered discrimination.'" *Associated Gen. Contractors*, 713 F.3d at 1191 (quoting *W. States Paving Co.*, 407 F.3d at 997-98). Further, the state must make a "'serious, good faith consideration of workable race-neutral alternatives[.]'" 713 F.3d at 1199 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003).

(1)     Presence of discrimination within accessing homeownership

---

rationale underpinning the constitutional justification for remedial race-conscious programs: they are designed to root out 'patterns of discrimination.'" *Associated Gen. Contractors*, 713 F.3d at 1197 (citing *Croson*, 488 U.S. at 504).

[12] Defendant provides evidence regarding several discriminatory programs from the federal government or holdings from Washington state courts. Plaintiff challenges these actions as irrelevant to the remedial action currently being taken by the State. At this preliminary stage, and based on the evidence showing passive and active discriminatory acts by the State and local governments (after being delegated power by the State), the Court need not determine whether these federal and state court actions are relevant to the analysis.

ORDER RE: PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 15

1    In considering the presence of discrimination in the relevant area, "courts consider

2    statistical and anecdotal evidence to identify the existence of discrimination.  The Supreme Court

3    has suggested that a 'significant statistical disparity' could be sufficient to justify race-conscious

4    remedial programs.  Although generally not sufficient, anecdotal evidence complements

5    statistical evidence because of its ability to bring 'the cold numbers convincingly to life.'"

6    *Associated Gen. Contractors*, 713 F.3d at 1196 (cleaned up).  The state need not identify

7    individual acts of deliberate discrimination to make this showing.  *Id.* at 1197

8        To address this criterion, the Court finds it helpful to compare the two primary Ninth

9    Circuit cases that consider this question and reach different conclusions:  *Western States Paving*

10   *Co.*, 407 F.3d 983 and *Associated General Contractors*, 713 F.3d 1187.  Helpfully, both cases

11   analyze the same federal program to award contract preference to minority owned transportation

12   firms.

13       In *Western States Paving Co.*, the state "conceded that 'there's [sic] no statistical studies

14   done by the state to try to establish the existence of discrimination in the highway contracting

15   industry that are completed or that are valid.'"  407 F.3d at 1000.  Instead, the State could only

16   plausibly rely on the disparity between the proportion of minority-owned firms and the

17   percentage of funds awarded to those firms under race-neutral contracts—for which there was

18   about a 2% disparity.  The Ninth Circuit found this to have "little weight" "because it does not

19   account for factors that may affect the relative capacity" of those firms.  *Id.*  The court noted that

20   the small disparity was insufficient standing alone to support the existence of discrimination and

21   there was no anecdotal evidence to bolster the showing.  *Id.* at 1001-1002 (collecting cases that

22   demonstrate significant and non-significant statistical disparities).

23       By contract, in *Associated General Contractors*, the program at issue was supported by

24   "substantial statistical and anecdotal evidence of discrimination in the California transportation

ORDER RE: PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 16

1    contracting industry" that accounted for capacity to perform work, previously administered

2    affirmative action programs, and other factors such as size, location, or experience of the firms.

3    *Associated Gen. Contractors*, 713 F.3d at 1196; s*ee also W. States Paving* Co., 407 F.3d at 1000-

4    1001.  "The substantial statistical disparities alone would give rise to an inference of

5    discrimination," and when "combined with the anecdotal evidence pass[ed] constitutional

6    muster."  713 F.3d at 1196.

7         The present case more resembles *Associated General Contractors*.  The statistical

8    evidence of discrimination is stark.  The average homeownership rate, regardless of race, is 64%.

9    Dkt. # 31-2 at 69-71.  When that is broken down by race or ethnicity a large gap becomes

10   apparent:  White homeowners (68.5%); Korean homeowners (58.8%); Asian Indian homeowners

11   (54.7%); American Indian/Alaska Natives (AIAN) homeowners (54%); Latino homeowners

12   (47.3%); Black homeowners (37.4%); Native Hawaiian and other Pacific Islander (NHPI)

13   homeowners (36%).  *Id.*

14        As in *Associated General Contractors*, the Study goes beyond simply pointing out the

15   racial disparities and accounts for other factors that may affect these numbers.  The Study

16   demonstrates that these rates have remained relatively steady (or with Black homeowners,

17   declining) since 1970.  *Id.* at 72.  The Study also presents the statistical disparities in wealth and

18   access to borrowing, both of which are necessary to buy a house, suggesting evidence of

19   discrimination along similar racial lines.  *Id.* at 77-94.  For example, Latino prospective

20   homebuyers are denied mortgage loans at 12% nearly double that of White prospective

21   homebuyers.  *Id.* at 81.

22        Beyond that, the statistical evidence of disparate homeownership rates, unlike that of

23   *Western States Paving Co.*, is not a "small disparity," but significant and thus could lead to an

24   inference of discriminatory exclusion.   407 F.3d at 1001; *see Croson*, 488 U.S. at 509 ("Where

there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise."). *Compare Md. Troopers Ass'n v. Evans*, 993 F.2d 1072, 1078 & n.3 (4th Cir. 1993) (holding that there was no statistical evidence of discrimination where there was a 4.9 percent gap between the qualified Black labor pool and the Black police officers*), with Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1414 (9th Cir.1991) (concluding that discrimination was likely to exist where minority availability for prime contracts was 49.5% but minority dollar participation was only 11.1%), *and Cone Corp. v. Hillsborough County*, 908 F.2d 908, 916 (11th Cir.1990) (holding that a "glaring 10.78% disparity between the percentage of minority contractors in the County and the percentage of County construction dollars awarded to minorities . . . clearly constitutes a prima facie case of discrimination").

This, with the historical and anecdotal evidence of past discrimination referenced above, and ongoing discrimination as it relates to homeownership, supports a conclusion that there is discrimination present when attempting to access homeownership. *See, e.g.*, Dkt. # 31-2 at 72-73, 77, 79-80, 170-178 (Survey respondent: "I witnessed many of my underwriting colleagues deny Black borrowers who had similarly situated loan profiles as white borrowers . . . I had a client with an obviously Black sounding name have her offer [to purchase a home] rejected with no real reason given . . . These instances of racism are hard to prove, but fairly easy to spot. The stories go on and on."). Thus, at this stage, the Program passes this prong.

            (2)      Limitation of remedial program to groups that have experienced discrimination

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

The Court next considers if the Program is limited to groups that have suffered discrimination. The Program is available only to Black, Latino, Native American, Alaskan Native, Native Hawaiian, Pacific Islander, Korean, or Asian Indian prospective homebuyers—all the subgroups identified to have a gap between the average homeownership rates. Dkt. # 31-1 at 5-9; Dkt. # 31-2 at 69. In comparison, subgroups whose homeownership rates are at or above the average are excluded. For example, Japanese Americans, for whom the Study details historic acts of discrimination related to access homeownership, have a homeownership rate of 74% well above the average of 64% and thus are not eligible for the Program. Dkt. # 31-2 at 37-40, 71; *see Associated Gen. Contractors*, 713 F.3d at 1199 (holding that the "program adheres precisely to the narrow tailoring" where it included racial groups where the statistical evidence showed "systematic and substantial" disparity, but not "Hispanic or Subcontinent Asian American" where "the statistical evidence did not support an inference of a pattern of discrimination against").

Also, the Program requires that the applicant must show documents to prove that either they, their parent, grandparent, or great-grandparent is Black, Latino, Native American, Alaskan Native, Native Hawaiian, Pacific Islander, Korean, or Asian Indian and lived in Washington before April 1968, presumably to show that they experienced the discrimination listed above. Dkt. # 31-1 at 5-9; Dkt. # 37 at 8-12.

Contrary to Plaintiff's suggestion, precedent on narrow tailoring does not require an individual to prove their own or family member's experience with housing discrimination as a prerequisite to be eligible for the Program. Dkt. # 30 at 13. Plaintiff has provided no caselaw for such a conclusion, and Ninth Circuit caselaw suggests the contrary. *See, e.g.*, *Associated Gen. Contractors*, 713 F.3d at 1198 ("[T]he anecdotal evidence does not need to prove, that *every* minority-owned business is discriminated against" (original emphasis)).

ORDER RE: PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 19

1

2

3        Nor has Plaintiff provided caselaw to show that any concern of the Program being

4   "underinclusive" suffices to show a likelihood of success.  The Program has identified areas of

5   historic and current discrimination and is addressing it.  For Jewish homeowners—the group

6   Plaintiff raises as being discriminated against but not included in the Program—there is no

7   evidence of a current homeownership gap.  The Study directly addresses this issue and states that

8   the lack of current data available "does not preclude any future programs and efforts that assist

9   those who make the case that they were subject to discriminatory acts" and recommends further

10  exploration.  Dkt. # 31-2 at 95; *see also* Dkt. # 31-1 at 7 (Program FAQ describing why some

11  racial groups are included and others aren't, and explaining "Phase II" that "could allow

12  participation by applicants who are outside the currently approved racial groups but you are able

13  to show past and ongoing impact by state-supported discrimination").

        Finally, as required for narrow tailoring, the Program has a built-in "reasonable

durational limit[]."  *Students for Fair Admissions*, 600 U.S. at 212.  The Legislature mandated

that at least every five years an updated study that, in addition to other requirements, must

evaluate the impact on the classes of people identified as eligible for the Program and

recommend "program modifications and improvements."  RCW 43.181.030(2)(a).  The

Legislature further gave the Commission power to "amend the special purpose credit programs,

rules, and policies" based on the studies.  RCW 43.181.040(5).  And the original study has

recommended approaches for evaluating the Program's success of remediating past

discrimination and assessing whether to wind down the Program.  Dkt. # 31-2 at 155-167

(describing the role of future studies to include "[e]xamining whether there is a continued need

for the Covenant Homeownership Program to achieve its statutory purposes, in order to identify

a logical endpoint for the program").

ORDER RE: PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 20

On its face, the Program appears to be limited to groups that have faced discrimination that would affect purchasing a home, and Plaintiff has not made a showing otherwise.

(3)    Consideration of race-neutral alternatives

As required for a program to be narrowly tailored, the State gave "serious, good faith consideration of workable race-neutral alternatives." *Grutter*, 539 U.S. at 339.  Washington already has multiple race-neutral, first and low-income homebuyer programs.  In passing the Act, the Legislature acknowledged the ineffectiveness of these programs in addressing discrimination in homebuying.  RCW 43.181.900.  The Study's analysis of the current programs supports the Legislature's findings.  Dkt. # 31-2 at 96-154.  The Study also analyzed a possible race-neutral program as an alternative to the current Program and found it not to be viable with the available funding.  *Id.*; *Grutter*, 539 U.S. at 339-40 ("Narrow tailoring does not require exhaustion of every conceivable race-neutral alternative" nor does it require "a dramatic sacrifice" of the legislature's goals).

* * *

At this preliminary stage, Plaintiff has not shown a likelihood of success on the merits.  Assuming Plaintiff has raised a "serious questions going to the merits," the Court considers whether "the balance of hardships tips sharply in the plaintiff's favor."  *All. for the Wild Rockies*, 632 F.3d at 1134-35.

2.    Irreparable harm

When a constitutional infringement has been alleged there is often a presumption of irreparable harm.  *Associated Gen. Contractors of California, Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991).  But this presumption does not apply when the plaintiff fails to "demonstrate a sufficient likelihood of success on the merits."  *Id.* at 1412 n.9.  "The degree of irreparable harm required for a preliminary injunction increases as the probability of success on

the merits decreases, and vice versa." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003). While not dispositive, when considering the hardship to parties, "[a] delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief." *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984).

Plaintiff has not shown a high likelihood of success on the merits, and thus the presumption is inapplicable, and Plaintiff must show irreparable harm. Beyond citing general principles of irreparable harm as applied to equal protection challenges, Plaintiff has not made that showing. *See* Dkt. # 30 at 15. Plaintiff's only argument is that "Washington continues to deny FAIR's members an even playing field in applying for first-time homebuyer assistance." *Id.* But Plaintiff has not shown, or even alleged, that any of its members are attempting to apply for the Program. They do not explain how the "even playing field" injury is irreparable when there is no specific house or opportunity for which its members might lose. As now briefed by the parties and considered by this Court twice, Member A is only *qualified* to apply for the Program but she has not identified a home to purchase nor does she seem to currently be applying for the Program. *See* Dkt. # 24; Dkt. # 36 at 19-22; *see* Dkt. # 41 at 9-11 ("FAIR's Members Do Not Have to Apply for the Program").

While FAIR's members may be interested in applying for the Program, it is not their only option. There are many other state-sponsored first-time homebuying programs for which she would be eligible. Dkt. # 31-2 at 97-101; Dkt-31-1 at 9 (guiding ineligible prospective homebuyers to these alternative programs). Plaintiff does not explain why this Program is necessary to provide its member an even playfield.

Further, Plaintiff's delay in seeking a preliminary injunction weighs against the need for one. This preliminary injunction motion was filed on July 25, 2025, more than a year after the Program was launched on July 1, 2024, and nine months into litigation, which commenced on

ORDER RE: PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 22

October 29, 2024. *See generally* Dkt. ## 1-30; *Lydo Enters.*, 745 F.2d at 1213 ("A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights") (citation omitted). While there was a change to the Program that went into effect July 2025, Plaintiff does not explain how this change would now cause an irreparable harm where one would not have also existed nine months earlier. Dkt. # 30 at 15-16. In fact, Plaintiff argues Member A—their individual member from whom they have standing—has been eligible (minus her race) for the Program since the Program began. Dkt. # 1. "'[T]he basic function of a preliminary injunction is to preserve the *status quo ante litem* pending a determination of the action on the merits," but because of Plaintiff's delay the status quo for over a year now has been the Program in operation. *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (holding that a court is "not required to issue a preliminary injunction against a practice which has continued unchallenged for several years"); *Citizens of the Ebey's Rsrv. for a Healthy, Safe & Peaceful Env't v. U.S. Dep't of the Navy*, 122 F. Supp. 3d 1068, 1083 (W.D. Wash. 2015) (finding a 16-month delay is "is inconsistent with the purpose of a preliminary injunction").

Plaintiff has not shown a high risk of irreparable harm.

3.      Balance of the equities and public interest

"The third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry when the government opposes a preliminary injunction." *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). The balance of the equities concerns the burdens to a plaintiff compared with the burden on the defendant if an injunction is ordered and the public interest mostly concerns the injunction's impact on nonparties. *Id.*

The potential burden to Plaintiff is limited given the low risk of irreparable harm. Meanwhile, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by

representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S.

1301, 1303 (2012).  The reason for this rule is on display in this case.  The Program has been

operating for over a year and currently has over a hundred people "in the pipeline" of becoming

new homeowners.  Dkt. # 37 at 12.  Especially where Plaintiff has multiple other homebuying

assistance programs open to their members, the Court finds it in the public interest not to

interrupt the Program's ongoing operation, which would impact nonparty applicants some of

whom have already begun the processes of using the Program. [13]  *See Porretti*, 11 F.4th at 1050

("The public interest mostly concerns the injunction's impact on nonparties rather than parties.").

## IV
### CONCLUSION

Plaintiff has not shown a likelihood of success on the merits; and assuming Plaintiff has

raised a serious question to trigger the sliding scale approach, it has not shown that the balance of

hardships tips sharply in its favor.  Thus, the Court DENIES the Motion for Preliminary

Injunction.

Dated this 9th day of February, 2026.

John H. Chun
United States District Judge

---

[13] Plaintiff's argument that "halting the race-based eligibility would merely open the Program to all applicants, regardless of race" fails.  Dkt. # 30 at 16.  The Study makes clear that to have the Program run as a race-neutral program and still achieve the remedial effect it would cost the State $6.6 billion, exponentially more than the $75-$100 million currently projected.  Dkt. # 31-2 at 9, 117-118.  The Legislature has specifically sought to reserve the ability to reallocate funding to ongoing race-neutral programs, should the Program be found invalid "in whole or in part."  *See* RCW 43.181.020.

ORDER RE: PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 24